Steve W. Berman (*pro hac vice* forthcoming)
Craig R. Spiegel (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
steve@hbsslaw.com
craigs@hbsslaw.com
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Brian J. Shearer (*pro hac vice* forthcoming)
Craig L. Briskin (*pro hac vice* forthcoming)
JUSTICE CATALYST LAW, INC.
718 7th Street NW
Washington, DC 20001
bshearer@justicecatalyst.org
cbriskin@justicecatalyst.org
Telephone: (202) 524-8846

*Attorneys for Plaintiff Sia Fraser, individually
and on behalf of all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIA FRASER, individually and on behalf of all others similarly situated, | No. |
| Plaintiff, | **<u>CLASS ACTION COMPLAINT</u>** |
| v. | **DEMAND FOR JURY TRIAL** |
| TEAM HEALTH HOLDINGS, INC. | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  PARTIES ............................................................................................................5

    A.  Plaintiff ....................................................................................................5

    B.  Defendant TeamHealth ..........................................................................6

III.  JURISDICTION AND VENUE ..........................................................................6

IV.  FACTS ................................................................................................................7

    A.  TeamHealth and the takeover of America's emergency rooms. ...............7

    B.  TeamHealth profits from American's healthcare emergencies through pricing fraud. ...........................................................................................9

        1.  Chargemasters: Providers set their prices....................................10

        2.  TeamHealth's billing fraud—quantum meruit provides the true rates TeamHealth is lawfully entitled to charge....................................10

        3.  TeamHealth uses subsidiaries and "independent" contractors to avoid state-law ban on the practice of medicine by corporation. ............16

    C.  The crippling cost of out-of-network care ..............................................18

V.  TOLLING OF THE STATUTE OF LIMITATIONS .........................................20

VI.  CLASS ACTION ALLEGATIONS.....................................................................21

VII.  CLAIMS FOR RELIEF ....................................................................................24

COUNT ONE VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT  ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.* ....................24

    A.  Team Health is a culpable "person" under RICO. ..................................24

    B.  The TeamHealth Fraudulent Billing Enterprise is a RICO enterprise. ....................25

    C.  The TeamHealth Fraudulent Billing Enterprise uses the U.S. mails and interstate wire facilities to carry out its fraud.........................................27

    D.  TeamHealth directed the TeamHealth Fraudulent Billing Enterprise's affairs.....................................................................................................29

E.   TeamHealth has conducted a pattern of racketeering activity.....................................30

F.   TeamHealth's violations of RICO damaged the plaintiff and class members. ...................................................................................................................31

COUNT TWO VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* ........................................................34

COUNT THREE VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT CAL. CIV. CODE § 1750, *ET SEQ.* ...................................................................................36

DEMAND FOR JUDGMENT ........................................................................................................37

JURY DEMAND............................................................................................................................37

Plaintiff Sia Fraser, on behalf of herself and all others similarly situated, alleges the following against defendant Team Health Holdings, Inc. ("TeamHealth") based on personal knowledge, the investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.     TeamHealth is a private equity-funded corporation that contracts with hospitals to take over their emergency, critical care, radiology, and anesthesiology departments, supplying them with doctors and other medical professionals as well as running their administrative functions.

2.     In 2016, TeamHealth boasted that it controlled 17% of the emergency medicine market in the United States. Currently, it operates 3,300 acute and post-acute facilities in 47 states.

3.     Most states bar the corporate practice of medicine. As the American Medical Association has explained, this "doctrine prohibits corporations from practicing medicine or employing a physician to provide professional medical services." The principle underlying the prohibition is simple: medical professionals must always prioritize public health over private profits.

4.     TeamHealth has turned this convention on its head. It has constructed an enterprise, composed of subsidiaries and medical practice groups that TeamHealth has acquired or with which it has contracted, for the sole purpose of profiting from patients' health emergencies and other healthcare needs (together, the "TeamHealth Fraudulent Billing Enterprise").[1] As the director of this enterprise, TeamHealth controls the terms of its physicians' employment, all physician staffing decisions, and, most importantly, all the rates its physicians and practice groups charge patients. The successful goal of this enterprise is to maximize corporate profits while avoiding state bans on the corporate practice of medicine.

5.     But the corporate practice of medicine is not TeamHealth's only illegal endeavor. The rates that TeamHealth and its various subsidiaries charge patients are themselves unlawful.

---

[1] TeamHealth refers to this enterprise as the "TeamHealth system." *See*, *e.g.*, TeamHealth Holdings, Inc., 2016 Form 10-K at 3 ("Unless the context requires otherwise, references to 'TeamHealth' … refer to Team Health Holdings, Inc., its subsidiaries and its affiliates, including its affiliated medical groups, all of which are part of the TeamHealth system.").

CLASS ACTION COMPLAINT - 1
010898-11/1325458 V1

6.      The TeamHealth Fraudulent Billing Enterprise maximizes its profits by sending fraudulent bills to patients for the care they receive from TeamHealth physicians. TeamHealth has inflated the rates it charges patient-consumers far above those that it knows it is legally entitled to collect from those patients.

7.      Courts across the country recognize that doctors who have not reached an agreement on price with patients, like other merchants, are only entitled to the reasonable market value of the services. Patients sign no paperwork with TeamHealth—let alone agree on price. Yet, the TeamHealth Fraudulent Billing Enterprise pursues patients ruthlessly for far more than the reasonable value of their services, through a medical debt collector that is a TeamHealth subsidiary. The TeamHealth Fraudulent Billing Enterprise has sued thousands of patients in the last few years, including patients who would qualify for free care and reduced rates under hospitals' "charity care" programs.

8.      Based on these past lawsuits against patient-consumers, TeamHealth knows that its legal entitlement to collect from patients or their insurers is based in equity, through the remedies of unjust enrichment, quantum meruit, and implied contract. And these equitable remedies only permit TeamHealth to recover a *fraction* of its billed rates. Therefore, TeamHealth knows that the prices it bills consumers are vastly inflated above the rates it is legally allowed to charge them.

9.      In fact, TeamHealth admitted that its rates were substantially higher than the reasonable value of the services it provides in a lawsuit against United Health, a large U.S. healthcare insurer.[2] In that case, TeamHealth alleged that United Health was undercompensating TeamHealth for emergency room care. But TeamHealth did not even attempt to collect its full rates. Instead, it complained that United Health failed paying a high enough *fraction* of TeamHealth's inflated prices—the very prices it charges *in full* to many patient-consumers.

---

[2] *See Emergency Care Services of PA, P.C. & Emergency Physician Assoc. of PA, P.C. v. UnitedHealth Group, Inc., et al.*, No. 1:19-cv-01195-SHR, Dkt. No. 1 (M.D.P.A. July 11, 2019).

10.     As hospitals have reported, "TeamHealth ER physicians expect to be paid nearly three times the median rate for in-network physicians at participating hospitals, and their billed charges are even higher, at more than four times the median rate."[3]

11.     Every time the TeamHealth Fraudulent Billing Enterprise sends a bill to a patient-consumer, demanding payment at its artificially inflated rates, that bill constitutes a lie: the bill misrepresents to the patient that they owe the TeamHealth Fraudulent Billing Enterprise much more than the patient actually does for the services provided.

12.     The TeamHealth Fraudulent Billing Enterprise never tells patients that the enterprise has fraudulently inflated its rates far above those it is legally entitled to collect. Instead, the enterprise demands that patient- consumers pay its inflated prices, which it transmits through mail and wire, in full.

13.     The plaintiff and the proposed class here—uninsured or out-of-network patients who visited facilities run by the TeamHealth Fraudulent Billing Enterprise—received bills from TeamHealth demanding payment of artificially inflated rates.

14.     For many class members, the treatment TeamHealth offers is worse than the disease. A 2019 study by the American Cancer Society found that 137.1 million Americans—41.8% of the population—faced medical financial hardship in the past year.[4] According to a recent Peterson-Kaiser Family Foundation report, unexpected medical bills "lead the list of expenses most Americans worry they would not be able to afford."[5] "Two thirds of Americans say they are either 'very

---

[3] Courtney Robinson, *Some Physicians at Tampa General Hospital take Pay Cut Because of Health Care Costs*, 10 Tampa Bay, Feb. 4, 2020 6:58 P.M., available at: https://www.wtsp.com/article/news/investigations/10-investigates/tampa-general-hospital-pay-cut-health-care/67-e330d676-db40-4454-a647-5985eba6ccc3/ (emphasis added), last visited July 9, 2020.

[4] K. Robin Yabroff, Jingxuan Zhao, Xuesong Han, & Zhiyuan Zheng, *Prevalence and Correlates of Medical Financial Hardship in the USA*, 34 Journal of General Internal Medicine, 1494–1502 (2019).

[5] Karen Pollitz, et al., *An Examination of Surprise Medical Bills and Proposals To Protect Consumers from Them*, PETERSON-KAISER HEALTH SYSTEM TRACKER at 2, Feb. 10, 2020, available at:  https://www.healthsystemtracker.org/brief/an-examination-of-surprise-medical-bills-and-proposals-to-protect-consumers-from-them-3/, last visited July 9, 2020.

worried' or 'somewhat worried' about being able to afford their own or a family member's unexpected medical bills."[6] And for good reason: 60 percent of American cannot afford to pay an unexpected medical bill of more than $1,000[7] and 66.5 percent of all bankruptcies in the United States are due in whole or in part to medical debt.[8]

15.     Emergency rooms alone deliver nearly half of all medical care in the United States. And when medical care is too expensive—even for consumers who have insurance—they forgo necessary treatment, risking more serious illness and even death.

16.     The coronavirus pandemic has intensified this crisis. The New York Times recently reported on Andrew Cencini, whose coronavirus test was free but whose visit to a TeamHealth emergency room was not—even though he was insured, his total bill was almost $2,000. Early testing and intervention can help mitigate the harms of the virus and prevent infected individuals from spreading it. Facing the prospect of ruinous medical bills, many sick individuals have forgone testing and treatment, putting themselves and their communities at greater risk. A recent report observed, the "coronavirus crisis raises even greater concerns over whether physician staffing firms … will continue to charge Covid-19 patients, who can least afford it, outrageous out-of-network fees."[9]

17.     Congresswoman Katie Porter of California put it best: "We will not be able to truly reopen and rebuild if Americans rightly fear costly medical bills for visiting their health care providers for coronavirus tests."

18.     Plaintiff and the proposed class are uninsured and out-of-network consumers who were billed for emergency, radiology, anesthesiology and critical care provided by the TeamHealth

---

[6] *Id.*

[7] Annie Nova, *A $1,000 Emergency Would Push Many Americans into Debt*, CNBC, Jan. 23, 2019 9:41 A.M., available at:  https://www.cnbc.com/2019/01/23/most-americans-dont-have-the-savings-to-cover-a-1000-emergency.html, last visited July 9, 2020.

[8] Lorie Konish, *This is the real reason most Americans file for bankruptcy,* CNBC, Feb. 11, 2018, available at:  https://www.cnbc.com/2019/02/11/this-is-the-real-reason-most-americans-file-for-bankruptcy.html, last visited July 9, 2020.

[9] Eileen Appelbaum & Rosemary Batt, *Coronavirus and the Implications of Private Equity Buyouts in Healthcare*, CENTER FOR ECON. & POLICY RES. (Mar. 25, 2020), available at: https://bit.ly/2BlGqug, last visited July 9, 2020.

1
2
3
4
5
6
7

Fraudulent Billing Enterprise. TeamHealth used this enterprise to engage in mail and wire fraud by transmitting false and inflated medical bills across the country, causing uninsured and out-of-network consumers to overpay and become indebted for care. Plaintiff brings this action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* and state consumer protection statutes on behalf of all others similarly situated, seeking monetary damages, injunctive and/or other equitable relief, restitution and/or disgorgement of profits, and attorneys' fees, costs, and expenses.

8

## II.   PARTIES

9

**A.   Plaintiff**

10
11
12
13

19.   Plaintiff Sia Fraser lives in Vista, California. In September 2019, she was treated for emergency gallstone surgery by a doctor in a TeamHealth-owned physician group at Tri-City Medical Center in Oceanside, California and then billed for these services by TeamHealth on at least October 15, 2019, and November 18, 2019.

14
15

20.   Because her insurance plan did not begin until the day after her visit, Ms. Fraser was considered uninsured.

16
17
18
19
20

21.   In addition to a bill from the hospital, which was covered under the hospital's Financial Assistance Program (FAP), Ms. Fraser received bills from Team Physicians of Southern CA (part of the TeamHealth Fraudulent Billing Enterprise) for $1,082 under the CPT code 99220 (observation care).[10] The hospital's FAP did not cover TeamHealth's bill, and TeamHealth continues to demand payment. Plaintiff is paying the bill under a payment plan.

21
22
23
24

22.   The bills Ms. Frasier received directed payments to TeamHealth.com and www.thbillpay.com. Team Physicians of Southern CA's registered mailing address in the NPI registry is 5000 Hopyard Road, Pleasanton, California. This is the address of TeamHealth West, a regional subsidiary of TeamHealth.

25
26
27
28

[10] CPT codes are a standardized set of codes to categorize medical care, which are used for billing and medical records.

CLASS ACTION COMPLAINT  - 5
010898-11/1325458 V1

**B.**     **Defendant TeamHealth**

23.     Defendant Team Health is a privately held company based in Knoxville, Tennessee. In 2017, Blackstone Group LP—a private equity firm based in New York—acquired TeamHealth for $6.1 billion. Founded in 1979, TeamHealth primarily provides emergency room staffing services through a network of subsidiaries and independent contractors: in 2018 alone, its physicians treated 16 million emergency department visits. TeamHealth now claims to treat "roughly 29 million patients annual across the country" with "more than 16,000 physicians and advanced practice clinicians," in the practice areas of emergency medicine, anesthesiology, hospital medicine, OB/GYN, critical care, orthopedic and general surgery, ambulatory care, post-acute care and behavioral health.

### III.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the plaintiff's claims arise under federal law and under 18 U.S.C. § 1964(c): this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiff is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because the defendant transacts business in, is found in, and/or has agents in this judicial district, and because some of the actions giving rise to this complaint took place within this district. In particular, and as alleged in this complaint, TeamHealth operates through regional subsidiaries that facilitate with hospitals and providers. TeamHealth West is the TeamHealth facilitator with responsibilities over the western United States, and it owns the provider group— Team Physicians of Southern California—that provided care to plaintiff. TeamHealth West is located in Pleasanton, California, which is within this judicial district.

26.     The Court has personal jurisdiction over the defendant. Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this judicial district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this judicial district.

## IV.     FACTS

**A.     TeamHealth and the takeover of America's emergency rooms.**

27.     Founded as "Southeastern Emergency Physicians" in 1979, TeamHealth's original stated mission was to "provide high-quality medical care to under-resourced emergency rooms."[11] But over the course of the 1990s (and after changing its name to Team Health Holdings, Inc.), TeamHealth transformed from a small physician staffing company into a regional emergency services empire, growing by 700% in the course of the decade.[12]

28.     In 2009, TeamHealth went public to aid further expansions and clinical services.[13] TeamHealth now specializes in emergency medicine, anesthesiology, inpatient services (hospitalists comprising the specialties of internal medicine, orthopedic surgery, general surgery and OB/GYN), scribes, ambulatory care, pediatrics, post-acute care and other healthcare services.[14]

29.     Today, TeamHealth is "one of the largest providers of outsourced clinical staffing and administrative services for hospital-based and free-standing EDs in the United States," boasting a reach spanning 47 states and approximately 3,400 acute and post-acute facilities and physicians' groups nationwide.[15]

---

[11] TeamHealth, *Team Health Through the Years | 1979 and 1980s*, YOUTUBE (June 19, 2019), available at: https://www.youtube.com/watch?v=736u81cW-ps&feature=youtu.be, last visited July 9, 2020.

[12] TeamHealth, *Team Health Through the Years | 1990s*, YOUTUBE (June 19, 2019), available at: https://www.youtube.com/watch?v=WJiczs_3IXc&feature=youtu.be., last visited July 9, 2020.

[13] TeamHealth, *Team Health Through the Years | 2000s*, YOUTUBE (June 19, 2019), available at: https://www.youtube.com/watch?v=0v-rBhjEaV4&feature=youtu.be., last visited July 9, 2020.

[14] TeamHealth Holdings, Inc., 2016 10-K at 3.

[15] *Id.*

CLASS ACTION COMPLAINT - 7
010898-11/1325458 V1

30.     In the last 10 to 15 years alone, TeamHealth has acquired the following emergency physician practices: Delphi Healthcare Partners (Morrisville, North Carolina), Emergency Medicine Specialists, Premier Physician Services, Inc., Certified Anesthesia Services (Washington, DC), Florida Gulf-to-Bay Anesthesiology Associates, PhysAssist Scribes, Inc. (Fort Worth, Texas), Ruby Crest Emergency Medicine, Princeton Emergency Physicians, Brookhaven Anesthesia Associates, IPC Healthcare Inc. ($1.6 billion), Children's Emergency Services, Tri-City Emergency Medical Group, Lake County Anesthesia Associates, Anesthesia Associates of Cincinnati, Grossmont Emergency Medical Group, EmMed PC, Florida Emergency Physicians, Synergy Emergency Physicians, X32 Healthcare, Emergency Medicine Consultants and Mediserv Ltd. (Fort Worth, TX), and EmergiNet.

31.     TeamHealth operates nationally. Together, TeamHealth and its closest competitor EmCare capture approximately 30 percent of the physician outsourcing market in the United States.

32.     TeamHealth contracts with hospitals to staff and manage various hospital departments. In addition to providing medical specialists, TeamHealth executes administrative services including:

    a.  "Recruiting, schedule and credential coordination for clinical and non-clinical medical professionals;

    b.  coding, billing and collection of fees for services provided by medical professionals;

    c.  provision of experienced medical directors;

    d.  administrative support services, such as payroll and professional liability insurance coverage, continuing medical education services and management training;

    e.  claims and risk management services; and

    f.  standardized procedures and operational consulting."[16]

---

[16] *Id.*

CLASS ACTION COMPLAINT  - 8
010898-11/1325458 V1

33.     From a patient's perspective, TeamHealth medical professionals appear to be employed by the hospitals in which they operate. Their staff work within the hospital and do not wear uniforms or other apparel that would identify them as non-hospital staff. Nonetheless, TeamHealth is a separate entity from the hospitals with which it contracts.

34.     Patients only learn of this reality upon receipt of a separate bill from TeamHealth. At no point do consumer patients sign any paperwork with TeamHealth agreeing to pay their fees. And TeamHealth is not a signatory to patients' hospital admissions and release paperwork.[17] TeamHealth does not ask patients to sign anything at all, let alone a contract agreeing to pay specific prices for services rendered.

35.     The majority of TeamHealth's revenues come from three areas of practice: emergency medicine, hospital medicine (non-emergency hospital services), and anesthesiology. However, emergency medicine is by far the most lucrative practice area for TeamHealth.

36.     In 2015, TeamHealth reported that 68% of its net revenue came from emergency medicine and that it controlled 17% of the emergency medicine market in the United States.[18] This market share translates into more than 10 million patient encounters every year.[19] Based on the profitability of emergency medicine, TeamHealth's acquisitions have unsurprisingly focused on this specialty.

**B.      TeamHealth profits from American's healthcare emergencies through pricing fraud.**

37.     The rates that TeamHealth charges patient-consumers are artificially inflated far above the reasonable value of the services it provides. And TeamHealth knows it.

---

[17] When consumers enter hospitals staffed by TeamHealth physicians, they may sign various admittance and release forms. But because TeamHealth physicians are independent contractors, those forms do not apply to TeamHealth.

[18] Team Health Inc., 2015 Form Ex-99.1, at 2, 12, available at: https://www.sec.gov/Archives/edgar/data/1082754/000119312515367511/d41748dex991.htm, last visited July 9, 2020.

[19] *Id.* at 20.

1

**1.     Chargemasters: Providers set their prices.**

2

38.     To understand these rates, some background on how medical providers, including

3

hospitals, charge patients is useful.

4

39.     Hospitals use standardized health care codes, called Current Procedural Terminology

5

(CPT) codes, to bill patients for the services provided to patients within their facilities. In turn, the

6

healthcare providers that operate within those hospitals, including TeamHealth, maintain lists of

7

prices for each CPT code. This list of prices is called a "list price" or "chargemaster."

8

40.     Recently, the Trump Administration promulgated a rule requiring all hospitals to post

9

their chargemasters publicly on their websites.[20] Most hospitals publish their chargemasters in an

10

excel spreadsheet with thousands or even hundreds of thousands of data points.

11

41.     Because TeamHealth provides a limited set of services and only bills for physician

12

time—and not drugs, equipment, facilities, etc.—TeamHealth's chargemasters lists are likely much

13

shorter, covering only a few dozen codes and prices.

14

42.     Despite these new regulations requiring transparency, *TeamHealth does not publish*

15

*its chargemasters*.

16

43.     Instead, the way patients learn of TeamHealth's rates is through the bill TeamHealth

17

sends them in the mail. For the plaintiff here, the first time she saw TeamHealth's prices was on the

18

final bill that arrived in her mailbox.

19

**2.     TeamHealth's billing fraud—quantum meruit provides the true rates**
**TeamHealth is lawfully entitled to charge.**

20

21

44.     TeamHealth sets rates for services by TeamHealth Fraudulent Billing Enterprise

22

physicians that vastly outstrip the rates hospitals normally charge for the exact same services.

23

45.     TeamHealth bills these wildly inflated rates despite knowing that they are excessive

24

and cannot lawfully be recovered.

25

46.     If TeamHealth sued a patient who did not pay his or her medical bill, its only legal

26

entitlement to payment is based in equity, such as unjust enrichment, quantum meruit, and implied

27

_____

28

[20] 45 C.F.R. § 180.40.

CLASS ACTION COMPLAINT - 10
010898-11/1325458 V1

contract. TeamHealth cannot sue for breach of contract because it *has no contract with the patient.* And even if TeamHealth had an enforceable contract with the patient, there is no agreement with the patient on the prices to be paid and the law assumes a reasonable or market rate price (essentially, the same result).

47.     The common law doctrine of quantum meruit—"as much as he deserved"—provides that in the absence of a contract, when one confers a benefit on another expecting payment for that benefit and the recipient accepted the benefit, the person providing the benefit may be entitled to payment for the fair value of the service. Typically, quantum meruit for services is an amount "measured by [the services'] value in the community where they are rendered,"[21] or "the customary rate of pay for such work in the community at the time the work was performed."[22]

48.     "The measure of recovery in quantum meruit is the reasonable value of the services rendered provided they were of direct benefit to the defendant."[23] "The underlying idea behind quantum meruit is the law's distaste for unjust enrichment. If one has received a benefit which one may not justly retain, one should restore the aggrieved party to his or her former position by return of the *thing* or its *equivalent* in money."[24] In a healthcare collection case involving unjust enrichment, the hospital (the plaintiff) confers a benefit on the patient (the defendant), and so the patient must return the value of the care the patient received to the hospital.

49.     For example, in California, the elements of a quantum meruit claim are: (1) the plaintiff performed services for the defendant; (2) the reasonable value of the service; (3) the services were rendered at the defendant's request, and (4) the plaintiff was not paid. Crucially, the "reasonable value" of services charged is the "going rate" or fair market value.[25] In *Central*

---

[21] *UnitedHealthcare Services, Inc. v. Asprinio*, 16 N.Y.S.3d 139, 148 (N.Y. Sup. Ct. 2015).

[22] *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009) (internal quotation marks omitted).

[23] *Palmer v. Gregg*, 65 Cal.2d 657 (1967).

[24] *Arrison v. Info. Res., Inc.,* 1999 WL 551232, at *6 (N.D. Cal. July 16, 1999) (internal quotation and bracket marks omitted).

[25] *Central California v. Blue Cross of California*, 226 Cal. App. 4th 1260, 1274 (2014).

CLASS ACTION COMPLAINT  - 11
010898-11/1325458 V1

*California v. Blue Cross of California*, a non-contracting insurer was required by statute to pay the hospital "the reasonable and customary value" of its services, which "embodies the concept of quantum meruit."[26]

50.     Even if there is an enforceable contract, but no agreed price, the result is no different: The law will insert a "reasonable" price for the service.[27] Patients never assent to health care providers' list prices, nor would they if they had a meaningful choice. In the absence of a contract, the provider is only entitled to "the average amount that [the provider] would have accepted as full payment from third-party payers such as private insurers and federal healthcare programs."[28]

51.     Courts across the country have concluded that a hospital's list prices are not fair or accurate measures of the reasonable value or going rate.[29] One study found that the first 30 to 74 minutes of critical care in California would cost an out-of-network patient as much as 2897% of the Medicare rate.[30] A 2015 study found, "Among the 97 procedures studied, average out-of-network billed charges, as a percentage of corresponding Medicare fees, ranged from a low of 118 percent of Medicare ('eye exam new patient') to a high of 1382 percent of Medicare ('electrocardiogram (ECG)/monitoring and analysis')."[31]

---

[26] *Id.*

[27] *See, e.g.*, *Moore v. Mason & Hanger Co.*, 35 N.Y.S.2d 687, 688 (1942) ("Ordinarily where one man at the request of another performs work or service of any kind, and nothing else appears, there may be drawn an inference that the service is to be paid for, and, if no price is set, the reasonable value of the services may be found to have been earned pursuant to contract therefor."). *See also* Cal. Civ. Code § 1611 ("When a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an interested party, the consideration must be so much money as the object of the contract is reasonably worth.").

[28] *Nassau Anesthesia Assocs. PC v. Chin*, 924 N.Y.S.2d 252, 286 (2011).

[29] *See, e.g.*, Children's *Hosp. Central Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1277 (Cal. App. 2014) ("Hospital rarely receives payment based on its published charge master rates."); *In re North Cypress Med. Center Operating Co., Ltd.*, 559 S.W.3d 128, 133 (Tex. 2018) ("because of the way chargemaster pricing has evolved, the charges themselves are not dispositive of what is reasonable").

[30] America's Health Insurance Plans, *Survey of Charges Billed by Out-of-Network Providers: A Hidden Threat to Affordability*, Jan. 2013, at 11, available at: https://bit.ly/2WRTOP6, last visited July 9, 2020.

[31] America's Health Insurance Plans, *Charges Billed by Out-of-Network Providers: Implications for Affordability,* Sept. 29, 2015, available at https://bit.ly/3cSzuCT, last visited July 9, 2020.

52.     The California Supreme Court has made clear that a provider's rates are not a proper measure of quantum meruit. Rather, courts should assess the market value of the care: "[U]nder quantum meruit, the costs of the services provided are not relevant to a determination of reasonable value. Quantum meruit measures the value of services to the recipient, not the costs to the provider."[32]

53.     In short, contrary to popular belief, physicians cannot legally charge patients whatever they want. Or, as one Pennsylvania court put it, a "[h]ospital's contention that it can unilaterally set a price for its services that bears no relationship to the amount typically paid for those service is untenable."[33]

54.     Yet, TeamHealth has taken advantage of this common misconception, billing at grossly inflated prices.

55.     In particular, TeamHealth directly bills patients in two scenarios. First, when an uninsured patient receives care from a TeamHealth physician, TeamHealth sends a bill to that patient demanding payment of TeamHealth's inflated list rates (or chargemasters).

56.     Second, when TeamHealth is out-of-network with a patient's insurance plan, the patient's insurer and TeamHealth have not previously negotiated a price for the care provided. TeamHealth bills the consumer and insurer for its list price.

57.     Some insurance plans do not cover any out-of-network care, in which case TeamHealth bills the consumer for the full list price.

58.     Sometimes insurance plans do cover a portion of out-of-network care. In these cases, the insurer only covers a portion of TeamHealth's exorbitant list rates. TeamHealth bills the rest to consumers, either in the form of typical cost-sharing in accordance with the insurance plan or through a practice known as "balance billing."

---

[32] Children's *Hosp. Central Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1278 (Cal. App. 2014).

[33] *Temple University Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 510 (Penn. Sup. Ct. 2003).

59.     For example, if TeamHealth bills $1,000 to an insured patient whose plan covers 50% of out-of-network care, if the insurer agrees to pay 50% on that price, TeamHealth bills consumers for the remaining $500 in accordance with the insurance plan. The consumer's share is inflated as a result of the higher list price conveyed to consumers on the bill.

60.     If, instead, the insurer believes only $600 is the "allowable rate" for the care provided, the insurer will only pay 50% of that, or $300. If TeamHealth bills for both the remaining $300 and an additional $400 to recoup the full list price, that extra $400 is called a "balance bill."

61.     In some cases, TeamHealth has fraudulently enhanced its ability to bill out-of-network and/or "balance bill" by entering hospitals and exiting their insurance networks, at least for a period of time. When executing this strategy, TeamHealth does not disclose to patients that it is out-of-network. Thus, even if the hospital is within a patient's insurance network, that patient is forced to pay out-of-network rates along with any amounts TeamHealth balance bills on top.

62.     This conduct constitutes a serious fraud: TeamHealth sends patients bills with rates it knows it cannot collect in court in the hopes that patients will pay all or a large portion of these bills due to their lack of knowledge.

63.     In sending these bills, TeamHealth represents to patients that the rates printed within them are the real, reasonable value of its services. Yet, TeamHealth knows they are not. In various lawsuits, TeamHealth has conceded that the rates it charges consumers do not represent the real value of its services.

64.     In *Emergency Care Services of Pennsylvania, P.C. et al. v. UnitedHealth Group, Inc. et al.*,[34] TeamHealth sued UnitedHealth after the insurer refused to reimburse TeamHealth for out-of-network care at its charged rates. TeamHealth claimed relief under implied contract and unjust enrichment theories, arguing that UnitedHealth had paid as low as 15-20% of TeamHealth's rates, instead of what TeamHealth asserted was reasonable and customary: 75-90% of their list prices. In so arguing, TeamHealth effectively conceded that its rates are artificially inflated beyond the reasonable value of the services it provides.

---

[34] Case No. 1:19-cv-1195, Dkt. No. 1 at 14 (M.D. Pa.).

CLASS ACTION COMPLAINT  - 14
010898-11/1325458 V1

65.     As UnitedHealth has explained, TeamHealth "refuse[s] to accept rates that reflect fair market prices and that promote an affordable, predictable experience for patients. TeamHealth ER physicians expect to be paid *nearly three times the median rate for in-network physicians at participating hospitals*, and their billed charges are even higher, *at more than four times the median rate*."[35] This price inflation hurts consumers "by driving up the cost of health care."[36]

66.     Similarly, in a case in Texas, TeamHealth raised quantum meruit claims against Humana for failing to compensate it enough for out-of-network care, seeking it's "usual and customary" rates.[37] Presumably, when it refers to customary and reasonable, it means some fraction of its prices, like it asserted in *Emergency Care Services of Pennsylvania, P.C. et al. v. UnitedHealth Group*, and not 100 percent of its prices, which it charges to consumers.

67.     Furthermore, in a letter to the U.S. Senate in response to congressional inquiries into TeamHealth's billing practices, TeamHealth admitted it has across-the-board inflated list prices well over the cost of the services it provides.[38] TeamHealth admitted that the average cost per encounter is only $150. At the same time, it said it billed 2.5 million uninsured patients and collected $85 million, which it claimed was only 3.7% of what it billed. That means, while TeamHealth's average cost was only $150 per encounter, its chargemaster prices (the amounts billed to uninsured patients) averaged $918 per encounter. TeamHealth admitted its chargemaster prices are over six times its cost of care.

68.     In short, TeamHealth has admitted that the rates it charges patients are fraudulent: they do not accurately represent the fair or reasonable market value of the services it provides. And

---

[35] Courtney Robinson, *Some Physicians at Tampa General Hospital take Pay Cut Because of Health Care Costs*, 10 Tampa Bay, Feb. 4, 2020 6:58 P.M., available at: https://www.wtsp.com/article/news/investigations/10-investigates/tampa-general-hospital-pay-cut-health-care/67-e330d676-db40-4454-a647-5985eba6ccc3/ (emphasis added), last visited July 9, 2020.

[36] *Id.*

[37] *Emerg. Svcs. of Texas, P.A. v. Humana Ins. Co.*, Case 5:19-cv-00138-OLG, Dkt. No. 1 (W.D. Tex February 14, 2019).

[38] March 13, 2019, Team Health Letter Responding to Bi-Partisan Workgroup's Request for Data and Information on Surprise Medical Bills, available at: https://www.documentcloud.org/documents/6568825-TeamHealth-Letter.html, last visited July 9, 2020.

while TeamHealth may collect a lower amount from uninsured patients because they cannot pay the bill, it is charging them as much or *more* than it charges insured patients.

69.     Plaintiff Sia Fraser's experience is demonstrative of TeamHealth's inflated prices. TeamHealth billed her $1,082 for observation care. For the exact same hospital visit, the hospital Tri-City Medical Center billed her $63 per hour ($378 for six hours) for observation care performed by hospital physicians. The physicians had the same patient, with the same injuries. They both billed for observation care. And the TeamHealth physician billed over 17 times more than the hospital physician.

70.     TeamHealth's rate increases are so harmful to consumers in part because TeamHealth aggressively pursues debt collection. Since 2017, TeamHealth has sued over *4,800 patients* to force them to pay their artificially inflated bills.[39]

### 3.     TeamHealth uses subsidiaries and "independent" contractors to avoid state-law ban on the practice of medicine by corporation.

71.     As a private-equity owned corporation, TeamHealth is only able to profit from inflated, fraudulent medical billing by constructing an elaborate web of subsidiaries and "independent" contractors.

72.     Most states prohibit the corporate practice of medicine. Although this doctrine varies somewhat from state to state, it generally "prohibits corporations from practicing medicine or employing a physician to provide professional medical services."[40] These laws are intended to prevent commercialization of the practice of medicine, ensure physicians are never conflicted about whether to put patients or shareholders first, and prevent business influences from interfering with independent medical judgement.

---

[39] Wendy C. Thomas, et al., *A Private Equity-Owned Doctors' Group Sued Poor Patients Until It Came Under Scrutiny*, NAT'L PUB. RADIO, Nov. 27, 2019, available at: https://www.npr.org/sections/health-shots/2019/11/27/783449133/a-private-equity-owned-doctors-group-sued-poor-patients-until-it-came-under-scru#:~:text=Health%20Inc.-,A%20Private%20Equity%2DOwned%20Doctors'%20Group%20Sued%20Poor%20Patients,Until%20It%20Came%20Under%20Scrutiny&text=Andrea%20Morales%2FMLK50-,Jennifer%20Brooks%2C%20who%20had%20repeatedly%20visited%20the%20emergency%20room%20at,%248%2C500%20in%20unpaid%20medical%20bills., last visited July 9, 2020.

[40] American Medical Association, *Issue Brief: Corporate Practice of Medicine,* at 1 (2015).

73.     In order to avoid these laws, TeamHealth has spun a web of subsidiaries and purportedly independent organizations, which it has dubbed the "TeamHealth system" and this complaint refers to as the "TeamHealth Fraudulent Billing Enterprise."

74.     The TeamHealth Fraudulent Billing Enterprise is structured as a pyramid. TeamHealth sits at the top and owns several subsidiaries that act as regional facilitators.

75.     While the following names are not the official corporate names of these subsidiaries, the regional facilitators go by names like TeamHealth Atlantic, TeamHealth Central, TeamHealth Mid-Atlantic, TeamHealth Northeast, TeamHealth Southeast, and TeamHealth West.

76.     The facilitators themselves own subsidiary practice groups that employ physicians who provide care. For example, the provider group who served Ms. Fraser is Team Physicians of Southern CA, which, in turn, is owned by TeamHealth West (officially Quantum Plus, LLC).

77.     The subsidiary facilitators also staff hospitals by contracting with provider groups that function as independent contractors.

78.     As TeamHealth described it in a 2016 filing with the Securities Exchange Commission (SEC):

> Separate subsidiaries or other affiliates of Team Health Holdings, Inc. carry out all operations and employ all employees within the TeamHealth system. The terms "clinical providers," "TeamHealth physicians or providers," "affiliated providers," "our providers" or "our clinicians" and similar terms mean and include: (i) physicians and other healthcare providers who are employed by subsidiaries or other affiliated entities of Team Health Holdings, Inc., and (ii) physicians and other healthcare providers who contract with subsidiaries or other affiliated entities of Team Health Holdings, Inc. All such physicians and other healthcare providers exercise their independent professional clinical judgment when providing clinical patient care. Team Health Holdings, Inc. is a holding company that does not contract with physicians to provide medical services nor does it practice medicine in any way.[41]

79.     The subsidiary facilitators negotiate contracts with the hospitals and provider groups, recruit physicians, coordinate physician schedules, and conduct local marketing.

---

[41] Team Health Holdings, Inc., 2016 Form 10-K at 3.

80.     Another subsidiary of TeamHealth—Healthcare Revenue Recovery Group (HRRG)—performs all defaulted debt collection for the TeamHealth Fraudulent Billing Enterprise.

81.     Yet another subsidiary of TeamHealth—Health Care Financial Services of TeamHealth—sets all prices for the TeamHealth Fraudulent Billing Enterprise.[42]

82.     TeamHealth itself performs the remaining functions, including accounting, payroll, human resources, capital spending, information systems, compliance, and legal services. TeamHealth also coordinates the web of corporate entities towards one common purpose: squeezing as much money as possible out of consumers through a pattern of fraudulent communications that misrepresent the amounts they are entitled to charge for the care physicians in the TeamHealth Fraudulent Billing Enterprise provide.

## C.     The crippling cost of out-of-network care

83.     The impact of TeamHealth's fraudulent billing practices can be more devastating than the medical emergency or procedure that precipitated the bill in the first place. According to a recent Kaiser Family Foundation Study, two thirds of Americans are either "very worried" (35 percent) or "somewhat worried" (30 percent) about being able to afford their own or their family's unexpected medical bills.[43]

---

[42] *See* https://www.hcfm.com/our-services/, last visited July 9, 2020 ("HCFS of Team Health provides reliable, full-service management of your entire revenue cycle. From creating an appropriate fee schedule to preparing patient statements, our billing services help you improve reimbursement rates and collect more of the money your practice is legitimately owed."); *see also* https://www.hcfm.com/about/, last visited July 9, 2020 ("As a division of Team Health, which staffs more than 250 hospital EDs nationwide, Health Care Financial Services of Team Health has developed a sophisticated coding and billing operation designed to meet the unique requirements of emergency physician care.").

[43] Lunna Lopes, et al., *Data Note:  Public Worries About and Experience With Surprise Medical Bills* (Feb. 28, 2020), available at:  https://www.kff.org/health-costs/poll-finding/data-note-public-worries-about-and-experience-with-surprise-medical-bills/, last visited July 9, 2020.

Figure 1: Unexpected Medical Bills Top List of Public's Worries

84.     This concern is far from baseless: in the Kaiser study, one in three insured, nonelderly adults reported that they received an unexpected medical bill in the past 24 months. Of those who received an unexpected bill, 11 percent reported that the unexpected costs were *$1,000 or more*.[44]

85.     Hospital staff have spotlighted the crippling effect of TeamHealth's practices. In 2018, a group of hospital internists at St. David's Hospital in Texas sued TeamHealth, revealing that the corporation "pressured doctors to make medical decisions based on finances."[45] According to the doctors' complaint, TeamHealth "implement[ed] a scheme of corporate governance over physicians to manipulate their medical practice to save St. David's money."[46]

86.     Senator Elizabeth Warren and Representative Katie Porter are currently investigating TeamHealth for "slashing their doctors' pay and benefits," even as they treat coronavirus patients in

---

[44] *Id.*

[45] Phil Prazan, *Doctor's Sue St. David's Contract over Corporate Practice of Medicine*, KXAN News Austin, June 18, 2018 7:57 P.M., available at: https://www.kxan.com/news/local/austin/doctors-sue-st-davids-contractor-over-corporate-practice-of-medicine/, last visited July 9, 2020.

[46] *Id.*

TeamHealth-controlled emergency departments.[47] The Senators reiterated their concerns in a second letter, noting that in the past two months, Doctor Patient Unity—TeamHealth's lobbying organization—has spent an additional $1.2 million on TV advertisements, money that could have been used to compensate emergency room physicians during the pandemic.[48]

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

87.     **Discovery Rule Tolling**: Plaintiff and members of the proposed class had no means of knowing that medical bills received from the TeamHealth Fraudulent Billing Enterprise demanded payment of inflated amounts that the TeamHealth Fraudulent Billing Enterprise is not legally entitled to recover. Plaintiff did not discover until recently, and could not have discovered through reasonable diligence, that her TeamHealth bill was unlawfully inflated and that the bill and its payment constituted a cognizable injuries. All applicable statutes of limitations have thus been tolled by operation of the discovery rule.

88.     **Fraudulent Concealment**: Far from disclosing that the TeamHealth Fraudulent Billing Enterprise seeks to recover unlawfully inflated medical bills, the enterprise affirmatively conceals this fact in the medical bills sent to plaintiff and the proposed class. These bills falsely represent that the amounts billed constitute the actual value of medical services provided by TeamHealth physicians. The TeamHealth Fraudulent Billing Enterprise knew that patients would have no reason to believe that TeamHealth would bill for amounts it cannot lawfully recover, and plaintiff and the proposed class could not have discovered the fraud earlier through the exercise of reasonable diligence. All applicable statutes of limitations have thus been tolled by TeamHealth's active and fraudulent concealment of the facts giving rise to plaintiff's claims.

---

[47] Letter from Senator Elizabeth Warren and Representative Katie Porter to Stephen A. Schwartzman, Chief Executive Officer of Blackstone, and Wayne Berman, Senior Managing Director and Head of Global Gov't Affairs of Blackstone (April 15, 2020), available at: https://twitter.com/RepKatiePorter/status/1250524828274249728/photo/1, last visited July 9, 2020.

[48] Letter from Senator Elizabeth Warren and Representative Katie Porter to Stephen A. Schwartzman, Chief Executive Officer of Blackstone, and Wayne Berman, Senior Managing Director and Head of Global Gov't Affairs of Blackstone (May 8, 2020), available at: https://porter.house.gov/uploadedfiles/response_to_blackstone_5.8.20.pdf, last visited July 9, 2020.

1

## VI.    CLASS ACTION ALLEGATIONS

2       89.    Plaintiff bring this action on behalf of herself and all others similarly situated under

3   Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as representative of a class defined as

4   follows:

5           All individual persons who were either uninsured or received out-of-network care
            when they were provided medical treatment in the United States or its territories and
6           who received a bill from Team Health Holdings, Inc. or an entity billing on its behalf
            for that treatment.
7

8       90.    There are two ways a consumer may be billed directly by TeamHealth or an entity

9   acting on its behalf. First, if a consumer is uninsured, TeamHealth will bill that consumer for 100%

10  of TeamHealth's artificially inflated rates (the uninsured scenario). Second, if TeamHealth is "out-

11  of-network" in an insured consumer's health plan, TeamHealth may bill that consumer directly for

12  any amounts not reimbursed by the consumer's insurer (the "out-of-network" scenario). This

13  includes instances where (a) a consumer's insurance plan covers none of the out-of-network care,

14  (b) a consumer's insurance plan covers some of the list price as part of a cost sharing plan and

15  consumers pay the remainder, and (c) balance bills.

16      91.    In both of these scenarios—the uninsured scenario and the out-of-network scenario—

17  any individual's payment for TeamHealth's services is determined based on TeamHealth's

18  artificially inflated prices, and the consumer receives a bill from TeamHealth demanding payment of

19  the inflated amounts. Accordingly, each scenario falls within the class definition.

20      92.    Members of the class are so numerous and geographically dispersed that joinder of all

21  members is impracticable. TeamHealth admits that it provides medical services to millions of

22  patients each year in hospitals across the country. Thus, joinder of all members is clearly

23  impracticable. The class is readily identifiable from information and records in the possession of

24  TeamHealth.

25      93.    Plaintiff's claims are typical of the claims of the members of the class. Plaintiff and

26  all members of the class were damaged by the same wrongful conduct of the TeamHealth—i.e.,

27  plaintiff and all members of the class received treatment from a TeamHealth physician and were

28  billed artificially inflated prices for the services they received.

CLASS ACTION COMPLAINT  - 21
010898-11/1325458 V1

94.    Plaintiff will fairly and adequately protect and represent the interests of the class. The interests of plaintiff are coincident with, and not antagonistic to, those of the other members of the class.

95.    Class counsel that represents the plaintiff are experienced in the prosecution of class action litigation and have particular experience with class action litigation involving RICO fraud. Class counsel also have extensive experience in class actions concerning the manipulation of and fraudulent inflation of list prices, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

96.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because TeamHealth has acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally-applicable conduct is inherent in TeamHealth's wrongful conduct.

97.    Questions of law and fact common to the class include, but are not limited to:

    i.    Whether TeamHealth engaged in a fraudulent, unfair, and/or deceptive scheme or course of conduct by setting and transmitting chargemaster prices above the reasonable rates they would be entitled to collect in court;

    ii.    Whether TeamHealth attempted to set list prices based on quantum meruit;

    iii.    What the quantum meruit value of TeamHealth's services are;

    iv.    Whether the TeamHealth Fraudulent Billing Enterprise has the common purpose of profiting from inflated or high list prices;

    v.    Whether TeamHealth engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive plaintiff and class members;

    vi.    Whether the defendant organized a series of subsidiary companies to avoid state corporate practice of medicine laws;

    vii.    Whether defendant's avoidance of corporate practice of medicine laws allowed it to maintain its fraudulent pricing scheme;

1         viii.    Whether the "TeamHealth Fraudulent Billing Enterprise" consisting of

2               (1) defendant, (2) its direct regional subsidiaries, (3) the subsidiary that

3               performs centralized pricing functions, (4) the subsidiary that performs debt

4               collection, and (5) the provider groups consisting of both subsidiaries to its

5               direct regional subsidiaries and unowned independent entities, constitutes an

6               "enterprise" with the common purpose of perpetrating the fraudulent list price

7               scheme;

8         ix.    Whether TeamHealth violated RICO;

9         x.    Whether TeamHealth is liable to plaintiff and class members for damages for

10              conduct actionable under state consumer protection statutes; and

11        xi.    Whether TeamHealth is liable to plaintiff and the class members for damages

12              flowing from their misconduct.

13      98.    Plaintiff and members of the class have all suffered, and will continue to suffer, harm

14 and damages as a result of TeamHealth's unlawful and wrongful conduct. A class action is superior

15 to other available methods for the fair and efficient adjudication of this controversy under Rule

16 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their

17 common claims in a single forum simultaneously, efficiently, and without the unnecessary

18 duplication of evidence, effort, or expense that numerous individual actions would engender. The

19 benefits of proceeding through the class mechanism, including providing injured persons or entities a

20 method for obtaining redress on claims that could not practicably be pursued individually,

21 substantially outweighs potential difficulties in management of this class action. Absent a class

22 action, most members of the class likely would find the cost of litigating their claims to be

23 prohibitive and will have no effective remedy at law. The class treatment of common questions of

24 law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves

25 the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

26 Additionally, TeamHealth has acted and failed to act on grounds generally applicable to plaintiff and

27 the class and require court imposition of uniform relief to ensure compatible standards of conduct

28

CLASS ACTION COMPLAINT  - 23
010898-11/1325458 V1

1    toward the class, thereby making appropriate equitable relief to the class as a whole within the

2    meaning of Rules 23(b)(1) and (b)(2).

3        99.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this

4    action that would preclude its maintenance as a class action.

5                            **VII.   CLAIMS FOR RELIEF**

6                                  **COUNT ONE**
     **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
7              **ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.***

8        100.   Plaintiff, on behalf of herself and all others similarly situated, re-alleges and

9    incorporates by reference each of the allegations contained in the preceding paragraphs of this

10   complaint.

11       101.   RICO makes it "unlawful for any person employed by or associated with any

12   enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

13   participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

14   racketeering activity." 18 U.S.C. § 1692(c).

15       102.   Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that,

16   although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those

17   associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

18       103.   A "person" is "any individual or entity capable of holding a legal or beneficial interest

19   in property." 18 U.S.C. § 1961(3).

20       104.   "Racketeering activity" includes mail and wire fraud. 18 U.S.C. § 1961(1).

21   **A.    Team Health is a culpable "person" under RICO.**

22       105.   This count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

23   § 1962(c), is asserted against TeamHealth on behalf of the plaintiff and class members as represented

24   by the named plaintiff.

25       106.   Plaintiff, the members of class, and TeamHealth are each "persons," as that term is

26   defined in 18 U.S.C. § 1961(3).

27

28
     CLASS ACTION COMPLAINT  - 24
     010898-11/1325458 V1

1

**B.     The TeamHealth Fraudulent Billing Enterprise is a RICO enterprise.**

2

107.     For purposes of this claim, the RICO "enterprise" is an association-in-fact consisting

3

of: (a) TeamHealth; (b) its direct regional subsidiaries; (c) the subsidiary that performs centralized

4

pricing functions, Health Care Financial Services (HCFS); (d) the subsidiary that performs debt

5

collection, Healthcare Revenue Recovery Group (HRRG); and (e) the provider groups—both the

6

subsidiaries to TeamHealth's regional subsidiaries and unowned, independent entities. This

7

complaint refers to this association-in-fact enterprise as the "TeamHealth Fraudulent Billing

8

Enterprise." TeamHealth refers to the same collective as the "TeamHealth System."[49]

9

108.     Each member of the enterprise plays a different role, but all work towards a common

10

purpose: extracting profits derived from centrally set, fraudulent prices.

11

109.     TeamHealth and its Health Care Financial Services subsidiary set the prices and

12

facilitate transmittal of the first bills to consumers.

13

110.     TeamHealth's Healthcare Revenue Recovery Group sends those fraudulent prices to

14

consumers and seeks to collect payment of them.

15

111.     The provider groups perform the care that give the enterprise the cover necessary to

16

transmit and collect on the fraudulent prices.

17

112.     The regional subsidiaries that TeamHealth owns negotiate contracts with hospitals,

18

enabling the provider groups to supply the care for which the fraudulent prices are transmitted.

19

113.     While many of the parties in the TeamHealth Fraudulent Billing Enterprise are

20

commonly owned, not all are. Many provider groups are independent contractors that TeamHealth

21

does not own. They are nonetheless part of the TeamHealth Fraudulent Billing Enterprise.

22

114.     As for the members of the enterprise that are subsidiaries, TeamHealth organized the

23

enterprise to circumvent state laws prohibiting the corporate practice of medicine. If the subsidiaries

24

were divisions of TeamHealth—and the physicians were employees of TeamHealth—they could not

25

perform the medical services necessary to facilitate profiting from TeamHealth's fraudulent prices.

26

27

_____

28

[49] Team Health Holdings, Inc., 2016 Form 10-K at 3.

CLASS ACTION COMPLAINT  - 25
010898-11/1325458 V1

115.    The TeamHealth Fraudulent Billing Enterprise is an ongoing and continuing business organization consisting of corporations and individuals that are and have been associated for the common and/or shared purposes of setting, administering, and deriving wrongful profits from fraudulent healthcare prices. The enterprise is such a cohesive unit that TeamHealth has named it the "TeamHealth System." The TeamHealth Fraudulent Billing Enterprise has existed continuously for years.

116.    To accomplish its common purpose, the enterprise systematically inflates its chargemaster prices for the services it performs. The enterprise does not attempt to tie their prices to any legally permissible standard, such as quantum meruit, which is what they could collect in court given they have no contracts with consumers. The enterprise then uses these chargemaster prices for out-of-network and uninsured patients who receive emergency room services, anesthesiology services, radiology services, and hospitalist services.

117.    The enterprise performs these actions willfully, and with knowledge that the plaintiff and class members make payments based on the rates they set. The TeamHealth Fraudulent Billing Enterprise then represents—either affirmatively or through half-truths and omissions—to the plaintiff and class members that the rates for their services are lawful. The TeamHealth Fraudulent Billing Enterprise conceals from the plaintiff and class members the reality that the real value of their services are far lower.

118.    This scheme is fraudulent. The enterprise's prices are not reasonable approximations of the actual value of their services, and the TeamHealth Fraudulent Billing Enterprise conceals the artificial inflation of its rates as well as the tactics its uses to extract these rates. The TeamHealth Fraudulent Billing Enterprise also conceals from the plaintiff and class members the purpose of this artificial rate inflation: higher profits for TeamHealth.

119.    The TeamHealth Fraudulent Billing Enterprise inflated their chargemaster prices, fraudulently represented these prices as the real value of their services, and thereby caused the uninsured and out-of-network class members to overpay and become over-indebted for the care they received from the TeamHealth Fraudulent Billing Enterprise.

120.    The TeamHealth Fraudulent Billing Enterprise maintains systemic linkages because there are contractual relationships, financial ties, and continuing coordination of activities between the TeamHealth and each entity that is an associate.

121.    At all relevant times, all members of the TeamHealth Fraudulent Billing Enterprise have been aware of the enterprise's conduct, have acted as knowing and willing participants in that conduct, and have reaped profits from that conduct. The enterprise pays the regional subsidiaries and provider groups from the inflated bills and prices. These subsidiaries and provider groups understand the degree to which the enterprise's prices are inflated above the real costs of the care they provide. TeamHealth and its Health Care Financial Services subsidiary create the inflated prices. TeamHealth's Healthcare Revenue Recovery Group and Health Care Financial Services subsidiaries transmit the inflated prices for collection.

122.    The TeamHealth Fraudulent Billing Enterprise knowingly makes material misrepresentations and omissions in furtherance of the fraudulent scheme regarding:

      a.    The true, legal, and reasonable cost of the services it provides;

      b.    The extent to which its artificially inflated prices depart from these reasonable costs;

      c.    Its lack of a legal basis or substantiation for the transmitted prices.

123.    TeamHealth alone could not have accomplished the purposes of the TeamHealth System without the assistance of the provider groups. For TeamHealth to profit from the scheme, the providers needed to be separately owned (so as to avoid state corporate practice of medicine laws) and continually provide care to patients.

124.    The impacts of the TeamHealth Fraudulent Billing Enterprise are still in place, i.e., the artificial price inflation and out-of-network fraud is still ongoing.

**C.    The TeamHealth Fraudulent Billing Enterprise uses the U.S. mails and interstate wire facilities to carry out its fraud.**

125.    The TeamHealth Fraudulent Billing Enterprise engages in and affects interstate commerce by conducting the following activities across state boundaries: the sale, purchase, contracting for, and/or administration of the medical services; the setting of the prices for medical

services; and/or the transmission and/or receipt of invoices, billing statements, debt collection notices, and payments related to the use or administration of the medical services the enterprise provided.

126.     The TeamHealth Fraudulent Billing Enterprise participated in the administration of medical services to millions of individuals located throughout the United States.

127.     The TeamHealth Fraudulent Billing Enterprise's illegal conduct and wrongful practices were carried out by an array of employees and independent contractors, working across state boundaries. The enterprise necessarily relied upon frequent transfers of documents, information, products, and funds through the U.S. mails and interstate wire facilities.

128.     In particular, the TeamHealth Fraudulent Billing Enterprise transmitted fraudulent prices directly to and sought payment from consumers using the U.S. mails and interstate wire facilities.

129.     The nature and pervasiveness of the TeamHealth Fraudulent Billing Enterprise's scheme, which was orchestrated out of the corporate headquarters of TeamHealth and its subsidiaries, necessarily required those headquarters to communicate directly and frequently through the U.S. mails and interstate wire facilities with each other and the provider groups.

130.     Most of the precise dates of the enterprise's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) cannot be alleged without access to the enterprise members' books and records. However, the plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts furthered the pricing-fraud scheme.

131.     Plaintiff Sia Frasier received bills in the mail on October 15, 2019, and November 18, 2019, from Team Physicians of Southern California. These bills included one of the TeamHealth Fraudulent Billing Enterprise's fraudulent prices, $1,082 for care code 99220. The bills were sent to Frasier's address in Vista, California. They had a return addresses in Alcoa, Tennessee and Cincinnati, Ohio, respectively. The bills provided an option to pay by credit card over the Internet at www.TeamHealth.com/billing and www.thbillpay.com.

132.    In addition, the enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved thousands of communications including, *inter alia*:

    a.    Marketing materials about the enterprise members' medical services, which the enterprise sent to hospitals located across the country;

    b.    Written and oral representations of the enterprise's rates for its medical services made at least annually and, in many cases, several times during a single year;

    c.    Thousands of written and oral communications discussing, negotiating, and confirming the enterprise members' contracts with the hospitals;

    d.    Written and oral communications with U.S. government agencies and private insurers that fraudulently misrepresented what the enterprise's rates were, or that were intended to deter investigations into the true reasonable costs of their services or to forestall changes to reimbursement based on something other than its rates;

    e.    Written and oral communications with health insurers and patients;

    f.    Transmission of information about the enterprise's rates to third parties;

    g.    Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the enterprise's scheme; and

    h.    In addition to the above-referenced RICO predicate acts, TeamHealth's corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the scheme. These mails include some of the documents referenced in this Complaint.

**D.**    **TeamHealth directed the TeamHealth Fraudulent Billing Enterprise's affairs.**

133.    TeamHealth has exerted control over the TeamHealth Fraudulent Billing Enterprise. In violation of Section 1962(c) of RICO, TeamHealth has conducted or participated in the conduct of

the affairs of the TeamHealth Fraudulent Billing Enterprise, directly or indirectly. Such participation was carried out in the following ways:

    a.    TeamHealth directly controls the rates of the healthcare services that the provider groups deliver within the enterprise, including, but not limited to, emergency room services, anesthesiology services, radiology services, and hospitalist services;

    b.    TeamHealth directly controls the rates that it charges to the plaintiff and class members;

    c.    TeamHealth directly controls the creation and distribution of marketing, sales, and other materials used to acquire new hospital contracts;

    d.    TeamHealth designed the organizational structure of the enterprise and centrally performs accounting, payroll, compliance, and legal services;

    e.    TeamHealth represents to the plaintiff and class members—by stating its rates without disclosing that these rates differed substantially from the legally permissible cost for its services—that these rates represented lawful debts.

    f.    TeamHealth represents to the plaintiff and class members—by stating its rates and communicating a right to payment on those rates—that it had a basis in the law for the rates it transmitted.

134.    The TeamHealth Fraudulent Billing Enterprise identified above had a hierarchical decision-making structure that TeamHealth directed.

135.    In violation of Section 1962(c) of RICO, TeamHealth has conducted the affairs of the TeamHealth Fraudulent Billing Enterprise. This enterprise fraudulently inflated the rates for their providers' services and misrepresented to plaintiff and class members that they had a basis in law or contract to collect those inflated prices, thereby inducing plaintiff and class members to pay inflated amounts, and incur inflated debt, for their services.

**E.    TeamHealth has conducted a pattern of racketeering activity.**

136.    TeamHealth has conducted and participated in the affairs of the TeamHealth Fraudulent Billing Enterprise through a pattern of racketeering activity, including acts that are

indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. TeamHealth's pattern of racketeering likely involved hundreds of thousands, if not millions, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their pricing schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which TeamHealth intended to defraud plaintiff, members of the class, and other intended victims of the fraudulent pricing scheme.

137. TeamHealth's fraudulent and unlawful pricing scheme consisted, in part, of deliberately overstating its rates for its hospital-based services.

138. TeamHealth's schemes were calculated and crafted such that plaintiff and members of the class would be billed for TeamHealth's medical services based on TeamHealth's artificially inflated rates. In designing and implementing the scheme, TeamHealth was cognizant, at all times, of the fact those plaintiff and class members were not part of the enterprise and relied upon the integrity of TeamHealth in setting its rates.

139. By intentionally and artificially inflating its rates, and by subsequently failing to disclose such practices to the plaintiff and class members, the enterprise engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

140. The enterprise's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiff and members of the class. Each separate use of the U.S. mails and/or interstate wire facilities that the enterprise employed was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiff and members of the class. The TeamHealth Fraudulent Billing Enterprise has engaged in the pattern of racketeering activity for the purpose of conducting its ongoing business affairs.

**F.     TeamHealth's violations of RICO damaged the plaintiff and class members.**

141. TeamHealth's violations of federal law and its pattern of racketeering activity have directly and proximately injured the plaintiff and class members in their business or property. The

plaintiff and class members have overpaid and been overbilled for many hundreds of millions of dollars based on the enterprise's fictitious rates for its medical services.

142.    The TeamHealth Fraudulent Billing Enterprise sent billing statements through the U.S. mails or by interstate wire facilities and reported its rates and other information by the same methods in furtherance of its pricing scheme. The plaintiff and members of the class have made inflated payments and incurred debt for the enterprise's medical services based on and/or in reliance on reported and false rates.

143.    As previously explained, when a TeamHealth Fraudulent Billing Enterprise provider treats a patient, that patient is responsible for paying all or a portion of the enterprise's inflated rates.

    a.    If the patient is uninsured, the enterprise misrepresents that she must pay 100% of the enterprise's rates.

    b.    If the patient is insured, but the TeamHealth Fraudulent Billing Enterprise provider is outside the patient's insurance network, the enterprise misrepresents that the patient must pay 100% of the enterprise's rates not covered by the patient's insurer.

144.    The amount of each of these payment demands is tied directly to the enterprise's list prices. No other intermediary in the supply chain has control over or is responsible for the rates on which consumer payments are based. By setting the rates for its medical services, TeamHealth is setting the prices plaintiff and class members must pay.

145.    The plaintiff's and class members' damages are therefore the difference between what they were billed and what they would have been billed if defendant's list prices were reasonable approximations of the value of the services rendered, pursuant to state doctrines of equity like quantum meruit.

146.    TeamHealth's racketeering activity proximately caused the plaintiff's injuries and those of the class members. By transmitting fraudulently inflated bills, TeamHealth caused plaintiff and the class to incur debt that, but for TeamHealth's inflated bills, plaintiff and the class would not have incurred.  But for the misrepresentations that TeamHealth made regarding the reasonable rates for the medical services the enterprise provided, plaintiff and the class members also would have

paid less, out-of-pocket, for the medical services they received.  When plaintiff and class members received bills from the TeamHealth Fraudulent Billing Enterprise, they had no reason to know that the bills demanded payment of inflated amounts that could not be lawfully recovered. Plaintiff and class members were further induced to pay because nonpayment of these inflated bills would result in adverse credit consequences.

147.    The plaintiff and class members were both: (i) the participants in the marketplace that most directly relied on the falsity of the enterprise's inflated benchmark prices, and (ii) the participants that were most directly harmed by the fraud. There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms resulting from the TeamHealth Fraudulent Billing Enterprise's fraudulent scheme.

148.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, TeamHealth is liable to plaintiff and members of the class for three times the damages that plaintiff and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

149.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the plaintiff and members of the class further seek injunctive relief against TeamHealth for its pricing fraud, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiff may need to avail herself of a hospital where the TeamHealth Fraudulent Billing Enterprise operates in the future. And the plaintiff and members of the class may be repeatedly billed TeamHealth's fraudulent rates. In a country where tens of thousands of citizens cannot afford their medical expenses, where the expense of medical bills is a great burden on millions, and where the current COVID-19 crisis has led to an increase in hospitalizations, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiff will seek injunctive relief, including an injunction against TeamHealth, to prevent it from charging artificially inflated rates and failing to disclose when it operates outside a hospital's insurance networks.

**COUNT TWO**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***

150.    Plaintiff hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

151.    This claim is brought by plaintiff on behalf of members of the class who received care from a TeamHealth physician or medical service provider in California.

152.    California Business and Professions Code § 17200 (UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."[50]

153.    TeamHealth violated the "unlawful" prong of § 17200 by its violations of the CLRA, as described below.

154.    TeamHealth violated the "fraudulent" prong of § 17200 through its pricing fraud. As described throughout this complaint, TeamHealth billed uninsured and out-of-network patients for medical services at inflated list prices TeamHealth is not lawfully entitled to recover. TeamHealth knew its list prices were inflated and false. Plaintiff and members of the class reasonably relied on TeamHealth's inflated and false list prices to make payments for medical services provided by TeamHealth physicians, and those inflated list prices caused plaintiff and the class to incur medical debt that they would not otherwise have incurred. Plaintiff and members of the class were injured.

155.    In addition, TeamHealth violated the "unfair" prong of § 17200. California courts have set out several definitions of unfairness. TeamHealth's conduct is unfair under each of them:

a.    A practice is unfair when "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[51] Here, TeamHealth's billing fraud has caused thousands, if not millions, of patients to overpay for medical care, without any countervailing

---

[50] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

[51] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

1          benefits to consumers or competition. Patients had no reason to believe

2          TeamHealth's inflated list prices were unrecoverable in court, and thus no

3          reasonable means of avoiding the injuries they suffered.

4       b.     A practice is unfair when it "offends an established public policy or is

5          immoral, unethical, oppressive, unscrupulous or substantially injurious to

6          consumers."[52] Billing patients for unrecoverable amounts satisfies each of

7          these criteria.

8       c.     A practice is unfair when it violates a public policy "tethered to specific

9          constitutional, statutory or regulatory provisions."[53] TeamHealth's billing

10         practices at issue violate basic principles of equity and quantum meruit, which

11         are inscribed in Cal. Civ. Code § 1611.

12      156.    TeamHealth's actions, as set forth above, occurred within the conduct of its business

13 and in trade or commerce.

14      157.    Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in

15 interest any money or property, real or personal, which may have been acquired by means of" a

16 violation of the statute.

17      158.    Plaintiff requests that this Court enter such orders or judgments as may be necessary,

18 including: a declaratory judgment that TeamHealth has violated the UCL; an order enjoining

19 TeamHealth from continuing its unfair, unlawful, and/or fraudulent trade practices; an order

20 restoring to the plaintiff any money lost as result of TeamHealth's unfair, unlawful, and/or fraudulent

21 trade practices, including restitution and disgorgement of any profits TeamHealth received as a result

22 of its unfair, unlawful, or fraudulent practices, and for any other relief as may be just and proper.

23      159.    In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award attorneys'

24 fees to a successful party against one or more opposing parties in any action which has resulted in the

25 enforcement of an important right affecting the public interest if: (a) a significant benefit, whether

26

27          [52] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013).

28          [53] *See id.*

pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## COUNT THREE
### VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
### CAL. CIV. CODE § 1750, *ET SEQ.*

160.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

161.     This claim is brought by the plaintiff on behalf of members of the class who received care from a TeamHealth physician or medical service provider in California.

162.     The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

163.     TeamHealth is a "person" under Cal. Civ. Code § 1761(c).

164.     The plaintiff and class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased medical services from TeamHealth.

165.     As alleged in this complaint, and immediately above, TeamHealth has engaged in both "unfair" and "deceptive" acts. TeamHealth billed uninsured and out-of-network patients for medical services at inflated list prices TeamHealth is not lawfully entitled to recover. TeamHealth knew its list prices were inflated and false. Plaintiff and members of the class reasonably relied on TeamHealth's inflated and false list prices to make payments for medical services provided by TeamHealth physicians. Those inflated list prices also caused the class to incur debt it would not otherwise have incurred. TeamHealth's deceptive billing practices caused massive economic injuries to patients in California and across the country, without any countervailing benefits to consumers or the public.

166.     The plaintiff seeks an order enjoining TeamHealth's unfair or deceptive acts or practices, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

1

### DEMAND FOR JUDGMENT

2

WHEREFORE, the plaintiff, on behalf of herself and the proposed class, respectfully

3

demands that this Court:

4

A.    Determine that this action may be maintained as a class action pursuant to Federal

5

Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and direct that reasonable notice of this

6

action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare the

7

plaintiff as the representatives of the class;

8

B.    Enter judgment against TeamHealth and in favor of the plaintiff and the class;

9

C.    Award plaintiff and the class damages (i.e., three times overcharges) in an amount to

10

be determined at trial;

11

D.    Award plaintiff and the class restitution;

12

E.    Award plaintiff and the class their costs of suit, including reasonable attorneys' fees

13

as provided by law; and

14

F.    Enjoin TeamHealth from continuing to bill patients for inflated and false list prices

15

that exceed the amounts TeamHealth can lawfully recover.

16

Award such further and additional relief as the case may require and the Court may deem just

17

and proper under the circumstances.

18

### JURY DEMAND

19

Pursuant to Federal Rule of Civil Procedure 38, the plaintiff, on behalf of herself and the

20

proposed class, demand a trial by jury on all issues so triable.

21

Dated: July 10, 2020                          Respectfully submitted,

22

By */s/ Ben M. Harrington*

23

Ben M. Harrington (313877)
Rio S. Pierce (298297)

24

HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202

25

Berkeley, California  94710
Telephone:  (510) 725-3000

26

Facsimile:  (510) 725-3001
Email: benh@hbsslaw.com

27

Email: riop@hbsslaw.com

28

CLASS ACTION COMPLAINT  - 37
010898-11/1325458 V1

1
2
3
4
5
6

7
8
9
10
11

12
13
14
15
16

17
18
19
20
21
22
23
24
25
26
27
28

Steve W. Berman (*pro hac vice* forthcoming)
Craig R. Spiegel (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
steve@hbsslaw.com
craigs@hbsslaw.com
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Hannah Brennan (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
hannahb@hbsslaw.com
Telephone: (617) 482-3700
Facsimile:  (617) 482-3003

Brian Shearer (*pro hac vice* forthcoming)
Craig L. Briskin (*pro hac vice* forthcoming)
JUSTICE CATALYST LAW
718 7th Street NW
Washington, DC 20001
brianshearer@justicecatalyst.org
cbriskin@justicecatalyst.org
Telephone: (202) 524-8846

DocuSign Envelope ID: EE3733D1-9523-4275-A907-36AAAF4E7F46

1   Steve W. Berman
    Craig R. Spiegel
2   HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
3   Seattle, WA 98101
    steve@hbsslaw.com
4   craigs@hbsslaw.com
    Telephone: (206) 623-7292
5   Facsimile:  (206) 623-0594

7   Brian J. Shearer
    Craig L. Briskin
8   JUSTICE CATALYST LAW, INC.
    718 7th Street NW
9   Washington, DC 20001
    bshearer@justicecatalyst.org
10  cbriskin@justicecatalyst.org
    Telephone: (202) 524-8846

12  *Attorneys for Plaintiff Sia Fraser, individually
    and on behalf of all others similarly situated*

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

17  SIA FRASER, individually and on behalf of all       No.
    others similarly situated,

18                                                       **DECLARATION OF SIA FRASER
                                  Plaintiff,             RE: CLRA VENUE**
19            v.

20  TEAM HEALTH HOLDINGS, INC.

21                                Defendant.

1          I, Sia Fraser, have personal knowledge of the facts stated herein and, if necessary,

2    could competently testify thereto.

3          2.     I am a Plaintiff in the above-entitled action.

4          3.     Pursuant to Cal. Civ. Code § 1780(d), I make this declaration in support of the Class

5    Action Complaint and the claim therein for relief under Cal. Civ. Code § 1780(a).

6          4.     The claim asserted in the Class Action Complaint under Cal. Civ. Code § 1780(a)

7    relates to a medical bill I received for medical care provided in the State of California.

8          5.     This action for relief under Cal. Civ. Code § 1780 has been commenced in a county

9    that is a proper place for trial because Defendant does business in this District (the Northern District

10   of California) and throughout the State of California.

11

12         I declare under penalty of perjury under the laws of the State of California that the foregoing

13   Declaration is true and correct, and was executed by me in the city of Vista, California, on July 9,

14   2020.

15

16

17   By: 

18                    Sia Fraser

19

20

21

22

23

24

25

26

27

28