Carol Lynn Thompson (SBN 148079)
cthompson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Matthew P. Henry (SBN 308878)
mhenry@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Mark B. Blocker (*Pro Hac Vice*)
mblocker@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7436

*Attorneys for Defendant*
*Team Health Holdings, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND

| | |
|---|---|
| SIA FRASER, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> TEAM HEALTH HOLDINGS, INC., <br><br> Defendant. | Civil Action No.  4:20-cv-04600-JSW <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:   January 8, 2021 <br> Time:  9:00 a.m. <br> Judge: Hon. Jeffrey S. White <br> Courtroom:    5, 2nd Floor <br><br> **JURY TRIAL DEMANDED** |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that Defendant Team Health Holdings, Inc. will and hereby does move this Court to dismiss Plaintiff Sia Fraser's Class Action Complaint (ECF No. 1, Jul. 10, 2020) ("Compl."). This Motion shall be heard on January 8, 2021, at 9:00 a.m., or as soon thereafter as it may be heard, before the Honorable Jeffrey S. White, United States District Judge, in Courtroom 5 of the Oakland Courthouse located at 1301 Clay Street, Oakland, CA 94612. This Motion is brought pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). This Motion is based on this Notice, the Memorandum of Points and Authorities, the Declarations of Matthew P. Henry ("Henry Decl.") and Paula Dearolf ("Dearolf Decl.") and the attached exhibits, the Request for Judicial Notice in Support of Defendant's Motion to Dismiss, the complete files and records of this action, and such other matters and arguments as may come before this Court, including those raised in connection with reply briefing and oral argument.

Team Health Holdings, Inc. seeks an order dismissing the Complaint in its entirety with prejudice.

Respectfully submitted,

Dated: September 25, 2020

*/s/ Carol Lynn Thompson*

Mark B. Blocker (*Pro Hac Vice*)
mblocker@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7436

Carol Lynn Thompson (SBN 148079)
cthompson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Matthew P. Henry (SBN 308878)
mhenry@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

*Attorneys for Defendant*
*Team Health Holdings, Inc.*

# **TABLE OF CONTENTS**

I.         SUMMARY OF ARGUMENT ......................................................................... 1

II.        STATEMENT OF ISSUES TO BE DECIDED ................................................ 2

III.       RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............... 2

           A.      The Parties. .................................................................................................. 2

           B.      Medical Prices in the United States. .................................................... 3

           C.      Plaintiff's Complaint................................................................................. 4

IV.        LEGAL STANDARD...................................................................................... 5

V.         ARGUMENT ................................................................................................... 5

           A.      Plaintiff's RICO Claim Should be Dismissed for Failure to State a Claim...... 5

                   1.      Plaintiff Has Not Pled a RICO Enterprise. ........................................ 6

                   2.      Plaintiff Has Not Alleged that Holdings Conducted the Affairs of the Enterprise. ......................................................................................... 8

                   3.      Plaintiff Has Not Alleged Any Predicate Racketeering Acts. ............ 10

                   4.      Plaintiff Has Not Alleged a Pattern of Racketeering. ........................ 15

           B.      The California Statutory Claims — under the UCL and CLRA — Should Be Dismissed. ....................................................................................... 16

VI.        CONCLUSION................................................................................................ 19

DEFENDANT'S MOTION TO DISMISS, CASE NO. 4:20-CV-04600-JSW

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)................................................................................5, 8, 9

*AT&T Corp. v. Shroeder*
No. C04-5709FDB, 2006 WL 1806187 (W.D. Wash. June 28, 2006).........................12

*Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*
No. CV 15-06209-MWF, 2017 WL 8943149 (C.D. Cal. Oct. 20, 2017) ......................7

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)...........................................................................5, 8

*Bowden v. Med. Ctr., Inc.*
845 S.E.2d 555 (Ga. 2020)..................................................................12, 13

*Bridge v. Phoenix Bond & Indem. Co.*
553 U.S. 639 (2008)................................................................................16

*Brown v. Knoxville HMA Holdings, LLC*
447 F. Supp. 3d 639 (M.D. Tenn. 2020)....................................................12

*Boyle v. United States,*
556 U.S. 938 (2009)..................................................................................6

*Camp v. Pac. Fin. Grp.*
956 F. Supp. 1541 (C.D. Cal. 1997) .......................................................10

*Cansino v. Bank of Am.*
224 Cal. App. 4th 1462 (2014) ...............................................................17

*Children's Hosp. of Central Cal. v. Blue Cross of Cal.*
226 Cal. App. 4th 1260 (2014) ...............................................................13

*Davis v. HSBC Bank, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ..................................................................3

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*
751 F.3d 990 (9th Cir. 2014) ........................................................... *passim*

*Eclectic Props. E., LLC v. The Marcus & Millichap Co.*
No. C-09-00511 RMW, 2012 WL 713289 (N.D. Cal. Mar. 5, 2012) .........................16

*Edwards v. Marin Park, Inc.*
356 F.3d 1058 (9th Cir. 2004) ...................................................................5

*Finkelstein v. AXA Equitable Life Ins. Co.*
   325 F. Supp. 3d 1061 (N.D. Cal. 2018) ..................................................................3

*Flushing Hosp. & Med. Ctr. v. Woytisek,*
   41 N.Y.2d 1081 (1977) ..........................................................................................3

*Gomez v. Guthy-Renker, LLC*
   No. EDCV14-01425 JGB, 2015 WL 4270042 (C.D. Cal. July 13, 2015)..................10

*Gould v. Workers Comp. Appeals Bd.*
   4 Cal. App. 4th 1059 (1992) .................................................................................13

*Grauberger v. St. Francis Hosp.*
   169 F. Supp. 2d 1172 (N.D. Cal. 2001) ................................................................12

*Gregory v. Albertson's, Inc.*
   104 Cal. App. 4th 845 (2002) ...............................................................................18

*H.J. Inc. v N.W. Bell Tel. Co.*
   492 U.S. 229 (1989)..........................................................................................15, 16

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*
   No. 2:11-CV-07166-MRP, 2012 WL 10731957 (C.D. Cal. June 29, 2012) .............7, 8

*In re Jamster Mktg. Litig.,*
   No. 05CV0819 JM(CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) ..................6

*In re U.S. Foodservice Inc. Pricing Litig..*
   729 F. 3d 108 (2d Cir. 2013)................................................................................12

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*
   865 F. Supp. 2d 1002 (C.D. Cal. 2011) ................................................................10

*Kearns v. Ford Motor Co.*
   567 F.3d 1120 (9th Cir. 2009) ................................................................................5

*Kwikset Corp. v. Superior Court*
   51 Cal. 4th 310 (2011) ........................................................................................17

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*
   940 F.2d 397 (9th Cir. 1991) ..............................................................................5, 9

*Langford v. Rite Aid of Ala., Inc.*
   231 F.3d 1308 (11th Cir. 2000) ............................................................................15

*Lazar v. Hertz Corp.*
   69 Cal. App. 4th 1494 (1999) ..............................................................................18

*Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*
   No. CV 090-5612 GAF, 2010 WL 11508022 (C.D. Cal. Feb. 26, 2010).....................12

iv

*Misson v. Polimeno*
No. C 12-6359 MEJ, 2013 WL 1209476 (N.D. Cal. Mar. 25, 2013) ...........................................16

*Monroe v. Geico Gen. Ins. Co.*
No. 5:14-CV-05174-EJD, 2018 WL 500260 (N.D. Cal., Jan. 19, 2018).....................................18

*Moore v. Kayport Package Exp., Inc.*
885 F.2d 531 (9th Cir. 1989) ......................................................................................................16

*Moran v. Prime Healthcare Mgmt., Inc.*
3 Cal. App. 5th 1131 (2016) .......................................................................................................18

*Nassau Anesthesia Assocs. PC v. Chin*
924 N.Y.S. 2d 252 (2011)........................................................................................................3, 13

*Reves v. Ernst & Young*
507 U.S. 170 (1993).......................................................................................................................8

*River City Markets, Inc. v. Fleming Foods W., Inc.*
960 F.2d 1458 (9th Cir. 1992) ....................................................................................................16

*Schulenberg v. Rawlings Co.*
No. CVN03-0134-HDM(VPC), 2003 WL 22129230 (D. Nev. Aug. 20, 2003) ..........................12

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985).......................................................................................................................6

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*
992 F. Supp. 2d 962 (C.D. Cal. 2014) ........................................................................................17

*United States ex rel. Martinez v. KPC Healthcare Inc.*
No. 8:15-cv-01521-JLS-DFM, 2017 WL 10439030 (C.D. Cal. June 8, 2017) .............................9

*UnitedHealthcare Servs., Inc. v. Asprinio*
16 N.Y.S. 3d 139 (2015)..............................................................................................................11

*Yagman v. Kelly*
No. CV 17-6022-MWF, 2018 WL 2138461 (C.D. Cal. Mar. 20, 2018) ........................................8

*Yourish v. Cal. Amplifier*
191 F.3d 983 (9th Cir. 1999) .......................................................................................................13

**RULES AND STATUTES**

Fed. R. Civ. P. 9(b) ................................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)..................................................................................................................2

18 U.S.C. § 1962(c) ...................................................................................................................5, 6

DEFENDANT'S MOTION TO DISMISS, CASE NO. 4:20-CV-04600-JSW

**OTHER**

Cal. Bus. & Prof. Code §17200 et seq., Unfair Competition Law ("UCL") .............................. *passim*

Cal. Bus. & Prof. Code § 17203 ........................................................................................17

Cal. Bus. & Prof. Code § 17204 ........................................................................................17

Cal. Civ. Code §1750 et seq., Consumer Legal Remedies Act ("CLRA") ................................. *passim*

DEFENDANT'S MOTION TO DISMISS, CASE NO. 4:20-CV-04600-JSW

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   SUMMARY OF ARGUMENT

This lawsuit challenges the prices for emergency room medical services charged to certain patients.  The Complaint alleges that the prices billed by emergency medical provider groups affiliated with Defendant Team Health Holdings, Inc. ("Defendant" or "Holdings") to uninsured and out-of-network patients are too high.  Unfortunately, the Complaint never alleges why those prices are too high.  Worse, the Complaint tries to transform this unexplained, garden-variety pricing dispute into a sinister, civil RICO conspiracy by relying on trumped up rhetoric about Holdings' operations.

In light of the deficiencies of Plaintiff's three-count complaint, it should be dismissed with prejudice.  Count I does not allege — and certainly not with the specificity required by Federal Rule of Civil Procedure 9(b) — any of the elements of a civil RICO claim.  The Complaint does not allege a viable RICO enterprise because it fails to allege a common purpose among the members of the claimed enterprise.  In addition, the Complaint fails to allege Holdings' role in that purported enterprise, especially since Holdings is a corporate holding company, which has no employees or operations.  The Complaint neither alleges a predicate racketeering act, nor a pattern of racketeering. While Plaintiff asserts that the "fraudulently inflated" bills sent to patients constitute mail and wire fraud, the Complaint fails to establish how the bills — even those sent to Fraser — are fraudulent, and the two bills sent to Plaintiff for the same service do not amount to a pattern.

The remaining two counts of the Complaint allege California state law claims under the Unfair Competition Law, Cal. Bus. & Prof. Code §17200 et seq. ("UCL"), and the Consumer Legal Remedies Act, Cal. Civ. Code §1750 et seq. ("CLRA"), based on the same underlying billing practices.  Holdings, however, is a holding company that did not send bills to patients and therefore did not make the purported misrepresentations in those bills — which are not fraudulent in any event — nor did it receive payment from plaintiff so that both the UCL and CLRA claims fail.  Moreover, plaintiff fails to plead that Holdings engaged in any specific practice proscribed by the CLRA.

Plaintiff cannot fix these shortcomings, and Holdings respectfully submits that the Complaint should be dismissed with prejudice.

## II.   STATEMENT OF ISSUES TO BE DECIDED

- Whether Count I should be dismissed pursuant to Fed. R. Civ. Proc. 9(b) and 12(b)(6) for failure to plead the elements of a RICO claim with specificity, including: i) a RICO enterprise; ii) conduct by Holdings as part of the enterprise; iii) predicate acts of mail or wire fraud; or iv) a pattern of racketeering activity.

- Whether Counts II and III should be dismissed pursuant to Fed. R. Civ. Proc. 9(b) and 12(b)(6) for failure to plead with specificity that Holdings made any misrepresentations to Plaintiff because Holdings did not send any bills to Plaintiff.

- Whether Count II should be dismissed for failure to plead that Plaintiff "lost money or property" because Plaintiff did not pay any amount to Holdings.

- Whether Count II should be dismissed to the extent it relies on "unlawful" violations of the CLRA because Plaintiff fails to plead an underlying CLRA violation.

- Whether Count III should be dismissed for failure to specify the specific practice prohibited by the CLRA that Holdings allegedly violated.

## III.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Parties.

Defendant Team Health Holdings, Inc. ("Defendant" or "Holdings") is a holding company based in Knoxville, Tennessee.  Compl. ¶¶ 23, 78 (Jul. 10, 2020), ECF No. 1.  Like many corporate holding companies, it does not have any employees or engage in any activities, but instead owns operating subsidiaries (the "Subsidiaries").  *Id.* ¶ 78.  The Subsidiaries act as emergency room staffing companies.  *Id.* ¶¶ 23, 77, 79.  The Subsidiaries contract with hospitals throughout the country to provide doctors and other medical staff to under-resourced hospitals, particularly emergency room doctors.  *Id.* ¶¶ 23, 27, 77, 79.  The Subsidiaries, in turn, arrange for groups of physicians (medical provider groups) that will provide the emergency room services at the hospital.  *Id.* ¶ 79.  The Subsidiaries provide administrative services to the medical provider groups — negotiating contracts with insurance companies and hospitals, handling the billing functions, and collecting payments for services provided by the medical provider groups.  *Id.* ¶¶ 32, 109-10.  The

Complaint does not allege, nor could it, that doctors share in any of Holdings' or the Subsidiaries' profits.

Plaintiff Sia Fraser ("Plaintiff") is a California resident who received emergency room services at Tri-City Medical Center in Oceanside, California. *Id.* ¶ 19. She was treated by an emergency room doctor who belonged to a medical provider group that was affiliated with a Subsidiary, and later received a bill for those services. *Id.* ¶¶ 19, 21-22; Decl. of Paula Dearolf in Supp. of Mot. to Dismiss ("Dearolf Decl."), Ex. 2 (Bill to Fraser, Oct. 15, 2019).[1] At the time of her emergency services, she was uninsured. Compl. ¶ 20. Upon admission, Plaintiff signed an admittance form acknowledging that she would receive care from physicians who were independent contractors, and who would bill her separately for the services provided. *Id.* ¶ 34 & n.17; Dearolf Decl., Ex. 1 (Conditions of Admission Form, Sept. 30, 2019) at 1.

**B.   Medical Prices in the United States.**

Prices for medical services in the United States vary depending on whether a patient has insurance. Most prices are set through negotiations between medical provider groups and insurance companies. *See, e.g.*, *Nassau Anesthesia Assocs. PC v. Chin*, 924 N.Y.S.2d 252, 254 (2011) ("[P]rivate insurers may be able to obtain 'very substantial discount[s]' from medical providers for a variety of reasons, i.e. 'volume of payments, promptness of payment, assurance of payment.'" (quoting *Flushing Hosp. & Med. Ctr. v. Woytisek*, 41 N.Y.2d 1081, 1082 (1977))). Once those prices are determined, patients who are insured pay the prices to which their insurance company agreed.

Some patients, however, do not have insurance or their insurer does not have a contract with the medical provider group. Compl. ¶¶ 55-56. Medical provider groups have list prices that apply to every service provided that is not covered by a negotiated insurance network contract. *Id.* ¶ 55. These prices are contained in a document called a "Chargemaster" and therefore are often referred to

---

[1] On a motion to dismiss, this Court can consider documents that are subject to judicial notice without converting the motion into a summary judgment motion. *See Finkelstein v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061, 1066 (N.D. Cal. 2018) ("Under the incorporation by reference doctrine, courts are permitted to look beyond the pleadings without converting a Rule 12(b)(6) motion into a motion for summary judgment." (citing *Davis v. HSBC Bank, N.A.*, 691 F.3d 1152, 1160-61 (9th Cir. 2012))). As set forth in the concurrently filed Request for Judicial Notice, the Court can consider the Bill to Fraser and Conditions of Admission Form. Dearolf Decl., Exs. 1-2.

as Chargemaster prices.  *Id.* ¶¶ 39, 55.  The medical provider groups affiliated with the Subsidiaries are no different; they have Chargemaster prices for each hospital at which they provide services.  *Id.* A Subsidiary referred to in the Complaint as "Health Care Financial Services of TeamHealth" ("HCFS") allegedly establishes the Chargemaster prices for medical provider groups that are affiliated with the Subsidiaries.  *Id.* ¶ 109.

Patients do not always pay the full Chargemaster prices.  As the Complaint points out, many hospitals have financial assistance programs that allow for substantial discounts from those list prices.  *Id.* ¶ 21.  And even for patients that pay in full, they seldom pay immediately, as Plaintiff's own experience demonstrates.  She negotiated a payment plan to pay her $1,082 bill, but, as of the date the Complaint was filed, had not paid the balance in full.  *Id.*

**C.     Plaintiff's Complaint.**

The gist of the Complaint is that the Chargemaster prices allegedly set by the Subsidiaries are purportedly too high.  But stripped of the purely rhetorical references to prices being "fraudulent" or "inflated," the Complaint offers no specifics.  For example, the Complaint alleges that "the real value of their services are far lower," but never explains why.  Compl. ¶ 117.  Similarly, the Complaint alleges that the Chargemaster prices are "not reasonable approximations of the actual value of their services," *id.* ¶ 118, but, again, does not explain why.  The Complaint does not contain a comparison between the Subsidiaries' Chargemaster prices and the Chargemaster prices of even a single competitor for a single service.

Premised on this untethered theory that the Chargemaster prices set by the Subsidiaries are too high, the Complaint alleges three claims.  Count I asserts a RICO claim on behalf of a purported nationwide class of all uninsured patients or out-of-network patients who "were provided medical treatment . . . and who received a bill from Team Health Holdings, Inc. or an entity billing on its behalf for that treatment."  Compl. ¶¶ 89, 100-49.  Counts II and III assert California statutory claims under the Unfair Competition Law (Bus. & Prof. Code § 17200 et seq., "UCL") and the Consumer Legal Remedies Act (Civ. Code § 1750 et seq., "CLRA") on behalf of a purported California sub-class.  Compl. ¶¶ 150-66.  All three claims are based on the theory that the bills sent to patients

1   included Chargemaster rates that purportedly were higher than the reasonable value of the services

2   provided.  *See id.* ¶¶ 12, 118, 154, 165.

3   **IV.   LEGAL STANDARD**

4           In order to survive a motion to dismiss, a complaint must plead sufficient facts "to state a

5   claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

6   In order to be facially plausible, a complaint must create a "reasonable inference that the defendant

7   is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

8   The complaint must do more than show that liability is possible; it must show that liability is

9   plausible.  *Id.*

10          In addition, where, as here, the allegations sound in fraud, Plaintiff also must satisfy the

11  heightened pleading requirements of Rule 9(b), pleading the circumstances of fraud with

12  particularity.  Plaintiff's claims all rely on a common theory: that she received "fraudulent" bills that

13  listed "inflated" charges that were "not reasonable approximations of the actual value of the[]

14  services."  Compl. ¶¶ 118-19, 122, 128, 136, 154-55, 165.  Since all of the claims are based on this

15  "unified course of fraudulent action," *see id.*, they are all governed by Rule 9(b).  *See Edwards v.*

16  *Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) ("Rule 9(b) . . . applies to civil RICO

17  fraud claims."); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule 9(b) applies

18  to CLRA and UCL claims that allege a "unified course of fraudulent conduct").  This means that

19  Plaintiff must "detail with particularity the time, place, and manner of each act of fraud, plus the role

20  of each defendant in each scheme."  *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d

21  397, 405 (9th Cir. 1991).

22  **V.    ARGUMENT**

23          **A.    Plaintiff's RICO Claim Should be Dismissed for Failure to State a Claim.**

24          Plaintiff's RICO claim should be dismissed because the Complaint fails to allege the

25  essential elements of a RICO claim.  Plaintiff must allege that Holdings participated in "(1) the

26  conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering

27  activity or collection of unlawful debt . . . [that is] (5) the proximate cause of harm to the victim."

28  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18

U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985)).  Plaintiff has not pled any of these elements, let alone with the specificity required by Rule 9(b).

### 1.    Plaintiff Has Not Pled a RICO Enterprise.

In order to satisfy the RICO enterprise element, Plaintiff must plead "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props.*, 751 F.3d at 997 (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).  Here, Plaintiff cannot satisfy the critical common purpose element because all the Complaint alleges is that the participants in the alleged enterprise shared a common purpose of wanting to make money, which is an entirely lawful purpose.  *See, e.g.*, Compl. ¶ 115.  To allege a RICO enterprise, Plaintiff must "set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct."  *In re Jamster Mktg. Litig.*, No. 05CV0819 JM(CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009).

Paragraph 107 of the Complaint defines the supposed RICO enterprise, and alleges that it consists of Holdings, the Subsidiaries, and the medical provider groups.  Compl. ¶ 107.  As to the medical provider groups, the Complaint alleges that some are owned by the Subsidiaries and others are "unowned, independent entities," *id.* ¶¶ 107, 113, but it does not identify a single such unowned entity that is alleged to have participated in the enterprise.  Paragraph 108 alleges that the common purpose shared by these entities is "extracting profits derived from centrally set, fraudulent prices." *Id.* ¶ 108.  Paragraph 115 reiterates this point, alleging that the common purpose is "deriving wrongful profits."  *Id.* ¶ 115.

Stripped of the nefarious language, which some courts refer to as "artful modifiers," *Jamster*, 2009 WL 1456632, at *5, all the Complaint alleges is that a group of persons and entities were involved in trying to earn profits by providing or facilitating lifesaving emergency medical services.  But as numerous courts have pointed out, merely "earning profits" is not sufficient to allege a RICO common purpose because a complaint has to allege that the enterprise participants were doing something that was *inconsistent* with normal business activity.  *Id.* ("The challenge for Plaintiffs is to set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct.").  Allegations that a group of persons acted together to try to earn profits for themselves

are "consistent with ordinary business conduct and an ordinary business purpose." *Id.*; *see also In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) ("Parties that enter commercial relationships 'for their own gain or benefit' do not constitute an 'enterprise.'" (citations omitted)).

Here, there is little doubt that each participant was engaged in the common and entirely lawful behavior of earning profits. As to Holdings, it earns profits from its equity interest in its subsidiaries, including dividends declared by those Subsidiaries. The Subsidiaries earned profits by billing for the administrative services performed. The medical provider groups received payments based on the medical services provided.[2] But none of this suggests anything other than lawful business conduct. The fact that Plaintiff contends that the charges to patients were too high does not transform this collection of entities and persons into a RICO enterprise. *Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*, No. CV 15-06209-MWF (AFMx), 2017 WL 8943149, at *9–10 (C.D. Cal. Oct. 20, 2017) (allegations that defendants were engaged in fraudulent medical billing was insufficient to allege a RICO enterprise).

Even assuming, *arguendo,* that earning profits by charging "inflated" amounts to patients could satisfy the common purpose, the Complaint is still deficient because it does not plausibly allege how any of the medical provider groups — especially the unowned, independent medical provider groups — benefited from the enterprise. Again, there is no allegation that any of the independent medical provider groups shared in any of the purportedly inflated profits. Rather, the Complaint suggests that medical provider groups were paid a set amount that did not depend on the profits earned. *See* Compl. ¶ 121. Indeed, the Complaint alleges that the "higher profits" earned through the "artificial rate inflation" were kept by Holdings, and not by the physicians. *Id.* ¶ 118. It is not plausible to allege a common purpose in which one of the participants (the medical provider groups) — indeed, the key participants, *id.* ¶ 123 — would go along with an enterprise in which they

---

[2] Plaintiff alleges that the "[t]he enterprise pays the regional subsidiaries and provider groups from the inflated bills and prices," Compl. ¶ 121, but this is insufficient to show a shared common fraudulent purpose. Any time a plaintiff alleges that one entity obtains wrongful profits and does business with another entity, she can allege that the second entity was paid from the wrongful profits, but that does not mean that those two entities form an enterprise. *See Countrywide*, 2012 WL 10731957, at *9 (rejecting allegations of common purpose between Countrywide and lenders that amounted to "Countrywide offered to buy something, and the lenders obliged.").

allegedly received no portion of the allegedly inflated profits. *Countrywide*, 2012 WL 10731957, at *8 (no RICO enterprise where the complaint merely pled "facts from which the Court *might* conclude that the parties acted improperly . . . . and then attempts to bootstrap a conclusion that these thousands of diverse and disparate entities shared a common purpose and cooperated with each other in furtherance of that purpose" (emphasis in original)). In fact, the Complaint alleges that the medical provider groups only provided the "cover" necessary to earn the allegedly illicit profits, but never alleges they shared in them. Compl. ¶¶ 111 and 123.

And it is not hard to figure out why Plaintiff is so insistent that the medical provider groups are part of the enterprise, even though they allegedly gained nothing from it. Without the medical provider groups, the enterprise would consist only of Holdings and the Subsidiaries, and it is well-settled that corporate affiliates cannot constitute a RICO enterprise. *Yagman v. Kelly*, No. CV 17-6022-MWF (PJWx), 2018 WL 2138461, at *15 (C.D. Cal. Mar. 20, 2018) ("[A] parent corporation and its subsidiaries do not together constitute a RICO 'enterprise.'"). Accordingly, Plaintiff has not plausibly alleged a common purpose, and therefore her RICO claim fails.[3]

### 2.   Plaintiff Has Not Alleged that Holdings Conducted the Affairs of the Enterprise.

The RICO claim also fails because the Complaint does not allege the specific acts undertaken by Holdings in conducting the affairs of the alleged enterprise or that the alleged conduct of the enterprise was distinct from its own affairs. As the Supreme Court has explained, in RICO cases "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). This means that the defendant must "participate in the operation or management of the enterprise itself." *Id.*

---

[3] Plaintiff's fraud theory is also implausible because she has not alleged why hospitals would participate in this fraudulent scheme. Although the Complaint does not allege that hospitals were part of the enterprise, it alleges that the Subsidiaries contract with hospitals to staff their emergency rooms, and the hospitals would logically be provided with the Chargemaster rates. Compl. ¶¶ 23, 77, 79. It is implausible to suggest that a hospital would contract with an outside service provider that it knew was intentionally charging fraudulent rates. *See Iqbal*, 556 U.S. at 678 (holding that, to survive a motion to dismiss, a complaint must plead sufficient facts to make liability plausible, not just possible (quoting *Twombly*, 550 U.S. at 557)).

1       However, because Holdings has no employees and conducts no operations, it could not have

2  carried out the operations of the claimed enterprise.  The Complaint admits that Holdings is a

3  holding company and "[s]eparate subsidiaries or other affiliates of Team Health Holdings, Inc. carry

4  out all operations and employ all employees within the TeamHealth system."  Compl. ¶ 78 (quoting

5  Holdings' 2016 Form 10-K).  The Complaint alleges that "[a] subsidiary of TeamHealth—Health

6  Care Financial Services of TeamHealth—sets all prices for the TeamHealth Fraudulent Billing

7  Enterprise."  *Id.* ¶ 81 (citing HCFS website).  The Complaint thus never alleges Holdings' role in the

8  alleged fraud or any act committed by Holdings in furtherance of the fraud.

9       The Complaint tries to get around this shortcoming by lumping together Holdings and the

10  Subsidiaries and claiming both are responsible for setting prices.  *See id.* ¶¶ 109, 133.  As to

11  Holdings, however, that claim is implausible because it has no employees and carries out no

12  operations.  *See Iqbal*, 556 U.S. at 678 (holding that, to survive a motion to dismiss, a complaint

13  must plead sufficient facts to make liability plausible, not just possible (quoting *Twombly*, 550 U.S.

14  at 557)).  Further, Plaintiff cannot satisfy Rule 9(b) by suggesting that Holdings is responsible for the

15  actions of its Subsidiaries, because that does not explain the role of the parent company in the

16  alleged fraud, as courts have recognized.  *See Lancaster*, 940 F.2d at 405; *accord United States ex*

17  *rel. Martinez v. KPC Healthcare Inc.*, No. 8:15-cv-01521-JLS-DFM, 2017 WL 10439030, at *1-3

18  (C.D. Cal. June 8, 2017) (in claim arising from medical billing practices, Rule 9(b) not satisfied as to

19  the holding companies by alleging that they "owned, operated, directed, and conspired with" the

20  hospital at issue).

21       Moreover, even if the Court were to attribute to Holdings the acts of the Subsidiaries, the

22  Complaint still fails to establish the requisite conduct element.  Plaintiff alleges that Holdings

23  controls the following activities of the enterprise: (1) setting the rates for medical services provided

24  by affiliated medical provider groups; (2) creating and distributing marketing, sales, and other

25  materials to acquire new hospital contracts; (3) designing the organizational structure and

26  performing accounting, payroll, compliance, and legal services; and (4) communicating amounts

27  owed to patients.  *See* Compl. ¶ 133.  These are the same administrative services that the Complaint

28  alleges that the Subsidiaries provide to hospitals and medical provider groups.  *See id.* ¶ 32.  This

9

1    hardly suggests the conduct of an illegal enterprise.

2           Courts have rejected similar attempts to turn standard business relationships between service

3    providers and clients into allegations of conducting the affairs of an enterprise.  For example, in

4    *Gomez v. Guthy-Renker, LLC*, No. EDCV14-01425 JGB (KKx), 2015 WL 4270042 (C.D. Cal. July

5    13, 2015), the court held that simply "elaborating verbosely on what a Servicer/Client Relationship

6    means" did not show conduct of a RICO enterprise.  *Id.* at *6, *11; *see also In re WellPoint, Inc.*

7    *Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034-35 (C.D. Cal. 2011) ("[T]he

8    existence of a business relationship between WellPoint, Ingenix, and the Insurance Defendants

9    without more does not show that WellPoint conducted the enterprise.").  Similarly here, there is no

10   allegation that the Subsidiaries engaged in any conduct separate and apart from their regular business

11   activities.  As a result, the Court should reject Plaintiff's attempt at artfully pleading RICO

12   "conduct" based merely on a standard service relationship.

### 3.        Plaintiff Has Not Alleged Any Predicate Racketeering Acts.

14          The RICO claim also fails because Plaintiff has not alleged that Holdings engaged in any

15   predicate acts.  *Eclectic Props.*, 751 F. 3d at 997 ("Racketeering activity . . . requires predicate

16   acts.").  The Complaint alleges that Holdings (and "the TeamHealth Fraudulent Billing Enterprise")

17   engaged in mail and wire fraud by "transmitt[ing] fraudulent [bills] . . . to and [seeking] payment

18   from [patients] using the U.S. mails and interstate wire facilities."  Compl. ¶ 128.  The bills allegedly

19   were fraudulently inflated because the Chargemaster prices did not represent "reasonable

20   approximations of the actual value of the[] services" which purportedly is what would be

21   recoverable in a lawsuit in which a court decided a quantum meruit award.  *Id.* ¶ 118.  The

22   Complaint's allegations fail to establish that any bill sent to any patient, including Plaintiff, was

23   fraudulent and so fail to establish that Holdings engaged in the alleged predicate act, mail or wire

24   fraud.  *See Camp v. Pac. Fin. Grp.*, 956 F. Supp. 1541, 1551 (C.D. Cal. 1997) (failure to state RICO

25   claim where plaintiffs had not identified any reason why alleged mailings were fraudulent).

26          As to Plaintiff, the Complaint alleges that the price billed — $1,082 for CPT Code 99220 —

27   was fraudulently inflated, yet Plaintiff does not even attempt to allege what amount represented the

28   purported reasonable value of the services provided or mention the amount charged by a single

1   competitor for that same service.  Compl. ¶ 131.  Plaintiff suggests that the amount billed was

2   unreasonable because the hospital separately charged Plaintiff for "observation care" performed by

3   hospital physicians, but charged a much lower amount.  *Id.* ¶ 69.  This apples-to-oranges

4   comparison, however, is of no help, because the Complaint does not allege that the amount billed by

5   the hospital was the market rate for observation care services provided in that locality, nor does it

6   allege whether that was the charge before or after the hospital applied the discount from its Financial

7   Assistance Program, or whether the hospital billed her at an in-network rate.  *See id.* ¶ 21.

8   Moreover, as the Complaint points out, charges are determined by CPT code, and the Complaint

9   does not allege that the services provided by the hospital physician were provided under the same

10  CPT code.  *See UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S. 3d 139, 145 (2015) (CPT codes

11  essential to determine if an appropriate comparison is being made).  The Complaint also fails to

12  allege any facts demonstrating how the Chargemaster price for that CPT observation care code (or

13  any other CPT code) was set or why Holdings knew that price was fraudulently inflated in setting it.

14  In fact, medical rates are just like lawyer billing rates: there are a range of rates that may be charged

15  by different providers in different areas for medical services to uninsured and out-of-network

16  patients in the absence of an agreed contract price.  *See, e.g.*, Decl. of Matthew P. Henry in Supp. of

17  Mot. to Dismiss ("Henry Decl."), Ex. 1 (Survey of Out-of-Network Costs) at 4 ("Out-of-network

18  charge extremes varied widely across the country."); Fair Health Consumer Database of Medical

19  Prices, available at https://www.fairhealthconsumer.org/medical.

20         Moreover, the bills sent to Plaintiff *do not* make the purported misrepresentation alleged in

21  the Complaint.  Plaintiff alleges that the bills represent "either affirmatively or through half-truths

22  and omissions" that the amounts billed "are not reasonable approximations of the actual value of

23  their services," because the medical provider group is only entitled to what it could recover in a

24  quantum meruit action.  Compl. ¶¶ 117-18.  Notwithstanding this allegation, the October 15, 2019

25  bill sent to Plaintiff makes no reference to "quantum meruit," "legally recoverable amounts," or

26  "reasonable approximations of the value of services provided."  *See* Dearolf Decl., Ex. 2 (Bill to

27  Fraser, Oct. 15, 2019).  Rather, the bill lists the amount charged and makes no representation about

28

the purported "reasonableness" of that charge or what could be recovered in a hypothetical quantum meruit lawsuit. *Id.*

In those cases where courts have sustained RICO claims based on over-billing, the bill contained an actual misrepresentation. For example, in *AT&T Corp. v. Shroeder*, No. C04-5709FDB, 2006 WL 1806187, at *3 (W.D. Wash. June 28, 2006), the court found that plaintiff had adequately alleged a predicate act based on fraudulent overcharges where the defendant billed AT&T for its purported pro rata share of O&M costs, but intentionally misrepresented the known O&M costs on the invoices. *See also In re U.S. Foodservice Inc. Pricing Litig..*, 729 F. 3d 108 (2d Cir. 2013) (defendant engaged in scheme to fraudulently inflate and misrepresent its apparent costs where customer invoices were billed on a cost-plus basis).

By contrast, courts have not hesitated to dismiss RICO claims, finding that there was no predicate act, where plaintiff alleged no more than a legal dispute about the defendant's entitlement to the amount billed. *See Schulenberg v. Rawlings Co.*, No. CVN03-0134-HDM(VPC), 2003 WL 22129230, at *7 (D. Nev. Aug. 20, 2003) ("The alleged acts of mail and wire fraud simply represent a dispute over application of the law, which is an insufficient legal basis to assert a RICO claim."); *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001) (finding that hospital lien that Plaintiff alleged was "fraudulent" because it "exceeded the amount that [the hospital] had agreed to accept" was insufficient to support a RICO claim); *Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*, No. CV 090-5612 GAF (JCx), 2010 WL 11508022, at *12 (C.D. Cal. Feb. 26, 2010) (a disagreement over the "'reasonable and customary' value for services rendered under the California statutory scheme" is a dispute over the law and not a basis for imputing fraud); *Brown v. Knoxville HMA Holdings, LLC*, 447 F. Supp. 3d 639, 650 (M.D. Tenn. 2020) ("[T]he Amended Complaint fails to allege that Defendants made false or fraudulent representations regarding the legality of the hospital liens because neither state law nor existing Tennessee state court precedent make clear that the liens are unlawful."); *Bowden v. Med. Ctr., Inc.*, 845 S.E.2d 555, 566 (Ga. 2020) (dismissing claim under Georgia RICO statute because the alleged fraud was use of Chargemaster rates to supply the amount of a lien, which was a legal dispute).

1   Here, Plaintiff's assertion that Holdings could not recover the full amount of its

2   Chargemaster rates in a hypothetical quantum meruit suit is no different from these cases and

3   depends upon the ultimate resolution of a purported legal dispute.  Courts rely on a variety of factors

4   in determining the amount recoverable in a quantum meruit lawsuit, *Gould v. Workers Comp.*

5   *Appeals Bd.*, 4 Cal. App. 4th 1059, 1071 (1992); *Children's Hosp. of Central Cal. v. Blue Cross of*

6   *Cal.*, 226 Cal. App. 4th 1260, 1274-75 (2014), and it would be impossible for Holdings to anticipate

7   what amount any particular court might find recoverable in a theoretical quantum meruit lawsuit for

8   charges in any given location.  *Cf. Bowden*, 845 S.E.2d at 564 ("Indeed, because so many factors can

9   affect the determination of what a 'reasonable charge' may actually be for a hospital's services, . . . a

10  hospital may not know within 75 days of providing medical services to a patient exactly what a

11  reasonable charge is supposed to be under the circumstances." (internal citations omitted)).  The

12  mailing of Fraser's bills thus do not satisfy the predicate act requirement.

13  Apart from the woefully inadequate allegations specific to Plaintiff, the Complaint does not

14  even attempt to allege how any other patient was fraudulently overcharged for services rendered by a

15  medical provider group affiliated with a Subsidiary.[4]  The Complaint's general allegations —

16  untethered to any specific bill or charge — that purport to show that Holdings knew that the

17  Chargemaster rates are inflated fail to establish that any Subsidiary intentionally sent fraudulent bills

18  to patients.

19  • The Complaint points to a statement by UnitedHealth in a news article asserting that

20      medical provider groups allegedly affiliated with Subsidiaries bill and expect to be paid

21      much more than the median rate for *in-network* physicians at participating hospitals.

22      Compl. ¶ 65 (quoting Courtney Robinson, *Some Physicians at Tampa General Hospital*

23      *take Pay Cut Because of Health Care Costs*, 10 Tampa Bay, Feb. 4, 2020).  That

---

24  [4] While alleging that Holdings engaged in a fraudulent billing scheme affecting every uninsured or
25  out-of-network patient billed by medical provider groups affiliated with a Subsidiary, Plaintiff
    attempts to excuse her failure to plead even one other predicate act — apart from the Fraser bill —
26  on the grounds that she needs access to the enterprise members' books and records.  Compl. ¶ 130.
    This is grossly insufficient.  Plaintiff is required to conduct an adequate investigation and allege
27  sufficient particular facts in filing a Complaint alleging a nationwide RICO enterprise that defrauded
    millions of patients.  *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 994 (9th Cir. 1999) (finding fraud
28  allegations insufficient where plaintiffs attempted to show falsity of various misrepresentations by
    alleging existence of information exclusively available to defendants).

statement was made in the midst of a payment dispute between UnitedHealth and the medical provider groups and has no evidentiary basis.  *See* Henry Decl., Ex. 2 (Courtney Robinson Article) at 2.  Moreover, in-network charges are always lower than the charges billed to out-of-network and uninsured patients; in-network providers agree to discounted rates in exchange for the certainty of payment.  *See, e.g.*, *Nassau Anesthesia Assoc.*, 914 N.Y.S.2d at 254 ("[P]rivate insurers may be able to obtain 'very substantial discount[s]' from medical providers for a variety of reasons, i.e. 'volume of payments, promptness of payment, assurance of payment.'").

- The Complaint points to lawsuits in Pennsylvania and Texas where medical provider groups, allegedly affiliated with Subsidiaries, brought suit against UnitedHealth and Humana, based on theories of quantum meruit, for payment for medical services provided to UnitedHealth and Humana's insureds.  Compl. ¶¶ 64, 66.  Plaintiff claims that because the medical provider groups in those lawsuits agreed to accept only 75-90% of the Chargemaster rates that Holdings acknowledges that the Chargemaster rates are fraudulently inflated.  *Id.*  However, the fact that the medical provider groups agreed to accept a reduced reimbursement rate from two market dominant insurers only demonstrates the willingness of those provider groups to compromise on rates in exchange for certainty of recovery from out-of-network insurers.

- The Complaint cites a letter by TeamHealth's CEO, Leif Murphy, that acknowledges that the average cost to medical provider groups affiliated with Subsidiaries of an emergency room visit is $150.  Compl. ¶ 67; Henry Decl., Ex. 3 (Murphy Letter) at 2.  As the Murphy letter explains, however, the vast majority of patients seen by medical provider groups affiliated with Subsidiaries are either uninsured or insured through Medicaid or Medicare.  Henry Decl., Ex. 3 (Murphy Letter) at 2.  Because of the infrequency with which uninsured patients pay any portion of their bill, and the low reimbursement rates for Medicaid and Medicare, *74% of all patients seen by medical provider groups affiliated with Subsidiaries pay less than the average cost of their care*.  *Id.*  Accordingly, in order for the provision of emergency medical care to be economically feasible, medical

14

provider groups must bill at rates higher than the average cost of care; some patients ultimately pay more than the average cost of care (largely individuals with private insurance) to subsidize the majority of patients, who pay less than the average cost of care. *Id.*  This does not mean, though, that the patients who pay more than the cost of their care are paying more than the "market rate" for the services provided.  Merely charging one group of patients more than another is not fraudulent and does not give rise to RICO liability.  *See, e.g.*, *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000).  In fact, it is inherent in and fundamental to the U.S. healthcare system as it currently exists.

In short, Plaintiff has not alleged any predicate acts of mail or wire fraud because she has not provided any basis for concluding that the medical provider group referred to as Team Physicians of Southern CA, or any other medical provider groups affiliated with a Subsidiary, acted fraudulently by sending a bill that listed the Chargemaster rate.[5]

### 4.   Plaintiff Has Not Alleged a Pattern of Racketeering.

The Complaint also fails to allege the requisite "pattern" of racketeering activity.  *Eclectic Props.*, 751 F. 3d at 997.  In order to allege a pattern of racketeering activity based on mail or wire fraud, Plaintiff must allege that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v N.W. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  *Id.* at 242.

Although Plaintiff claims that the alleged enterprise participants have engaged in "hundreds of thousands, if not millions" of acts of mail and wire fraud, Compl. ¶ 136, Plaintiff only pleads facts relating to two: the bills sent to Plaintiff in late 2019 arising from her single episode of emergency services.  *Id.* ¶ 131.  At most, this shows conduct over the course of one month, which is insufficient

---

[5] The RICO claim also fails to the extent it is based on billing practices for out-of-network patients. Plaintiff was uninsured, and does not claim to have suffered any injury from the alleged out-of-network billing practices, so she lacks standing to pursue these claims.  *See Eclectic Props.*, 751 F.3d at 997 (holding that, in order to state a RICO violation, Plaintiff must plead conduct by the defendant that is "the proximate cause of harm to the victim").

to show a "pattern" of racketeering.  *H.J.*, 492 U.S. at 239; *River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1464 (9th Cir. 1992) ("[E]vidence of a pattern of breach of contract activity spanning just one month, even when embellished by the familiar 'racketeering,' is not sufficient to establish a violation of RICO.").[6]

In addition, multiple predicate acts arising out of a single transaction are insufficient to show a pattern of racketeering.  *Eclectic Props. E., LLC v. The Marcus & Millichap Co.*, No. C-09-00511 RMW, 2012 WL 713289, at *10 (N.D. Cal. Mar. 5, 2012), *aff'd sub nom.*, 751 F.3d 990 (9th Cir. 2014) ("Plaintiffs make no attempt to show how a single transaction can constitute a pattern."); *Misson v. Polimeno*, No. C 12-6359 MEJ, 2013 WL 1209476, at *3 (N.D. Cal. Mar. 25, 2013) ("Plaintiffs' RICO claim under § 1962(c), which is based on a single transaction, must fail.").  Therefore, Plaintiff has not alleged the requisite pattern of racketeering activity.

### B.   The California Statutory Claims — under the UCL and CLRA — Should Be Dismissed.

Plaintiff's claims under the California UCL (Count II) and CLRA (Count III) also should be dismissed.  These claims, like the RICO claim, are based on the assertion that a medical provider affiliated with one of the Subsidiaries, allegedly called "Team Physicians of Southern CA," sent her "fraudulently inflated" bills.  Compl. ¶¶ 154, 165.  The UCL claim alleges that this practice was fraudulent, unfair, and unlawful (based on a violation of the CLRA).  *Id.* ¶¶ 153-55.  The CLRA claim alleges that this practice was deceptive and unfair.  *Id.* ¶ 165.

First, both of these claims should be dismissed because, as discussed in section V.A.3, *supra*, Plaintiff has not alleged how the bills were inflated or contain any misrepresentation, nor has

---

[6] Paragraph 132 of the Complaint alleges that the enterprise used the U.S. mails to send "thousands of communications," but as to the general categories of communications listed in that paragraph — marketing materials, contracts and negotiations with hospitals, communications with insurers — the Complaint fails to allege, as required by Rule 9(b), what was fraudulent about those statements, who was responsible for the statements, when they were made, or how they were made.  *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) ("Rule 9(b) requires that the pleader state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.").  Moreover, these communications could not be predicate acts for Plaintiff's RICO claims in any event since they did not proximately cause injury to Fraser or any other patient — Plaintiff has not alleged that *anyone* relied on these statements in a way that caused injury to any patient.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658–59 (2008) ("[N]one of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations.").

---

16

1   Plaintiff alleged the specific role played by Holdings in making the misrepresentation or a basis for

2   concluding that Holdings acted with scienter.  Thus, Plaintiff has not alleged any fraudulent or

3   deceptive conduct with the specificity required by Rule 9(b).

4          Second, and relatedly, both of these claims also fail because Holdings did not send Plaintiff

5   any bills; rather, the bills were sent by "Team Physicians of Southern CA."  Dearolf Decl., Ex. 2

6   (Bill to Fraser, Oct. 15, 2019).  Since Holdings did not send the bills, it did not make any

7   misrepresentations to Plaintiff, even assuming *arguendo* that the bills were fraudulent or deceptive.

8   *See, e.g.*, *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1468 (2014) (upholding dismissal of

9   fraud and UCL claims against defendants that did not make the alleged misrepresentations on which

10  the claims were based); *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 974

11  (C.D. Cal. 2014) ("Plaintiffs' CLRA claim fails because, Plaintiffs have failed to identify any

12  statement *made by Toyota* that misrepresents the performance of automatic pre-collision braking

13  feature." (emphasis added)).

14         Each of the claims fails for additional reasons as well.  The UCL claim fails because Plaintiff

15  has not alleged that Holdings is in possession of any "money or property" that was acquired from her

16  by means of a violation of the statute.  *See* Bus. & Prof. Code §§ 17203, 17204.  As the California

17  Supreme Court has explained, standing to bring a UCL claim is limited to "those actually injured by

18  a defendant's business practices" meaning "those who *had* had business dealings with a defendant

19  and had lost money or property as a result of the defendant's unfair business practices."  *Kwikset*

20  *Corp. v. Superior Court*, 51 Cal. 4th 310, 321 (2011).  Plaintiff merely alleges that she received a bill

21  from "*Team Physicians of Southern CA*" and that she "is paying the bill under a payment plan."

22  Compl. ¶ 21 (emphasis added).  She does not allege that she has made payments to Holdings, much

23  less payments in excess of the purported reasonable value of those services.  As a result, her

24  allegations are insufficient to show that Holdings acquired any money or property from her and her

25  UCL claim fails.  Moreover, she is not entitled to the only monetary remedy available under the

26  UCL: restitution.  *See Kwikset*, 51 Cal. 4th at 336 ("A restitution order against a defendant thus

27  requires both that money or property have been lost by a plaintiff, on the one hand, and that it have

28  been acquired by a defendant, on the other.").

1      While Plaintiff primarily alleges that Holdings violated the UCL based on purported

2  fraudulent conduct, she also alleges that its practices are "unfair" and offend public policy, alleging

3  that the Subsidiaries' billing practices "violate basic principles of equity and quantum meruit."

4  Compl. ¶ 155(c).  However, the primary purpose of equity and quantum meruit is to determine the

5  amount recoverable in a lawsuit relating to a specific individual; these legal doctrines do not reflect

6  some essential public policy.  *See Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 855 (2002)

7  (rejecting "unfair" UCL claim because "Appellant seeks an extension of the policy that departs from

8  the primary focus of the statute").

9      Moreover, for all the reasons discussed *supra* at Section V.A.3*,* the Complaint fails to allege

10 any basis to conclude that the Chargemaster rates were set through an improper process or that it was

11 unfair to charge uninsured patients, like Fraser, those rates.  On the contrary, medical provider

12 groups are entitled to charge differential rates based on insurance status.  *Moran v. Prime Healthcare*

13 *Mgmt., Inc.*, 3 Cal. App. 5th 1131, 1141 (2016) ("[T]o the extent plaintiff alleges defendants violated

14 the UCL by discriminatorily charging self-pay patients more than patients covered by government

15 programs or private insurance, his argument fails.").

16     In addition, to the extent the UCL claim purports to be based on "unlawful" activity in

17 violation of the CLRA, *see* Compl. ¶ 153, this claim fails because Plaintiff has failed to establish an

18 underlying violation of the CLRA in the first place.  *See, e.g.*, *Lazar v. Hertz Corp.*, 69 Cal. App. 4th

19 1494, 1505 (1999).

20     Finally, the CLRA claim fails for the additional reason that the operative paragraph of the

21 Complaint (¶ 165) does not allege which of the twenty-seven enumerated unlawful practices in

22 Section 1770 was violated by Holdings.  *See Monroe v. Geico Gen. Ins. Co.*, No. 5:14-CV-05174-

23 EJD, 2018 WL 500260, at *8 (N.D. Cal., Jan. 19, 2018) (granting summary judgment on CLRA

24 claim that failed to identify which prohibited practice defendant was alleged to have violated).

25

26

27

28

1

## VI.     CONCLUSION

2

      For all the reasons set forth herein, Holdings respectfully requests that the Court dismiss

3

Plaintiff's Complaint in its entirety with prejudice.

4

5

  Dated: September 25, 2020             */s/ Carol Lynn Thompson*

6

                                Carol Lynn Thompson (SBN 148079)
                                cthompson@sidley.com

7

                                Jaime A. Bartlett (SBN 251825)
                                jbartlett@sidley.com

8

                                Matthew P. Henry (SBN 308878)
                                mhenry@sidley.com

9

                                SIDLEY AUSTIN LLP

10

                                555 California Street, Suite 2000
                                San Francisco, CA 94104

11

                                Telephone: (415) 772-1200
                                Facsimile: (415) 772-7400

12

13

                                Mark B. Blocker (*Pro Hac Vice Pending*)
                                mblocker@sidley.com

14

                                SIDLEY AUSTIN LLP
                                One South Dearborn

15

                                Chicago, IL 60603
                                Telephone: (312) 853-7000

16

                                Facsimile: (312) 853-7436

17

18

                                *Attorneys for Defendant*
                                *Team Health Holdings, Inc.*

19

20

21

22

23

24

25

26

27

28

19