Steve W. Berman (admitted *pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
steve@hbsslaw.com
craigs@hbsslaw.com
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Benjamin Elga (*pro hac vice* forthcoming)
Brian J. Shearer (*pro hac vice* forthcoming)
Craig L. Briskin (admitted *pro hac vice*)
JUSTICE CATALYST LAW, INC.
81 Prospect Street, 7th Floor
Brooklyn, NY 11201
belga@justicecatalyst.org
bshearer@justicecatalyst.org
cbriskin@justicecatalyst.org
Telephone: (518) 732-6703

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIA FRASER, TRICIA BAKONYI, GABRIELLE DIBELLA, and KATJA FIUME individually and on behalf of all others similarly situated,<br><br>                                    Plaintiffs,<br><br>          v.<br><br>TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, TEAMHEALTH, INC. n/k/a TEAM HEALTH, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,<br><br>                                    Defendants. | No. 4:20-cv-04600-JSW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

2

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................1

II.    PARTIES ........................................................................................................5

     A.    Plaintiffs ...........................................................................................5

     B.    Defendants........................................................................................9

III.   JURISDICTION AND VENUE ....................................................................11

IV.   FACTS..........................................................................................................12

     A.    TeamHealth and the takeover of America's emergency rooms. ...............12

     B.    TeamHealth profits from American's healthcare emergencies through pricing fraud. ................................................................................14

           1.    Pricing of medical services in the United States. .........................14

           2.    TeamHealth's billing fraud—quantum meruit provides the true rates TeamHealth is lawfully entitled to charge. ..........................15

           3.    TeamHealth uses subsidiaries and "independent" contractors to avoid state-law ban on the practice of medicine by corporations. ...................................................................................22

     C.    The crippling cost of out-of-network care.................................................24

V.    TOLLING OF THE STATUTE OF LIMITATIONS .........................................26

VI.   CLASS ACTION ALLEGATIONS ................................................................27

VII.  CLAIMS FOR RELIEF .................................................................................30

COUNT ONE  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT  ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ*. .....................30

     A.    Defendants are culpable "persons" under RICO. ......................................30

     B.    The TeamHealth Fraudulent Billing Enterprise is a RICO enterprise. .....................30

     C.    The TeamHealth Fraudulent Billing Enterprise uses the U.S. mails and interstate wire facilities to carry out its fraud.........................................35

     D.    Defendants directed and participated in the TeamHealth Fraudulent Billing Enterprise's affairs. .......................................................38

E.     Defendants have conducted a pattern of racketeering activity. ................................39

F.     Defendants' violations of RICO damaged the plaintiffs and class members. ....................................................................................................40

COUNT TWO  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. ........................................................42

COUNT THREE  VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT CAL. CIV. CODE § 1750, *ET SEQ*. ..................................................................................44

COUNT FOUR  VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ*. ........................................................45

COUNT FIVE  VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW N.Y. GEN. BUS. LAW §§ 349-350 ............................................................................47

DEMAND FOR JUDGMENT ............................................................................................48

JURY DEMAND ............................................................................................................48

1    Plaintiffs Sia Fraser, Tricia Bakonyi, Gabrielle DiBella, and Katja Fiume, on behalf of

2    themselves and all others similarly situated, allege the following against defendants Team Health

3    Holdings, Inc., AmeriTeam Services, LLC, TeamHealth Inc. n/k/a Team Health LLC, and HCFS

4    Health Care Financial Services, LLC (together, "TeamHealth") based on personal knowledge, the

5    investigation of counsel, and information and belief.

6                                    **I.      INTRODUCTION**

7    1.      TeamHealth is a private equity-funded network of entities that contract with hospitals

8    to take over their emergency, critical care, radiology, and anesthesiology departments, supplying

9    them with doctors and other medical professionals as well as running their administrative functions.

10   2.      In 2016, TeamHealth boasted that it controlled 17% of the emergency medicine

11   market in the United States. Currently, it operates 3,300 acute and post-acute facilities in 47 states.

12   3.      Most states bar the corporate practice of medicine. As the American Medical

13   Association has explained, this "doctrine prohibits corporations from practicing medicine or

14   employing a physician to provide professional medical services." The principle underlying the

15   prohibition is simple: medical professionals must always prioritize public health over private profits.

16   4.      TeamHealth has turned this convention on its head. It has constructed an enterprise,

17   composed of subsidiaries and medical practice groups that TeamHealth has acquired or with which it

18   has contracted, for the sole purpose of profiting from patients' health emergencies and other

19   healthcare needs (together, the "TeamHealth Fraudulent Billing Enterprise").[1] As the director of this

20   enterprise, TeamHealth controls the terms of its physicians' employment, all physician staffing

21   decisions, and, most importantly, all the rates its physicians and practice groups charge patients. The

22   successful goal of this enterprise is to maximize corporate profits while avoiding state bans on the

23   corporate practice of medicine.

24   5.      The rates that TeamHealth and its various subsidiaries charge patients are unlawful.

25

26   _____

27   [1] TeamHealth refers to this enterprise as the "TeamHealth system." *See*, *e.g.*, TeamHealth
     Holdings, Inc., 2016 Form 10-K at 3 ("Unless the context requires otherwise, references to
     'TeamHealth' … refer to Team Health Holdings, Inc., its subsidiaries and its affiliates, including its
28   affiliated medical groups, all of which are part of the TeamHealth system.").

FIRST AMENDED CLASS ACTION COMPLAINT  - 1
010898-11/1357161 V2

6.      The TeamHealth Fraudulent Billing Enterprise maximizes its profits by sending fraudulent bills to patients for the care they receive from TeamHealth physicians. TeamHealth has inflated the rates it charges patient-consumers far above those that it knows it is legally entitled to collect from those patients.

7.      Courts across the country recognize that doctors who have not reached an agreement on price with patients, like other merchants, are only entitled to the reasonable market value of the services. Patients sign no paperwork with TeamHealth—let alone agree on price. Yet, the TeamHealth Fraudulent Billing Enterprise pursues patients ruthlessly for far more than the reasonable value of their services. The TeamHealth Fraudulent Billing Enterprise has sued thousands of patients in the last few years, including patients who would qualify for free care and reduced rates under hospitals' "charity care" programs.

8.      TeamHealth knows that its legal entitlement to collect from patients or their insurers is based in equity, through the remedies of unjust enrichment, quantum meruit, and implied contract. And these equitable remedies only permit TeamHealth to recover a *fraction* of its billed rates. Therefore, TeamHealth knows that the prices it bills consumers are vastly inflated above the rates it is legally allowed to charge them.

9.      In fact, TeamHealth admitted that its rates are substantially higher than the reasonable value of its services in a lawsuit against United Health, a large U.S. healthcare insurer.[2] In that case, TeamHealth alleged that United Health was undercompensating TeamHealth for emergency room care. But TeamHealth did not even attempt to collect its full rates. Instead, it complained that United Health failed to pay a high enough *fraction* of TeamHealth's inflated prices—the very prices it charges *in full* to many patient-consumers.

---

[2] *See Emergency Care Services of PA, P.C. & Emergency Physician Assoc. of PA, P.C. v. UnitedHealth Group, Inc., et al.*, No. 1:19-cv-01195-SHR, Dkt. No. 1 (M.D. Pa. July 11, 2019).

10.     As hospitals have reported, "TeamHealth ER physicians expect to be paid nearly three times the median rate for in-network physicians at participating hospitals, and their billed charges are even higher, at more than four times the median rate."[3]

11.     Every time the TeamHealth Fraudulent Billing Enterprise sends a bill to a patient-consumer, demanding payment at its artificially inflated rates, that bill constitutes a lie: the bill misrepresents to the patient that they owe the TeamHealth Fraudulent Billing Enterprise much more than the patient actually does for the services provided.

12.     The TeamHealth Fraudulent Billing Enterprise never tells patients that the enterprise has fraudulently inflated its rates far above those it is legally entitled to collect. Instead, the enterprise demands that patient-consumers pay its inflated prices, which it transmits through mail and wire, in full.

13.     Plaintiffs and the proposed class here—uninsured or out-of-network patients who visited facilities run by the TeamHealth Fraudulent Billing Enterprise—received bills from TeamHealth demanding payment of artificially inflated rates.

14.     For many class members, the treatment TeamHealth offers is worse than the disease. A 2019 study by the American Cancer Society found that 137.1 million Americans—41.8% of the population—faced medical financial hardship in the past year.[4] According to a recent Peterson-Kaiser Family Foundation report, unexpected medical bills "lead the list of expenses most Americans worry they would not be able to afford."[5] "Two thirds of Americans say they are either 'very worried' or 'somewhat worried' about being able to afford their own or a family member's

---

[3] Courtney Robinson, *Some Physicians at Tampa General Hospital take Pay Cut Because of Health Care Costs*, 10 Tampa Bay, Feb. 4, 2020 6:58 P.M., available at: https://www.wtsp.com/article/news/investigations/10-investigates/tampa-general-hospital-pay-cut-health-care/67-e330d676-db40-4454-a647-5985eba6ccc3/ (emphasis added), last visited Oct. 16, 2020.

[4] K. Robin Yabroff, Jingxuan Zhao, Xuesong Han, & Zhiyuan Zheng, *Prevalence and Correlates of Medical Financial Hardship in the USA*, 34 Journal of General Internal Medicine, 1494–1502 (2019).

[5] Karen Pollitz, et al., *An Examination of Surprise Medical Bills and Proposals To Protect Consumers from Them*, PETERSON-KAISER HEALTH SYSTEM TRACKER at 2, Feb. 10, 2020, available at: https://www.healthsystemtracker.org/brief/an-examination-of-surprise-medical-bills-and-proposals-to-protect-consumers-from-them-3/, last visited Oct. 16, 2020.

unexpected medical bills."[6] And for good reason: 60 percent of American cannot afford to pay an unexpected medical bill of more than $1,000[7] and 66.5 percent of all bankruptcies in the United States are due in whole or in part to medical debt.[8]

15.     Emergency rooms alone deliver nearly half of all medical care in the United States. And when medical care is too expensive—even for consumers who have insurance—they forgo necessary treatment, risking more serious illness and even death.

16.     The coronavirus pandemic has intensified this crisis. The New York Times recently reported on Andrew Cencini, whose coronavirus test was free but whose visit to a TeamHealth emergency room was not. Even though he was insured, his total bill was almost $2,000. Early testing and intervention can help mitigate the harms of the virus and prevent infected individuals from spreading it. Facing the prospect of ruinous medical bills, many sick individuals have forgone testing and treatment, putting themselves and their communities at greater risk. A recent report observed, the "coronavirus crisis raises even greater concerns over whether physician staffing firms … will continue to charge Covid-19 patients, who can least afford it, outrageous out-of-network fees."[9]

17.     Congresswoman Katie Porter of California put it best: "We will not be able to truly reopen and rebuild if Americans rightly fear costly medical bills for visiting their health care providers for coronavirus tests."

18.     Plaintiffs and the proposed class are uninsured and out-of-network consumers who were billed for emergency, radiology, anesthesiology and other care provided by the TeamHealth Fraudulent Billing Enterprise. TeamHealth used this enterprise to engage in mail and wire fraud by transmitting false and inflated medical bills across the country, causing uninsured and out-of-

---

[6] *Id.*

[7] Annie Nova, *A $1,000 Emergency Would Push Many Americans into Debt*, CNBC, Jan. 23, 2019 9:41 A.M., available at: https://www.cnbc.com/2019/01/23/most-americans-dont-have-the-savings-to-cover-a-1000-emergency.html, last visited Oct. 16, 2020.

[8] Lorie Konish, *This is the real reason most Americans file for bankruptcy,* CNBC, Feb. 11, 2018, available at: https://www.cnbc.com/2018/02/11/this-is-the-real-reason-most-americans-file-for-bankruptcy.html, last visited Oct. 16, 2020.

[9] Eileen Appelbaum & Rosemary Batt, *Coronavirus and the Implications of Private Equity Buyouts in Healthcare*, CENTER FOR ECON. & POLICY RES. (Mar. 25, 2020), available at: https://bit.ly/2BlGqug, last visited Oct. 16, 2020.

1  network consumers to overpay and become indebted for care. Plaintiffs bring this action for

2  violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961,

3  *et seq.*, and state consumer protection statutes on behalf of all others similarly situated, seeking

4  monetary damages, injunctive and/or other equitable relief, restitution and/or disgorgement of

5  profits, and attorneys' fees, costs, and expenses.

6  **II.      PARTIES**

7  **A.      Plaintiffs**

8      19.      Plaintiff **Sia Fraser** lives in Vista, California. In September 2019, she was treated for

9  emergency gallstone surgery by a doctor in a TeamHealth-owned physician group at Tri-City

10  Medical Center in Oceanside, California and then billed for these services by TeamHealth on at least

11  October 15, 2019, and November 18, 2019.

12      20.      Because her insurance plan did not begin until the day after her visit, Ms. Fraser was

13  considered uninsured.

14      21.      In addition to a bill from the hospital, which was covered under the hospital's

15  Financial Assistance Program (FAP), Ms. Fraser received bills from TeamHealth and TeamHealth's

16  Alcoa Billing Center for services provided by Team Physicians of Southern CA (part of the

17  TeamHealth Fraudulent Billing Enterprise)—specifically, for $1,082 under the CPT code 99220

18  (observation care).[10] TeamHealth's bills did not indicate that Ms. Fraser's legal payment obligations

19  might be less than the billed amount. Far from it, they describe the billed amount as "NOW DUE."

20      22.      The hospital's FAP did not cover TeamHealth's bill, and TeamHealth continues to

21  demand payment. Ms. Fraser is paying the bill under a payment plan.

22      23.      The bills Ms. Frasier received directed payments to TeamHealth.com and

23  www.thbillpay.com. Team Physicians of Southern CA's registered mailing address in the NPI

24  registry is 5000 Hopyard Road, Pleasanton, California. This is the address of TeamHealth West, a

25  regional subsidiary of TeamHealth.

26

27      ───────────────────
        [10] CPT codes are a standardized set of codes to categorize medical care, which are used for
28  billing and medical records.

FIRST AMENDED CLASS ACTION COMPLAINT  - 5
010898-11/1357161 V2

24.     Plaintiff **Tricia Bakonyi** resides in Austin, Texas. On September 30, 2019, Ms. Bakonyi experienced discomfort in her abdomen and visited the emergency department at St. David's Medical Center South in Austin. At the time, Ms. Bakonyi was insured by UnitedHealthcare, and St. David's Medical Center South was an "in network" facility under her plan.

25.     Ms. Bakonyi does not recall being informed at any point that she might be treated by an out-of-network physician. After receiving an ultrasound and CT scan, Ms. Bakonyi was advised that the pain was likely due to a prior condition and would not require surgery.

26.     In December 2019, Ms. Bakonyi received an explanation of benefits from her insurer, UnitedHealthcare, indicating that while TeamHealth had submitted a claim for $1,370 for services provided to Ms. Bakonyi, TeamHealth had not justified the level of service billed. Specifically, TeamHealth assigned CPT code 99285 to the services it provided, but this code is limited to health problems with "significant threat to life or function." UnitedHealthcare instructed TeamHealth to resubmit the claim under the correct, and less costly CPT code.

27.     Instead of resubmitting the claim under the correct code, however, TeamHealth proceeded to bill Ms. Bakonyi directly for the entire $1,370. Ms. Bakonyi received the first bill in early July 2020. The bill did not state or otherwise suggest that Ms. Bakonyi's legal payment obligations might be less than the entire billed amount. The bill stated in prominent text: "You owe $1,370.00" and that this amount was her "[r]esponsibility." The bill requested payment online to "pay.teamhealth.com" or by mail with check payable to Longhorn Emergency Medical Association, PA, PO Box 740021, Cincinnati, OH. Longhorn Emergency Medical Association is a member of the TeamHealth Fraudulent Billing Enterprise.

28.     After receiving a bill from TeamHealth, Ms. Bakonyi requested a more detailed description of the charges. Shortly thereafter, Ms. Bakonyi received a second bill from TeamHealth dated July 14, 2020. This second bill also requested payment of $1,370. Throughout the month of July, Ms. Bakonyi received multiple texts from TeamHealth demanding payment on the bill, including on July 4, 10, 16, 19, 25 and 31.

29.     In late July 2020, Ms. Bakonyi contacted her insurer, UnitedHealthcare, and was advised by a representative that the care she received from the TeamHealth physician did not qualify

for the CPT code TeamHealth had assigned, and that a lower and less costly code should have been used instead. The representative explained that UnitedHealthcare had denied TeamHealth's claim for this reason, and that Ms. Bakonyi should not be billed by TeamHealth for the requested amounts.

30.     Ms. Bakonyi raised these issues with TeamHealth and requested assurance that the bill would not be sent to collections. A TeamHealth representative indicated on July 30, 2020, that an appeal process was underway, but that the services had been "coded correctly." Since that communication, TeamHealth has not provided Ms. Bakonyi with any indication that the bill will be withdrawn and/or not sent to collections. Ms. Bakonyi has not made payments on TeamHealth's bill and is concerned that her credit will be adversely impacted by the outstanding debt.

31.     Plaintiff **Gabrielle DiBella** resides in Liverpool, New York. On June 20, 2020, Ms. DiBella visited the emergency department of St. Joseph's Hospital Health Center in Syracuse, New York after being exposed to a bat. Ms. DiBella believed that, due to the exposure, she might require a rabies shot.

32.     Ms. DiBella is insured by Blue Cross Blue Shield, and she visited St. Joseph's Hospital Health Center because it is "in network" under her insurance plan. Ms. DiBella does not recall receiving any notice that she might be treated by an out-of-network provider.

33.     After Ms. DiBella arrived at St. Joseph's Hospital Health Center, she was advised that, per standard protocol, she would not receive a rabies shot unless and until the bat to which she was exposed had been tested for rabies. Ms. DiBella did not have the bat tested, and thus, she did not receive a rabies shot. She also did not receive any other shots, medicines or tests. She was visited by a doctor for a few minutes, but left the facility without receiving any treatment.

34.     On July 9 and July 15, Ms. DiBella received text messages from unknown numbers identifying a supposed outstanding bill for medical services provided by "Emergency Care Services of New York," a provider group that is part of the TeamHealth Fraudulent Billing Enterprise. Around the same time, Ms. DiBella received a voice message requesting payment for the same services. Ms. DiBella believed these messages were a scam, particularly because the texts contained links requesting entry of her social security number and data of birth. Although Ms. DiBella had no

reason to know at the time, Emergency Care Services of New York is the out-of-network provider group that "treated" her on June 20, 2020.

35.     On or around July 15, 2020, Ms. DiBella received a bill for $554.00 from TeamHealth for her June 20, 2020 emergency department visit. The bill did not indicate that Ms. DiBella's legal payment obligations might be less than the billed amount. The bill stated in prominent text: "You owe $554.00" and that this amount was her "[r]esponsibility." The bill referenced physician services under CPT code 99283 (assigned to emergency department encounters for a "moderately severe problem"). The TeamHealth bill requested payment online through "pay.teamhealth.com" or by mail to "Emerg Care Services of NY, P.C., PO BOX 740021, Cincinnati, OH 45274-0021."

36.     Ms. DiBella has not yet made payments on her TeamHealth bill and she is concerned that the outstanding debt will adversely impact her credit.

37.     Plaintiff **Katja Fiume** resides in La Mesa, California. On June 13, 2020, Ms. Fiume visited the emergency department of Sharp Grossmont Hospital in La Mesa because she was experiencing discomfort in her chest and lungs.

38.     Ms. Fiume had her temperature, blood pressure and vital signs taken upon arrival at Sharp Grossmont Hospital. She was advised that her vital signs were normal and that further tests would be required to assess what might be causing her discomfort. Ms. Fiume is uninsured and, because her vital signs were normal, she elected not to have further tests administered. Before leaving the emergency room, Ms. Fiume was required to sign a form indicating that she was declining further treatment voluntarily. Ms. Fiume does not recall receiving treatment from any doctor, and the form she signed did not identify one (despite having a space for any treating doctor's name).

39.     Approximately one month later, Ms. Fiume received a bill from TeamHealth demanding payment of $715.00 for services rendered by doctor Brook Beall of Team Physicians of Northern California Medical Group, Inc., a member of the TeamHealth Fraudulent Billing Enterprise. The bill did not state or otherwise suggest that Ms. Fiume's legal payment obligations might be less than the billed amount. The bill stated in prominent text: "You owe $715.00" and that

this amount was her "[r]esponsibility." The bill referenced CPT code 99284, which is assigned to "high severity" emergency department visits.

40.      Ms. Fiume has not yet made payments on her TeamHealth bill and she is concerned that the outstanding debt will adversely impact her credit.

**B.      Defendants**

41.      Defendants Team Health Holdings, Inc. ("Holdings"), AmeriTeam Services, LLC ("AmeriTeam"), TeamHealth, Inc. n/k/a Team Health, LLC ("TeamHealth, Inc."), and HCFS Health Care Financial Services, LLC ("HCFS"), collectively operate under the registered, trade-marked name and logo "Team Health," "TEAMHEALTH," or "TEAMHEALTH."[11]

42.      Founded in 1979, the TeamHealth organization primarily provides emergency room staffing services through a network of subsidiaries and independent contractors: in 2018 alone, its physicians treated 16 million emergency department visits. TeamHealth now claims to treat "roughly 29 million patients annual across the country" with "more than 16,000 physicians and advanced practice clinicians," in the practice areas of emergency medicine, anesthesiology, hospital medicine, OB/GYN, critical care, orthopedic and general surgery, ambulatory care, post-acute care and behavioral health.

43.      Defendant **Holdings** is a Delaware corporation with its principal office in Knoxville, Tennessee. Holdings was a publicly traded company until February 6, 2017, when it was purchased by Blackstone Group LP—a private equity firm based in New York—for $6.1 billion. According to its own litigation filings, Holdings engages in "strategic planning and goals, implementation of overall vision, values, mission and direction of the TEAMHEALTH organization, which from time to time may include marketing, branding, strategic direction and relationships, growth and finance/accounting related activities for the various operating affiliates and subsidiaries comprising

---

[11] Defendant's Motion to Dismiss Second Amended Class Action Complaint, *Sanchez v. Team Health, LLC*, 1:18-cv-21174 (S.D. Fla.), Dkt. No. 79-3, Supplemental Declaration of John R. Stair, at 2.

1   the TEAMHEALTH organization, including, among hundreds of other companies, AmeriTeam [and]

2   HCFS."[12]

3       44.     Defendant **AmeriTeam** is a Tennessee limited liability company and the current

4   primary operating subsidiary of the TeamHealth organization. AmeriTeam is owned by Holdings and

5   its managing member is Team Finance, LLC, a wholly owned Holdings subsidiary. AmeriTeam

6   performs a variety of duties for the broader TeamHealth organization, including payroll, procuring

7   professional liability insurance, information technology (including owning and maintaining the

8   TeamHealth website), finance, tax, compliance, accounts payable, human resources, and negotiations

9   with health insurance plans.[13] Holdings's Chief Operations Counsel, John R. Stair, has stated that

10  "because of its function and purpose within the TEAMHEALTH organization, [AmeriTeam] is

11  uniquely situated to support and assist other affiliated operating entities in aligning themselves with

12  the overall mission, values, goals and vision of the TEAMHEALTH organization."[14]

13      45.     Defendant **TeamHealth, Inc**. is a Tennessee limited liability company. TeamHealth,

14  Inc. is owned by Holdings through an intermediary holding company named Team Finance, LLC.

15  Prior to January 1, 2015, TeamHealth, Inc. performed a role substantially similar to the role

16  AmeriTeam Services, LLC is performing now. On or around January 1, 2015, TeamHealth, Inc.

17  converted into Team Health, LLC and, according to TeamHealth, became a non-operational holding

18  company.[15]

19      46.     Defendant **HCFS** is a Florida limited liability company. HCFS performs billing

20  services for companies associated with the TeamHealth organization. According to Holdings's Chief

21  Operations Counsel, John R. Stair, HCFS "obviously shares a common interest in aligning itself with

22  the overall mission, values and goals of being associated with the TEAMHEALTH brand and so

23  obviously shares a common interest" with other companies in the TeamHealth organization,

24

25      [12] *Id*. at 9.

26      [13] *Id*. at 5.

27      [14] *Id*. at 6.

28      [15] *Id.* at 6-7.

including "operating affiliates"[16] "In this capacity, HCFS does the coding for ER charts reflecting medical treatment provided by [physicians] and then prepares and sends bills to third party payors and/or patients."[17]

### III.   JURISDICTION AND VENUE

47.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c): this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiff is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

48.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because TeamHealth transacts business in, is found in, and/or has agents in this judicial district, and because some of the actions giving rise to this complaint took place within this district. In particular, and as alleged in this complaint, TeamHealth operates through regional subsidiaries that facilitate with hospitals and providers. TeamHealth West is the TeamHealth facilitator with responsibilities over the western United States, and it owns the provider group— Team Physicians of Southern California—that provided care to Plaintiff Sia Fraser. TeamHealth West is located in Pleasanton, California, which is within this judicial district.

49.    The Court has personal jurisdiction over the defendants. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this judicial district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons

---

[16] *Id.* at 8.

[17] Defendant's Motion to Dismiss Second Amended Class Action Complaint, *Sanchez v. Team Health, LLC*, 1:18-cv-21174 (S.D. Fla.), Dkt. No. 79-2, Ameriteam Services, LLC's Notice of Serving Answers and Objections to Plaintiff's Interrogatories to Defendant AmeriTeam Services, LLC, at 4-5.

1   residing in, located in, or doing business throughout the United States, including in this judicial

2   district.

3                               IV.    FACTS

4   A.      TeamHealth and the takeover of America's emergency rooms.

5          50.    Founded as "Southeastern Emergency Physicians" in 1979, TeamHealth's original

6   stated mission was to "provide high-quality medical care to under-resourced emergency rooms."[18]

7   But over the course of the 1990s (and after changing its name to Team Health Holdings, Inc.),

8   TeamHealth transformed from a small physician staffing company into a regional emergency

9   services empire, growing by 700% in the course of the decade.[19]

10         51.    In 2009, TeamHealth went public to aid further expansions and clinical services.[20]

11  TeamHealth now specializes in emergency medicine, anesthesiology, inpatient services (hospitalists

12  comprising the specialties of internal medicine, orthopedic surgery, general surgery and OB/GYN),

13  scribes, ambulatory care, pediatrics, post-acute care and other healthcare services.[21]

14         52.    Today, TeamHealth is "one of the largest providers of outsourced clinical staffing and

15  administrative services for hospital-based and free-standing EDs in the United States," boasting a

16  reach spanning 47 states and approximately 3,400 acute and post-acute facilities and physicians'

17  groups nationwide.[22]

18         53.    In the last 10 to 15 years alone, TeamHealth has acquired the following emergency

19  physician practices: Delphi Healthcare Partners (Morrisville, North Carolina), Emergency Medicine

20  Specialists, Premier Physician Services, Inc., Certified Anesthesia Services (Washington, DC),

21  Florida Gulf-to-Bay Anesthesiology Associates, PhysAssist Scribes, Inc. (Fort Worth, Texas), Ruby

22

23         [18] TeamHealth, *Team Health Through the Years | 1979 and 1980s*, YOUTUBE (June 19, 2019),
    available at: https://www.youtube.com/watch?v=736u81cW-ps&feature=youtu.be, last visited Oct.
24  16, 2020.

25         [19] TeamHealth, *Team Health Through the Years | 1990s*, YOUTUBE (June 19, 2019), available at:
    https://www.youtube.com/watch?v=WJiczs_3IXc&feature=youtu.be., last visited Oct. 16, 2020.

26         [20] TeamHealth, *Team Health Through the Years | 2000s*, YOUTUBE (June 19, 2019), available at:
    https://www.youtube.com/watch?v=0v-rBhjEaV4&feature=youtu.be., last visited Oct. 16, 2020.

27         [21] TeamHealth Holdings, Inc., 2016 10-K at 3.

28         [22] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT  - 12
010898-11/1357161 V2

Crest Emergency Medicine, Princeton Emergency Physicians, Brookhaven Anesthesia Associates, IPC Healthcare Inc. ($1.6 billion), Children's Emergency Services, Tri-City Emergency Medical Group, Lake County Anesthesia Associates, Anesthesia Associates of Cincinnati, Grossmont Emergency Medical Group, EmMed PC, Florida Emergency Physicians, Synergy Emergency Physicians, X32 Healthcare, Emergency Medicine Consultants and Mediserv Ltd. (Fort Worth, TX), and EmergiNet.

54.     TeamHealth operates nationally. Together, TeamHealth and its closest competitor EmCare capture approximately 30 percent of the physician outsourcing market in the United States.

55.     TeamHealth contracts with hospitals to staff and manage various hospital departments. In addition to providing medical specialists, TeamHealth executes administrative services including:

    a.   "Recruiting, schedule and credential coordination for clinical and non-clinical medical professionals;

    b.   coding, billing and collection of fees for services provided by medical professionals;

    c.   provision of experienced medical directors;

    d.   administrative support services, such as payroll and professional liability insurance coverage, continuing medical education services and management training;

    e.   claims and risk management services; and

    f.   standardized procedures and operational consulting."[23]

56.     From a patient's perspective, TeamHealth medical professionals appear to be employed by the hospitals in which they operate. Their staff work within the hospital and do not wear uniforms or other apparel that would identify them as non-hospital staff. Nonetheless, TeamHealth is a separate entity from the hospitals with which it contracts.

---

[23] *Id.*

1    57.    Patients only learn of this reality upon receipt of a separate bill from TeamHealth. At

2    no point do consumer patients sign any paperwork with TeamHealth agreeing to pay their fees. And

3    TeamHealth is not a signatory to patients' hospital admissions and release paperwork.[24] TeamHealth

4    does not ask patients to sign anything at all, let alone a contract agreeing to pay specific prices for

5    services rendered.

6    58.    The majority of TeamHealth's revenues come from three areas of practice: emergency

7    medicine, hospital medicine (non-emergency hospital services), and anesthesiology. However,

8    emergency medicine is by far the most lucrative practice area for TeamHealth.

9    59.    In 2015, TeamHealth reported that 68% of its net revenue came from emergency

10   medicine and that it controlled 17% of the emergency medicine market in the United States.[25] This

11   market share translates into more than 10 million patient encounters every year.[26] Based on the

12   profitability of emergency medicine, TeamHealth's acquisitions have unsurprisingly focused on this

13   specialty.

14   **B.    TeamHealth profits from American's healthcare emergencies through pricing fraud.**

15   60.    The rates that TeamHealth bills patient-consumers are artificially inflated far above

16   the reasonable value of the services it provides. And TeamHealth knows it.

17   **1.    Pricing of medical services in the United States.**

18   61.    To understand TeamHealth's billing fraud, some background on healthcare pricing is

19   useful.

20   62.    Hospitals use standardized health care codes, called Current Procedural Terminology

21   (CPT) codes, for the services they provide.  The hospitals assign prices to those CPT codes, and

22   those prices are known as the "list price" or "chargemaster."

23

24   _____

25   [24] When consumers enter hospitals staffed by TeamHealth physicians, they may sign various admittance and release forms. But because TeamHealth physicians are independent contractors, those forms do not apply to TeamHealth.

26   [25] Team Health Inc., 2015 Form Ex-99.1, at 2, 12, available at: https://bit.ly/2GLNNyz, last visited Oct. 16, 2020.

27   [26] *Id.* at 20.

28

63. The healthcare providers that operate within hospitals, including TeamHealth, also use CPT codes for the services they provide.

64. Recently, the Trump Administration promulgated a rule requiring all hospitals to post their chargemasters publicly on their websites.[27] Most hospitals publish their chargemasters in an excel spreadsheet with thousands or even hundreds of thousands of data points.

65. Because TeamHealth provides a limited set of services and only bills for physician services—and not drugs, equipment, facilities, etc.—TeamHealth's services appear to cover only a few dozen codes and prices.

66. In contrast to hospitals, *TeamHealth does not publish its prices anywhere*.

67. The first and only way patients learn of TeamHealth's exorbitant prices is on the bill TeamHealth sends them in the mail. That was the case for Plaintiffs, who did not know they would be receiving a second bill from a TeamHealth entity of which they had never heard. As one commentator put it, receiving such a bill is akin to "going to a restaurant and getting a separate, unexpected bill for dessert because the pastry chef did not sign a contract with the owner."[28]

**2. TeamHealth's billing fraud—quantum meruit provides the true rates TeamHealth is lawfully entitled to charge.**

68. TeamHealth sets rates for services by TeamHealth Fraudulent Billing Enterprise physicians that vastly outstrip the rates hospitals normally charge for the exact same services, and TeamHealth bills uninsured and out-of-market patients for 100% of these inflated amounts.

69. TeamHealth bills these wildly inflated rates despite knowing that they are excessive and cannot lawfully be recovered.

70. If TeamHealth sued a patient who did not pay his or her medical bill, its only legal entitlement to payment is based in equity, such as unjust enrichment, quantum meruit, and implied contract. TeamHealth cannot sue for breach of contract because it *has no contract with the patient.* And even if TeamHealth had an enforceable contract with the patient, there is no agreement with the

[27] 45 C.F.R. § 180.40.

[28] Ezekiel Emanuel, No One Likes Surprise Medical Bills. So Why Does Congressional Action Seem So Unlikely?, Washington Post, Sept. 4, 2019, https://wapo.st/3jVOT9a, last visited Oct. 13, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT  - 15
010898-11/1357161 V2

patient on the prices to be paid and the law assumes a reasonable or market rate price (essentially, the same result).

71.     The common law doctrine of quantum meruit—"as much as he deserved"—provides that in the absence of a contract, when one confers a benefit on another expecting payment for that benefit and the recipient accepted the benefit, the person providing the benefit may be entitled to payment for the fair value of the service. Typically, quantum meruit for services is an amount "measured by [the services'] value in the community where they are rendered,"[29] or "the customary rate of pay for such work in the community at the time the work was performed."[30]

72.     "The measure of recovery in quantum meruit is the reasonable value of the services rendered provided they were of direct benefit to the defendant."[31] "The underlying idea behind quantum meruit is the law's distaste for unjust enrichment. If one has received a benefit which one may not justly retain, one should restore the aggrieved party to his or her former position by return of the *thing* or its *equivalent* in money."[32] In a healthcare collection case involving unjust enrichment, the hospital (the plaintiff) confers a benefit on the patient (the defendant), and so the patient must return the value of the care the patient received to the hospital.

73.     For example, in California, the elements of a quantum meruit claim are: (1) the plaintiff performed services for the defendant; (2) the reasonable value of the service; (3) the services were rendered at the defendant's request, and (4) the plaintiff was not paid. Crucially, the "reasonable value" of services charged is the "going rate" or fair market value.[33] In *Central California v. Blue Cross of California*, a non-contracting insurer was required by statute to pay the

---

[29] *UnitedHealthcare Services, Inc. v. Asprinio*, 16 N.Y.S.3d 139, 148 (N.Y. Sup. Ct. 2015).

[30] *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009) (internal quotation marks omitted).

[31] *Palmer v. Gregg,* 65 Cal.2d 657 (1967).

[32] *Arrison v. Info. Res., Inc.,* 1999 WL 551232, at *6 (N.D. Cal. July 16, 1999) (internal quotation and bracket marks omitted).

[33] *Central California v. Blue Cross of California*, 226 Cal. App. 4th 1260, 1274 (2014).

hospital "the reasonable and customary value" of its services, which "embodies the concept of quantum meruit."[34]

74. Even if there is an enforceable contract, but no agreed price, the result is no different: The law will insert a "reasonable" price for the service.[35] Patients never assent to health care providers' list prices, nor would they if they had a meaningful choice. In the absence of a contract, the provider is only entitled to "the average amount that [the provider] would have accepted as full payment from third-party payers such as private insurers and federal healthcare programs."[36] That amount is a fraction of list prices. As one commentator put it, "[n]o one—not hospital administrators, not government insurers, and not private insurers—expect the chargemaster rates to be paid" in full.[37] Rather, all of these entities receive substantial discounts. Throughout the industry there is "widespread agreement, even on the part of many hospital administrators, that the prices reflected on chargemasters are ludicrously high and are set in an arbitrary and capricious manner."[38]

75. Courts across the country have concluded that a provider's list prices are not a fair or accurate measures of the reasonable value or going rate.[39] One study found that the first 30 to 74 minutes of critical care in California would cost an out-of-network patient as much as 2897% of the

---

[34] *Id.*

[35] *See, e.g.*, *Moore v. Mason & Hanger Co.*, 35 N.Y.S.2d 687, 688 (1942) ("Ordinarily where one man at the request of another performs work or service of any kind, and nothing else appears, there may be drawn an inference that the service is to be paid for, and, if no price is set, the reasonable value of the services may be found to have been earned pursuant to contract therefor."). *See also* Cal. Civ. Code § 1611 ("When a contract does not determine the amount of the consideration, nor the method by which it is to be ascertained, or when it leaves the amount thereof to the discretion of an interested party, the consideration must be so much money as the object of the contract is reasonably worth.").

[36] *Nassau Anesthesia Assocs. PC v. Chin*, 924 N.Y.S.2d 252, 286 (2011).

[37] George A. Nation III, Hospital Chargemaster Insanity: Heeling the Healers, 43 PEPP. L. REV. 745, 764 (2016).

[38] *Id.* at 748.

[39] *See, e.g.*, Children's *Hosp. Central Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1277 (Cal. App. 2014) ("Hospital rarely receives payment based on its published charge master rates."); *In re North Cypress Med. Center Operating Co., Ltd.*, 559 S.W.3d 128, 133 (Tex. 2018) ("because of the way chargemaster pricing has evolved, the charges themselves are not dispositive of what is reasonable").

Medicare rate.[40] A 2015 study found, "Among the 97 procedures studied, average out-of-network billed charges, as a percentage of corresponding Medicare fees, ranged from a low of 118 percent of Medicare ('eye exam new patient') to a high of 1382 percent of Medicare ('electrocardiogram (ECG)/monitoring and analysis')."[41]

76.     The California Supreme Court has made clear that a provider's rates are not a proper measure of quantum meruit. Rather, courts should assess the market value of the care: "Quantum meruit measures the value of services to the recipient."[42]

77.     In short, contrary to popular belief, physicians cannot legally charge patients whatever they want. Or, as one Pennsylvania court put it, a "[h]ospital's contention that it can unilaterally set a price for its services that bears no relationship to the amount typically paid for those service is untenable."[43]

78.     Yet, TeamHealth has taken advantage of this common misconception, billing consumers with grossly inflated list prices. And unlike hospitals, TeamHealth does not even publish those prices.

79.     In particular, TeamHealth directly bills patients in two scenarios. First, when an uninsured patient receives care from a TeamHealth physician, TeamHealth sends a bill to that patient demanding payment of TeamHealth's inflated list prices.

80.     Second, when TeamHealth is out-of-network with a patient's insurance plan, the patient's insurer and TeamHealth have not previously negotiated a price for the care provided. TeamHealth bills the consumer and insurer for its list price.

---

[40] America's Health Insurance Plans, *Survey of Charges Billed by Out-of-Network Providers: A Hidden Threat to Affordability*, Jan. 2013, at 11, available at: https://bit.ly/2WRTOP6, last visited Oct. 16, 2020.

[41] America's Health Insurance Plans, *Charges Billed by Out-of-Network Providers: Implications for Affordability,* Sept. 29, 2015, available at https://bit.ly/3cSzuCT, last visited Oct. 16, 2020.

[42] *Children's Hosp. Central Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1278 (Cal. App. 2014).

[43] *Temple University Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc*., 832 A.2d 501, 510 (Pa. Sup. Ct. 2003).

81.     Some insurance plans do not cover any out-of-network care, in which case TeamHealth bills the consumer for the full list price.

82.     Sometimes insurance plans do cover a portion of out-of-network care. In these cases, the insurer only covers a portion of TeamHealth's exorbitant list rates. TeamHealth bills the rest to consumers, either in the form of typical cost-sharing in accordance with the insurance plan or through a practice known as "balance billing."

83.     For example, if TeamHealth bills $1,000 to an insured patient whose plan covers 50% of out-of-network care, if the insurer agrees to pay 50% on that price, TeamHealth bills consumers for the remaining $500 in accordance with the insurance plan. The consumer's share is inflated as a result of the higher list price conveyed to consumers on the bill.

84.     If, instead, the insurer believes only $600 is the "allowable rate" for the care provided, the insurer will only pay 50% of that, or $300. If TeamHealth bills for both the remaining $300 and an additional $400 to recoup the full list price, that extra $400 is called a "balance bill."

85.     In some cases, TeamHealth has fraudulently enhanced its ability to bill out-of-network and/or "balance bill" by entering hospitals and exiting their insurance networks, at least for a period of time. When executing this strategy, TeamHealth does not disclose to patients that it is out-of-network. Thus, even if the hospital is within a patient's insurance network, that patient is forced to pay out-of-network rates along with any amounts TeamHealth balance bills on top.

86.     This conduct constitutes a serious fraud: TeamHealth sends patients bills with rates it knows it cannot collect in court in the hopes that patients will pay all or a large portion of these bills due to their lack of knowledge.

87.     In sending these bills, TeamHealth represents to patients that the rates printed within them are the real, reasonable value of its services. Yet, TeamHealth knows they are not. In various lawsuits, TeamHealth has conceded that the rates it charges consumers do not represent the real value of its services, which is all TeamHealth can lawfully recover.

88.     In *Emergency Care Services of Pennsylvania, P.C. et al. v. UnitedHealth Group, Inc. et al.*,[44] TeamHealth sued UnitedHealth after the insurer refused to reimburse TeamHealth for out-of-network care at its charged rates. TeamHealth claimed relief under implied contract and unjust enrichment theories, arguing that UnitedHealth had paid as low as 15-20% of TeamHealth's rates, instead of what TeamHealth asserted was the "reasonable and usual customary reimbursement rate for [its] services"—namely, 75-90% of its list prices.[45] TeamHealth argued that this "reasonable rate" for its services applies across "the industry as a whole."[46] While TeamHealth's reimbursement rate is likely far less than 75-90% (as the United Health litigation itself attests), TeamHealth conceded the ultimate point—that its list prices, which it bills in full to consumers, are artificially inflated beyond the reasonable value of the services it provides.

89.     As UnitedHealth has explained, TeamHealth "refuse[s] to accept rates that reflect fair market prices and that promote an affordable, predictable experience for patients. TeamHealth ER physicians expect to be paid *nearly three times the median rate for in-network physicians at participating hospitals*, and their billed charges are even higher, *at more than four times the median rate*."[47] This price inflation hurts consumers "by driving up the cost of health care."[48]

90.     Similarly, in a case in Texas, TeamHealth raised quantum meruit claims against Humana for failing to compensate it enough for out-of-network care. Here again, TeamHealth did not even seek reimbursement of its list prices, demanding instead that it be paid at the lower "usual and customary" reimbursement rate.[49] TeamHealth complained that Humana was paying just 17% of

---

[44] Case No. 1:19-cv-1195, Dkt. No. 1 at 14 (M.D. Pa.).

[45] *Id.*, Dkt. No. 48 at 1.

[46] *Id.*, Dkt. No. 1 at 11.

[47] Courtney Robinson, *Some Physicians at Tampa General Hospital take Pay Cut Because of Health Care Costs*, 10 Tampa Bay, Feb. 4, 2020 6:58 P.M., available at: https://bit.ly/33URpXC (emphasis added), last visited Oct. 16, 2020.

[48] *Id.*

[49] *Emerg. Svcs. of Texas, P.A. v. Humana Ins. Co.*, Case No. 5:19-cv-00138-OLG, Dkt. No. 1 (W.D. Tex. Feb. 14, 2019).

FIRST AMENDED CLASS ACTION COMPLAINT  - 20
010898-11/1357161 V2

1    that usual and customary rate. TeamHealth never suggested that Humana might be responsible for

2    the full list prices TeamHealth imposes on uninsured and out-of-network consumers.

3        91.     TeamHealth's rates are also inflated relative to other providers. A 2018 study by the

4    National Bureau of Economic Research found that when TeamHealth takes over an emergency

5    department, total payments to physicians increase on average by $269.01.[50]



6

7

8

9

10

11

12

13       92.     Furthermore, in a letter to the U.S. Senate in response to congressional inquiries into

14   TeamHealth's billing practices, TeamHealth admitted it has inflated list prices across-the-board well

15   over the cost of the services it provides.[51] TeamHealth admitted that the average cost per encounter is

16   only $150. At the same time, it said it billed 2.5 million uninsured patients and collected $85 million,

17   which it claimed was only 3.7% of what it billed. That means, while TeamHealth's average cost was

18   only $150 per encounter, its prices (the amounts billed to uninsured patients) averaged $918 per

19   encounter. TeamHealth admitted its prices are over six times its cost of care.

20       93.     In short, TeamHealth has admitted that the rates it charges patients are fraudulent:

21   they do not accurately represent the fair or reasonable market value of the services it provides. And

22   while TeamHealth may claim to collect a lower amount from uninsured patients because some

23   cannot pay the bill, this in no way justifies charging them more than TeamHealth admits is

24

25       [50] Zack Cooper, Finoa Scott Morton & Nathan Shekita, *Surprise! Out-of-Network Billing for*
     *Emergency Care in the United States* (July 2017, Revised January 2018) at Table 4 & Figure 5
26   Panel E.

27       [51] Team Health Letter Responding to Bi-Partisan Workgroup's Request for Data and
     Information on Surprise Medical Bills, Mar. 13, 2019, available at: https://bit.ly/3iZgF33, last visited
28   July 9, 2020.

reasonable and legally recoverable.  Such price inflation injures patients by shackling them with unlawful medical debt, which many patients feel compelled to pay (if they are even able) to escape adverse credit and other financial consequences.

94.     Plaintiff Sia Fraser's experience is demonstrative of TeamHealth's inflated prices. TeamHealth billed her $1,082 for observation care. For the exact same hospital visit, the hospital Tri-City Medical Center billed her $63 per hour ($378 for six hours) for observation care performed by hospital physicians. The physicians had the same patient, with the same injuries. They both billed for observation care. And the TeamHealth physician billed over 17 times more than the hospital physician.

95.     TeamHealth's billing practices are so harmful to consumers in part because TeamHealth aggressively pursues debt collection. Since 2017, TeamHealth has sued over *4,800 patients* to force them to pay their artificially inflated bills.[52]

### 3.     TeamHealth uses subsidiaries and "independent" contractors to avoid state-law ban on the practice of medicine by corporations.

96.     As a private-equity owned corporation, TeamHealth is only able to profit from inflated, fraudulent medical billing by constructing an elaborate web of subsidiaries and "independent" contractors.

97.     Most states prohibit the corporate practice of medicine. Although this doctrine varies somewhat from state to state, it generally "prohibits corporations from practicing medicine or employing a physician to provide professional medical services."[53] These laws are intended to prevent commercialization of the practice of medicine, ensure physicians are never conflicted about whether to put patients or shareholders first, and prevent business influences from interfering with independent medical judgement.

---

[52] Wendy C. Thomas, et al., *A Private Equity-Owned Doctors' Group Sued Poor Patients Until It Came Under Scrutiny*, NAT'L PUB. RADIO, Nov. 27, 2019, available at: https://n.pr/30Yvmxe, last visited Oct. 16, 2020.

[53] American Medical Association, *Issue Brief: Corporate Practice of Medicine*, at 1 (2015).

FIRST AMENDED CLASS ACTION COMPLAINT  - 22
010898-11/1357161 V2

98.     In order to avoid these laws, TeamHealth has spun a web of subsidiaries and purportedly independent organizations, which it has dubbed the "TeamHealth system" and this complaint refers to as the "TeamHealth Fraudulent Billing Enterprise."

99.     The TeamHealth Fraudulent Billing Enterprise is structured as a pyramid. Defendant Holdings sits at the top and provides strategic directives to the entire enterprise. Among the entities operating under Holdings are Defendants AmeriTeam and (prior to 2015) TeamHealth, Inc. These entities conduct the day-to-day operations of the enterprise, including payroll, procuring professional liability insurance, information technology (including owning and maintaining the TeamHealth website), finance, tax, compliance, accounts payable, human resources, and negotiations with health insurance plans

100.    AmeriTeam and TeamHealth, Inc. also own and/or have owned subsidiaries that act as regional facilitators. While the following names are not the official corporate names of these subsidiaries, the regional facilitators go by names like TeamHealth Atlantic, TeamHealth Central, TeamHealth Mid-Atlantic, TeamHealth Northeast, TeamHealth Southeast, and TeamHealth West.

101.    The facilitators themselves own subsidiary practice groups that employ physicians who provide care (or they own other companies that themselves employ physicians). For example, the provider group who served Ms. Fraser is Team Physicians of Southern CA, which, in turn, is owned by TeamHealth West (officially Quantum Plus, LLC).

102.    The subsidiary facilitators also staff hospitals by contracting with provider groups that function as independent contractors.

103.    As TeamHealth described it in a 2016 filing with the Securities Exchange Commission (SEC):

> Separate subsidiaries or other affiliates of Team Health Holdings, Inc. carry out all operations and employ all employees within the TeamHealth system. The terms "clinical providers," "TeamHealth physicians or providers," "affiliated providers," "our providers" or "our clinicians" and similar terms mean and include: (i) physicians and other healthcare providers who are employed by subsidiaries or other affiliated entities of Team Health Holdings, Inc., and (ii) physicians and other healthcare providers who contract with subsidiaries or other affiliated entities of Team Health Holdings, Inc. All such physicians and

other healthcare providers exercise their independent professional clinical judgment when providing clinical patient care. Team Health Holdings, Inc. is a holding company that does not contract with physicians to provide medical services nor does it practice medicine in any way.[54]

104.    The subsidiary facilitators negotiate contracts with the hospitals and provider groups, recruit physicians, coordinate physician schedules, and conduct local marketing.

105.    Defendant HCFS serves the entire enterprise by setting prices and sending bills to consumers.[55] Another subsidiary of TeamHealth—Healthcare Revenue Recovery Group (HRRG)—performs debt collection for the TeamHealth Fraudulent Billing Enterprise.

106.    The TeamHealth Fraudulent Billing Enterprise exists for one common purpose: squeezing as much money as possible out of consumers through a pattern of fraudulent communications that misrepresent the amounts they are entitled to charge for the care physicians in the enterprise provide.

**C.      The crippling cost of out-of-network care.**

107.    The impact of TeamHealth's fraudulent billing practices can be more devastating than the medical emergency or procedure that precipitated the bill in the first place. According to a recent Kaiser Family Foundation Study, two thirds of Americans are either "very worried" (35 percent) or "somewhat worried" (30 percent) about being able to afford their own or their family's unexpected medical bills.[56]

---

[54] Team Health Holdings, Inc., 2016 Form 10-K at 3.

[55] *See* https://www.hcfin.com/our-services/, last visited Oct. 16, 2020 ("HCFS of Team Health provides reliable, full-service management of your entire revenue cycle. From creating an appropriate fee schedule to preparing patient statements, our billing services help you improve reimbursement rates and collect more of the money your practice is legitimately owed."); *see also* https://www.hcfin.com/about/, last visited July 9, 2020 ("As a division of Team Health, which staffs more than 250 hospital EDs nationwide, Health Care Financial Services of Team Health has developed a sophisticated coding and billing operation designed to meet the unique requirements of emergency physician care.").

[56] Lunna Lopes, et al., *Data Note: Public Worries About and Experience With Surprise Medical Bills* (Feb. 28, 2020), available at: https://www.kff.org/health-costs/poll-finding/data-note-public-worries-about-and-experience-with-surprise-medical-bills/, last visited Oct. 16, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT  - 24
010898-11/1357161 V2



Figure 1: Unexpected Medical Bills Top List Of Public's Worries

108.    This concern is far from baseless: in the Kaiser study, one in three insured, nonelderly adults reported that they received an unexpected medical bill in the past 24 months. Of those who received an unexpected bill, 11 percent reported that the unexpected costs were *$1,000 or more*.[57]

109.    Hospital staff have spotlighted the crippling effect of TeamHealth's practices. In 2018, a group of hospital internists at St. David's Hospital in Texas sued TeamHealth, revealing that the corporation "pressured doctors to make medical decisions based on finances."[58] According to the doctors' complaint, TeamHealth "implement[ed] a scheme of corporate governance over physicians to manipulate their medical practice to save St. David's money."[59]

110.    Senator Elizabeth Warren and Representative Katie Porter are currently investigating TeamHealth for "slashing their doctors' pay and benefits," even as they treat coronavirus patients in

---

[57] *Id.*

[58] Phil Prazan, *Doctor's Sue St. David's Contract over Corporate Practice of Medicine*, KXAN News Austin, June 18, 2018 7:57 P.M., available at: https://bit.ly/2SPmjdt, last visited Oct. 16, 2020.

[59] *Id.*

1   TeamHealth-controlled emergency departments.[60] The Senators reiterated their concerns in a second

2   letter, noting that in the past two months, Doctor Patient Unity—TeamHealth's lobbying

3   organization—has spent an additional $1.2 million on TV advertisements, money that could have

4   been used to compensate emergency room physicians during the pandemic.[61]

5                        **V.      TOLLING OF THE STATUTE OF LIMITATIONS**

6           111.    **Discovery Rule Tolling**: Plaintiffs and members of the proposed class had no means

7   of knowing that medical bills received from the TeamHealth Fraudulent Billing Enterprise demanded

8   payment of inflated amounts that the TeamHealth Fraudulent Billing Enterprise is not legally entitled

9   to recover. Plaintiffs did not discover until recently, and could not have discovered through

10  reasonable diligence, that their TeamHealth bill was unlawfully inflated and that the bill itself and

11  any payment of the amounts it demanded constituted cognizable injuries. All applicable statutes of

12  limitations have thus been tolled by operation of the discovery rule.

13          112.    **Fraudulent Concealment**: Far from disclosing that the TeamHealth Fraudulent

14  Billing Enterprise seeks to recover unlawfully inflated medical bills, the enterprise affirmatively

15  conceals this fact in the medical bills sent to plaintiffs and the proposed class. These bills falsely

16  represent that the amounts billed constitute the actual value of medical services provided by

17  TeamHealth physicians. The TeamHealth Fraudulent Billing Enterprise knew that patients would

18  have no reason to believe that TeamHealth would bill for amounts it cannot lawfully recover, and

19  plaintiffs and the proposed class could not have discovered the fraud earlier through the exercise of

20  reasonable diligence. All applicable statutes of limitations have thus been tolled by TeamHealth's

21  active and fraudulent concealment of the facts giving rise to plaintiffs' claims.

22

23

24          [60] Letter from Senator Elizabeth Warren and Representative Katie Porter to Stephen A.
25  Schwartzman, Chief Executive Officer of Blackstone, and Wayne Berman, Senior Managing
    Director and Head of Global Gov't Affairs of Blackstone (April 15, 2020), available at:
26  https://twitter.com/RepKatiePorter/status/1250524828274249728/photo/1, last visited Oct. 16, 2020.
            [61] Letter from Senator Elizabeth Warren and Representative Katie Porter to Stephen A.
27  Schwartzman, Chief Executive Officer of Blackstone, and Wayne Berman, Senior Managing
    Director and Head of Global Gov't Affairs of Blackstone (May 8, 2020), available at:
28  https://porter.house.gov/uploadedfiles/response_to_blackstone_5.8.20.pdf, last visited Oct. 16, 2020.

FIRST AMENDED CLASS ACTION COMPLAINT  - 26
010898-11/1357161 V2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.   CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3), as representative of a class defined as follows:

> All individual persons who were either uninsured or received out-of-network care when they were provided medical treatment in the United States or its territories and who received a bill from TeamHealth or an entity billing on its behalf for that treatment.

114.    There are two ways a consumer may be billed directly by TeamHealth or an entity acting on its behalf. First, if a consumer is uninsured, TeamHealth will bill that consumer for 100% of TeamHealth's artificially inflated rates (the uninsured scenario). Second, if TeamHealth is "out-of-network" in an insured consumer's health plan, TeamHealth may bill that consumer directly for any amounts not reimbursed by the consumer's insurer (the "out-of-network" scenario). This includes instances where (a) a consumer's insurance plan covers none of the out-of-network care, (b) a consumer's insurance plan covers some of the list price as part of a cost sharing plan and consumers pay the remainder, and (c) balance bills.

115.    In both of these scenarios—the uninsured scenario and the out-of-network scenario— any individual's payment for TeamHealth's services is determined based on TeamHealth's artificially inflated prices, and the consumer receives a bill from TeamHealth demanding payment of the inflated amounts. Accordingly, each scenario falls within the class definition.

116.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. TeamHealth admits that it provides medical services to millions of patients each year in hospitals across the country. Thus, joinder of all members is clearly impracticable. The class is readily identifiable from information and records in the possession of TeamHealth.

117.    Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and all members of the class were damaged by the same wrongful conduct of TeamHealth—i.e., plaintiffs and all members of the class received treatment from a TeamHealth physician and were billed artificially inflated prices for the services they received.

1      118.    Plaintiffs will fairly and adequately protect and represent the interests of the class. The

2   interests of plaintiffs are coincident with, and not antagonistic to, those of the other members of the

3   class.

4      119.    Class counsel that represents the plaintiffs are experienced in the prosecution of class

5   action litigation and have particular experience with class action litigation involving RICO fraud.

6   Class counsel also have extensive experience in class actions concerning the manipulation of and

7   fraudulent inflation of list prices, including two cases in federal district court (*AWP* and *McKesson*)

8   that resulted in recoveries well in excess of $500 million.

9      120.    Questions of law and fact common to the members of the class predominate over

10  questions that may affect only individual class members because TeamHealth has acted on grounds

11  generally applicable to the entire class, thereby making overcharge damages with respect to the class

12  as a whole appropriate. Such generally-applicable conduct is inherent in TeamHealth's wrongful

13  conduct.

14     121.    Questions of law and fact common to the class include, but are not limited to:

15          i.    Whether TeamHealth engaged in a fraudulent, unfair, and/or deceptive scheme

16                or course of conduct by setting and transmitting prices above the reasonable

17                rates they would be entitled to collect in court;

18          ii.   Whether TeamHealth attempted to set list prices based on quantum meruit;

19          iii.  What the quantum meruit value of TeamHealth's services are;

20          iv.   Whether the TeamHealth Fraudulent Billing Enterprise has the common

21                purpose of profiting from inflated or high list prices;

22          v.    Whether TeamHealth engaged in a pattern of deceptive and/or fraudulent

23                activity intended to defraud or deceive plaintiffs and class members;

24          vi.   Whether TeamHealth organized a series of subsidiary companies to avoid state

25                corporate practice of medicine laws;

26          vii.  Whether TeamHealth's avoidance of corporate practice of medicine laws

27                allowed it to maintain its fraudulent pricing scheme;

28

FIRST AMENDED CLASS ACTION COMPLAINT  - 28
010898-11/1357161 V2

viii.    Whether the "TeamHealth Fraudulent Billing Enterprise" constitutes an "enterprise" under RICO;

ix.    Whether TeamHealth violated RICO;

x.    Whether TeamHealth is liable to plaintiffs and class members for damages for conduct actionable under state consumer protection statutes; and

xi.    Whether TeamHealth is liable to plaintiffs and the class members for damages flowing from their misconduct.

122.    Plaintiffs and members of the class have all suffered, and will continue to suffer, harm and damages as a result of TeamHealth's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the class likely would find the cost of litigating their claims to be prohibitive and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. Additionally, TeamHealth has acted and failed to act on grounds generally applicable to plaintiffs and the class and require court imposition of uniform relief to ensure compatible standards of conduct toward the class, thereby making appropriate equitable relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

123.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VII.   CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. § 1961, *ET SEQ.*

124.   Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this complaint.

125.   RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1692(c).

126.   Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

127.   A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

128.   "Racketeering activity" includes mail and wire fraud. 18 U.S.C. § 1961(1).

**A.   Defendants are culpable "persons" under RICO.**

129.   This count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against defendants on behalf of the plaintiffs and class members as represented by the named plaintiff.

130.   Plaintiffs, the members of class, and Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

**B.   The TeamHealth Fraudulent Billing Enterprise is a RICO enterprise.**

131.   For purposes of this claim, the RICO "enterprise" is an association-in-fact consisting of: (a) Holdings, which provides strategic directives; (b) AmeriTeam and TeamHealth, Inc., which provide and/or have provided day-to-day management; (c) a network of subsidiaries organized regionally that contract with provider groups; (d) the provider groups—both subsidiaries and unowned, independent entities; (e) HCFS, the subsidiary that performs centralized pricing functions;

FIRST AMENDED CLASS ACTION COMPLAINT  - 30
010898-11/1357161 V2

and (f) Healthcare Revenue Recovery Group (HRRG), the subsidiary that performs debt collection. This First Amended Complaint refers to this association-in-fact enterprise as the "TeamHealth Fraudulent Billing Enterprise." Defendants refer to the same collective as the "TeamHealth System"[62]

132.    Each member of the enterprise plays a different role, but all work towards a common purpose: extracting profits derived from centrally set, fraudulent prices.

133.    According to a sworn declaration submitted by Holdings's Chief Operations Officer in a different case, Holdings engages in "strategic planning and goals, implementation of overall vision, values, mission and direction of the TEAMHEALTH organization, which from time to time may include marketing, branding, strategic direction and relationships, growth and finance/accounting related activities for the various operating affiliates and subsidiaries comprising the TEAMHEALTH organization, including, among hundreds of other companies, AmeriTeam [and] HCFS."[63] In other words, Holdings controls the strategy and direction of the enterprise.

134.    AmeriTeam is the present operating arm of Holdings, which executes on its directions, and engages in more day-to-day management of the enterprise. According to Holdings's Chief Operations Counsel, "because of its function and purpose within the TEAMHEALTH organization, AmeriTeam is uniquely situated to support and assist other affiliated operating entities in aligning themselves with the overall mission, values, goals and vision of the TEAMHEALTH organization."[64] In other words, AmeriTeam polices the rest of the enterprise to ensure everyone is striving towards the common purpose originally conceived by Holdings.

135.    AmeriTeam negotiates with insurers for the enterprise.

136.    Prior to January 1, 2015, TeamHealth, Inc. performed day-to-day management functions comparable to those being performed by AmeriTeam today, including by "providing

---

[62] Team Health Holdings, Inc., 2016 Form 10-K at 3.

[63] Defendant's Motion to Dismiss Second Amended Class Action Complaint, *Sanchez v. Team Health, LLC*, 1:18-cv-21174 (S.D. Fl.), Dkt. No. 79-3, Supplemental Declaration of John R. Stair, at 9.

[64] *Id.* at 6.

1   various administrative support services (e.g., payroll human resource assistance, etc.,) to operating

2   subsidiaries."[65]

3       137.    The regional subsidiaries (or their subsidiaries) negotiate contracts with hospitals,

4   enabling the provider groups to supply the care for which the fraudulent prices are transmitted. They

5   also contract with the provider groups to bring them into the enterprise.  For example, there is a

6   regional subsidiary in Florida called Southwest Florida Emergency Management, LLC that owns

7   another company called Paragon Contracting Services, LLC. According to Holdings's Chief

8   Operations Counsel, Paragon enters into written agreements with hospitals to provide staffing, and

9   then also enters into independent contractor agreements with physicians to staff those hospitals.[66]

10      138.    The provider groups perform the care that gives the enterprise the cover necessary to

11  transmit and collect on the fraudulent prices.

12      139.     HCFS sets the prices and transmits bills to consumers, in coordination with and at the

13  direction of AmeriTeam and, previously, TeamHealth, Inc.

14      140.    TeamHealth's Healthcare Revenue Recovery Group also sends those fraudulent prices

15  to consumers and seeks to collect payment of them.

16      141.    The TeamHealth Fraudulent Billing Enterprise is an elaborate web of relationships

17  coordinated at the top by Holdings. Plaintiffs received care from physicians connected to different

18  branches of the TeamHealth Fraudulent Billing Enterprise.

19      142.    While many of the parties in the TeamHealth Fraudulent Billing Enterprise are

20  commonly owned, not all are. Many provider groups are independent contractors that TeamHealth

21  does not own. They are nonetheless part of the TeamHealth Fraudulent Billing Enterprise.

22      143.    As for the members of the enterprise that are subsidiaries, defendants organized the

23  enterprise to circumvent state laws prohibiting the corporate practice of medicine. If the subsidiaries

24  were divisions of TeamHealth—and the physicians were employees of TeamHealth—they could not

25  perform the medical services necessary to facilitate profiting from TeamHealth's fraudulent prices.

26

27      [65] *Id.* at 6.

28      [66] *Id.* at 3-4.

144.    The TeamHealth Fraudulent Billing Enterprise is an ongoing and continuing business organization consisting of corporations and individuals that are and have been associated for the common and/or shared purposes of setting, administering, and deriving wrongful profits from fraudulent healthcare prices. The enterprise is such a cohesive unit that defendants have named it the "TeamHealth System." The TeamHealth Fraudulent Billing Enterprise has existed continuously for years.

145.    The common purpose of the enterprise is to circumvent prohibitions on the corporate practice of medicine and fraudulently overcharge patients. To accomplish its common purpose, the enterprise systematically inflates its prices for the services it performs. The enterprise does not attempt to tie its prices to any legally permissible standard, such as *quantum meruit*, which is what they could collect in court given they have no contracts with consumers. The enterprise then uses these prices for out-of-network and uninsured patients who receive emergency room services, anesthesiology services, radiology services, hospitalist services, and other care. Patients are billed the inflated prices in full, and nowhere advised that their legal obligation may be less than the billed amount. When patients do not pay, the enterprise brings nonpayment actions that shackle consumers with unlawful debt.

136.    By executing on its common purpose—overcharging patients—the enterprise generates the revenues sufficient to feed an expansive network of corporate subsidiaries, executives, and ultimately, private equity investors, who are wholly uninvolved in the provision of medical care. Were TeamHealth charging quantum meruit for its doctors' care, there simply would not be enough revenue for so many non-doctors to make money.

146.    The enterprise performs these actions willfully, and with knowledge that the plaintiffs and class members make payments based on the rates they set. The TeamHealth Fraudulent Billing Enterprise then represents—either affirmatively or through half-truths and omissions—to the plaintiffs and class members that the rates for their services are lawful. The TeamHealth Fraudulent Billing Enterprise conceals from the plaintiffs and class members the reality that the real value of their services are far lower.

147.   This scheme is fraudulent. The enterprise's prices are not reasonable approximations of the actual value of their services, and the TeamHealth Fraudulent Billing Enterprise conceals the artificial inflation of its rates as well as the tactics its uses to extract these rates. The TeamHealth Fraudulent Billing Enterprise also conceals from the plaintiffs and class members the purpose of this artificial rate inflation: higher profits for TeamHealth.

148.   The TeamHealth Fraudulent Billing Enterprise inflated its prices, fraudulently represented these prices as the real value of its services, and thereby caused the uninsured and out-of-network class members to overpay and become over-indebted for the care they received from the TeamHealth Fraudulent Billing Enterprise.

149.   The TeamHealth Fraudulent Billing Enterprise maintains systemic linkages because there are contractual relationships, financial ties, and continuing coordination of activities between the TeamHealth and each entity that is an associate.

150.   At all relevant times, all members of the TeamHealth Fraudulent Billing Enterprise have been aware of the enterprise's conduct, has acted as knowing and willing participants in that conduct, and has reaped illegal profits from that conduct. The enterprise pays the regional subsidiaries and provider groups from the inflated bills and prices. Defendants, acting through defendant HCFS, create the inflated prices. TeamHealth's Healthcare Revenue Recovery Group transmits the inflated prices for collection. Because all participants in the enterprise share in its ill-gotten profits, all benefit from the enterprise's operations.

151.   The TeamHealth Fraudulent Billing Enterprise knowingly makes material misrepresentations and omissions in furtherance of the fraudulent scheme regarding:

          a.   The true, legal, and reasonable cost of the services it provides;

          b.   The extent to which its artificially inflated prices depart from these reasonable costs; and

          c.   Its lack of a legal basis or substantiation for the transmitted prices.

152.   Defendants alone could not have accomplished the purposes of the TeamHealth Fraudulent Billing Enterprise without the assistance of the provider groups. For defendants to profit

from the scheme, the providers needed to be separately owned (so as to avoid state corporate practice of medicine laws) and continually provide care to patients.

153.    The impacts of the TeamHealth Fraudulent Billing Enterprise are still in place, i.e., the artificial price inflation and out-of-network fraud is still ongoing.

**C.    The TeamHealth Fraudulent Billing Enterprise uses the U.S. mails and interstate wire facilities to carry out its fraud.**

154.    The TeamHealth Fraudulent Billing Enterprise engages in and affects interstate commerce by conducting the following activities across state boundaries: the sale, purchase, contracting for, and/or administration of the medical services; the setting of the prices for medical services; and/or the transmission and/or receipt of invoices, billing statements, debt collection notices, and payments related to the use or administration of the medical services the enterprise provided.

155.    The TeamHealth Fraudulent Billing Enterprise participated in the administration of medical services to millions of individuals located throughout the United States.

156.    The TeamHealth Fraudulent Billing Enterprise's illegal conduct and wrongful practices were carried out by an array of employees and independent contractors, working across state boundaries. The enterprise necessarily relied upon frequent transfers of documents, information, products, and funds through the U.S. mails and interstate wire facilities.

157.    In particular, the TeamHealth Fraudulent Billing Enterprise transmitted fraudulent prices directly to and sought payment from consumers using the U.S. mails and interstate wire facilities.

158.    The nature and pervasiveness of the TeamHealth Fraudulent Billing Enterprise's scheme, which was orchestrated out of the corporate headquarters of TeamHealth and its subsidiaries, necessarily required those headquarters to communicate directly and frequently through the U.S. mails and interstate wire facilities with each other and the provider groups.

159.    Most of the precise dates of the enterprise's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) cannot be alleged without access to the enterprise members' books and records. However, the plaintiffs can generally describe

the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts furthered the pricing-fraud scheme.

160.    Plaintiff Sia Fraser received bills from TeamHealth and TeamHealth's Alcoa Billing Center in the mail on October 15, 2019, and November 18, 2019. The bills included one of the TeamHealth Fraudulent Billing Enterprise's fraudulent prices, $1,082 for care code 99220. The bills were sent to Fraser's address in Vista, California. They had a return addresses in Alcoa, Tennessee and Cincinnati, Ohio, respectively. The bills provided an option to pay by credit card over the internet at www.TeamHealth.com/billing and www.thbillpay.com.

161.    Plaintiff Tricia Bakonyi received bills from TeamHealth dated July 7, 2020, and July 14, 2020. The bills included one of the TeamHealth Fraudulent Billing Enterprise's fraudulent prices, $1370.00 for care code 99285. The bills were sent to Ms. Bakonyi in Austin, Texas. They had return addresses in Fairlawn and Cincinnati, Ohio. The bills provided the option to pay by credit card over the internet at www.thbillpay.com and www.TeamHealth.com/biling. Ms. Bakonyi also received text messages from TeamHealth throughout the month of July, 2020—including on July 4, 10, 16, 19, 25 and 31—demanding payment on the fraudulently billed amount.

162. Plaintiff Gabrielle DiBella received a bill from TeamHealth dated July 12, 2020. The bill included one of the TeamHealth Fraudulent Billing Enterprise's fraudulent prices, $554.00 for care code 99283. The bill was sent to Ms. DiBella in Liverpool, New York, with a return address in Fairlawn, Ohio. The bill also provided the option to pay by credit card over the internet at pay.teamhealth.com. Ms. DiBella also received text messages from TeamHealth on July 9, 2020, and July 15, 2020, both demanding payment on the billed amount.

163.    Plaintiff Katja Fiume received a bill from TeamHealth dated July 6, 2020. The bill included one of the TeamHealth Fraudulent Billing Enterprise's fraudulent prices, $715.00 for care code 99284. The bill was sent to Ms. Fiume in La Mesa, California, with a return address in Alcoa, Tennessee. The bill also provided the option to pay by credit card over the internet at pay.teamhealth.com.

164.    In addition, Plaintiffs allege that every bill TeamHealth sent to a member of the proposed class fraudulently demanded payment on amounts that TeamHealth knew it could not

1    legally recover. Each of these bills is a predicate act of mail and/or wire fraud, and the precise timing

2    of these predicate acts will be revealed in TeamHealth's books and records.

3          165.    In addition, the enterprise's use of the U.S. mails and interstate wire facilities to

4    perpetrate the scheme involved thousands of communications including, *inter alia*:

5          a.    Marketing materials about the enterprise members' medical services, which

6                the enterprise sent to hospitals located across the country;

7          b.    Written and oral representations of the enterprise's rates for its medical

8                services made at least annually and, in many cases, several times during a

9                single year;

10         c.    Thousands of written and oral communications discussing, negotiating, and

11               confirming the enterprise members' contracts with the hospitals;

12         d.    Written and oral communications with U.S. government agencies and private

13               insurers that fraudulently misrepresented what the enterprise's rates were, or

14               that were intended to deter investigations into the true reasonable costs of their

15               services or to forestall changes to reimbursement based on something other

16               than its rates;

17         e.    Written and oral communications with health insurers and patients;

18         f.    Transmission of information about the enterprise's rates to third parties;

19         g.    Receipts of money on tens of thousands of occasions through the U.S. mails

20               and interstate wire facilities—the wrongful proceeds of the enterprise's

21               scheme; and

22         h.    In addition to the above-referenced RICO predicate acts, defendants' corporate

23               headquarters have communicated through use of the U.S. mails and by

24               interstate wire facilities with their various local headquarters or divisions, in

25               furtherance of the scheme. These mails include some of the documents

26               referenced in this Complaint.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT  - 37
010898-11/1357161 V2

1

**D.    Defendants directed and participated in the TeamHealth Fraudulent Billing Enterprise's affairs.**

166.    In violation of Section 1962(c) of RICO, defendants have conducted or participated in the conduct of the affairs of the TeamHealth Fraudulent Billing Enterprise, directly or indirectly. Such participation was carried out as set forth above, and in the following ways:

      a.    Defendants directly control and participate in the rates of the healthcare services that the provider groups deliver within the enterprise, including, but not limited to, emergency room services, anesthesiology services, radiology services, and hospitalist services;

      b.    Defendants directly control and participate in the rates that TeamHealth charges to plaintiffs and class members;

      c.    Defendants directly control and participate in the billing of TeamHealth's rates to plaintiffs and class members;

      d.    Defendants directly control and participate in the creation and distribution of marketing, sales, and other materials used to acquire new hospital contracts;

      e.    Defendants directly control and participate in the design of the organizational structure of the enterprise and perform accounting, payroll, compliance, and legal services;

      f.    Defendants make and participate in representations to plaintiffs and class members indicating that TeamHealth's rates are lawful debts, without disclosing that these rates differ substantially from the legally permissible value of TeamHealth's services.

      g.    Defendants make and participate in false and deceptive representations to plaintiffs and class members indicating that TeamHealth has a basis in law for the rates it transmits.

167.    The TeamHealth Fraudulent Billing Enterprise identified above has a hierarchical decision-making structure, with Holdings providing strategic directives to the entire enterprise.

168.   In violation of Section 1962(c) of RICO, defendants have conducted the affairs of the TeamHealth Fraudulent Billing Enterprise. This enterprise fraudulently inflated the rates for their providers' services and misrepresented to plaintiffs and class members that they had a basis in law or contract to collect those inflated prices, thereby inducing plaintiffs and class members to pay inflated amounts, and incur inflated debt, for their services.

**E.     Defendants have conducted a pattern of racketeering activity.**

169.   Defendants have conducted and participated in the affairs of the TeamHealth Fraudulent Billing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. The enterprise's pattern of racketeering likely involved hundreds of thousands, if not millions, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their pricing schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which defendants intended to defraud plaintiffs, members of the class, and other intended victims of the fraudulent pricing scheme.

170.   The enterprise's fraudulent and unlawful pricing scheme consisted, in part, of deliberately overstating its rates for its hospital-based services.

171.   The enterprise's schemes were calculated and crafted such that plaintiffs and members of the class would be billed for TeamHealth's medical services based on TeamHealth's artificially inflated rates. In designing and implementing the scheme, defendants were cognizant, at all times, of the fact those plaintiffs and class members were not part of the enterprise and relied upon the integrity of defendants in setting its rates.

172.   By intentionally and artificially inflating its rates, and by subsequently failing to disclose such practices to the plaintiffs and class members, the enterprise engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

173.   The enterprise's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiffs and members of the class. Each

separate use of the U.S. mails and/or interstate wire facilities that the enterprise employed was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class. The TeamHealth Fraudulent Billing Enterprise has engaged in the pattern of racketeering activity for the purpose of conducting its ongoing business affairs.

**F.      Defendants' violations of RICO damaged the plaintiffs and class members.**

174.      Defendants' violations of federal law and its pattern of racketeering activity have directly and proximately injured the plaintiffs and class members in their business or property. The plaintiffs and class members have overpaid and been overbilled for many hundreds of millions of dollars based on the enterprise's fictitious rates for its medical services.

175.      The TeamHealth Fraudulent Billing Enterprise sent billing statements through the U.S. mails or by interstate wire facilities and reported its rates and other information by the same methods in furtherance of its pricing scheme. The plaintiffs and members of the class have made inflated payments and incurred debt for the enterprise's medical services based on and/or in reliance on reported and false rates.

176.      As previously explained, when a TeamHealth Fraudulent Billing Enterprise provider treats a patient, that patient is responsible for paying all or a portion of the enterprise's inflated rates.

      a.      If the patient is uninsured, the enterprise misrepresents that she must pay 100% of the enterprise's rates.

      b.      If the patient is insured, but the TeamHealth Fraudulent Billing Enterprise provider is outside the patient's insurance network, the enterprise misrepresents that the patient must pay 100% of the enterprise's rates not covered by the patient's insurer.

177.      The amount of each of these payment demands is tied directly to the enterprise's list prices. No other intermediary in the supply chain has control over or is responsible for the rates on which consumer payments are based. By setting the rates for TeamHealth's medical services, defendants are setting the prices plaintiffs and class members must pay.

178.    The plaintiffs' and class members' overcharges are therefore the difference between what they were billed and what they would have been billed if TeamHealth's list prices were reasonable approximations of the value of the services rendered, pursuant to state doctrines of equity like quantum meruit.

179.    Defendants' racketeering activity proximately caused the plaintiffs' injuries and those of the class members. By transmitting fraudulently inflated bills, defendants caused plaintiffs and the class to incur debt that, but for defendants' inflated bills, plaintiffs and the class would not have incurred. But for the misrepresentations that defendants made regarding the reasonable rates for the medical services the enterprise provided, plaintiffs and the class members also would have paid less, out-of-pocket, for the medical services they received. When plaintiffs and class members received bills from the TeamHealth Fraudulent Billing Enterprise, they had no reason to know that the bills demanded payment of inflated amounts that could not be lawfully recovered. Plaintiffs and class members were further induced to pay because nonpayment of these inflated bills would result in adverse credit consequences.

180.    The plaintiffs and class members were both: (i) the participants in the marketplace that most directly relied on the falsity of the enterprise's inflated benchmark prices, and (ii) the participants that were most directly harmed by the fraud. There is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms resulting from the TeamHealth Fraudulent Billing Enterprise's fraudulent scheme.

181.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, defendants are liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

182.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, the plaintiffs and members of the class further seek injunctive relief against defendants for their pricing fraud, plus the costs of bringing this suit, including reasonable attorneys' fees. Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. Plaintiffs may need to avail themselves of a hospital where the TeamHealth Fraudulent

Billing Enterprise operates in the future. And the plaintiffs and members of the class may be repeatedly billed the enterprise's fraudulent rates. In a country where tens of thousands of citizens cannot afford their medical expenses, where the expense of medical bills is a great burden on millions, and where the current COVID-19 crisis has led to an increase in hospitalizations, any continuing fraudulent, unfair, and unconscionable conduct is a serious matter that calls for injunctive relief as a remedy. Plaintiffs will seek injunctive relief, including an injunction against defendants, to prevent them from charging artificially inflated rates and failing to disclose when they operate outside a hospital's insurance networks.

**COUNT TWO**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***

183.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

184.    This claim is brought by Plaintiffs Sia Fraser and Katja Kiume on behalf of themselves and all members of the class who received care from a TeamHealth physician or medical service provider in California.

185.    California Business and Professions Code § 17200 (UCL) prohibits "unlawful, unfair, or fraudulent business acts or practices."[67]

186.    Defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, as described below.

187.    Defendants violated the "fraudulent" prong of § 17200 through their pricing fraud. As described throughout this complaint, defendants billed uninsured and out-of-network patients for medical services at inflated list prices defendants are not lawfully entitled to recover. Defendants knew their list prices were inflated and false. Plaintiffs and members of the class reasonably relied on those inflated and false list prices to make payments for medical services provided by TeamHealth

---

[67] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

physicians, and those inflated list prices caused plaintiffs and the class to incur medical debt that they would not otherwise have incurred. Plaintiffs and members of the class were injured.

188.     In addition, defendants violated the "unfair" prong of § 17200. California courts have set out several definitions of unfairness. Defendants' conduct was unfair under each of them:

      a.    A practice is unfair when "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[68] Here, defendants' billing fraud has caused thousands, if not millions, of patients to overpay for medical care, without any countervailing benefits to consumers or competition. Patients had no reason to believe defendants' inflated list prices were unrecoverable in court, and thus no reasonable means of avoiding the injuries they suffered.

      b.    A practice is unfair when it "offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[69] Billing patients for unrecoverable amounts satisfies each of these criteria.

      c.    A practice is unfair when it violates a public policy "tethered to specific constitutional, statutory or regulatory provisions."[70] Defendants' billing practices at issue violate basic principles of equity and quantum meruit, which are inscribed in Cal. Civ. Code § 1611.

189.     Defendants' actions, as set forth above, occurred within the conduct of their business and in trade or commerce.

---

[68] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

[69] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013).

[70] *See id.*

FIRST AMENDED CLASS ACTION COMPLAINT  - 43
010898-11/1357161 V2

190.     Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

191.     Plaintiffs requests that this Court enter such orders or judgments as may be necessary, including: a declaratory judgment that defendants have violated the UCL; an order enjoining them from continuing their unfair, unlawful, and/or fraudulent trade practices; an order restoring to the plaintiffs any money lost as result of defendants' unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits defendants received as a result of their unfair, unlawful, or fraudulent practices, and for any other relief as may be just and proper.

192.     In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## COUNT THREE
## VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
## CAL. CIV. CODE § 1750, *ET SEQ.*

193.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

194.     This claim is brought by Plaintiffs Sia Fraser and Katja Kiume on behalf of themselves and all members of the class who received care from a TeamHealth physician or medical service provider in California.

195.     The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). Defendants' billing practices are unfair and deceptive within the meaning of the CLRA, including under Cal. Civ. Code §§ 1770(a)(5), (7), (14), and (19).

196.     Defendants are each a "person" under Cal. Civ. Code § 1761(c).

FIRST AMENDED CLASS ACTION COMPLAINT  - 44
010898-11/1357161 V2

197.     Plaintiffs and class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased medical services from TeamHealth.

198.     As alleged in this complaint, and immediately above, defendants have engaged in both "unfair" and "deceptive" acts. Defendants billed uninsured and out-of-network patients for medical services at inflated list prices defendants are not lawfully entitled to recover. Defendants knew these list prices were inflated and false. Plaintiffs and members of the class reasonably relied on the inflated and false list prices to make payments for medical services provided by TeamHealth physicians. Those inflated list prices also caused the class to incur debt it would not otherwise have incurred. Defendants' deceptive billing practices caused massive economic injuries to patients in California and across the country, without any countervailing benefits to consumers or the public.

199.     As to all defendants, plaintiffs seek an order enjoining defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA. Plaintiffs further seek damages against defendant Holdings, having provided Holdings with notice more than thirty days prior to the filing of this First Amended Complaint that Holdings has engaged in practices declared unlawful under Cal. Civ. Code § 1750, *et seq.*  Holdings refused to correct those practices and bring them into compliance with the statute.

<div align="center">

**COUNT FOUR**
**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**
**TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.***

</div>

200.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

201.     This claim is brought by Plaintiff Tricia Bakonyi on behalf of herself and all members of the class who received care from a TeamHealth physician or medical service provider in Texas.

202.     Plaintiff Bakonyi and each defendant are each "persons" as defined by Tex. Bus. & Com. Code § 17.45(3). TeamHealth physicians provide "services" under Tex. Bus. & Com. Code § 17.45(2). Plaintiff and other class members are "consumers" as defined in Tex. Bus. & Com. Code § 17.45(4). Defendants have at all relevant times engaged in "trade" and "commerce" as defined in

1
2
Tex. Bus. & Com. Code § 17.45(6), by providing medical services and billing for those services, directly or indirectly affecting Texas citizens through that trade and commerce.

3    203.    As alleged in this complaint, and immediately above, defendants have engaged in
4  "unconscionable action[s]" in violation of Tex. Bus. & Com. Code §§ 17.50(a)(3). Defendants billed
5  uninsured and out-of-network patients for medical services at inflated list prices defendants are not
6  lawfully entitled to recover. Defendants knew these list prices were inflated and false, and yet they
7  presented them as lawful obligations for which plaintiff and class members were responsible.
8  Patients have no reason to suspect that healthcare providers will bill them for inflated amounts to
9  which they are not legally entitled. Defendants knew this and took advantage of patients' lack of
10  knowledge and understanding in a manner that is grossly unfair within the meaning of Tex. Bus. &
11  Com. Code § 17.45(5). Defendants' deceptive billing practices have caused massive economic
12  injuries to patients in Texas and across the country, without any countervailing benefits to consumers
13  or the public.

14    204.    Plaintiff and all class members have suffered economic damages within the meaning
15  of Tex. Bus & Com. Code § 17.50(a) because they have incurred debt—a payment obligation—that
16  they would not have otherwise incurred. Class members have also made payments to defendants that,
17  but for defendants' unconscionable billing practices, they would not have made.

18    205.    All procedural prerequisites, including notice, have been met. The giving of notice to
19  defendants is rendered impracticable pursuant to Tex. Bus. & Com. Code § 17.505(b). Pursuant to
20  Tex. Bus. & Com. Code § 17.505(b), plaintiff, individually and on behalf of the other Texas Class
21  members, will send to the Texas Consumer Protection Division a copy of this First Amended
22  Complaint.

23    206.    Pursuant to Tex. Bus. & Com. Code § 17.50, plaintiff requests on behalf of herself,
24  and all other class members who received care from a TeamHealth physician in Texas, (a) damages,
25  including elimination of unlawful debt, (b) injunctive relief, (c) costs and attorneys' fees, and (d) all
26  other relief the Court deems just and proper.

27
28

1

2

**COUNT FIVE**
**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW**
**N.Y. GEN. BUS. LAW §§ 349-350**

3       207.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding

4    paragraphs of this Complaint.

5       208.    This claim is brought by Plaintiff Gabrielle DiBella on behalf of members of the class

6    who were billed by TeamHealth for services provided in New York.

7       209.    The New York General Business Law (New York GBL) makes unlawful "[d]eceptive

8    acts or practices in the conduct of any business, trade or commerce."[71]

9       210.    Plaintiff DiBella and class members are "persons" within the meaning of N.Y. Gen.

10   Bus. Law § 349(h).

11      211.    Defendants are each a "person," "firm," "corporation," or "association" within the

12   meaning of N.Y. Gen. Bus. Law § 349.

13      212.    As described in this complaint, and immediately above, defendants have engaged in

14   deceptive acts in violation of the New York GBL. Defendants billed uninsured and out-of-network

15   patients for medical services at inflated prices defendants are not lawfully entitled to recover. These

16   misrepresentations were systemic and material, and defendants knew these prices were inflated and

17   false. By billing plaintiff and class members with inflated list prices, defendants caused plaintiff and

18   the class to incur medical debt that they would not otherwise have incurred. That is an economic

19   injury remediable under N.Y. Gen. Bus. Law § 349.

20      213.    Defendants' misconduct was consumer orientated, because defendants generated and

21   sent bills directly to consumer-patients with inflated prices. Defendants did this to extract additional

22   payments from consumer-patients for amounts that defendants were not entitled to collect. In doing

23   so, defendants harmed all consumers of the medical services TeamHealth provides, not just plaintiff.

24      214.    Defendants' willful and knowing conduct caused injury to plaintiff and the class.

25   Plaintiff and the class seek recovery of the following: actual damages or $50, whichever is greater;

26   discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs;

27   _____

28      [71] N.Y. Gen. Bus. Law § 349.

FIRST AMENDED CLASS ACTION COMPLAINT  - 47
010898-11/1357161 V2

an order enjoining defendants' unlawful conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

215.    Because defendants' billing scheme was knowingly perpetrated against one or more elderly persons, and caused such vulnerable persons substantial injury, additional civil penalties are also warranted pursuant to N.Y. Gen. Bus. Law § 350.

## DEMAND FOR JUDGMENT

WHEREFORE, the plaintiffs, on behalf of themselves and the proposed class, respectfully demands that this Court:

A.      Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare the plaintiffs as the representatives of the class;

B.      Enter judgment against defendants and in favor of the plaintiffs and the class;

C.      Award plaintiffs and the class damages (i.e., three times overcharges) in an amount to be determined at trial;

D.      Award plaintiffs and the class restitution;

E.      Award plaintiffs and the class punitive damages.

F.      Award plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law; and

G.      Enjoin defendants from continuing to bill patients for inflated and false list prices that exceed the amounts defendants can lawfully recover.

H.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

Dated: October 16, 2020

Respectfully submitted,

By */s/ Steve W. Berman*

Steve W. Berman (admitted *pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
steve@hbsslaw.com
craigs@hbsslaw.com
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Ben M. Harrington (SBN 313877)
Rio S. Pierce (SBN 298297)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: benh@hbsslaw.com
Email: riop@hbsslaw.com

Hannah Brennan (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
hannahb@hbsslaw.com
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Benjamin Elga (*pro hac vice* forthcoming)
Brian J. Shearer (*pro hac vice* forthcoming)
Craig L. Briskin (admitted *pro hac vice*)
JUSTICE CATALYST LAW, INC.
81 Prospect Street
Brooklyn, NY 11201
belga@justicecatalyst.org
bshearer@justicecatalyst.org
cbriskin@justicecatalyst.org
Telephone: (202) 524-8846

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on October 16, 2020, I electronically transmitted the foregoing document

3    to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of

4    Electronic Filing to all ECF registrants.

5

6                                            /s/ Steve W. Berman
                                             STEVE W. BERMAN
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28