Carol Lynn Thompson (SBN 148079)
cthompson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Matthew P. Henry (SBN 308878)
mhenry@sidley.com
Jennifer H. Lee (SBN 329079)
jhlee@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Mark B. Blocker (admitted *pro hac vice*)
mblocker@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7436

*Attorneys for Defendants Team Health Holdings,
Inc., AmeriTeam Services, LLC, TeamHealth Inc.
n/k/a Team Health, LLC, and HCFS Health Care
Financial Services, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND

| | |
|---|---|
| SIA FRASER, TRICIA BAKONYI, GABRIELLE DIBELLA, and KATJA FIUME, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, TEAMHEALTH, INC. n/k/a TEAM HEALTH, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,<br><br>                              Defendants. | Civil Action No.  4:20-cv-04600-JSW<br><br>CLASS ACTION<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   March 26, 2021<br>Time:  9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Courtroom:     5, 2nd Floor<br><br>**JURY TRIAL DEMANDED** |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Defendants Team Health Holdings, Inc., HCFS Health Care Financial Services, LLC, TeamHealth Inc. n/k/a Team Health LLC and AmeriTeam Services, LLC will and hereby do move this Court to dismiss Plaintiffs' First Amended Class Action Complaint (ECF No. 38, Oct. 16, 2020) ("FAC").  This Motion shall be heard on March 26, 2021, at 9:00 a.m., or as soon thereafter as it may be heard, before the Honorable Jeffrey S. White, United States District Judge, in Courtroom 5 of the Oakland Courthouse located at 1301 Clay Street, Oakland, CA 94612.  This Motion is brought pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  This Motion is based on this Notice, the Memorandum of Points and Authorities, the Declarations of Jaime Bartlett ("Bartlett Decl.") and Paula Dearolf ("Dearolf Decl.") and the attached exhibits, the Request for Judicial Notice in Support of Defendants' Motion to Dismiss, the complete files and records of this action, and such other matters and arguments as may come before this Court, including those raised in connection with reply briefing and oral argument.

Defendants seek an order dismissing the FAC in its entirety with prejudice.

Respectfully submitted,

Dated: December 18, 2020

*/s/ Carol Lynn Thompson*

Mark B. Blocker (admitted *Pro Hac Vice*)
mblocker@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7436

Carol Lynn Thompson (SBN 148079)
cthompson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Matthew P. Henry (SBN 308878)
mhenry@sidley.com
Jennifer H. Lee (SBN 329079)
jhlee@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

*Attorneys for Defendants Team Health Holdings, Inc., AmeriTeam Services, LLC, TeamHealth Inc. n/k/a Team Health, LLC, and HCFS Health Care Financial Services, LLC*

# TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT ................................................................................. 1

II.     STATEMENT OF ISSUES TO BE DECIDED ................................................... 2

III.    FACTUAL AND PROCEDURAL BACKGROUND............................................. 2

        A.   Defendants. ................................................................................................. 2

        B.   Healthcare Pricing...................................................................................... 3

        C.   Plaintiffs. .................................................................................................... 4

        C.   The Complaint. ........................................................................................... 5

IV.     LEGAL STANDARD ............................................................................................ 6

V.      ARGUMENT .......................................................................................................... 6

        A.   Plaintiffs Bakonyi, DiBella and Fiume Lack Article III Standing.................... 6

        B.   Plaintiff's RICO Claim Should be Dismissed for Failure to State a Claim...... 7

                1.   Plaintiffs Have Not Pled a Common Purpose. ..................................... 8

                2.   Plaintiffs Have Not Alleged Defendants' Conduct............................. 10

                3.   Plaintiffs Have Not Alleged Any Predicate Racketeering Acts.......... 12

        C.   Plaintiffs' State Law Statutory Claims Must Also Be Dismissed. ................. 17

                1.   The California Statutory Claims Should Be Dismissed...................... 17

                2.   The New York Gen. Bus. Law Section 349 Claim Should Be Dismissed. ......................................................................................... 19

                3.   Texas Statutory Claim Should Be Dismissed. .................................... 20

VI.     CONCLUSION.................................................................................................... 21

1

2

# TABLE OF AUTHORITIES

**Page(s)**

3

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................6, 11

*AT&T Corp. v. Shroeder*,
No. C04-5709FDB, 2006 WL 1806187 (W.D. Wash. June 28, 2006)........................14

*Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*,
Case No. CV 15-06209-MWF, 2017 WL 8943149 (C.D. Cal. Oct. 20, 2017) .............9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................................6

*Blue v. Diversified Adjustment Serv.*,
Case No. 5:17-cv-00366-SVW-KK, 2017 WL 3600723 (C.D. Cal. Aug. 11, 2017) ....7

*Bowden v. Med. Ctr., Inc.*,
845 S.E.2d 555 (Ga. 2020) ........................................................................................15

*Bradford v. Vento*,
48 S.W.3d 749 (Tex. 2001)........................................................................................21

*Brown v. Knoxville HMA Holdings, LLC*,
447 F. Supp. 3d 639 (M.D. Tenn. 2020) ...................................................................15

*Camp v. Pac. Fin. Grp.*,
956 F. Supp. 1541 (C.D. Cal. 1997) ..........................................................................12

*Cansino v. Bank of Am.*,
224 Cal. App. 4th 1462 (2014) ..................................................................................18

*Children's Hosp. of Cent. Cal. v. Blue Cross of Cal.*,
226 Cal. App. 4th 1260 (2014) ..................................................................................15

*Clapper v. Amnesty Int'l, USA*,
568 U.S. 398 (2013).....................................................................................................7

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
Nos. 2:11-ML-02265-MRP (MANx), 2:11-CV-07166-MRP, 2:11-cv-09889-MRP
(MANx), 2012 WL 10731957 (C.D. Cal. June 29, 2012) ........................................8, 9

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ....................................................................................2

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .................................................................................8, 12

*Edwards v. Marin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) ....................................................................................6

*Elston v. Encore Capital Grp., Inc.*,
No. 2:18-CV-0071-TOR, 2019 WL 3037054 (E.D. Wash. July 11, 2019)...................7

iii

*Finkelstein v. AXA Equitable Life Ins. Co.*,
  325 F. Supp. 3d 1061 (N.D. Cal. 2018) .................................................................................2

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) ...............................................................................................8

*Glenn v. Hyundai Motor Am.*,
  Case No. SA CV 15-2052-DOC, 2016 WL 3621280 (C.D. Cal. June 24, 2016)...........6

*Gomez v. Guthy-Renker, LLC*,
  Case No. EDCV 14-01425 JGB, 2015 WL 4270042 (C.D. Cal. July 13, 2015)..........11

*Gould v. Workers Comp. Appeals Bd.*,
  4 Cal. App. 4th 1059 (1992) .............................................................................................15

*Grauberger v. St. Francis Hosp.*,
  169 F. Supp. 2d 1172 (N.D. Cal. 2001) ......................................................................14, 15

*Gregory v. Albertson's, Inc.*,
  104 Cal. App. 4th 845 (2002) ......................................................................................18, 19

*In re Jamster Mktg. Litig.*,
  No. 05CV0819 JM(CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) ......................8

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ...........................................................................................6

*Keegan v. Am. Honda Motor Co.*,
  838 F. Supp. 2d 929 (C.D. Cal. 2012) ...............................................................................6

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) .....................................................................................................18

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
  940 F.2d 397 (9th Cir. 1991) .............................................................................................6

*Langford v. Rite Aid of Ala., Inc.*,
  231 F.3d 1308 (11th Cir. 2000) .......................................................................................17

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).............................................................................................................7

*McCoy v. FemPartners, Inc.*,
  484 S.W.3d 201 (Tex. App. 2015).................................................................................9, 10

*Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*,
  Case No. CV 09-05612 GAF, 2010 WL 11508022 (C.D. Cal. Feb. 26, 2010)............15

*Moran v. Prime Healthcare Mgmt., Inc.*,
  3 Cal. App. 5th 1131 (2016) .............................................................................................19

*Nassau Anesthesia Assocs. PC v. Chin*,
  924 N.Y.S.2d 252 (2011).............................................................................................3, 16

*Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank*,
  85 N.Y.2d 20 (1995) .........................................................................................................19

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)................................................................................................10

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) .................................................................................7

*Schulenberg v. Rawlings Co.*,
    No. CVN03-0134-HDM(VPC), 2003 WL 22129230 (D. Nev. Aug. 20, 2003) ..........14

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)..................................................................................................8

*Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*,
    861 F. Supp. 1351 (S.D. Tex. 1994) ......................................................................21

*Sokolski v. Trans Union Corp.*,
    53 F. Supp. 2d 307 (E.D.N.Y. 1999) .....................................................................20

*Stutman v. Chem. Bank*,
    95 N.Y.2d 24 (2000) ...............................................................................................19

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*,
    992 F. Supp. 2d 962 (C.D. Cal. 2014) ...................................................................18

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F. 3d 108 (2d Cir. 2013)...................................................................................14

*UnitedHealthcare Servs., Inc. v. Asprinio*,
    16 N.Y.S.3d 139 (2015).....................................................................................13, 19

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) .................................................................11

*Yagman v. Kelly*,
    Case No. CV 17-6022-MWF, 2018 WL 2138461 (C.D. Cal. Mar. 20, 2018) ............11

**Rules & Statutes**

18 U.S.C. § 1962(c) .......................................................................................................8

Fed. R. Civ. P. 12(b)(1)..................................................................................................7

Fed. R. Civ. P. 12(b)(6)..................................................................................................2

Fed. R. Civ. P. 9(b) ............................................................................................... *passim*

Cal. Bus. & Prof. Code §§ 17200 et seq.,
    (Unfair Competition Law, "UCL")...........................................................................6

Cal. Bus. & Prof. Code § 17203 .................................................................................18

Cal. Bus. & Prof. Code § 17204 .................................................................................18

Cal. Bus. & Prof. Code §§ 2400 et seq. ......................................................................9

Cal. Civ. Code §§ 1750 et seq.,
    (Consumer Legal Remedies Act, "CLRA")..............................................................6

N.Y. Gen. Bus. Law §§ 349-50,
    (New York General Business Law, "NYGBL").................................................. *passim*

N.Y. Gen. Bus. Law § 349-c................................................................................*20*

Tex. Bus. & Com. Code §§ 17.41 et seq.,
    (Texas Deceptive Trade Practices Act, "TDTPA") .................................................6

Tex. Bus. & Com. Code § 17.45................................................................................20

Tex. Bus. & Com. Code § 17.45(5)............................................................................21

Tex. Bus. & Com. Code § 17.50................................................................................20

Tex. Bus. & Com. Code § 17.50(a)(3).........................................................................21

Tex. Occ. Code §§ 155 et seq. ..................................................................................9

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## I.      SUMMARY OF ARGUMENT

3       The First Amended Complaint ("the FAC") alleges that Defendant Team Health Holdings,

4    Inc. ("Holdings"), and certain of its operating subsidiaries – Defendants HCFS Health Care

5    Financial Services ("HCFS"), TeamHealth Inc. n/k/a Team Health, LLC ("THI") and AmeriTeam

6    Services, LLC ("AmeriTeam") – engaged in a scheme to defraud uninsured and out-of-network

7    patients by billing them inflated amounts for medical care provided by emergency room physicians

8    who contracted with Defendants for billing and other administrative services.  While the FAC

9    alleges that the amounts billed were too high, it never explains why and, even worse, tries to

10   transform this unsubstantiated, pricing dispute into a sinister, civil RICO conspiracy.  The FAC

11   should be dismissed for several reasons.

12       First, the three newly-added plaintiffs lack Article III standing.  None of these plaintiffs have

13   paid any amount for the medical services for which they received purportedly inflated bills and so

14   have not suffered an injury-in-fact.  While these Plaintiffs allege that they *might* be reported to credit

15   agencies for failure to pay, that type of speculative future injury is insufficient to establish standing.

16       Second, Plaintiffs' RICO claim (Count I) should be dismissed because the FAC does not

17   allege — and certainly not with the specificity required by Rule 9(b) — essential elements of the

18   claim.  The FAC does not allege a viable RICO enterprise because it fails to allege a common

19   purpose among the members of the enterprise, nor does it allege each Defendants' conduct as part of

20   the enterprise as distinguished from ordinary business objectives and activities.  And, most critically,

21   the FAC fails to establish that the bills sent to Plaintiffs were fraudulently inflated and so fails to

22   plead a predicate act of mail or wire fraud.

23       Third, plaintiffs' claims under the California, Texas and New York consumer protection

24   statutes (Counts II–V) should be dismissed for similar reasons.  Plaintiffs cannot satisfy the standing

25   requirements for those statutes, and fail to allege any fraudulent or deceptive practice since there is

26   no basis for Plaintiffs' assertion that the bills make any misrepresentation.  Nor can Plaintiffs

27   demonstrate damages or causation.  Moreover, these claims cannot be asserted against any of the

28   Defendants apart from HCFS because they did not send the bills.

## II.   STATEMENT OF ISSUES TO BE DECIDED

- Whether Plaintiffs Bakonyi, DiBella and Fiume fail to satisfy Article III standing requirements because they did not pay any amount for the billed medical services.
- Whether Count I (RICO) should be dismissed pursuant to Fed. R. Civ. Proc. 9(b) and 12(b)(6) for failure to plead the elements of a RICO claim with specificity, including: i) a RICO enterprise; ii) conduct by Defendants in furtherance of the enterprise; and iii) predicate acts of mail or wire fraud.
- Whether Counts II, III, IV and V fail to state a claim against Defendants Holdings, THI, and AmeriTeam because those Defendants did not make any misrepresentation to, or collect any money or property from, Plaintiffs.
- Whether Count IV and V should be dismissed because Plaintiffs lack standing to assert such claims and cannot establish damages or causation.

## III.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Defendants.

Defendant Holdings is a non-operating holding company based in Tennessee.  FAC ¶ 43 (ECF No. 38).  It does not have any employees or engage in any activities.  *Id*. ¶ 42.  Its sole asset is its investment in and ownership of the membership interests of Team Finance, LLC, which is not a party to this action.  Decl. of Jaime Bartlett ("Bartlett Decl."), Ex. 4 ("Stair Decl.") ¶ 9.[1]

Defendant AmeriTeam is an operating subsidiary of Team Finance, LLC, based in Tennessee.  FAC ¶ 44.  AmeriTeam enters into support services agreements with medical providers, including other operating subsidiaries of Team Finance LLC, to provide administrative services such as payroll, information technology, finance, tax, compliance, and human resources.  *Id*.  AmeriTeam

---

[1] On a motion to dismiss, this Court can consider documents that are subject to judicial notice without converting the motion into a summary judgment motion.  *See Finkelstein v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061, 1066 (N.D. Cal. 2018) ("Under the incorporation by reference doctrine, courts are permitted to look beyond the pleadings without converting a Rule 12(b)(6) motion into a motion for summary judgment." (citing *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160-61 (9th Cir. 2012))).  As set forth in the concurrently filed Request for Judicial Notice ("RJN"), the Court can consider the Supplemental Stair Declaration cited in the Complaint.

1   also procures professional liability insurance and negotiates agreements with health insurance plans.

2   *Id.*  AmeriTeam receives a management fee for providing these services.

3        Defendant THI is a limited liability company owned by Team Finance, LLC.  *Id.* ¶ 45.

4   Before January 2015, THI provided administrative support services, like those now provided by

5   AmeriTeam, pursuant to service contracts and also earned a management fee. *Id.*

6        Defendant HCFS is a Florida limited liability company and operating subsidiary of Team

7   Finance, LLC, that provides billing services to other operating subsidiaries and affiliated medical

8   groups—including coding, billing and collection services—pursuant to service agreements.  *Id.* ¶ 46.

9   HCFS receives a fee for such services.

10       "TeamHealth" or "TEAMHealth" is a registered, trade-marked name and logo routinely used

11  by Team Finance LLC operating subsidiaries, and medical service providers affiliated or associated

12  with such subsidiaries.  Stair Decl. ¶ 4.  While the FAC refers to Defendants collectively as

13  "TeamHealth," they are separate entities and there is no organization operating as "TeamHealth."

14       Certain operating subsidiaries of Team Finance LLC, not named as Defendants in the FAC,

15  contract with hospitals to provide outsourced clinical staffing.  FAC ¶ 52.  These subsidiaries, in

16  turn, contract with physicians as either independent contractors or employees to provide the clinical

17  staffing necessary to fulfill the hospital contracts.  *Id.* ¶¶ 42, 52.  The physicians are solely

18  responsible for providing medical care to patients and making clinical decisions.  None of the

19  Defendants provide medical care or make clinical decisions, nor contract directly with physicians.

20         **B.**    **Healthcare Pricing.**

21       Hospitals bill patients for the services provided by hospital employees as well as any

22  medications or medical supplies provided to those patients.  Medical care provided in a hospital by

23  independently contracted clinical staff pursuant to outsourcing contracts is billed directly by that

24  physician or her medical group, and not by the hospital.

25       The charges for services rendered by medical care providers vary depending on whether a

26  patient has insurance.  Most charges are set through negotiations between insurance companies and

27  medical providers.  *See, e.g.*, *Nassau Anesthesia Assocs. PC v. Chin*, 924 N.Y.S.2d 252, 254 (2011).

28  Insured patients are billed charges based on their insurer's adjustment of the claim.

Some patients, however, do not have insurance or their insurer does not have a contract with the medical provider. FAC ¶¶ 79-80. Medical providers set list charges for services not covered by a negotiated insurance network contract in a document called a Chargemaster. *Id.* ¶¶ 62, 80. Hospitals are required to publish their Chargemaster, but Plaintiffs allege that non-hospital medical care providers are not. *Id.* ¶¶ 64-66. The FAC alleges that HCFS sets the Chargemaster prices charged to uninsured and out of network patients by affiliated medical provider groups at the hospitals with which those medical providers contracted to provide services. *Id.* ¶ 139.

Patients do not always pay the full Chargemaster amount. As the FAC points out, many hospitals have financial assistance programs that allow for substantial discounts. *Id.* ¶ 21. Many patients never pay their medical bills and even for patients that pay in full, they seldom pay immediately, as Plaintiffs' experience demonstrates.

### C.   Plaintiffs.

Plaintiff Sia Fraser is a California resident who received emergency room services at Tri-City Medical Center in California. *Id.* ¶ 19. Upon admission, Fraser signed an admittance form acknowledging that she would receive care from physicians who were independent contractors, and who would bill her separately for the services provided. *Id.* ¶ 57 & n.24; Decl. of Paula Dearolf ("Dearolf Decl."), Ex. 1 (Conditions of Admission Form, Sept. 30, 2019) at 1. Fraser was treated by an emergency room doctor employed by Team Physicians of Southern California. *Id.* ¶¶ 19, 21, 23. At the time of her emergency services, she was uninsured. *Id.* ¶ 20. Fraser subsequently received a bill from HCFS seeking payment of $1,082 for treatment under CPT code 99220. *Id.* ¶ 21.

Plaintiff Tricia Bakonyi is a Texas resident who received emergency services at St. David's Medical Center South on September 30, 2019 and was insured by UnitedHealthcare. *Id.* ¶ 24. Longhorn Emergency Medical Services submitted a claim to UnitedHealthcare for $1,370 for the treatment provided to Bakonyi under CPT code 99285. *Id.* ¶ 26. UnitedHealthcare refused to pay, asserting the claim should have been submitted under a different CPT code *Id.* ¶¶ 26, 29. Bakonyi has not made any payments as of July 2020, and was told by an HCFS representative that it continued to negotiate with UnitedHealthcare for payment and disputed any coding error. *Id.* ¶ 30.

Plaintiff Gabriela DiBella resides in New York.  *Id.* ¶ 31.  She was treated on an emergency basis on June 20, 2020 at St. Joseph's Hospital.  *Id.*  She received a bill for services provided by Emergency Care Services of New York at St. Joseph's for $554.00 from HCFS for CPT Code 99283.  *Id.* ¶¶ 34-35.  DiBella alleges that she is insured by Blue Cross Blue Shield, *id.* ¶ 32, but she did not provide insurance information to HCFS or the medical provider.  DiBella has not responded or otherwise contacted HCFS or paid the bill.  *Id.* ¶ 36.

Plaintiff Katja Fiume resides in California.  *Id.* ¶ 37.  She was treated on an emergency basis on June 13, 2020 at Sharp Grossmont Hospital and is not insured.  *Id.* ¶¶ 37-38.  She received a bill for $715 for treatment provided by Dr. Brook Beall of Team Physicians of Northern California under CPT Code 99284.  *Id.* ¶ 39.  Fiume has not made any payments to Team Physicians.  *Id.* ¶ 40.  Her bill was submitted for reimbursement through the AB75 program and Fiume will not be responsible for payment.  Dearolf Decl. ¶ 12.

**C.      The Complaint.**

Plaintiffs filed their amended complaint on October 16, 2020.[2]  The gist of the FAC is that the Chargemaster prices allegedly set by HCFS and charged by affiliated medical groups are too high and that Defendants impermissibly billed Plaintiffs amounts that could not be recovered in a hypothetical quantum meruit action.  But stripped of the purely rhetorical references to bills being "fraudulent" or "inflated," the FAC offers no specifics.  While alleging that the Chargemaster prices are "not reasonable approximations of the actual value of their services," and that "the real value of their services are far lower," *id.* ¶¶ 146-47, the FAC never explains why or what the reasonable value was, and does not compare the Chargemaster prices for services rendered to Plaintiffs with the Chargemaster prices of even a single competitor for those same services.

Premised on this untethered theory that the Chargemaster prices are too high so that the bills requesting payment for those amounts are purportedly "fraudulent," the FAC asserts five claims. Count I asserts a RICO claim on behalf of a purported nationwide class of all uninsured patients or out-of-network patients who "were provided medical treatment . . . and who received a bill from

---

[2] Plaintiff Fraser originally filed this action on July 10, 2020, only asserting claims against Holdings. The amended complaint added three plaintiffs and three defendants: AmeriTeam, THI and HCFS.

DEFENDANTS' MOTION TO DISMISS, CASE NO. 4:20-CV-04600-JSW

1   Team Health [Holdings, Inc.] or an entity billing on its behalf for that treatment." *Id.* ¶¶ 113, 124-

2   82. Counts II and III assert California statutory claims under the Unfair Competition Law (Cal. Bus.

3   & Prof. Code §§ 17200 et seq., "UCL") and the Consumer Legal Remedies Act (Cal. Civ. Code §§

4   1750 et seq., "CLRA") on behalf of a purported California sub-class. *Id.* ¶¶ 183-99. Counts IV and

5   V assert claims under the Texas Deceptive Trade Practices Act (Tex. Bus. & Com. Code §§ 17.41 et

6   seq., "TDTPA") and the New York General Business Law (N.Y. Gen. Bus. Law §§ 349-350

7   ("NYGBL"), respectively. *Id.* ¶¶ 200-15.

8   **IV.   LEGAL STANDARD**

9           To survive a motion to dismiss, a complaint must plead sufficient facts "to state a

10   claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

11   In order to be facially plausible, a complaint must create a "reasonable inference that the defendant

12   is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

13   In addition, where the allegations sound in fraud, Plaintiff must satisfy the heightened pleading

14   requirements of Rule 9(b), pleading the circumstances of fraud with particularity, including "the

15   time, place, and manner of each act of fraud, plus the role of each defendant in each scheme."

16   *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991). Here,

17   Plaintiffs' claims are all premised on the same "unified course of fraudulent action" – *i.e.,* that

18   Defendants fraudulently demanded payment of "inflated" charges that were "not reasonable

19   approximations of the actual value of the[] services"—so those claims all are governed by Rule 9(b).

20   FAC ¶ 147; *see Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) (civil RICO

21   fraud claims); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (CLRA and UCL

22   claims alleging fraud); *Glenn v. Hyundai Motor Am.*, Case No. SA CV 15-2052-DOC (KESx), 2016

23   WL 3621280, at *10 (C.D. Cal. June 24, 2016) (applying Rule 9(b) to Texas DTPA and NYGBL §

24   349 claims); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012) (NYGBL

25   § 349 claims).

26   **V.   ARGUMENT**

27           **A.   Plaintiffs Bakonyi, DiBella and Fiume Lack Article III Standing.**

28           The claims of Plaintiffs Bakonyi, DiBella and Fiume should be dismissed because they lack

1    Article III standing.  Fed. R. Civ. P. 12(b)(1).  To establish Article III standing, a plaintiff "bears the

2    burden" of establishing an injury-in-fact that is: (1) concrete, particularized, and actual or imminent;

3    (2) fairly traceable to the defendant's conduct; and (3) redressable by a favorable court decision.

4    *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  A 12(b)(1) motion can be brought as

5    either a facial challenge based on the pleadings or a factual challenge based on evidence outside the

6    complaint.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

7              Here, the facts demonstrate that none of these three Plaintiffs have made any payment—or

8    even promised payment—for the medical services at issue.  Dearolf Decl. ¶¶ 6, 10, 13.  The FAC

9    alleges that Plaintiffs did not contractually agree to pay any amount in exchange for the services

10   provided.  FAC ¶ 57.  All the FAC alleges is that each Plaintiff was sent a bill that purportedly

11   charged more than Plaintiffs believe the medical providers were entitled to collect under quantum

12   meruit principles.  The mere receipt of a bill in an allegedly excessive amount does not constitute

13   injury-in-fact under Article III.  *See Blue v. Diversified Adjustment Serv.*, Case No. 5:17-cv-00366-

14   SVW-KK, 2017 WL 3600723 (C.D. Cal. Aug. 11, 2017) (no injury-in-fact where plaintiff received a

15   collections letter with various payment options but did not pay any amounts that purportedly

16   constituted abusive practices); *see also Elston v. Encore Capital Grp., Inc.,* No. 2:18-CV-0071-TOR,

17   2019 WL 3037054, at *4 (E.D. Wash. July 11, 2019) (no injury-in-fact where plaintiff "simply

18   received the [collections] letter and filed suit" without paying or promising to pay because there is

19   no "concrete harm based on her receiving the letter.").

20             While Plaintiffs profess to be concerned that "outstanding debt will adversely impact [their]

21   credit," FAC ¶¶ 36, 40, none of these Plaintiffs have been reported to a credit agency. Dearolf Decl.

22   ¶¶ 6, 10, 13.  Speculative concerns about potential future harm do not establish injury-in-fact.  *See,*

23   *e.g., Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409-10 (2013).  Indeed, these concerns are

24   particularly speculative here because Bakonyi's insurer is still negotiating the bills directly, DiBella

25   has never even sought insurance coverage, and Fiume's bill was submitted to the AB75 program.

26             **B.      Plaintiff's RICO Claim Should be Dismissed for Failure to State a Claim.**

27             Plaintiff's RICO claim should be dismissed because the FAC fails to allege the essential

28   elements of a RICO claim.  Plaintiff must allege that Defendants participated in "(1) the conduct of

1   (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity . . .

2   [that is] (5) the proximate cause of harm to the victim." *Eclectic Props. E., LLC v. Marcus &*

3   *Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v.*

4   *Imrex Co.*, 473 U.S. 479, 496–97 (1985)).  Plaintiff has not pled any of these elements, let alone with

5   the specificity required by Rule 9(b).

6           **1.      Plaintiffs Have Not Pled a Common Purpose.**

7           "The hallmark of an enterprise is an association of entities, groups or individuals that 'must

8   share a common purpose to engage in a particular fraudulent course of conduct and work together to

9   achieve such purposes.'"  *In re Jamster Mktg. Litig.*, No. 05CV0819 JM(CAB), 2009 WL 1456632,

10  at *5 (S.D. Cal. May 22, 2009), *quoting First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d

11  159, 174 (2d Cir. 2004.  Plaintiffs have not satisfied the common purpose element because the FAC

12  merely alleges that Defendants shared the lawful common purpose of wanting to earn money.  An

13  alleged RICO enterprise must "distinguish ordinary business conduct from fraudulent conduct."

14  *Jamster*, 2009 WL 1456632, at *5.

15          Paragraph 131 of the FAC defines the supposed RICO enterprise and alleges that it consists

16  of:  a) Defendant Holdings; b) Defendants AmeriTeam and THI; c) a purported network of regional

17  subsidiaries that contract with provider groups; d) the provider groups that staff hospitals and

18  provide care; e) Defendant HCFS and f) non-party Healthcare Revenue Group (HRRG).  FAC ¶ 131.

19  Paragraph 132 alleges that the common purpose shared by these entities is "extracting profits derived

20  from centrally set, fraudulent prices."  *See also id.* ¶¶ 131, 177.  Stripped of the accusatory language,

21  or "artful modifiers," *Jamster*, 2009 WL 1456632, at *5, all the FAC alleges is that a group of

22  entities were involved in trying to earn profits.  But as numerous courts have pointed out, merely

23  "earning profits" is not sufficient to allege a RICO common purpose because a complaint has to

24  allege that the enterprise participants were doing something that was *inconsistent* with normal

25  business activity.  *Id.*  Allegations that a group of persons acted together to try to earn profits is

26  "consistent with ordinary business conduct and an ordinary business purpose."  *Id.*; *see also In re*

27  *Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, Nos. 2:11-ML-02265-MRP (MANx), 2:11-CV-

28  07166-MRP, 2:11-cv-09889-MRP (MANx), 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012)

("Parties that enter commercial relationships 'for their own gain or benefit' do not constitute an 'enterprise.'" (citations omitted)).

Here, there is little doubt that each purported participant was engaged in the entirely lawful conduct of earning money in exchange for services provided to patients and to each other. As to Holdings, it earns profits from its equity interest in its subsidiary, TeamHealth Finance LLC. The other Defendants (AmeriTeam, THI and HCFS) earned contractual management fees—not a percentage of patient charges—in exchange for the administrative services performed. The provider groups received payments based on the medical services provided and the charges billed.[3]  None of this suggests anything other than lawful business conduct. The fact that Plaintiff contends—without any supporting allegation—that the charges billed to patients were too high does not transform this collection of entities and persons into a RICO enterprise. *Bay City Surgery Ctr., Inc. v. ILWU-PMA Welfare Plan Bd. of Trustees*, Case No. CV 15-06209-MWF (AFMx), 2017 WL 8943149, at *9–*10 (C.D. Cal. Oct. 20, 2017) (allegations that defendants engaged in fraudulent medical billing were insufficient to allege RICO enterprise).

Plaintiffs also attempt to conjure up some improper common purpose by suggesting that the purported enterprise was designed "to circumvent prohibitions on the corporate practice of medicine." FAC ¶¶ 143, 145. However, the allegations of the FAC fail to explain how Defendants have flouted restrictions on the corporate practice of medicine which are designed to ensure that only properly licensed medical professionals, and not artificial entities, provide medical care. *See, e.g.,* Cal. Bus. & Prof. Code §§ 2400 et seq.; *see also* Tex. Occ. Code §§ 155 et seq.  None of the Defendants are alleged to have provided clinical care or exercised any type of professional medical judgment as unlicensed providers. Nor does the FAC allege that the clinical care or professional decisions rendered by the medical providers were impermissibly affected by their business arrangements with Defendants. *McCoy v. FemPartners, Inc.,* 484 S.W.3d 201, 207 (Tex. App.

---

[3] Plaintiff alleges that the "[t]he enterprise pays the regional subsidiaries and provider groups from the inflated bills and prices," FAC ¶ 150, but this is insufficient to show a shared common fraudulent purpose. Any time a plaintiff alleges that one entity obtains wrongful profits and does business with another entity, she can allege that the second entity was paid from the wrongful profits, but that does not mean that those two entities share a common purpose. *See Countrywide*, 2012 WL 10731957, at *9 (rejecting allegations of common purpose between Countrywide and lenders that amounted to "Countrywide offered to buy something, and the lenders obliged.").

9

2015) (no violation of CPOM doctrine where doctor "was completely independent . . . as to diagnosis, treatment, and operation of the clinic, using his own judgment in all such matters.").  And, there is no evidence that any of the Defendants impermissibly "employed" any medical provider. FAC ¶ 143.  Rather, Defendants are in the business of providing administrative services and eliminating the overhead burdens—*i.e.,* the non-clinical functions—associated with running a medical practice which is perfectly appropriate.  *McCoy*, 484 S.W.3d at 210.

### 2.    Plaintiffs Have Not Alleged Defendants' Conduct.

The RICO claim also fails because the FAC does not allege specific acts undertaken by Defendants in conducting the affairs of the alleged enterprise or that the alleged conduct of the enterprise was distinct from any of the entities' own affairs.  As the Supreme Court has explained, in RICO cases, "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs."  *See Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (citation omitted).  This means that the defendant must "participate in the operation or management of the enterprise itself."  *Id.*

First, Holdings has no employees and conducts no operations so it could not have carried out the operations of the claimed enterprise.  The FAC attempts to get around this by vaguely alleging that Holdings "provides strategic directives" to its operating subsidiaries, FAC ¶¶ 131, 133, without making any allegations about how that relates to the conduct of the RICO enterprise.  The FAC claims such "strategic directives" related to "marketing, branding, strategic direction and relationships, growth and finance/accounting related activities"—quoting the Supplemental Stair Declaration which describes the role of Holdings vis a vis its operating subsidiaries—all of which are lawful business activities by a holding company in the management of its subsidiaries.  The FAC thus fails to allege specific conduct by Holdings in the management or operation of the purported RICO enterprise as required by Rule 9(b).

Second, AmeriTeam and THI are alleged to provide "day-to-day management" services, *id.* ¶¶ 134-136, yet fails to allege how any of those day-to-day management services – such as human resources or insurance contracting – constitute "conduct" of the RICO enterprise as opposed to routine business functions.  Courts have rejected similar attempts to turn standard business

10

relationships between service providers and clients into allegations of conducting the affairs of an enterprise.  For example, in *Gomez v. Guthy-Renker, LLC*, Case No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042 (C.D. Cal. July 13, 2015), the court held that simply "elaborating verbosely on what a Servicer/Client Relationship means" did not show conduct of a RICO enterprise.  2015 WL 4270042, at *6, *11; *see also In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034-35 (C.D. Cal. 2011) ("[T]he existence of a business relationship between WellPoint, Ingenix, and the Insurance Defendants without more does not show that WellPoint conducted the enterprise.").

Third, HCFS allegedly "sets the prices and transmits bills to consumers," FAC ¶ 139, but the FAC fails to allege how it does so in a purportedly fraudulent manner.  As discussed, *infra* Section V.B.3.a, there are no allegations about how HCFS sets Chargemaster prices in some systemic way that results in wholly inflated prices, nor that it drafts bills to defraud customers and misrepresent the prices charged or the providers' entitlement to such charges.  The mere acts of setting prices or sending bills does not establish conduct pursuant to a RICO enterprise, as opposed to the mere provision of routine billing services pursuant to an administrative contract with medical providers and groups in a normal service provider relationship.

Fourth, with respect to the regional subsidiaries and the provider groups—who are essential to the purported enterprise[4]—the FAC implausibly suggests that these non-defendants enter into hospital contracts and provide medical care merely to provide "the cover necessary to transmit and collect on the fraudulent prices." *Id.* ¶¶ 137-38.  The notion that these providers' professional relationships with hospitals and their provision of medical care are conducted as a mere "cover" for a fraudulent RICO enterprise is plainly implausible – they would have no incentive to do so.  *Iqbal*, 556 U.S. at 678 (complaint must plead facts sufficient to make liability plausible).  Moreover, there are no allegations in the FAC about any specific conduct by any particular regional subsidiary or medical provider group that establishes conduct in the operation of "the enterprise," independent of

---

[4] Without the medical provider groups, the enterprise impermissibly consists of Holdings and its operating subsidiaries—AmeriTeam, THI and HCFS—which fails to meet the distinctness requirement for a RICO enterprise. *Yagman v. Kelly*, Case No. CV 17-6022-MWF (PJWx), 2018 WL 2138461, at *15 (C.D. Cal. Mar. 20, 2018) ("parent corporation and its subsidiaries do not together constitute a RICO 'enterprise'").

their essential activities in the provision of medical care.

Plaintiffs' failure to plead specific conduct, as required by Rule 9(b), by each Defendant and member of the enterprise contributing to the actual management and operations of the purported RICO enterprise mandates dismissal of this claim.

### 3.    Plaintiffs Have Not Alleged Any Predicate Racketeering Acts.

The RICO claim further fails because the FAC does not allege predicate acts of mail or wire fraud.  The FAC alleges that Defendants engaged in mail and wire fraud by "transmitt[ing] fraudulent [bills] . . . to and [seeking] payment from [patients] using the U.S. mails and interstate wire facilities."  FAC ¶ 157.  However, the FAC's allegations fail to establish that any bill sent to any patient, including Plaintiffs, was fraudulent or that Defendants intentionally sent fraudulent bills, and so fails to establish that Defendants engaged in the alleged predicate act of mail or wire fraud. *See Camp v. Pac. Fin. Grp.*, 956 F. Supp. 1541, 1551 (C.D. Cal. 1997) (failure to state RICO claim where plaintiffs had not identified any reason why alleged mailings were fraudulent); *Eclectic Properties E.*, 751 F.3d at 997, 999-1000 (affirming dismissal where plaintiffs failed to establish scienter required for mail fraud).

#### a.    Plaintiffs Fail to Establish Misrepresentations.

The FAC repeatedly asserts that the bills sent to Plaintiffs and the putative class members were fraudulently inflated because the Chargemaster prices did not represent "reasonable approximations of the actual value of the[] services," which purportedly is what would be recoverable in a lawsuit in which a court awarded quantum meruit.  FAC ¶ 147.  However, the FAC never alleges how the prices billed were systemically inflated, what the reasonable charge for any services provided to Plaintiffs (or any other patient) would have been, or why billing the Chargemaster prices was inherently fraudulent.

As to Fraser, the FAC alleges that the price billed—$1,082 for CPT Code 99220—was inflated, but does not allege what price should have been charged.  The FAC suggests that the amount billed was unreasonable because the hospital separately charged Plaintiff for "observation care" performed by hospital physicians, but charged a much lower amount.  *Id.* ¶¶ 21 ,94.  This apples-to-oranges comparison, however, does not improve the claim, because the FAC does not

1    allege whether that was the charge before or after the hospital applied the discount from its Financial

2    Assistance Program, or whether the hospital billed her at an in-network rate.  *See id.* ¶ 21.

3    Moreover, as the FAC points out, charges are determined by CPT code, and the FAC does not allege

4    that the services provided by the hospital physician were provided under the same CPT code.  *See*

5    *UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 145 (2015) (CPT codes essential to

6    determine if an appropriate comparison is being made).

7         As to the other three Plaintiffs—Bakonyi, DiBella and Fiume—the FAC merely recites the

8    amount charged and the relevant CPT codes, FAC ¶¶ 161-63, but does not allege what should have

9    been charged or how the price charged was inflated.  In fact, while contending that "the reasonable

10   value" for quantum meruit is "the 'going rate' or fair market value," *id.* ¶ 73, the FAC offers no

11   information about the amount that another provider allegedly would have charged for the same

12   services.  This silence speaks volumes because the publicly-available FAIR Health Consumer

13   Database of Medical Prices, available at https://www.fairhealthconsumer.org/medical, which is

14   designed to apprise consumers of the likely cost of medical care,[5] indicates that the amount billed

15   was the "going rate" for two Plaintiffs, was higher for one and was *lower* for another.

| Plaintiff | CPT Code | Zip Code | Billed Price | FAIR Health |
|-----------|----------|----------|--------------|-------------|
| Bakonyi | 99285 | 78704 | $1,370.00 | $1,370.00 |
| DiBella | 99284 | 13202 | $554.00 | $846.00 |
| Fiume | 99284 | 91942 | $715.00 | $715.00 |
| Fraser | 99220 | 92056 | $1,082.00 | $845.00 |

21   *See* RJN at pp. 1, 7 (court may take judicial notice of internet website).  Of course, the FAIR Health

22   Consumer Database simply provides an estimated average cost, and individual providers may charge

23   more or less based on their experience level or other factors.

24        Apart from these woefully inadequate allegations about Plaintiffs' bills, the FAC does not

25   even attempt to explain how HCFS set systematically inflated Chargemaster prices for all medical

---

[5] The FAIR Health Consumer Database was designed to bring fairness and transparency to the out-of-network reimbursement system and permits consumers to look up the estimated cost charged to uninsured and out-of-network patients by using CPT code and zip code.  The FAIR Health Consumer Database estimates cost based on the billed rates for billions of medical services and providers in all fifty states. *See* https://www.fairhealthconsumer.org/#answer2.

DEFENDANTS' MOTION TO DISMISS, CASE NO. 4:20-CV-04600-JSW

1   providers for which it provided such services that were then transmitted to all uninsured or out-of-

2   network patients.  And, medical rates are just like lawyer billing rates:  there is a range of rates that

3   may be charged by different providers in different areas for medical services to uninsured and out-

4   of-network patients in the absence of an agreed contract price.  *See, e.g.*, Barlett Decl., Ex. 1 (Survey

5   of Out-of-Network Costs) at 4 ("Out-of-network charge extremes varied widely across the

6   country.").

7         In any event, the bills sent to Plaintiffs *do not* contain the purported misrepresentations

8   alleged in the FAC.  The FAC alleges that the bills represent "either affirmatively or through half-

9   truths and omissions" that the providers' "rates for their services are lawful" and that prices billed

10  are "the real value of [their] services."  FAC ¶¶ 146-48.  Yet, none of the bills sent to Plaintiffs make

11  any reference to "lawful rates," or "the value of services provided."  *See* Dearolf Decl., Ex. 2 (Bill to

12  Fraser, Oct. 15, 2019).  Rather, the bill identifies the provider, the service provided, and the amount

13  charged and invites patients to contact HCFS if they have any questions about the bill.  *Id.*

14        In those cases where courts have sustained RICO claims based on over-billing, the bills

15  contained an actual misrepresentation.  For example, in *AT&T Corp. v. Shroeder*, No. C04-

16  5709FDB, 2006 WL 1806187, at *3 (W.D. Wash. June 28, 2006), the court found that plaintiff had

17  adequately alleged a predicate act where the defendant billed AT&T for its purported pro rata share

18  of O&M costs, but intentionally misrepresented the known O&M costs on the invoices.  *See also In*

19  *re U.S. Foodservice Inc. Pricing Litig.*, 729 F. 3d 108 (2d Cir. 2013) (defendant fraudulently inflated

20  and misrepresented its apparent costs where customer invoices were billed on a cost-plus basis).

21        By contrast, courts have not hesitated to dismiss RICO claims, finding that there was no

22  predicate act, where plaintiff alleged no more than a legal dispute about the defendant's entitlement

23  to the amount billed.  *See Schulenberg v. Rawlings Co.*, No. CVN03-0134-HDM(VPC), 2003 WL

24  22129230, at *7 (D. Nev. Aug. 20, 2003) ("The alleged acts of mail and wire fraud simply represent

25  a dispute over application of the law, which is an insufficient legal basis to assert a RICO claim.");

26  *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001) (finding that hospital

27  lien that Plaintiff alleged was "fraudulent" because it "exceeded the amount that [the hospital] had

28

1   agreed to accept" was insufficient to support a RICO claim); *Methodist Hosp. of S. Cal. v. Blue*

2   *Cross of Cal.*, Case No. CV 09-05612 GAF (JCx), 2010 WL 11508022, at *12 (C.D. Cal. Feb. 26,

3   2010) (a disagreement over the "'reasonable and customary' value for services rendered under the

4   California statutory scheme" is a dispute over the law and not a basis for imputing fraud); *Brown v.*

5   *Knoxville HMA Holdings, LLC*, 447 F. Supp. 3d 639, 650 (M.D. Tenn. 2020) ("[T]he Amended FAC

6   fails to allege that Defendants made false or fraudulent representations regarding the legality of the

7   hospital liens because neither state law nor existing Tennessee state court precedent make clear that

8   the liens are unlawful."); *Bowden v. Med. Ctr., Inc.*, 845 S.E.2d 555, 566 (Ga. 2020) (dismissing

9   claim under Georgia RICO statute because the alleged fraud was use of Chargemaster rates to supply

10  the amount of a lien, which was a legal dispute).

11       Here, Plaintiffs' assertion that Defendants could not recover the full amount of its

12  Chargemaster rates in a hypothetical quantum meruit suit is no different from these cases and

13  depends upon the ultimate resolution of a purported legal dispute.  Courts rely on a variety of factors

14  in determining the amount recoverable in a quantum meruit lawsuit, *Gould v. Workers Comp.*

15  *Appeals Bd.*, 4 Cal. App. 4th 1059, 1071 (1992); *Children's Hosp. of Cent. Cal. v. Blue Cross of*

16  *Cal.*, 226 Cal. App. 4th 1260, 1274-75 (2014), and it would not be possible for Defendants to

17  anticipate what amount any particular court might find recoverable in a theoretical quantum meruit

18  lawsuit for charges for any given doctor in any given location.  *Cf. Bowden*, 845 S.E.2d at 564

19  ("Indeed, because so many factors can affect the determination of what a 'reasonable charge' may

20  actually be for a hospital's services, . . . a hospital may not know within 75 days of providing

21  medical services to a patient *exactly* what a reasonable charge is supposed to be under the

22  circumstances." (internal citations omitted)).  Plaintiffs' bills did not contain misrepresentations or

23  constitute mail fraud.

24                    **b.      The Complaint Fails to Allege Scienter**.

25       The FAC's general allegations—untethered to any specific bill or charge—that Defendants

26  intended to defraud patients and knew that the Chargemaster rates are inflated also fail to establish

27  scienter.  In support of their allegation that Defendants knew the Chargemaster rates were inflated,

28  the FAC first points to a statement by UnitedHealth in a news article asserting that medical provider

1    groups allegedly affiliated with "TeamHealth" bill and expect to be paid much more than the median

2    rate for *in-network* physicians at participating hospitals.  FAC ¶ 89 (quoting Courtney Robinson,

3    *Some Physicians at Tampa General Hospital take Pay Cut Because of Health Care Costs*, 10 Tampa

4    Bay, Feb. 4, 2020, attached as Exhibit 2 to Bartlett Decl.).  That statement was made in the midst of

5    a payment dispute between UnitedHealth and the medical provider groups and therefore cannot

6    establish Defendants' knowledge.  *See* Bartlett Decl., Ex. 2 at 2.  Moreover, in-network charges are

7    always lower than the charges billed to out-of-network and uninsured patients; in-network providers

8    agree to discounted rates in exchange for volume and the certainty of payment.  *See, e.g.*, *Nassau*

9    *Anesthesia Assoc.*, 924 N.Y.S.2d at 254 ("[P]rivate insurers may be able to obtain 'very substantial

10   discount[s]' from medical providers for a variety of reasons, i.e. 'volume of payments, promptness

11   of payment . . .'").  And, ironically, the FAC also cites an article quoting hospital internists for the

12   proposition that "TeamHealth" forces physicians to bill *less* and provide *fewer services*.  FAC ¶ 109

13   n.59.

14          Second, the FAC points to lawsuits in Pennsylvania and Texas where medical provider

15   groups, allegedly affiliated with "TeamHealth," brought suit against UnitedHealth and Humana,

16   based on theories of quantum meruit, for payment for medical services provided to insureds of

17   UnitedHealth and Humana.  FAC ¶¶ 88-90.  Plaintiffs claim that because the medical provider

18   groups in those lawsuits agreed to accept only 75-90% of the Chargemaster rates that Defendants

19   acknowledge that the Chargemaster rates are fraudulently inflated.  *Id.*  However, the fact that the

20   medical provider groups agreed to accept a reduced reimbursement rate from two market dominant

21   insurers only demonstrates a willingness to compromise on rates in exchange for certainty of

22   payment by out-of-network insurers.

23          Third, the FAC cites a letter by Holdings' CEO that acknowledges that the average cost to

24   medical provider groups of an emergency room visit is $150.  FAC ¶ 92; Bartlett Decl., Ex. 3

25   (Murphy Letter) at 2.  As the letter explains, however, the vast majority of patients seen by the

26   medical provider groups are either insured through Medicaid or Medicare or uninsured.  Bartlett

27   Decl., Ex. 3 (Murphy Letter) at 2.  Because uninsured patients infrequently pay any portion of their

28   bill, and the low reimbursement rates for Medicaid and Medicare, *74% of all patients seen by*

*medical provider groups pay less than the average cost of their care*.  *Id.*  Accordingly, in order for the provision of emergency medical care to be economically feasible, medical provider groups must bill at rates higher than the average cost of care.  Some patients ultimately pay more than the average cost of care (largely individuals with private insurance) to subsidize the majority of patients, who pay less than the average cost of care.  *Id.*  This does not mean, though, that the patients who pay more than the cost of their care are paying more than the "market rate" for the services provided.  Merely charging one group of patients more than another is not fraudulent and does not give rise to RICO liability.  *See, e.g.*, *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000).  In fact, it is inherent in and fundamental to the U.S. healthcare system as it currently exists.

In short, Plaintiffs have not alleged predicate acts of mail or wire fraud because they have not established that the bills contained misrepresentations or that Defendants acted with scienter.

### C.    Plaintiffs' State Law Statutory Claims Must Also Be Dismissed.

Plaintiffs also assert four claims under California, New York, and Texas state statutes, each of which are generally directed against unfair or deceptive business practices.  All four claims, however, attempt to plead wrongful conduct by resting on the same inadequately and conclusorily asserted facts discussed above—namely, that Defendants charged inflated fees and purportedly made misrepresentations about those fees in the bills sent to Plaintiffs.  *See* FAC ¶¶ 186-88, 198 (CLRA and UCL violation); ¶¶ 202-04 (violation of the Texas DTPA); ¶¶ 209-15 (deceptive act in violation of the NYGBL).  Plaintiffs have not alleged how bills were inflated or contained misrepresentations, nor have Plaintiffs alleged the specific role Defendants played in making the misrepresentation or a basis for concluding that Defendants acted with scienter.  Thus, Plaintiffs have not alleged any unfair, fraudulent or deceptive conduct with the specificity required by Rule 9(b) so that Counts II through IV should be dismissed.  These claims also fail for additional reasons set out below.

### 1.    The California Statutory Claims Should Be Dismissed.

The claims under the California consumer statutes—the UCL (Count II) and CLRA (Count III), are brought by Plaintiffs Fraser and Fiume.

As an initial matter, the UCL claim fails because Plaintiffs have not alleged that Defendants are in possession of any "money or property" that was acquired by means of a violation of the

1    statute.  *See* Bus. & Prof. Code §§ 17203, 17204.  As the California Supreme Court has explained,

2    standing to bring a UCL claim is limited to "those actually injured by a defendant's business

3    practices" meaning "those who *had* had business dealings with a defendant and had lost money or

4    property as a result of the defendant's unfair business practices."  *Kwikset Corp. v. Superior Court*,

5    51 Cal. 4th 310, 321 (2011).  Plaintiff Fiume admits she has not paid (and, indeed is not expecting to

6    ever pay) her bill.  FAC ¶ 40.  Plaintiff Fraser merely alleges that she received a bill and that she "is

7    paying the bill under a payment plan."  *Id.* ¶ 22.  She does not allege that she has made payments to

8    Defendants (and the payments went to the medical providers), much less payments in excess of the

9    purported reasonable value of those services.  As a result, her allegations are insufficient to show

10   that Defendants acquired any money from her and her UCL claim fails.  Moreover, she is not

11   entitled to the only monetary remedy available under the UCL: restitution.  *See Kwikset*, 51 Cal. 4th

12   at 336 ("A restitution order against a defendant thus requires both that money or property have been

13   lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.").

14          Second, these claims also fail to the extent they are brought against Defendants other than

15   HCFS, none of which sent Plaintiffs any bills.  Since these Defendants did not send the bills, they

16   could not have made any misrepresentations to Plaintiffs, even assuming *arguendo* that the bills

17   were fraudulent or deceptive.  *See, e.g.*, *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1468

18   (2014) (upholding dismissal of fraud and UCL claims against defendants that did not make the

19   alleged misrepresentations on which the claims were based); *Tae Hee Lee v. Toyota Motor Sales,*

20   *U.S.A., Inc.*, 992 F. Supp. 2d 962, 974 (C.D. Cal. 2014) ("Plaintiffs' CLRA claim fails because,

21   Plaintiffs have failed to identify any statement *made by Toyota* that misrepresents the performance of

22   automatic pre-collision braking feature." (emphasis added)).

23          While Plaintiffs primarily allege that Defendants violated the UCL based on purported

24   fraudulent conduct, they also allege that their practices are "unfair" and offend public policy,

25   alleging that the billing practices "violate basic principles of equity and quantum meruit."  FAC ¶

26   188(c).  However, the primary purpose of equity and quantum meruit is to determine the amount

27   recoverable in a lawsuit relating to a specific individual; these legal doctrines do not reflect some

28   essential public policy.  *See Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 855 (2002)

1  (rejecting "unfair" UCL claim because "Appellant seeks an extension of the policy that departs from

2  the primary focus of the statute").

3           Moreover, for all the reasons discussed in Section V.A.3 above, the FAC fails to allege any

4  basis to conclude that the Chargemaster rates were set through an improper process or that it was

5  unfair to charge uninsured patients, like Fraser or Fiume, those rates.  On the contrary, medical

6  provider groups are entitled to charge differential rates based on insurance status.  *Moran v. Prime*

7  *Healthcare Mgmt., Inc.*, 3 Cal. App. 5th 1131, 1141 (2016) ("[T]o the extent plaintiff alleges

8  defendants violated the UCL by discriminatorily charging self-pay patients more than patients

9  covered by government programs or private insurance, his argument fails.").

10          **2.       The New York Gen. Bus. Law Section 349 Claim Should Be Dismissed.**

11          Plaintiffs' claim under the NYGBL fails for four reasons in addition to the inadequacy of the

12  facts pled that underlie this claim.  First, Plaintiff DiBella, the only named Plaintiff from New York,

13  lacks standing.  Under the NYGBL, a plaintiff must plead an "actual injury" for her claim to be

14  cognizable.  N.Y. Gen. Bus. Law § 349; *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000).  DiBella

15  has not pled any "actual injury."  She has not pled that either she paid any money or that her credit

16  score has been affected by any of Defendants' actions.  She merely pleads that she received a bill

17  that she did not pay and that she is worried it might eventually be reported and affect her credit

18  score.  FAC ¶ 36.  This is not sufficient to confer standing under the NYGBL.  *Cf. UnitedHealthcare*

19  *Servs.*, 16 N.Y.S.3d at 151 ("United has not shown it is likely to succeed in establishing that it

20  suffered any damages as result of any misleading billing by Defendants. United has refused to pay

21  the allegedly excessive portion of the charges. The patient has not paid them either.").

22          Second, DiBella's NYGBL claim fails because it is premised on supposed omissions that

23  were generally known.  Under N.Y. Gen. Bus. Law §§ 349-50, a plaintiff can only assert an

24  omissions-based claim if "the business alone possesses material information that is relevant to the

25  consumer and fails to provide this information."  *Oswego Laborer's Local 214 Pension Fund v.*

26  *Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995).  In other words, a defendant cannot be held liable

27  for failing to communicate a fact that is generally known by the public.

28          Here, the FAC alleges that DiBella was misled because her bill did not inform her that the

1    Chargemaster prices were allegedly inflated over the reasonable value of the services she received.

2    FAC ¶¶ 35, 212.  But the FAC itself alleges that it is common knowledge that Chargemaster list

3    prices are rarely paid in full.  *See id.* ¶ 74.  If this truly were commonly known, as the FAC alleges,

4    then it was not "the business alone" that possessed the material information, and therefore the claim

5    is not actionable under the NYGBL.

6           Third, DiBella's NYGBL claims fail because she has not plausibly alleged that the bill she

7    received was deceptive.  Under the NYGBL, a plaintiff must prove that the allegedly deceptive acts

8    would mislead a "reasonable consumer," not just the "least sophisticated consumer."  *Sokolski v.*

9    *Trans Union Corp.*, 53 F. Supp. 2d 307, 315 (E.D.N.Y. 1999).  As discussed above, a reasonable

10   consumer would not be deceived by a bill that merely listed the prices charged for certain services.

11   No "reasonable consumer" would believe that such a bill meant that the prices charged were equal to

12   the amount that could be recovered in a quantum meruit lawsuit.

13          Fourth, DiBella's NYGBL claims fail to the extent they are premised on consumer fraud

14   against elderly persons,[6] as the FAC does not allege a single instance of an allegedly fraudulent bill

15   submitted to a person over the age of sixty-five.  DiBella is the only named Plaintiff from New York,

16   and the FAC does not allege she is over age sixty-five. *See* FAC ¶¶ 31-36.

17          **3.     Texas Statutory Claim Should Be Dismissed.**

18          The claim under the Texas DTPA, brought by Plaintiff Bakonyi, also fails for two additional

19   reasons beyond the inadequately pled underlying premise of her claim.  First, Bakonyi, the only

20   Plaintiff from Texas, lacks standing.  Under the TDTPA, a plaintiff must allege both that she sought

21   or acquired goods or services "by purchase or lease" and that she suffered economic damages or

22   mental anguish.  *See* Tex. Bus. & Com. Code §§ 17.45, 17.50.  Here, Bakonyi has done neither.  She

23   has not alleged that she sought or acquired any goods or services "by purchase or lease" nor could

24   she because she has not paid any money.  FAC ¶ 30.  And she has not suffered any "economic"

25   damages, since she has not paid or agreed to pay any money or suffered adverse credit effects.  *id.*

26

27   _____
[6] Plaintiffs cite to N.Y. Gen. Bus. Law § 350 for the proposition that additional civil penalties are
warranted because the scheme was allegedly propagated against elderly persons.  *See* FAC ¶ 215.
However, Section 350 does not say anything about elderly persons.  Plaintiffs likely intended to refer

28   to N.Y. Gen. Bus. Law § 349-c.

1   Nor has she alleged any mental anguish.  *See id.* ¶ 204.

2        Second, the TDPTA claims fail because Bakonyi cannot show that any of the Defendants'

3   actions were "unconscionable."  *See* Tex. Bus. & Com. Code § 17.50(a)(3); FAC ¶ 203.  The

4   TDTPA defines unconscionable acts as ones that "to a consumer's detriment, take[] advantage of the

5   lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex.

6   Bus. & Com. Code § 17.45(5).  The test of an unconscionable act focuses on the "objective result" of

7   the transaction.  *Sergeant Oil & Gas Co. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1364

8   (S.D. Tex. 1994).  An act is only unconscionable if it results in unfairness that is "glaringly

9   noticeable, flagrant, complete and unmitigated." *Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001).

10        Bakonyi has failed to meet this standard.  She has not pointed to any "glaringly noticeable,

11   flagrant, complete and unmitigated" unfairness that she has suffered.  In fact, as discussed above, she

12   has not alleged any concrete harm.  Bakonyi admits she received medical services, and has not paid

13   any money for them, and does not allege that her credit has been affected.  FAC ¶ 30.  In light of

14   these facts, Bakonyi's mere receipt of a bill with a number on it that she claims is too large does not

15   constitute a "glaringly noticeable, flagrant, complete and unmitigated" unfairness.  Moreover, she

16   has not, and cannot show, that Defendants took advantage of her "lack of knowledge, ability,

17   experience or capacity" in any way.  Bakonyi had sufficient "knowledge, ability, experience or

18   capacity" to make the decision to speak with a lawyer about her medical bill, instead of paying it.

19   **VI.     CONCLUSION**

20        For all the reasons set forth herein, Defendants respectfully requests that the Court dismiss

21   Plaintiff's Complaint with prejudice.

22

23     Dated: December 18, 2020          */s/ Carol Lynn Thompson*

24                              Carol Lynn Thompson (SBN 148079)
                           cthompson@sidley.com

25                              Jaime A. Bartlett (SBN 251825)
                           jbartlett@sidley.com

26                              Matthew P. Henry (SBN 308878)
                           mhenry@sidley.com

27                              Jennifer H. Lee (SBN 329079)
                           jhlee@sidley.com

28

SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Mark B. Blocker (admitted *pro hac vice)*
mblocker@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7436

*Attorneys for Defendants Team Health Holdings, Inc., AmeriTeam Services, LLC, TeamHealth Inc. n/k/a Team Health, LLC, and HCFS Health Care Financial Services, LLC*