# EXHIBIT 3

# DECLARATION OF JAIME A. BARTLETT

# IN SUPPORT OF MOTION TO DISMISS
# FIRST AMENDED COMPLAINT

March 13, 2019

Honorable Bill Cassidy, M.D.
United States Senator
520 Hart Senate Office Building
Washington, DC 20510

The Honorable Tom Carper
United States Senator
513 Hart Senate Office Building
Washington, DC 25010

Honorable Todd Young
United States Senator
400 Russell Senate Office Building
Washington, DC 20510

Honorable Lisa Murkowski
United States Senator
522 Hart Senate Office Building
Washington, DC 20510

Honorable Michael F. Bennet
United States Senator
261 Russell Senate Office Building
Washington, DC 20510

Honorable Margaret Wood Hassan
United States Senator
330 Hart Senate Office Building
Washington, DC 20510

**Re:  Bi-Partisan Workgroup's Request for Data and Information on Surprise Medical Billing**

Dear Senators Cassidy, Bennet, Carper, Young, Murkowski and Hassan:

On behalf of TeamHealth and nearly 6,000 affiliated practicing physicians providing emergency department medical services to over 16 million patients per year in 39 states across the country, representing approximately 12% of the total US emergency department visits, I'd like to take this opportunity to thank you for your workgroup's efforts in developing a comprehensive legislative solution to protect patients from surprise medical billing.

As part of your workgroup's recent request to stakeholders seeking data and information to assist you in your efforts to pass meaningful surprise billing legislation, please accept this letter to supplement the narrative which the American College of Emergency Physicians (ACEP) submitted to your office on February 22, 2019. We submit this letter to you to document several important factors that contribute to out-of-network balance and surprise billing in the emergency department.

**Balance Billing for TeamHealth is a Contract Leveraging Tool and Not a Source of Revenue**
Balance billing yields immaterial revenue for TeamHealth and is not performed with the objective of enhancing revenue. Rather, for TeamHealth and for emergency medicine providers as a whole, balance billing is our only available source of contract negotiating leverage. In 2017, TeamHealth balance billed 0.16% (16 BPS) of the patients who presented in our emergency departments.  See the table below for 2017 frequency.

| Payer Type | Balance Billing Frequency |
|---|---|
| All Payers | 0.16% |
| All Commercial | 0.71% |
| Out-of-Network Commercial | 3.57% |

The average balance billed amount is $529, which excludes patient cost sharing amounts (e.g., co-payments, co-insurance and deductibles). However, only 30% of the patients we balance billed actually remitted a full or partial payment for such amount. In aggregate, TeamHealth receives just 0.08% (8 BPS) of our commercial fee-for-service collections from balance billed amounts.

Much of the public narrative and patient dissatisfaction results from a misunderstanding of health plan benefit design. The problem of surprise billing is often an issue of surprise lack of coverage. Our data indicates commercial patients are 9 times more likely to receive a bill greater than $750 that is the result of their copayment, co-insurance or deductible cost-sharing obligation as opposed to their receipt of an actual out-of-network balance bill.

### Escalating Bad Debt

For 2016, TeamHealth billed commercially insured patients for co-payments, co-insurance and deductible balances under their plan benefits in the total amount of $237 million and successfully collected $98 million, for a yield of 41%. The balance of $139 million represented bad debt for these patients and equated to a 10.7% shortfall in our overall commercial fee-for-service collections. This uncollectible amount reflected in the commercially insured population is rising each year and represents a direct cost shift from insurers and employers to providers. Therefore, we ask you to require insurers to fulfill their true role as the financial intermediary and insurer of health care services and remit in full their negotiated balances. Deferring patient collections to clinicians ultimately positions TeamHealth as the debt collector while ultimately interfering in the trusted relationship between patients and providers.

Separately, uninsured patients account for 16% of our volume and that percentage has been steadily rising during recent years.[1] For 2016, we treated 2.5 million uninsured patients and collected $85 million, for a collection rate of 3.7%, representing an average yield of $34 per patient. Even at Medicare rates, our uninsured bad debt represents an annual loss of revenue of $279 million.

### Economics of Emergency Medicine and Reliance on Commercial Insurance

To fully understand the economic model associated with the delivery of emergency care, it is important to recognize that nearly 3 in 4 patients who visit an emergency department are either uninsured or carry fixed-rate government sponsored insurance that has not appropriately kept up with inflation or other factors that support the cost for delivering care.

As referenced in the chart below, 74% of TeamHealth's emergency department patient encounters are reimbursed below our average cost of $150 per encounter, leaving the remaining commercial population (26%) with the responsibility of cross-subsidizing government sponsored reimbursement and uninsured patient populations. Rural and indigent markets with proportionately lower commercial coverage are by definition unsustainable without some form of subsidy payment from the hospital.

| Payer | Percentage of Overall Volume | Avg. Collection Amount  (Per Patient Visit) |
|---|---|---|
| Medicare | 25% | $145 |
| Medicaid | 33% | $75 |
| Uninsured | 16% | $34 |
| Commercial | 26% | $350 |

Unlike primary care and specialty providers who deliver elective and/or scheduled care, and even urgent care centers, emergency departments cannot choose their patients, and must staff their facilities with qualified medical professionals, 24 hours a day, 7 days a week.

---

[1] https://www.census.gov/content/dam/Census/library/publications/2018/demo/p60-264.pdf

**Out-of-Network Reimbursement is Declining**
Insurers are unilaterally reducing out-of-network reimbursement. This payer behavior increases the potential for increased balance billing frequency and for a higher patient balance billed amount. Prohibiting balance billing will only embolden insurers unless there are sufficient provider protections in place, such as a defined out-of-network payment standard. The table below shows a multi-year trend of allowables. It also illustrates that out-of-network reimbursement is now lower than in-network reimbursement, which provides an incentive for payers to terminate contracts and/or refuse to negotiate in good faith for in-network contracts.

Multi-Year Trend of Allowables

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| In Network Commercial (non-BCBS) | $492 | $513 | $575 | $587 |
| % Medicare | 365% | 378% | 420% | 425% |
| Out-of-Network Commercial (non-BCBS) | $578 | $528 | $482 | $429 |
| % Medicare | 441% | 389% | 349% | 306% |
| All BCBS Claims | $232 | $235 | $254 | $262 |
| % Medicare | 175% | 176% | 187% | 192% |

**All Private Insurers Must Be Part of the Solution**
The table above also illustrates that any solution to balance billing must be applied to all categories of payers. Absent this, exempted insurers would have unequal standing in the market. Any legislation must cover the entire private insurance market.

Additionally, we find that market-driven contract rates are further inhibited when there is no meaningful state regulation in effect that mandates honoring of a patient's Assignment of Benefits.[2] In these situations, an insurer can process the claim and remit the amounts to the patient instead of the provider, forcing the provider to collect the remitted payment from the patient in addition to any patient cost sharing amounts. A comprehensive solution to protecting patients from large bills and removing them from the provider/insurer transaction would require insurers to honor the patient's assignment of benefits which must also be applied in the states and federally for all out-of-network situations.

**Out of Network Reimbursement is Often Arbitrary**
Insurer adjudication of claims is unpredictable and varies widely, due to benefit plan design and changing payer behavior. The table below illustrates that payers adjudicate certain claims at or near Medicare rates and other claims at a high percentage of charges. However, aggressive payer behavior is shifting the distribution of claim adjudication in their favor. A defined payment standard is necessary to protect providers from unilateral insurer changes in reimbursement.

| Distribution of Allowable - All OON | | | | |
|---|---|---|---|---|
| % of Medicare | 2015 | 2016 | 2017 | 2018 |
| 100% – 199% | 23% | 26% | 31% | 45% |
| 200% - 299% | 25% | 24% | 20% | 11% |
| 300% - 399% | 8% | 8% | 6% | 6% |
| 400% - 499% | 11% | 9% | 8% | 7% |
| 500% + | 32% | 33% | 35% | 31% |

**TeamHealth Supports the Cassidy Plan**
TeamHealth endorses a meaningful, comprehensive national solution. We follow your lead and support your working draft legislation, "Protecting Patients from Surprise Medical Bills Act" (aka the 'Cassidy Plan') which calls for a defined usual, customary and reasonable (UCR) out-of-network payment amount. We support your working draft's proposal to adopt 125% of the median allowed amount as determined by a

---

[2] https://www.americanbar.org/groups/health_law/publications/aba_health_esource/2015-2016/july/undererisa/

nationally recognized independent benchmarking database (e.g., FairHealth Allowed Benchmarking Database Tool) as the basis for defining UCR. We recognize that this will result in short-term disruption to TeamHealth, but we believe the patient benefits outweigh the provider and insurer disadvantages.

To effectuate a viable national solution, TeamHealth also recommends the implementation of a: (i) ceiling on patient out-of-pocket cost-sharing for emergency care; (ii) a nationally imposed assignment of benefits provision; and (iii) stipulation requiring insurers and payers to collect patient out-of-pocket cost-sharing amounts from their insureds, which mitigates provider bad debt losses.

In closing, we propose for your consideration an enhanced Cassidy Plan which creates:

1. **Interim Direct Reimbursement (IDR)** - requiring health plans to remit an Interim Direct Reimbursement (IDR) payment to the out-of-network provider at not less than **125%** of the average allowed amount in accordance with the FairHealth Benchmarking Database for Allowed Amounts,[3] based on a base year of 2017, which shall then be adjusted annually for CPI inflationary factors, including geography and specialty;

2. **Insurer Reimbursement that Includes the Patient Cost Sharing Amount** - the IDR payment remitted directly to the provider must also include the patient cost-sharing obligation, including deductibles and co-insurance, which the health plan would then collect from the patient or employer. This removes the provider from the role of patient debt collector and protects the provider from the increasing cost shift;

3. **Cap on Patient Cost-Sharing for Emergency Care at $1,000** – a per incident patient cost-sharing cap of $1,000, specific to and exclusively limited to all emergency care, for both professional and facility care rendered during the emergency incident (as defined by EMTALA)[4] which shall be paired with a honoring of the patient's assignment of benefits, irrespective of in or out-of-network status.; and

4. **Baseball Style Alternative Dispute Resolution (ADR)** – available to both payers and providers to provide either with a cost-effective mechanism to challenge the reasonableness of the Interim Direct Payment. It shall apply to enrollees in self-funded plans (ERISA) as well as state regulated fully-insured plans, if such state has not implemented an alternative dispute resolution program with a defined out-of-network payment standard.

I believe your work is of utmost importance and must achieve a comprehensive solution that simultaneously protects patients and preserves the financial health and sustainability of the emergency medical delivery system. Your draft legislation acknowledges the negative and harmful implications that would occur by de-coupling commercial insurance's cross-subsidization of emergency care from any balance billing solution while failing to address underfunded government sources of reimbursement, bad debt and the uninsured. Please do not hesitate to reach out to me at any time. I can be reached at (865) 293-5300 and I would be happy to travel to your office in Washington, DC to meet in person.

Very truly yours,

Leif Murphy
President & Chief Executive Officer

---

[3] https://www.fairhealth.org/benchmark-data-products/benchmark-modules
[4] https://www.law.cornell.edu/uscode/text/42/1395dd