Steve W. Berman (admitted *pro hac vice*)
Craig R. Spiegel (SBN 122000)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
steve@hbsslaw.com
craigs@hbsslaw.com
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594

Benjamin Elga (*pro hac vice* forthcoming)
Brian J. Shearer (admitted *pro hac vice*)
Craig L. Briskin (admitted *pro hac vice*)
JUSTICE CATALYST LAW, INC.
81 Prospect Street, 7th Floor
Brooklyn, NY 11201
belga@justicecatalyst.org
bshearer@justicecatalyst.org
cbriskin@justicecatalyst.org
Telephone: (518) 732-6703

*Attorneys for Plaintiffs*
*Additional Attorneys Listed Below*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIA FRASER, TRICIA BAKONYI, GABRIELLE DIBELLA, and KATJA FIUME, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, TEAMHEALTH, INC. n/k/a TEAM HEALTH, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,<br><br>Defendants. | No. 4:20-cv-04600-JSW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:       March 26, 2021<br>Time:       9:00 a.m.<br>Judge:      Hon. Jeffrey S. White<br>Courtroom:  5, 2nd Floor |

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    SUMMARY OF ARGUMENT ...................................................................................1

4    II.   BACKGROUND ....................................................................................................2

5    III.  ARGUMENT .........................................................................................................3

6          A.    Plaintiffs Bakonyi, DiBella and Fiume Have Standing.....................................3

7          B.    Plaintiffs Plead a RICO Claim. ..................................................................5

8                1.    Plaintiffs Allege a RICO Enterprise. ..............................................5

9                2.    Each Defendant Participated in the Conduct of the Enterprise. ....................8

10               3.    The FAC Alleges Predicate Acts of Racketeering. .......................................10

11                     a.    Misrepresentation ............................................................10

12                     b.    Scienter ..........................................................................14

13         C.    Plaintiffs' State Law Claims are Well-Pleaded ...........................................15

14               1.    California UCL and CLRA Claims. ..................................................15

15               2.    New York General Business Law Claim.............................................16

16               3.    Texas Deceptive Trade Practice Act Claim..........................................17

17   IV.   CONCLUSION ....................................................................................................18

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Estate of Adkins v. Cty. of San Diego*,
2018 WL 1942397 (S.D. Cal. Apr. 25, 2018) .............................................................3

*Am. Hosp. Ass'n v. Azar*,
468 F. Supp. 3d 372 (D.D.C. 2020)...........................................................................10

*Ames v. T-Mobile USA, Inc.*,
2019 WL 366210 (S.D. Cal. Jan. 30, 2019) ..........................................................4, 15

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
945 S.W.2d 812 (Tex. 1997) .....................................................................................18

*Blue v. Diversified Adjustment Serv.*,
2017 WL 3600723 (C.D. Cal. Aug. 11, 2017) ............................................................4

*Bowden v. Med. Ctr., Inc.*,
845 S.E.2d 555 (Ga. 2020) ........................................................................................13

*Boyle v. United States*,
556 U.S. 938 (2009) .....................................................................................................5

*Brown v. Knoxville HMA Holdings, LLC*,
447 F. Supp. 3d 639 (M.D. Tenn. 2020) ...................................................................13

*Chang v. United States*,
327 F.3d 911 (9th Cir. 2003) .......................................................................................5

*Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*,
226 Cal. App. 4th 1260 (2014) ....................................................................................2

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018).......................................................................14

*Colomar v. Mercy Hosp., Inc.*,
461 F. Supp. 2d 1265 (S.D. Fla. 2006) ......................................................................11

*Corenbaum v. Lampkin*,
215 Cal. App. 4th 1308 (2013) ..................................................................................11

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
2012 WL 10731957 (C.D. Cal. June 29, 2012) ..........................................................8

*Elston v. Encore Capital Grp., Inc.*,
2019 WL 3037054 (E.D. Wash. July 11, 2019) ..........................................................4

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) ............................................................................6

*Friedman v. 24 Hour Fitness USA, Inc.*,
  580 F. Supp. 2d 985 (C.D. Cal. 2008) ...........................................................6

*Grauberger v. St. Francis Hosp.*,
  169 F. Supp. 2d 1172 (N.D. Cal. 2001) .........................................................13

*H.J. Inc. v. NW Bell Tel. Co.*,
  492 U.S. 229 (1989) ........................................................................................6

*Hall v. AT&T Corp.*,
  2005 WL 8173642 (S.D. Ill. Mar. 1, 2005) ...................................................4

*In re Jamster Mktg. Litig.*,
  2009 WL 1456632 (S.D. Cal. May 22, 2009) ...........................................5, 6, 7

*Johnson v. Trans-Carriers, Inc.*,
  2017 WL 28004 (W.D. Tenn. 2017) ...............................................................11

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ....................................................................................15

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) .........................................................................4

*Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*,
  2010 WL 11508022 (C.D. Cal. Feb. 26, 2010) ..............................................13

*Moran v. Prime Healthcare Mgmt., Inc.*,
  3 Cal. App. 5th 1131 (2016) ...........................................................................16

*In re N. Cypress Med. Ctr. Operating Co.*, Ltd.,
  559 S.W.3d 128 (Tex. 2018) .......................................................................10, 15

*Nassau Anesthesia Assocs. PC v. Chin*,
  924 N.Y.S.2d 252 (N.Y. Dist. Ct. 2011) ........................................................11

*Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cty.*,
  9 Cal. 5th 279 (2020) ......................................................................................16

*Ochoa v. Dorado*,
  228 Cal. App. 4th 120 (2014) .........................................................................11

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) .......................................................................5, 14

*In re Outlaw Lab., LP Litig.*,
  2020 WL 5552558 (S.D. Cal. Sept. 16, 2020) ............................................8, 12

*Rabang v. Kelly*,
   2017 WL 1496415 (W.D. Wash. Apr. 26, 2017) ......................................................................12

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ........................................................................................................................8

*Ross-Randolph v. Allstate Ins. Co.*,
   2001 WL 36042162 (D. Md. May 11, 2001) ............................................................................4

*Schulenberg v. Rawlings Co.*,
   2003 WL 22129230 (D. Nev. Aug. 20, 2003) ........................................................................13

*Shaw v. Nissan*,
   220 F. Supp. 3d 1046 (C.D. Cal. 2016) ....................................................................................6

*Stutman v. Chem. Bank*,
   95 N.Y.2d 24 (2000) .....................................................................................................................16

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013) ................................................................................................5, 13

*United States v. Berkeley Heartlab, Inc.*,
   2017 WL 2972143 (D.S.C. July 12, 2017) ........................................................................10, 12

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988) ......................................................................................................6

*United States v. Turkette*,
   452 U.S. 576 (1981) ...................................................................................................................5, 6

*United States v. Widergren*,
   8 F.3d 33 (9th Cir. 1993) ...........................................................................................................12

*Woodard v. Labrada*,
   2017 WL 3309765 (C.D. Cal. July 31, 2017) ........................................................................16

*In re Zappos.com, Inc.*,
   888 F.3d 1020 (9th Cir. 2018) ...............................................................................................4, 5

## STATUTES

18 U.S.C. § 1961(4).........................................................................................................................5

18 U.S.C. § 1962 .............................................................................................................................8

Cal. Bus. & Prof. Code § 17048 ................................................................................................16

Tx Bus. & Com. § 17.45...........................................................................................................17, 18

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b)......................................................................................................................14

Centers for Medicare & Medicaid Services (CMS), Final Rule dated Nov. 27, 2019,
    84 FR 65524-01 ..........................................................................................................11

George A. Nation III, *Hospital Chargemaster Insanity: Heeling the Healers*,
    43 Pepp. L. Rev. 745 (2016)......................................................................................10

George A. Nation III, *Determining the Fair and Reasonable Value of Medical*
    *Services: The Affordable Care Act, Government Insurers, Private Insurers and*
    *Uninsured Patients*,
    65 Baylor L. Rev. 425 (2013)....................................................................................11

Restatement (Second) of Contracts § 204 ..........................................................................2

Restatement (Second) of Torts § 545, cmt. c ...................................................................12

Restatement (Third) of Restitution § 50 .......................................................................2, 15

### I.     SUMMARY OF ARGUMENT

TeamHealth is a network of entities organized around a common purpose: circumventing bans on the corporate practice of medicine to fraudulently overbill patients. As alleged in the First Amended Complaint ("FAC"), every bill TeamHealth sends uninsured and out-of-network patients overstates the amount TeamHealth can lawfully recover for the services it renders. Every bill is a misrepresentation, and TeamHealth knows this.

The named Defendants here are the architects and executioners of this scheme—specifically, TeamHealth Holdings, Inc. ("Holdings"), AmeriTeam Services, LLC ("AmeriTeam"), TeamHealth Inc. ("THI"), and HCFS Health Care Financial Services, LLC ("HCFS"). As detailed in the FAC, each of these Defendants is liable for its role under the Racketeer Influenced and Corrupt Organizations Act (RICO), along with state laws prohibiting unfair and deceptive business practices.

Defendants' efforts to dismiss this action on the pleadings should be rejected. *First*, Defendants dispute the standing of three (of four) Plaintiffs because they have not yet paid their inflated TeamHealth bills. But a bill is an enforceable debt obligation of real economic consequence. Accordingly, courts have held that receipt of an unlawfully inflated bill is a cognizable injury-in-fact. Even if it were not, the threat of injury is sufficiently imminent to confer standing, particularly here given TeamHealth's aggressive practice of suing patients for nonpayment. *See infra* Point III.A.

*Second*, Defendants' RICO arguments are premised on an impermissibly narrow reading of the statute and open disregard for the FAC's well-pleaded allegations. Fraudulently overbilling patients manifestly is a "common purpose" sufficient to establish a RICO enterprise. It is not, as Defendants contend, "ordinary business"—or at least it should not be. *See infra* Point III.B.2. The FAC also explains at length each Defendants' essential role in the enterprise's affairs, *see infra* Point III.B.2, and precisely how Defendants' bills are fraudulently inflated, *see infra* Point III.B.3.

*Third*, as to the FAC's state-law claims, Defendants largely restate their defective standing and RICO contentions. Plaintiffs are not required to have paid their inflated bills to have standing under the California, Texas, and New York consumer protection statutes. *See infra* Point III.C. And knowingly overbilling patients plainly is a deceptive and unfair practice sufficient to state a claim under these laws.

## II.     BACKGROUND

TeamHealth is a private-equity funded network of entities that is rapidly taking over emergency departments across the country. As of 2016, TeamHealth controlled 17% of the emergency medicine market, occupying more than 3,300 facilities in 47 states. *See* FAC ¶ 2. TeamHealth's takeover of emergency departments is alarming because it is fraudulently overbilling captive patients in need of immediate care.

The scheme is straightforward. When patients receive treatment from TeamHealth providers, they do not enter any agreement specifying the price for the services rendered. *See id.* ¶ 7. This does not mean the services are free. It means, rather, that TeamHealth's entitlement to payment is based on principles of unjust enrichment and quantum meruit, which permit TeamHealth to bill only the "reasonable value" of the services provided, or the "going rate." *See Children's Hosp. Cent. Cal. v. Blue Cross of Cal.*, 226 Cal. App. 4th 1260, 1274 (2014); *see also* Restatement (Third) of Restitution § 50 ("Unjust enrichment from requested benefits is measured by their reasonable value to the recipient."); *see also* FAC ¶¶ 70-74.[1]

TeamHealth, however, bills uninsured and out-of-network patients—the proposed Class here—in amounts that far exceed the reasonable value of the services they receive.[2] Specifically, TeamHealth bills these patients its inflated "chargemaster rates" or list prices. *See* FAC ¶ 78. Chargemaster rates bear no relationship to the reasonable value of a provider's services, as is universally recognized within the industry and by courts. *See id.* ¶¶ 74-77; *see infra* at Point III.B.3(a). These rates are systematically inflated to gain leverage in negotiations with insurers, and TeamHealth's chargemasters are particularly high, as TeamHealth knows. *See* FAC ¶¶ 88-94. The upshot is that TeamHealth knowingly bills its most vulnerable patients—the uninsured and out-of-network—grossly inflated amounts. And when these patients are unable to meet TeamHealth's

---

[1] The same result is reached under principles of implied contract. *See* Restatement (Second) of Contracts § 204 ("When the parties to a bargain defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *see also* FAC ¶ 71.

[2] An "out-of-network" patient has insurance but receives care from a provider (here, TeamHealth) that is outside the insurer's network. *See* FAC ¶ 80.

1   payment demands, TeamHealth pursues them relentlessly, as is confirmed by the *thousands* of

2   nonpayment lawsuits TeamHealth has filed in recent years. *See id.* ¶ 95.

3   These practices are not just unfair. They are a massive fraud. Because TeamHealth can only

4   recover the "reasonable value" of its services, bills that demand more affirmatively misrepresent the

5   amount the patient owes. *See* FAC ¶ 11. Patients have no reason to believe that their bills represent

6   anything but honest charges, and TeamHealth does nothing to dispel that natural assumption. *See id.*

7   ¶¶ 77, 112. TeamHealth patients end up paying these inflated amounts, and even those who do not

8   are shackled with crippling debt obligations. *See* FAC ¶¶ 14, 95.

9   To execute this scheme, TeamHealth established and now directs sophisticated layers of

10   subsidiaries and affiliated provider groups, which, at least ostensibly, stand between TeamHealth and

11   its providers on the ground. TeamHealth uses this structure to circumvent laws prohibiting the

12   corporate practice of medicine, *see id.* ¶¶ 98-106, and it has a name for it: the "TeamHealth System."

13   *See id.* ¶ 131. In practice, the TeamHealth System is a quintessential RICO enterprise, with each of

14   the named Defendants conducting or participating in its affairs to effectuate a common purpose—

15   fraudulently overbilling patients. Defendant Holdings conceived the scheme and controls the

16   overarching strategy; Defendants AmeriTeam and THI manage the day-to-day operations and

17   execute Holdings' directives; and Defendant HCFS sends the fraudulently inflated bills. *See infra* at

18   Point III.B.2. Active participation from each Defendant was essential to execute this scheme and, as

19   described in the FAC and further below, each is liable under RICO and state laws prohibiting unfair

20   and deceptive business practices.

21   **III.   ARGUMENT**

22   **A.   Plaintiffs Bakonyi, DiBella and Fiume Have Standing.**

23   While the party invoking federal jurisdiction bears the burden of establishing Article III

24   standing, the showing required "at the pleading stage is not onerous." *Estate of Adkins v. Cty. of San*

25   *Diego*, 2018 WL 1942397, at *4 (S.D. Cal. Apr. 25, 2018). "[G]eneral factual allegations of injury

26   resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that the

27

28

1   general allegations embrace those specific facts that are necessary to support the claim." *Maya v.*

2   *Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).[3]

3          Here, Defendants concede that Plaintiff Fraser has standing, but they contend that Plaintiffs

4   Bakonyi, DiBella and Fiume have suffered no cognizable injury because the FAC does not allege

5   that they paid their inflated TeamHealth bills. But the bills themselves create an enforceable debt

6   obligation, and being shackled with debt is harmful—indeed, it can be ruinous. *See* FAC ¶ 14 ("66.5

7   percent of all bankruptcies in the United States are due in whole or in part to medical debt").

8   Accordingly, numerous courts have held that the receipt of an inflated bill or payment demand is

9   itself a cognizable injury-in-fact sufficient to support Article III standing. *See Hall v. AT&T Corp.*,

10  2005 WL 8173642, at *2 (S.D. Ill. Mar. 1, 2005) (AT&T bills seeking payment of "erroneous

11  charges" imposed injury-in-fact on paying and non-paying customers alike); *Ross-Randolph v.*

12  *Allstate Ins. Co.*, 2001 WL 36042162, at *3 (D. Md. May 11, 2001) ("The fact that creditors or the

13  medical providers have not yet compelled Plaintiffs to pay their outstanding bills does not

14  necessarily defeat standing"); *see also Ames v. T-Mobile USA, Inc.*, 2019 WL 366210, at *3-4 (S.D.

15  Cal. Jan. 30, 2019) (letter demanding payment of $46.66 debt supported standing under the UCL

16  because "[a]n enforceable obligation amounting to an imminent threat of injury to a legally protected

17  interest qualifies as economic damage").[4]

18         At a minimum, Defendants' inflated bills create a "substantial risk that harm will occur,"

19  which is all that is required to establish injury-in-fact. *See In re Zappos.com, Inc.*, 888 F.3d 1020,

20  1024 (9th Cir. 2018) (holding that the risk of identity theft arising from data breach constitutes a

21  cognizable injury). As Defendants would have it, Plaintiffs must either pay the unlawful bills, have

22  their credit ruined, or wait for a collections action to get through the courthouse doors. But standing

23

24         [3] Internal quotation and bracket marks omitted here, and throughout this submission.

25         [4] The cases Defendants cite to the contrary are inapposite factually and because they involved
    motions for summary judgment, where the standing inquiry is more strenuous. *See Blue v.*
26  *Diversified Adjustment Serv.*, 2017 WL 3600723, at *2-3 (C.D. Cal. Aug. 11, 2017) (involving claim
    that injury was conferred by statute rather than, as here, freestanding harm); *Elston v. Encore Capital*
27  *Grp., Inc.*, 2019 WL 3037054, at *4 (E.D. Wash. July 11, 2019) (involving separate issue of whether
    a collection notice complied with the technical requirements of the Fair Debt Collection Practices
28  Act).

law "does not require Damocles's sword to fall before [the courts] recognize the realistic danger of sustaining a direct injury." *Chang v. United States*, 327 F.3d 911, 921 (9th Cir. 2003). The threat of injury is particularly menacing here because Defendants "aggressively pursue[] debt collection," having sued "over *4,800 patients*" since 2017 alone. *See* FAC ¶ 95; *id.* ¶ 145.

Defendants also imply that Plaintiffs Bakonyi, DiBella, and Fiume lack standing because their bills *may* somehow be covered by insurers or (in the case of Fiume) California's AB75 program. *See* MTD at 7. There is, however, no allegation in the FAC that would support the inference that Defendants' bills will be covered by other payors. *See* FAC ¶¶ 30, 36, 40. Defendants' intimations as to *potential* third-party coverage also rest on factual claims—and speculative ones— that cannot be resolved on a motion to dismiss. *See* Opp. to RJN at 5; *see also In re Zappos.com, Inc.*, 888 F.3d at 1028 (holding that "facts outside the Complaints" cannot "support a facial challenge to standing at the motion to dismiss stage").

Even if Defendants' standing arguments were valid, and they are not, they would provide no basis to dismiss the FAC's RICO and California-law claims. These claims are being asserted by a fourth Plaintiff (Sia Fraser) that Defendants concede has standing.

**B.      Plaintiffs Plead a RICO Claim.**

Courts have recognized that overbilling schemes can support RICO liability. *See, e.g., In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (RICO claim could be established with proof that enterprise "inflated [its] invoices and misrepresented the amount due"). This is what Plaintiffs allege here. Defendants' arguments to the contrary proceed by distorting the FAC's well-pleaded allegations and erecting pleading requirements without any basis in the RICO statute. This tactic defies the Supreme Court's "instruction that we should not read the statutory terms of RICO narrowly." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007). Rather, "RICO is to be read broadly" and "liberally construed to effectuate its remedial purposes." *Id.*

**1.      Plaintiffs Allege a RICO Enterprise.**

A RICO "enterprise" can be "any union or group of individuals associated in fact." 18 U.S.C. § 1961(4). This definition is "obviously broad" and "expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009). It covers any "group of persons associated together for a common purpose of

1    engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Here,

2    Defendants contest the "common purpose" element. Relying on *In re Jamster Mktg. Litig.*, 2009 WL

3    1456632, at *5 (S.D. Cal. May 22, 2009), and *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385

4    F.3d 159, 174 (2d Cir. 2004), Defendants assert that a RICO common purpose must be "fraudulent"

5    in nature and, according to Defendants, the FAC alleges only that Defendants engaged in the

6    ordinary business purpose of "wanting to earn money." MTD at 8.

7            Defendants misconstrue the law and the FAC. As to the law, the Ninth Circuit has never

8    required that a RICO common purpose be fraudulent. And while *In re Jamster* adopted this view,

9    others courts have rejected it outright. *See Shaw v. Nissan,* 220 F. Supp. 3d 1046 (C.D. Cal. 2016)

10   ("[T]he court will not require an allegation of fraudulent common purpose."); *Friedman v. 24 Hour*

11   *Fitness USA, Inc.*, 580 F. Supp. 2d 985, 991 (C.D. Cal. 2008) (rejecting fraudulent purpose

12   requirement and recognizing an enterprise that involved "unwitting participants in Defendant's

13   scheme"); *see also United States v. Feldman,* 853 F.2d 648, 657-59 (9th Cir. 1988) (finding RICO

14   enterprise even though certain participants in the enterprise did not share in the defendants' unlawful

15   intent). Nor has the Supreme Court required that an enterprise's purpose be fraudulent. Far from it,

16   the common purpose requirement derives from *Turkette*, which described the common purpose there

17   as "engaging in *a* course of conduct." *Turkette*, 452 U.S. at 583 (emphasis added).

18           To require fraud in the purpose of the enterprise is simply not necessary to avoid imposing

19   liability on "ordinary business conduct." *In re Jamster Mktg. Litig.*, 2009 WL 1456632 at *5. That is

20   because, even if the purpose of a RICO enterprise is not fraudulent, the plaintiff must still prove a

21   pattern of racketeering, mail and wire fraud in this case. The Supreme Court has opined that concern

22   over RICO reaching "legitimate" businesses should be focused on "RICO's key requirement of a

23   pattern of racketeering." *H.J. Inc. v. NW Bell Tel. Co.*, 492 U.S. 229, 237 (1989). In short, by

24   establishing a pattern of racketeering, Plaintiffs necessarily demonstrate an illicit dimension to the

25   enterprise. But it does not follow that the common purpose itself must be illicit. Nothing in the RICO

26   statute requires this.

27           Even if this Court were to require a fraudulent common purpose, that much (and more) is

28   alleged in the FAC. The FAC states: "The common purpose of the enterprise is to circumvent

prohibitions on the corporate practice of medicine and fraudulently overcharge patients." FAC ¶ 145. The enterprise accomplished this by "squeezing as much money as possible out of consumers through a pattern of fraudulent communications that misrepresent the amounts [Defendants] are entitled to charge for the care physicians in the enterprise provide." FAC ¶ 106. In short, the FAC alleges anything but ordinary business. It alleges outright fraud.

Defendants' assertion that the FAC's fraud allegations rest on mere "accusatory language," *see* MTD at 8, ignores pages of detail explicating the enterprise's fraudulent scheme. The FAC describes, for example, how states ban the corporate practice of medicine, *see* FAC ¶ 97; how Defendants "spun a web of subsidiaries"—*i.e.*, the enterprise—in an attempt to circumvent these laws, *id.* ¶¶ 98, 100-04; how quantum meruit limits what Defendants can lawfully recover for medical care provided, *id.* ¶¶ 70-73; how Defendants knowingly bill uninsured and out-of-network patients inflated list prices that vastly exceed those amounts, *id.* ¶¶ 78-84, 87-94, 145; how Defendants rapaciously pursue patients for nonpayment of those inflated amounts, *id.* ¶ at 95; and how Plaintiffs and the proposed class have been injured, *id.* ¶¶ 19-40, 93, 95, 174.

The FAC goes further to detail the roles of each participant in the scheme, and the manner in which they "all work towards [their] common purpose." FAC ¶ 132. Sitting at the top, Defendant Holdings sets the directives and strategy for billing patients unlawful amounts, *id.* at ¶ 133; AmeriTeam and THI control day-to-day operations, "polic[ing] the rest of the enterprise" to ensure coordination, *id.* at ¶¶ 134-36; regional subsidiaries contract with ostensibly independent provider groups to evade corporate practice of medicine laws, *id.* at ¶¶ 137-38; HCFS sends the fraudulently inflated bills for services provided by the provider groups, *id.* at ¶ 139; HRRG aggressively pursued collection, *id.* at ¶ 140; and all share in the spoils, *id.* at ¶ 150. The cohesiveness and common purpose of this collective is underscored by the fact that TeamHealth has given it a name—the "TeamHealth System." FAC ¶ 144.[5]

---

[5] Holdings' Chief Operations Counsel likewise admitted in a sworn declaration that the alleged participants are aligned and "share[] a common interest" in "acting to fulfill the overall goals, mission, and vision of the TEAMHEALTH organization." *See* ECF No. 51-5 at ¶ 5; *id.* at ¶ 16.

1    These detailed allegations fully distinguish the cases Defendants invoke, all of which

2    involved complaints that did nothing more than identify routine commercial activity. *See, e.g., In re*

3    *Jamster Mktg. Litig.*, 2009 WL 1456632, at *5 (plaintiffs failed "to set forth sufficient allegations to

4    distinguish ordinary business conduct from fraudulent conduct"); *In re Countrywide Fin. Corp.*

5    *Mortg.-Backed Sec. Litig.*, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) (plaintiffs alleged

6    only "arms-length business transaction[s]"). By contrast, purposefully overbilling and pursuing

7    captive patients for unrecoverable amounts is not ordinary business—it is fraud. *See In re Outlaw*

8    *Lab., LP Litig.*, 2020 WL 5552558, at *15 (S.D. Cal. Sept. 16, 2020) (holding that the "conduct of

9    sending fraudulent demand letters to further [a] scheme, if true, amounts to mail fraud" under RICO,

10   rather than ordinary business).

11   Defendants separately contend that no common purpose can be alleged here because they

12   have, in fact, complied with corporate practice of medicine laws. *See* MTD at 9-10. This misses the

13   point. For one, Defendants' compliance is nowhere conceded, and the FAC alleges the opposite. *See,*

14   *e.g.,* FAC ¶ 4. Second, even if Defendants had strictly complied with bans on the corporate practice

15   of medicine, orchestrating a web of subsidiaries to evade those bans and overbill patients remains a

16   fraudulent common purpose.

17   ### 2.    Each Defendant Participated in the Conduct of the Enterprise.

18   Defendants next contend that not all participants in the enterprise are alleged to "conduct or

19   participate" in the enterprise's affairs, as RICO requires. *See* 18 U.S.C. § 1962; MTD at 10-12.[6] Here

20   again, Defendants ignore both the FAC's detailed allegations as well as RICO's plain text.

21   Defendants assert, for example, that **Holdings** has "no operations so it could not have carried

22   out the operations of the enterprise." MTD at 10. RICO liability, however, is in no way limited to

23   participants that execute the enterprise's day-to-day operations. As appropriate, the statute makes it

24   unlawful "to *conduct or* participate, directly or indirectly, in the conduct of such enterprise's affairs."

25   18 U.S.C. § 1962(c) (emphasis added). The statutory term "'conduct' means to lead, run, manage or

26

27   _____

28   [6] Defendants' arguments in this context do not address Defendant HRRG, presumably acknowledging that HRRG conducted and participated in the enterprise.

1   direct." *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993). That is what is alleged of Holdings here.

2   Quoting from a sworn declaration from Holdings' chief operations counsel, the FAC states:

3   > Holdings engages in "***strategic planning and goals, implementation of***

4   > ***overall vision, values, mission and direction of the TEAMHEALTH***
    > ***organization***, which from time to time may include marketing,
    > branding, strategic direction and relationships, growth and

5   > finance/accounting related activities for the various operating affiliates
    > and subsidiaries comprising the TEAMHEALTH organization."

6

7   FAC ¶ 133 (emphasis added).[7]

8        The notion that Holdings' strategic oversight somehow does not extend to the enterprise's

9   affairs, *see* MTD at 10, defies the FAC's well-pleaded allegations otherwise. *See* FAC ¶ 133

10  ("Holdings controls the strategy and direction of the enterprise."); ¶ 134 (alleging that the overbilling

11  scheme was "originally conceived by Holdings"). These allegations are more than plausible.

12  Plaintiffs "allege that every bill TeamHealth sent to a member of the proposed class fraudulently

13  demanded payment on amounts TeamHealth knew it could not legally recover." *Id.* at ¶ 164. A fraud

14  this pervasive does not occur without strategic direction, and that is what Holdings admittedly

15  provides.

16       The FAC likewise explains how **AmeriTeam** and **THI** participate in the conduct of the

17  enterprise—namely by serving as the "operating arm of Holdings" and "polic[ing] the rest of the

18  enterprise to ensure everyone is striving towards the common purpose." FAC ¶¶ 134, 136. Again,

19  this allegation is supported by Holdings' chief operations counsel, who acknowledged that

20  AmeriTeam (THI's successor) "is uniquely situated to support and assist other affiliated operating

21  entities in aligning themselves with the overall mission, values goals and vision of TeamHealth

22  organization." FAC ¶ 134. Defendants' only response is that day-to-day management is an ordinary

23  business function. But as discussed, the day-to-day management of a fraud is not.

24

25      [7] The same sworn declaration elaborates:  "Holdings recognizes and embraces its ***critical***

26  ***holding company activity of setting the overall mission, values, vision and goals of the***
    ***TeamHealth organization, so its respective operating affiliates are aligned in promoting***

27  ***and furthering the overall goals of the organization and not acting in a manner adverse or***
    ***antithetical to them***." ECF No. 51-5 at ¶ 19 (emphasis added).

28

**Third**, Defendants also contend that the FAC does not allege how HCFS's role in setting prices and billing customers is fraudulent. *See* MTD at 10. It does, at length. *See, e.g.,* FAC ¶¶ 68-95. Indeed, transmission of these inflated bills is the predicate act of mail and wire fraud that forms the pattern of racketeering. *See infra.*

**Last,** Defendants assert that it would be implausible for provider groups to participate in the enterprise, but without explaining why. *See* MTD at 11. Providers are paid "from the inflated bills and prices," *see* FAC ¶ 150, and money is a powerful inducement. There is no reason to believe medical providers are immune to its sway. And even if providers lacked fraudulent intent, that is not fatal to establishing an enterprise in the Ninth Circuit. *See supra* at Point III.B.1.

### 3. The FAC Alleges Predicate Acts of Racketeering.

Defendants assert that the FAC fails to allege mail and/or wire fraud because the FAC does not allege (1) any misrepresentation or (2) scienter. Defendants are wrong on both counts.

#### a. Misrepresentation

Understanding the misrepresentation here is no more difficult than understanding the nature of the chargemaster rates Defendants bill uninsured and out-of-network patients.

A chargemaster is a price list that hospitals and providers use "as a starting point in negotiating reimbursement payments, especially with third-party private payers." *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 375 (D.D.C. 2020). To gain leverage in these negotiations, hospitals are incentivized to greatly inflate their chargemaster rates and then offer insurers "huge discounts" off the inflated amounts to become an in-network provider. *See* George A. Nation III, *Hospital Chargemaster Insanity: Heeling the Healers*, 43 Pepp. L. Rev. 745, 764 (2016).

Over time, chargemasters have "lost any direct connection to the costs or to the amount the hospital actually expects to receive in exchange for its goods and services." *In re N. Cypress Med. Ctr. Operating Co.*, Ltd., 559 S.W.3d 128, 132 (Tex. 2018); *United States v. Berkeley Heartlab, Inc.*, 2017 WL 2972143, at *4 (D.S.C. July 12, 2017) (same). Within the industry (*i.e.*, among providers and insurers) chargemasters are universally recognized to be "highly inflated," *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d at 375, often exceeding "ten times the amount that the hospitals routinely

accept as full payment from insurers." Nation III, *Hospital Chargemaster Insanity: Heeling the Healers*, at 764.

Because chargemasters are vastly inflated relative to what providers actually accept as payment, courts across the country have rejected attempts to use chargemasters to measure the "reasonable value" of medical services. *See United States v. Berkeley Heartlab, Inc*., 2017 WL 2972143, at *5 (excluding as unreliable expert opinion equating chargemasters with reasonable value); *Corenbaum v. Lampkin,* 215 Cal. App. 4th 1308, 1330-31 (2013) (holding "that the full amount billed by medical providers for past medical services is not relevant to the value of the services"); *Ochoa v. Dorado,* 228 Cal. App. 4th 120, 135 (2014) ("[T]he full amount billed, but unpaid, for past medical services is not relevant to the reasonable value of the services provided."); *Johnson v. Trans-Carriers, Inc.,* 2017 WL 28004 at *2 (W.D. Tenn. 2017) (holding that chargemasters do not approximate reasonable value because they do "not reflect the rate for services in the actual marketplace"); *Nassau Anesthesia Assocs. PC v. Chin,* 924 N.Y.S.2d 252, 254 (N.Y. Dist. Ct. 2011) ("Since hospitals and related providers rarely receive payment based upon their 'published rates,' those rates cannot be deemed determinative in assessing the value of the services."); *Colomar v. Mercy Hosp., Inc.*, 461 F. Supp. 2d 1265, 1269 (S.D. Fla. 2006) (upholding on motion to dismiss claim that chargemaster bills were inflated and unreasonable as a matter of law).

Against this backdrop, the misrepresentations at issue are plain. By systematically billing uninsured and out-of-network patients full chargemaster rates, Defendants misrepresent the amount they are owed and entitled to recover from these patients. Every bill is a lie.

Defendants' contentions to the contrary should all be rejected. ***First***, Defendants assert that the complaint must specify in dollar terms the "reasonable value" for the services Defendants provide. This argument confuses the requirements for pleading fraud with proof of damages. The allegation here is that Defendants' chargemasters are universally inflated and unrecoverable and that, despite knowing this, Defendants' bill them in full. The specific lesser *amounts* Defendants could legitimately recover—that is, the delta between billed and recoverable amounts—goes to the *quantum* of Plaintiffs' damages and not whether a fraud has occurred. And to be clear, there are

numerous methodologies available for estimating these amounts on a classwide basis.[8] That, however, is a question for another day, as the "specific monetary amount of damages is not necessary" to plead a RICO claim. *See Rabang v. Kelly*, 2017 WL 1496415, at *10 (W.D. Wash. Apr. 26, 2017).

**Second**, Defendants argue that whether they overbilled Plaintiffs is ultimately a legal question, and that fraud claims supposedly cannot be predicated on a "legal dispute." MTD at 14-15. But courts routinely uphold fraud claims with a legal dimension. *See, e.g., In re Outlaw Lab., LP Litig*., 2020 WL 5552558, at *4, 15 (attorneys' demand letters could be deemed fraudulent under RICO because they threatened litigation that lacked a legal basis). True, fraud claims generally cannot be predicated on genuinely held legal opinions on matters of legitimate dispute. But the misrepresentations here are of a different order. To begin with, Defendants' bills on their face do not convey any legal opinion; they represent a supposed fact, specifically the amount patients literally "owe" for services rendered. And even if the bills could be characterized as a legal opinion as to the amount owed, they still would be actionable because the opinion is not honestly held—that is, Defendants know the bills are false. *See* Point III.B.3(b) (addressing scienter; *see also* Restatement (Second) of Torts § 545, cmt. c. (implied in a legal "opinion" is an "assertion that the facts known to the maker are not incompatible with his opinion or that he does know facts that justify him in forming it"); *United States v. Widergren*, 8 F.3d 33 (9th Cir. 1993) (statement of opinion does not support wire fraud *provided* it was "honestly held").

Moreover, there can be no legitimate dispute that Defendants' chargemasters exceed the reasonable value of the services they render. *See supra*; *see also United States v. Berkeley Heartlab, Inc.*, 2017 WL 2972143, at *5 ("[C]ourts have uniformly acknowledged that physicians' billed

---

[8] *See* Centers for Medicare & Medicaid Services (CMS), Final Rule dated Nov. 27, 2019, 84 FR 65524-01, at 65538 (observing that "there several potential metrics for assessing reasonableness of a hospital's charge in a given case as an alternative to the chargemaster (gross) rates described above"); George A. Nation III, *Determining the Fair and Reasonable Value of Medical Services: The Affordable Care Act, Government Insurers, Private Insurers and Uninsured Patients*, 65 Baylor L. Rev. 425, 457-67 (2013) (providing objective criteria for measuring the "reasonable value" of care provided to uninsured and out-of-network patients). Plaintiffs do not adopt any particular damages methodology at this stage, and need not.

charges do not necessarily reflect the market value of physician services."). This distinguishes all of the cases Defendants cite, which either involved open legal questions in genuine dispute[9] or legal questions the court resolved against the party claiming fraud.[10]

Notably, Defendants concede that they do not even attempt to tether their bills to the amount they can legitimately collect. They claim "it would not be possible for Defendants to anticipate what amount any particular court might find recoverable in a theoretical quantum meruit lawsuit." MTD at 15. Yet Defendants have the burden to prove what quantum meruit is when they sue patients. That they make no attempt to identify that amount in billing patients—but rather assert that the inflated billed amounts are in fact owed—is profoundly misleading.

***Third***, Defendants contend that their bills contain no misrepresentation because they do not affirmatively represent that the "rates for their services are lawful" or represent "real value of [their] service." MTD at 14. But what else could the bills mean? Every bill contains an "implicit representation that the invoiced amount was honestly owed." *See In re U.S. Foodserv. Inc. Pricing Litig.*, 729 F.3d at 120. The bills here go even further to emphasize that the billed amounts are "NOW DUE" and what "you owe." FAC ¶¶ 21, 27, 35, 39. The bills also nowhere indicate that the patients' rightful payment obligations may be some lesser amount or are legally uncertain. That itself is a material omission sufficient to support Plaintiffs' fraud claim.

***Fourth***, Defendants assert that there could be no misrepresentation because their bills actually reflect the "going rate" for their services. *See* MTD at 13. The FAC alleges otherwise, and with specificity. *See* FAC at ¶ 89 (recounting leading insurer's complaint that TeamHealth

---

[9] *Brown v. Knoxville HMA Holdings, LLC*, 447 F. Supp. 3d 639, 647 (M.D. Tenn. 2020) (representation that liens created "lawfully owed debts" not fraudulent only because defendants reading of the law was "objectively reasonable"); *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001) (rejecting fraud claim premised on legitimate question of statutory interpretation, as to which "federal trial courts have had differing opinions"); *Methodist Hosp. of S. Cal. v. Blue Cross of Cal.,* 2010 WL 11508022, at *12 (C.D. Cal. Feb. 26, 2010) (fraud claim premised on open question of "statutory interpretation" with no indication that declarant did not honestly hold legal opinion rendered).

[10] *Schulenberg v. Rawlings Co.*, 2003 WL 22129230, at *7 (D. Nev. Aug. 20, 2003) (claim fails because it "is dependent on the assertion that Ninth Circuit law bars the Defendant from asserting a lien" and that "it does not"); *Bowden v. Med. Ctr., Inc.*, 845 S.E.2d 555, 566 (Ga. 2020) (fraud claim not viable because premised on a misreading of Georgia lien statutes).

physicians billed "at more than four times the median rate"); *id.* ¶ 91 ("TeamHealth's rates are also inflated relative to other providers," citing 2018 study showing average $269.01 total payment increase when TeamHealth takes over an emergency room). These well-pleaded allegations control at this stage. Defendants' arguments to the contrary rely on an online report by FairHealth.org. *See* MTD at 13. The truth of this information cannot be judicially noticed. *See* Opp. to RJN at 4-5. Regardless, Defendants are using FairHealth.org pricing information to compare their chargemasters to the purported chargemasters of other providers. This tells us nothing. Chargemasters are systematically inflated, as already discussed, and cannot stand as a proxy for reasonable value.

### b.    Scienter

As to scienter, Defendants argue that the FAC fails to allege that "Defendants knew the Chargemaster rates were inflated." MTD at 15. It does, repeatedly. *See* FAC ¶ 6 ("TeamHealth has inflated the rates it charges patient-consumers far above those that it knows it is legally entitled to collect from those patients."); *id.* ¶ 8 (Defendants know "legal entitlement to collect from patients or their insurers is based in equity" and that "equitable remedies only permit TeamHealth to recover a *fraction* of its billed rates."); *id.* ¶ 164 (Defendants "demanded payment on amounts that TeamHealth knew it could not legally recover"); *id.* ¶ 187, ("Defendants knew their list prices were inflated and false."); *see also id.* at ¶¶ 194, 198, 203, 212. These allegations more than suffice on a motion to dismiss, where "the state of mind—or scienter—of the defendants may be alleged generally." *Odom*, 486 F.3d at 554; Fed. R. Civ. P. 9(b); *see also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 978 (N.D. Cal. 2018) (holding in RICO case that "only 'general allegations' of a defendant's state of mind are required").

The FAC also goes far beyond these allegations. It explains chargemaster inflation and how "no one" in the industry—Defendants included—"expect[s] the chargemaster rates to be paid in full." FAC ¶ 74. Moreover, "[c]ourts across the country have concluded that a provider's list prices are not a fair or accurate measure of the value or going rate." FAC ¶ 75 (assembling caselaw); *see also supra* at Point III.B.3(a). And in litigation, TeamHealth does not even attempt to collect its full chargemasters. *See* FAC ¶¶ 88, 90.

Defendants also suggest that they bill uninsured and out-of-market patients inflated amounts because this is necessary to cross-subsidize patients who do not pay their bills. *See* MTD at 16-17. But Defendants cannot defraud some patients because others do not pay. This is built into the quantum meruit standard, which limits Defendants' recovery to the reasonable value of their services provided *to the recipient*, not the value of services provided to *others*. *See* Restatement (Third) of Restitution § 50 ("Unjust enrichment from requested benefits is measured by their reasonable value to the recipient."). Moreover, even if it could be adjudicated on a motion to dismiss, Defendants' suggestion that they calibrate chargemasters to subsidize non-paying patients is simply not credible. Chargemasters are set to gain leverage with insurers and, as discussed, have "lost any direct connection to the costs or to the amount the hospital actually expects to receive in exchange for its goods and services." *In re N. Cypress Med. Ctr. Operating Co.*, Ltd., 559 S.W.3d at 132.

## C.     Plaintiffs' State Law Claims are Well-Pleaded

Plaintiffs also assert claims under California, New York, and Texas laws prohibiting unfair and deceptive business practices. Beyond rehashing their RICO arguments, Defendants raise several independent challenges to these state-law claims, none of which warrants dismissal.

### 1.     California UCL and CLRA Claims.

Defendants contend that the FAC's UCL claims fail because Plaintiffs supposedly do not allege that they conveyed "money or property" to Defendants. *See* MTD at 17-18. This is false. Plaintiff Sia Fraser is making installment payments on her inflated bill. *See* FAC ¶ 22. All Defendants share these payments, *id.* ¶ 150, and thus they have received money from Ms. Fraser.

The second California Plaintiff, Katja Kiume, does not allege to have made payments (yet) on her TeamHealth bill, but this is not fatal to her UCL claim for injunctive relief. Defendants conflate the requirements for restitution—which requires an economic benefit conferred on the defendant— with UCL standing, which requires only an economic injury of some form. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 336 (2011) ("[T]he economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant."); *see also Ames*, 2019 WL 366210, at *4 (demand for payment on allegedly

1   unenforceable debt itself constitutes economic injury sufficient to confer UCL standing for injunctive

2   relief claim).

3       Defendants argue further that UCL claims cannot be asserted against Defendants other than

4   HCFS, because HCFS is the specific entity that transmitted the fraudulent bills. MTD at 18. Liability

5   under the UCL, however, is not limited to the entity that "performs the offending acts." *Woodard v.*

6   *Labrada*, 2017 WL 3309765, at *11 (C.D. Cal. July 31, 2017). The statute makes it unlawful to

7   "jointly participate or collude" with others "in violation of this statute." Cal. Bus. & Prof. Code

8   § 17048. Courts extend UCL liability "on agency principles, on theories of aiding and abetting,

9   furnishing the means, and civil conspiracy." *Woodard,* 2017 WL 3309765 at *12. Here, all

10   Defendants are alleged to have participated in a common scheme—indeed, a RICO enterprise—to

11   fraudulently bill patients. All can be liable under the UCL.

12       Defendants separately assert that Plaintiffs cannot proceed under the "unfair" prong of the

13   UCL because their claims supposedly do "not reflect some essential public policy." MTD at 18.

14   Defendants ignore that many California courts do not require claims under the unfairness prong to be

15   tethered to public policy. *See Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cty.*, 9

16   Cal. 5th 279, 304 n.10 (2020). Regardless, it is difficult to imagine a public policy more important

17   than preventing deceptive overbilling for emergency medical care.

18       Last, Defendants contend that it is no UCL violation to charge patients different amounts

19   based on insurance status. But Plaintiffs nowhere allege that Defendants' rates must be uniform. The

20   claim is that Defendants' rates for uninsured and out-of-market patients vastly exceed reasonable

21   value for the services. The viability of that claim under the UCL is recognized in the very case

22   Defendants cite on this point. *See Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal. App. 5th 1131,

23   1151 (2016) ("Plaintiff has established a basis for maintaining his UCL cause of action on the basis

24   defendants' policy of billing self-pay patients the full amount of its charge description master rates

25   was unfair because the amount sought was allegedly unconscionable.").

26       **2.      New York General Business Law Claim.**

27       Defendants' challenges to Plaintiff Gabrielle DiBella's NYGBL claim likewise fail. First, for

28   all the reasons already discussed, Ms. DiBella's receipt of an inflated debt obligation constitutes an

1    "actual injury" for NYGBL purposes. *See supra* Point III.A. There is no requirement under the

2    NYGBL that inflated bills be paid before they cause a cognizable injury. Defendants rely on *Stutman*

3    *v. Chem. Bank,* 95 N.Y.2d 24, 29 (2000), but that case explicitly recognized that an "actual injury"

4    for NYGBL purposes need not involve "pecuniary harm."

5           Second, Defendants assert that chargemaster inflation cannot be misleading under the

6    NYGBL because, supposedly, the FAC admits everyone knows about it. *See* MTD. That is not what

7    the FAC alleges. It alleges that *industry participants*—insurers, hospitals, and Defendants

8    themselves—know that chargemasters are inflated. *See* FAC ¶ 74 (discussing understanding

9    "[t]hroughout the industry"). Patients do not know this—indeed, they are unlikely to know what a

10   "chargemaster" is to begin with. All patients know is that they receive a bill for certain amounts

11   supposedly owed. *See* FAC ¶ 203 (Defendants exploit patients' "lack of knowledge").

12          Third, and relatedly, Defendants assert that consumers cannot reasonably believe that the

13   billed amounts represent what Defendants are actually owed. MTD at 20. As noted above, this

14   argument assumes a level of cynicism that cannot be ascribed to the reasonable consumer.

15   Defendants' bills are not characterized as an offer to negotiate some lesser rate. They state that the

16   amounts billed are literally "owed" and "NOW DUE." *See* FAC ¶¶ 21, 27, 35, 39.

17          Fourth, Defendants contend that the FAC does not allege fraud against elderly persons,

18   precluding civil penalties under NYGBL § 349-c. In fact, the FAC alleges that "*every* bill"

19   Defendants sent to uninsured and out-of-market patients is fraudulent. *See* FAC ¶ 164 (emphasis

20   added). In the event that no elderly New York class member received a bill from Defendants, § 349-c

21   penalties would not be available. But this is no reason to dismiss the § 349 claim outright.

22          **3.      Texas Deceptive Trade Practice Act Claim.**

23          Defendants contend that only consumers who "purchase or lease" goods have standing under

24   the TDTPA, and that because Texas Plaintiff Tricia Bakonyi has not paid her TeamHealth bill, she

25   cannot assert a TDTPA claim. *See* MTD at 20-21. Defendants' selective quotation of the TDTPA

26   omits the relevant portion of the statute, which confers standing on anyone "who *seeks or* acquires

27   by purchase or lease, any goods or services … ." Tx Bus. & Com. § 17.45(4) (emphasis added).

28

1   There is no dispute that Ms. Bakonyi sought the services on which here TDTPA claim is based. She

2   has standing.

3          Rehashing their Article III standing arguments, Defendants assert that Plaintiff Bakonyi has

4   suffered no "economic damages" within the meaning of § 17.50(a), but as already discussed, inflated

5   debt obligations constitute economic damage. Defendants presume that "economic damage" means

6   out-of-pocket payments to the violating party. The Texas Supreme Court, however, has already

7   rejected that construction of the TDTPA. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945

8   S.W.2d 812, 815 (Tex. 1997) ("The DTPA does not require the consumer to be an actual purchaser

9   or lessor of the goods or services.").

10         As to the merits, Defendants assert that overbilling Ms. Bakonyi cannot be "unconscionable"

11  because she has not yet paid and has retained counsel. But these are not pertinent considerations

12  under the TDTPA. An "unconscionable" act is defined as "an act or practice which, to a consumer's

13  detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer

14  to a grossly unfair degree." Tx Bus. & Com. § 17.45(5). That is what happened here. When Ms.

15  Bakonyi needed emergency care, she visited a hospital within her insurance network, but she was

16  treated by TeamHealth physicians who never informed her that they were operating outside that

17  network. *See* FAC ¶ 24. This allowed Defendants to bill separately for the providers' services, and

18  they billed her full chargemaster rates even after her insurer deemed the charges unjustified. *See id.*

19  ¶¶ 26-27. That Ms. Bakonyi has not yet paid her bill, and is participating in a lawsuit, does not make

20  Defendants' conduct less unconscionable.

21                          **IV.   CONCLUSION**

22         For all of the reasons foregoing, Defendants' motion to dismiss should be denied in its

23  entirety. To the extent any claim is dismissed, Plaintiffs respectfully request leave to amend.

24

25

26

27

28

1   Dated: February 1, 2021          Respectfully submitted,

2                              By */s/ Steve W. Berman*

3                                Steve W. Berman (admitted *pro hac vice*)
Craig R. Spiegel (SBN 122000)

4                               HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000

5                               Seattle, WA 98101
steve@hbsslaw.com

6                               craigs@hbsslaw.com
Telephone: (206) 623-7292

7                               Facsimile:  (206) 623-0594

8

9                               Ben M. Harrington (SBN 313877)
Rio S. Pierce (SBN 298297)

10                             HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202

11                             Berkeley, California  94710
benh@hbsslaw.com

12                             riop@hbsslaw.com
Telephone: (510) 725-3000

13                             Facsimile:  (510) 725-3001

14                             Hannah Brennan (admitted *pro hac vice*)

15                             HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301

16                             Cambridge, MA 02142
hannahb@hbsslaw.com

17                             Telephone: (617) 482-3700
Facsimile:  (617) 482-3003

18

19                             Benjamin Elga (*pro hac vice* forthcoming)
Brian J. Shearer (admitted *pro hac vice*)

20                             Craig L. Briskin (admitted *pro hac vice*)
JUSTICE CATALYST LAW, INC.

21                             81 Prospect Street
Brooklyn, NY 11201

22                             belga@justicecatalyst.org

23                             bshearer@justicecatalyst.org
cbriskin@justicecatalyst.org

24                             Telephone: (202) 524-8846

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on February 1, 2021, I electronically transmitted the foregoing document to

3

the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of

4

Electronic Filing to all ECF registrants.

5

6

/s/ Steve W. Berman
STEVE W. BERMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28