Carol Lynn Thompson (SBN 148079)
cthompson@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Jennifer Lee (SBN 329079)
jhlee@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

Mark B. Blocker (*Pro Hac Vice*)
mblocker@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7436

*Attorneys for Defendants*
*Team Health Holdings, Inc., AmeriTeam Services,*
*LLC, TeamHealth Inc. n/k/a Team Health, LLC,*
*and HCFS Health Care Financial Services, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND

| | |
|---|---|
| SIA FRASER, TRICIA BAKONYI, GABRIELLE DIBELLA, and KATJA FIUME, individually and on behalf of all others similarly situated,<br><br>                                          Plaintiffs,<br><br>          v.<br><br>TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, TEAMHEALTH, INC. n/k/a TEAM HEALTH, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,<br><br>                                          Defendants. | Civil Action No.  4:20-cv-04600-JSW<br><br>CLASS ACTION<br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Date:   March 26, 2021<br>Time:  9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Courtroom:     5, 2nd Floor<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT. ....................................................... 1

II.     ARGUMENT. ........................................................................................................................ 1

        A.      Plaintiffs Bakonyi, DiBella and Fiume Lack Article III Standing. .............................. 1

        B.      The RICO Claim Should be Dismissed for Failure to State a Claim. ........................... 3

                1.      Plaintiffs Have Not Pled a Common Purpose. .................................................. 3

                2.      Plaintiffs Have Not Alleged Each Defendant's Conduct. ................................. 5

                3.      Plaintiffs Have Not Alleged Any Predicate Racketeering Acts. ...................... 6

        C.      Plaintiffs Fail to Address the Deficiencies in Their State Law Statutory Claims. ....... 11

                1.      The California Statutory Claims Should Be Dismissed. ................................. 11

                2.      The New York Gen. Bus. Law Section 349 Claim Should Be Dismissed. .... 13

                3.      The Texas Statutory Claim Should Be Dismissed. ......................................... 14

III.    CONCLUSION. .................................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Hosp. Ass'n v. Azar*,
    468 F. Supp. 3d 372 (D.D.C. 2020) .................................................................................7

*Ames v. T-Mobile USA, Inc.*,
    Case No. 3:17-cv-01666-L-AGS, 2019 WL 366210 (S.D. Cal. Jan. 30, 2019) .................2, 12

*Arthur Andersen & Co. v. Perry Equipment Corp.*,
    945 S.W.2d 812 (Tex. 1997)..............................................................................14, 15

*Blue v. Diversified Adjustment Serv.*,
    Case No. 5:17-CV-00366-SVW-KK, 2017 WL 3600723 (C.D. Cal. Aug. 11,
    2017) .........................................................................................................................1

*Bowden v. Med. Ctr., Inc.*,
    845 S.E.2d 555 (Ga. 2020)................................................................................10

*Bradford v. Vento*,
    48 S.W.3d 749 (Tex. 2001)..................................................................................15

*Cisneros v. Petland, Inc.*,
    972 F.3d 1204 (11th Cir. 2020) .............................................................................4

*Corenbaum v. Lampkin*,
    215 Cal. App. 4th 1308 (2013) ..............................................................................7

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
    No. 2:11-CV-07166-MRP, 2012 WL 10731957 (C.D. Cal. June 29, 2012) ...........................4

*Durell v. Sharp Health*care,
    183 Cal. App. 4th 1350 (2010) ..........................................................................12

*Elston v. Encore Capital Grp., Inc.*,
    No. 2:18- CV-0071-TOR, 2019 WL 3037054 (E.D. Wash. July 11, 2019)...........................1

*Friedman v. 24 Hour Fitness USA, Inc.*,
    580 F. Supp. 2d 985 (C.D. Cal. 2008) ...................................................................3

*Gilbert v. MoneyMutual, LLC*,
    No. 13-CV-01171-JSW, 2018 WL 8186605 (N.D. Cal. Oct. 30, 2018)..................................4

*Gomez v. Guthy-Renker, LLC*,
    Case No. EDCV 14-01425 JGB, 2015 WL 4270042 (C.D. Cal. July 13, 2015)..................4, 6

*Hale v. Sharp Healthcare*,
  183 Cal. App. 4th 1375 (2010) ........................................................................2

*Hall v. AT&T Corp.*,
  No. 04-CV-433-DRH, 2005 WL 8173642 (S.D. Ill. Mar. 1, 2005) ................2

*Hoffman v. Blattner Energy, Inc.*,
  315 F.R.D. 324 (C.D. Cal. 2016) ..................................................................14

*Huntington Hosp. v Abrandt*,
  779 N.Y.S.2d 891 (App. Term 2004) ..............................................................7

*In re Jamster Mktg. Litig.*,
  No. 05cv0819 (JM)(CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) ..........3, 4

*Johnson v. Trans.-Carriers, Inc.*,
  No. 2:15-cv-2533-STA-dkv 2017 WL 28004 (W.D. Tenn. Jan. 3, 2017) ..............7

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..........................................................................9

*Kwikset Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ..................................................................................11

*Langford v. Rite Aid of Ala., Inc.*,
  231 F.3d 1308 (11th Cir. 2000) ....................................................................11

*Lynn v. McCormick*,
  760 Fed. App'x 51 (2d Cir. 2019) ..................................................................4

*McCoy v. FemPartners, Inc.*,
  484 S.W.3d 201 (Tex. App. 2015) ..................................................................4

*Moran v. Prime Healthcare Mgmt., Inc.*,
  3 Cal. App. 5th 1131 (2016) ..........................................................................13

*In re N. Cypress Med. Ctr. Operating Co.*,
  559 S.W.3d 128 (Tex. 2018) ..........................................................................7

*Nassau Anesthesia Assocs. PC v. Chin*,
  924 N.Y.S.2d 252 (Dist. Ct. 2011) ................................................................7

*Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cty.*,
  9 Cal. 5th 279 (2020) ..............................................................................12, 13

*O'Shea v. P.C. Richard & Son, LLC*,
  15 Civ. 9069 (KPF), 2017 WL 3327602 (S.D.N.Y. Aug. 3, 2017) ................3

*Ochoa v. Dorado*,
  228 Cal. App. 4th 120 (2014) ........................................................................7

*Oswego Laborer's Local 214 Pension Fund v. Marine Midland Bank*,
    85 N.Y.2d 20 (1995) ...........................................................................................13

*Rabang v. Kelly*,
    Case No. C17-0088-JCC, 2017 WL 1496415 (W.D. Wash. April 26, 2017)...........................9

*Ross-Randolph v. Allstate Ins. Co.*,
    Civil Action No. DKC 99-3344, 2001 WL 36042162 (D. Md. May 11, 2001) ......................2

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ..............................................................................3

*Shaw v. Nissan N. Am., Inc.*,
    220 F. Supp. 3d 1046 (C.D. Cal. 2016) ................................................................3, 4

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................2

*Sterling v. Interlake Indus. Inc.*,
    154 F.R.D. 579 (E.D.N.Y. 1994) ..........................................................................8

*Stutman v. Chem. Bank*,
    95 N.Y.2d 24 (2000) ..........................................................................................13

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)...............................................................................10

*United States v. Berkeley Heartlab, Inc.*,
    Civil Action No. 9:14-cv-00230-RMG, 2017 WL 2972143 (D.S.C. July 11, 2017) ..............7

*UnitedHealthcare Servs., Inc. v. Asprinio*,
    16 N.Y.S.3d 139 (Sup. Ct. 2015)..........................................................................13

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) .................................................................6

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015).....................................................................8

*Woodard v. Labrada*,
    Case No. EDCV 16-00189 JGB, 2017 WL 3309765 (C.D. Cal. July 31, 2017)...................12

**Rules & Statutes**

Fed. R. Civ. P. 9(b) ............................................................................................5, 9

Fed. R. Civ. P. 12(b)(1).........................................................................................3

Fed. R. Evid. 201(b)..............................................................................................8

1

Tex. Bus. & Com. Code § 17.45(5) ................................................................................................15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' REPLY ISO MOTION TO DISMISS, CASE NO. 4:20-CV-04600-JSW

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT.

Plaintiffs' Opposition, ECF No. 53 ("Opp'n"), fails to overcome the pleading failures identified in Defendants' Motion to Dismiss, ECF No. 51 ("Mot."), and underscores that these failures cannot be cured by amendment. Plaintiffs have no answer for the fact that three of the Plaintiffs did not pay (or agree to pay) anything, so that they have no Article III standing. Even if they did, the Complaint fails to state a claim. As to the RICO claim, the First Amended Complaint, ECF No. 38 ("FAC"), fails to allege several key elements. The central theory of the Complaint—that the billing of chargemaster prices to uninsured and out-of-network patients is inherently fraudulent—is unsustainable and unsupported by particularized allegations specific to Defendants, their chargemaster prices, and their billing practices. Attempting to exploit criticisms of general healthcare industry billing practices, Plaintiffs fail to show that these Defendants intentionally conspired to misrepresent the value of the services provided to patients or the amounts charged. Relatedly, Plaintiffs' FAC fails to demonstrate that any of the Plaintiffs individually were charged (or paid) more than the reasonable value of the services rendered to them and so can neither establish a RICO or state consumer law violation. Accordingly, Defendants respectfully submit that Plaintiffs' claims should be dismissed with prejudice.

## II.    ARGUMENT.

### A.     Plaintiffs Bakonyi, DiBella and Fiume Lack Article III Standing.

Plaintiffs do not address the abundant case law holding that mere receipt of a disputed bill does not give rise to injury-in-fact. *See* Mot. 7 (citing *Blue v. Diversified Adjustment Serv.*, Case No. 5:17-CV-00366-SVW-KK, 2017 WL 3600723 (C.D. Cal. Aug. 11, 2017); *Elston v. Encore Capital Grp., Inc.,* No. 2:18-CV-0071-TOR, 2019 WL 3037054 (E.D. Wash. July 11, 2019)). Instead, the Opposition is forced to argue that Plaintiffs suffered an injury because the bills "create an enforceable debt obligation, and being shackled with debt is harmful." Opp'n 4. This argument is inconsistent with Plaintiffs' entire theory of liability that Defendants can only recover a so-called reasonable amount and not the charged amount. *See, e.g.*, FAC ¶¶ 57 n.24, 70-76. If all Defendants can recover is a reasonable amount, there is no chance of being saddled with improper debt, and the fact that the three Plaintiffs have not paid anything—even the claimed reasonable amount—means

1

1   they have no standing.[1]

2        The cases the Opposition cites do not improve Plaintiffs' argument. Two of them—*Hall v.*

3   *AT&T Corp.*, No. 04-CV-433-DRH, 2005 WL 8173642 (S.D. Ill. Mar. 1, 2005), and *Ross-Randolph*

4   *v. Allstate Ins. Co.*, Civil Action No. DKC 99-3344, 2001 WL 36042162 (D. Md. May 11, 2001)—

5   are of dubious vitality because they were decided before *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

6   1548 (2016) made clear that a plaintiff must show a "concrete" injury, *i.e.,* one that "actually

7   exist[s]." In any event, those cases are distinguishable. In *Hall*, standing was predicated on

8   defendant's subsequent actions in response to complaints about the bills, including refusing to

9   correct the bill and attempting to alter the parties' business arrangement. In *Ross-Randolph*, while

10   finding plaintiff had standing at the pleading stage, the court acknowledged that there would be no

11   standing if the defendant insurer could show that the medical providers never sought to collect on the

12   unpaid portion of the bills. The only post-*Spokeo* case cited, *Ames v. T-Mobile USA, Inc.*, Case No.

13   3:17-cv-01666-L-AGS, 2019 WL 366210 (S.D. Cal. Jan. 30, 2019), involved a letter seeking to

14   collect an admittedly valid debt that was reported to a credit rating agency (and so raised an

15   imminent threat of harm), unlike here, where Plaintiffs claim the bill was not valid, they never paid

16   any of it, and they were not referred to a credit agency.

17        Plaintiffs also argue that they have standing because they *may* later be subject to an adverse

18   credit report or collections action. Opp'n 4-5. But not only do Plaintiffs offer no evidence of this, the

19   only evidence undermines that claim, showing that none of the Plaintiffs have been referred to a

20   collections proceeding or had a negative credit report. Decl. of Paula Dearolf in Supp. of Mot. to

21   Dismiss ("Dearolf Decl.") ¶¶ 6, 10, 13 (Dec. 18, 2020), ECF No. 51-7. As to Bakonyi, the FAC

22   alleges that her insurer is still negotiating the bills directly—meaning she may never have to pay

23   anything—and HCFS Health Care Financial Services ("HCFS") told Bakonyi that she did not need

24   to make a payment. *Id.* ¶ 5. Fiume's bill was submitted by HCFS to a special program so that she

25   will owe nothing. *Id.* ¶ 12. DiBella never disclosed that she had insurance coverage or sought

26   coverage through her insurer, and so it is possible her insurer will pay the bill. *Id.* ¶ 8.

27   
28   [1] In contrast, courts have found standing in the case of disputed medical bills where the plaintiff at least made some payment. *See, e.g., Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1375, 1378 (2010).

1    Plaintiffs' only response to this argument—that the FAC does not suggest someone else will

2    pay Plaintiffs' bills—is irrelevant. Opp'n 5. Because Defendants made a factual challenge based on

3    evidence outside the complaint—the Dearolf Declaration[2]—Plaintiffs can only establish standing by

4    submitting controverting evidence; they cannot merely rely on the FAC's allegations. *O'Shea v. P.C.*

5    *Richard & Son, LLC*, 15 Civ. 9069 (KPF), 2017 WL 3327602, at *4 (S.D.N.Y. Aug. 3, 2017).

6    Plaintiffs have submitted no such evidence and have not met their burden of establishing standing.

7        **B.      The RICO Claim Should be Dismissed for Failure to State a Claim.**

8    Plaintiffs' Opposition demonstrates that the FAC fails to plead several key elements of a

9    RICO claim, and those deficiencies cannot be corrected through further amendment.

10        **1.      Plaintiffs Have Not Pled a Common Purpose.**

11    Plaintiffs' Opposition essentially asks the Court to eviscerate RICO's "common purpose"

12    requirement. According to Plaintiffs, every type of business association would meet the common

13    purpose requirement as long as two or more persons are working together with a shared business

14    objective, even if only one of them intends to engage in fraudulent conduct. But the reason for the

15    common purpose requirement is, as Defendants explained, to distinguish between ordinary business

16    activity and conduct of a RICO enterprise. Mot. 8. "The hallmark of an enterprise is an association

17    of entities, groups or individuals that must share a common purpose to engage in a particular

18    fraudulent course of conduct and work together to achieve such purposes." *In re Jamster Mktg.*

19    *Litig.*, No. 05cv0819 JM(CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009).

20    While Plaintiffs point out that at least two district courts have held that a fraudulent common

21    purpose is not required, Opp'n 6 (citing *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046 (C.D.

22    Cal. 2016); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008)), neither

23    one suggests that any shared purpose will suffice. In fact, those courts emphasized the importance of

24

25    _____

    [2] Plaintiffs contend that it is inappropriate for the Court to consider the statements in paragraphs 5-6,
    8-10, and 12-13 of the Dearolf Declaration because they have not yet been tested in discovery. Plfs.'
26    Partial Opp'n to Req. for Judicial Not. 6 (Feb. 1, 2021), ECF No. 54 ("RJN Opp'n"). As Defendants
    stated in their Motion to Dismiss, however, a 12(b)(1) motion can be brought as either a facial
27    challenge based on the pleadings or a factual challenge based on evidence outside the complaint. *See*
    *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Defendants are entitled to
28    submit declarations in support of a factual challenge and the contents of the Declaration do not need
    to be judicially noticed.

1    distinguishing between ordinary business conduct and the common purpose necessary for a RICO

2    enterprise.[3] *See, e.g., Shaw*, 220 F. Supp. 3d at 1054 (noting that "courts have overwhelmingly

3    rejected attempts to characterize routine commercial relationships as RICO enterprises" (quoting

4    *Gomez v. Guthy-Renker, LLC*, Case No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042, at *8

5    (C.D. Cal. July 13, 2015)) (internal quotation marks omitted)); *see also Gilbert v. MoneyMutual,*

6    *LLC*, No. 13-CV-01171-JSW, 2018 WL 8186605, at *13 (N.D. Cal. Oct. 30, 2018). Here, the FAC

7    only alleges that Defendants had a common purpose to contract with hospitals to provide emergency

8    medical services and to be paid for providing those services. Allegations that a group of persons

9    acted together to provide services and earn profits is "consistent with ordinary business conduct and

10   an ordinary business purpose." *Jamster,* 2009 WL 1456632, at *5; *see also In re Countrywide Fin.*

11   *Corp. Mortg.-Backed Sec. Litig*., No. 2:11-CV-07166-MRP (MANx), 2012 WL 10731957, at *8

12   (C.D. Cal. June 29, 2012).

13          Plaintiffs also contend that they have alleged actions outside ordinary business conduct by

14   alleging that Defendants had a common purpose to circumvent corporate practice of medicine

15   restrictions. Opp'n 6-7. However, the referenced paragraphs of the FAC do not allege any such

16   violation. Paragraphs 96 through 106 merely state the general policies underlying corporate practice

17   of medicine restrictions and then allege that TeamHealth affiliated entities work together to provide

18   medical services. None of these paragraphs alleges that the clinical care, diagnosis, or treatment

19   rendered by licensed medical providers affiliated with TeamHealth entities was impermissibly

20   affected by their business arrangements with Defendants. Therefore, these paragraphs do not allege a

21   violation of any corporate practice of medicine restrictions. *See* Mot. 9-10; *McCoy v. FemPartners,*

22   *Inc.,* 484 S.W.3d 201, 207 (Tex. App. 2015).

23          Apparently recognizing that these allegations fall short, Plaintiffs offer a fall-back argument:

24   ───────────────
     [3] Although courts have acknowledged that it is an open question in the Ninth Circuit whether
25   plaintiffs must establish a fraudulent common purpose, Defendants submit that the weight of recent
     authority elsewhere is consistent with Ninth Circuit precedent requiring such allegations. *See, e.g.,*
26   *Lynn v. McCormick*, 760 Fed. App'x 51, 53 (2d Cir. 2019) (failure to plead RICO claim where
     plaintiffs failed to adequately establish that alleged participant in enterprise "share[d] a fraudulent
27   purpose"); *Cisneros v. Petland, Inc.,* 972 F.3d 1204, 1211 (11th Cir. 2020) ("[W]here the
     participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly
28   allege that the participants shared the purpose of enriching themselves through a particular criminal
     course of conduct.") (internal citations omitted).

1  even if Defendants comply with corporate practice of medicine restrictions, the fact that Defendants

2  were "orchestrating a web of subsidiaries to evade those bans" still amounts to a common RICO

3  purpose. Opp'n 8. But this argument, if accepted, amounts to creating liability for admittedly lawful

4  conduct, which is inconsistent with the RICO common purpose element.

5       Similarly, while Plaintiffs contend that the FAC adequately alleges that Defendants had a

6  common purpose to fraudulently bill patients, Opp'n 7, as established in the Motion and below, the

7  bills sent to patients do not make any misrepresentations, and there are no allegations to support the

8  claims that the prices charged are fraudulently inflated. Mot. 12-14. Moreover, a majority of the

9  Defendants and the other alleged participants in the enterprise have no role in either setting charges

10  or billing patients. *See id.* at 10-12; *see also*, *infra* Section II.B.2. The fact that Plaintiffs contend—

11  without any supporting facts—that the charges billed to patients were too high or that Defendants

12  wanted to maximize the recovery for their services does not transform this collection of entities and

13  persons into a RICO enterprise.

14          **2.      Plaintiffs Have Not Alleged Each Defendant's Conduct.**

15       As Defendants demonstrated in the Motion, the RICO claim also should be dismissed

16  because the FAC does not allege, as required by Rule 9(b), specific acts, undertaken by each of the

17  Defendants in conducting the affairs of the alleged RICO enterprise, as distinct from each

18  Defendant's own business affairs. Plaintiffs' Opposition simply attaches conclusory statements or

19  "artful modifiers" to the FAC's allegations of standard business conduct to argue that they met this

20  requirement.

21       HCFS is the only Defendant that is alleged to "set[] the prices and transmits bills to

22  consumers;" yet, even as to HCFS, the FAC fails to allege how it does so in a purportedly fraudulent

23  manner. FAC ¶ 139. The Opposition claims that paragraphs 68 through 95 of the FAC make such

24  allegations, but those paragraphs merely summarize Plaintiffs' disputed legal theory—that the billed

25  prices should equate to the amount recoverable in quantum meruit—but not how HCFS allegedly

26  sets prices and why those prices are fraudulently inflated beyond the reasonable value of the services

27  provided.

28       As to the other Defendants, Plaintiffs argue that the FAC contains "detailed allegations"

1    about their participation in the purported enterprise, Opp'n 8-9, but, again, the cited allegations do

2    no more than describe these Defendants' routine business functions. For example, the Opposition

3    tries to transform Team Health Holdings, Inc.'s ("Holdings") role in providing strategic directives to

4    its subsidiaries related generally to "marketing, branding, strategic direction and relationships,

5    growth and finance/accounting related activities" into strategic directives related to the purported

6    RICO enterprise. Opp'n 9 (quoting Stair Decl.[4]). Likewise, with respect to TeamHealth Inc. n/k/a

7    Team Health, LLC ("THI") and AmeriTeam Services, LLC ("AmeriTeam"), the Opposition argues

8    that they act as the "operating arm of Holdings" or "polic[e] the rest of the enterprise," Opp'n 9

9    (quoting FAC ¶¶ 134, 136); however, these conclusory statements are premised on paragraphs from

10   the FAC describing how these Defendants, in exchange for a management fee, provide routine day-

11   to-day administrative management services, such as human resources or insurance contracting.

12   Again, these sort of routine business activities cannot be the basis for a RICO claim. Mot. 11 (citing

13   *Gomez v. Guthy-Renker, LLC*, Case No. EDCV14-01425 JGB (KKx), 2015 WL 4270042 (C.D. Cal.

14   July 13, 2015); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034-

15   35 (C.D. Cal. 2011)).

16          And, finally, as to the medical provider groups, the Opposition never explains how the FAC

17   alleges anything other than the provision of medical services to patients. While asserting that the

18   physicians' participation is not necessarily implausible because the medical providers would be paid

19   from the inflated bills and "money is a powerful inducement," Opp'n 10, the FAC fails to allege any

20   conduct to further the alleged enterprise or even any belief on the part of the medical providers that

21   the bills allegedly were inflated. Indeed, as Defendants pointed out in their Motion, the FAC quotes

22   an article stating that doctors complained that they *billed less* and performed *fewer* procedures at

23   TeamHealth-affiliated hospitals. Mot. 16 (citing FAC ¶ 109 n.59).

24                  **3.    Plaintiffs Have Not Alleged Any Predicate Racketeering Acts.**

25          Plaintiffs' Opposition also fails to explain how the FAC's allegations establish that bills sent

26   to any patient, including Plaintiffs, were fraudulent or why Defendants acted with scienter, and so

27

28   ---
     [4] Attached as Exhibit 4 to Decl. of Jaime P. Bartlett in Supp. of Mot. to Dismiss ("Bartlett Decl."), ECF Nos. 51-1 & 51-2.

1    fails to establish that Defendants engaged in the alleged predicate acts of mail or wire fraud.

2             **a.**       **Plaintiffs Fail to Allege Misrepresentations**.

3            Plaintiffs' Opposition mainly rests on the assertion that any price that is labelled as the

4    "chargemaster price" is always inflated—pointing to cases and articles involving the prices charged

5    by *other medical providers and hospitals*—and so any bill containing those prices falsely represents

6    the amount the provider was entitled to be paid. *See* Opp'n 10-11. No case supports this claim. The

7    cases cited in the Opposition largely stand for the unremarkable proposition that insurers typically do

8    not pay at full chargemaster prices, but instead negotiate discounts from those prices based on such

9    factors as the payor's ability to steer volume to the hospital or its ability to promptly pay. *See, e.g.,*

10   *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 375 (D.D.C. 2020) (hospitals may accept as little as

11   10% of chargemaster rates from insurers); *United States v. Berkeley Heartlab, Inc.*, Civil Action No.

12   9:14-cv-00230-RMG, 2017 WL 2972143 at *4 (D.S.C. July 11, 2017) (insurers and Medicare do not

13   pay chargemaster rates); *Nassau Anesthesia Assocs. PC v. Chin*, 924 N.Y.S.2d 252, 254 (Dist. Ct.

14   2011) (discounts extended because of volume and prompt pay). At most, the cited cases indicate that

15   chargemaster prices are "not dispositive" or "cannot be deemed determinative," of what is a

16   reasonable charge in the context of a particular billing dispute—not that charging those prices can be

17   used to *create* a billing dispute. *In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 132

18   (Tex. 2018); *Nassau*, 914 N.Y.S.2d at 254.[5]

19           Indeed, the cases and articles that Plaintiffs rely on in their Opposition illustrate why the

20   FAC's RICO theory is flawed: all hospitals and medical providers send bills to out-of-network and

21   uninsured patients based on the chargemaster prices. *See, e.g., N. Cypress Med.*, 559 S.W.3d at 132

22   (chargemaster rates are typically charged to uninsured patients); *Nassau*, 914 N.Y.S.2d at 254

23   (same); *Huntington Hosp. v Abrandt*, 779 N.Y.S.2d 891 (App. Term 2004) (same). Thus, far from

---

24   [5] Plaintiffs misleadingly cite several cases dealing with recoverable damages in personal injury cases
     to argue that billed rates are not relevant in determining the reasonable value of medical services.
25   Opp'n 11. However, those personal injury cases involved the calculation of an award of damages for
     medical expenses, which is limited to the "reasonable value of the services." *Ochoa v. Dorado*, 228
26   Cal. App. 4th 120, 134 (2014). In the cited cases, courts merely found that the unpaid billed amount
     was not sufficient—standing alone—to establish the measure of damages because medical providers
27   often agree to accept less than the billed amount. *See, e.g., id.* at 136; *Corenbaum v. Lampkin*, 215
     Cal. App. 4th 1308, 1325-26 (2013); *Johnson v. Trans.-Carriers, Inc.*, No. 2:15-cv-2533-STA-dkv
28   2017 WL 28004, at *2 (W.D. Tenn. Jan. 3, 2017).

1    suggesting a fraudulent scheme or RICO conspiracy, these cases show that billing out-of-network or

2    uninsured patients chargemaster prices is standard healthcare industry practice. While Plaintiffs may

3    believe that medical billing practices in the United States disadvantage out-of-network and uninsured

4    patients, their policy views do not establish that Defendants engaged in fraud.

5            Significantly, as Defendants demonstrated in their Motion, there is not a single allegation in

6    the FAC about the process used by Defendants to develop chargemaster prices. In fact, the FAC does

7    not explain how any chargemaster price set by Defendants was deliberately inflated and why

8    Defendants could not reasonably demand the chargemaster price for the specific medical service

9    provided. Even as to the named Plaintiffs, the FAC does not attempt to explain what price Plaintiffs

10   should have been charged for the services provided to them or why the chargemaster price was

11   inflated. Moreover, there is a wealth of data available about the prices charged for standard services

12   by CPT code, so Plaintiffs' failure to provide even a single price comparison underscores the

13   inadequacy of their claims.

14           As Defendants pointed out in their motion, the publicly available FAIR Health Consumer

15   Database of Medical Prices demonstrates that the amounts charged to three of the Plaintiffs were the

16   same as *or lower* than the rates charged by other providers.[6] Mot. 13. Likewise, as the article cited

17   by Plaintiffs in paragraph 75 of the FAC demonstrates (Survey of Charges Billed by Out-of-Network

---

18   [6] Plaintiffs oppose judicial notice of the FAIR Health Consumer Database rates, Bartlett Decl. Ex. 5,
     on the grounds that the prices do not qualify as a public record because "FAIR Health is not a
19   governmental entity." RJN Opp'n 5. However, there is no requirement that a database be prepared
     by a government entity to take judicial notice of it. All that Fed. R. Evid. 201(b) requires is that the
20   information be determinable from sources whose accuracy cannot reasonably be questioned. *Wells
     Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) (court can
21   take judicial notice of information available from public database searches). The FAIR Health
     consumer database was prepared by an independent entity and the website lists the sources of and
22   process for gathering the average price information. *See FAIR Health Consumer Database*,
     https://www.fairhealthconsumer.org. Plaintiffs do not dispute the rates in the FAIR Health database
23   or offer any reason why they are not accurate; instead Plaintiffs simply argue that the data is
     irrelevant since it reflects the average chargemaster rates of *other* providers.  Opp'n at 14. Moreover,
24   even if the Court did not judicially notice the FAIR Health data as evidence of the average rate
     charged to uninsured and out-of-network patients for the services provided to Plaintiffs, that data
25   still is noticeable to demonstrate the ready availability of comparative price information and to
     illustrate the deficiency of Plaintiffs' allegations of fraudulent overbilling. *See, e.g., Sterling v.
26   Interlake Indus. Inc.,* 154 F.R.D. 579, 586 (E.D.N.Y. 1994) (taking judicial notice of what could be
     learned from "a five minute exercise on the NEXIS database"). While Plaintiffs allege inflated
27   prices, they do not point to a single provider that charges less or identify what price (or even price
     range) should have been charged for the same services.

28

---

1  Providers), data about the amounts providers charge for the same service in different geographies by

2  CPT code is readily available to show pricing disparities and outliers. Barlett Decl. Ex. 1.[7] Without

3  establishing that Defendants' bills are too high relative to some measurable standard, Plaintiffs have

4  failed to meet their burden under Rule 9(b). In the absence of any specific allegations about

5  Defendants' charges, Plaintiffs' FAC amounts to a blanket allegation that Defendants—along with

6  the entire healthcare industry—commit fraud every time they bill patients based on their

7  chargemaster prices, regardless of the specific price, how it was set, or how it compares to the prices

8  charged by other providers in that same market.

9      Plaintiffs try to excuse their failure to allege even a single price comparison by making the

10  remarkable claim that they do not have to allege any specific lower price because that is a question

11  of damages. Opp'n 11. But this argument makes little sense: if Plaintiffs contend that the bills they

12  received contained prices that were too high, they must set forth some facts explaining what the

13  prices should have been. At the pleading stage, Plaintiffs have to allege some factual basis to infer

14  that the prices were too high. Simply declaring that *all* of the prices are too high, without more, is

15  not sufficient. And this is not a case like *Rabang v. Kelly*, Case No. C17-0088-JCC, 2017 WL

16  1496415 (W.D. Wash. April 26, 2017)[8], where an injury is already established. Here, in a case

17  premised entirely on overbilling, there is no way to infer that there was an injury absent some

18  allegation of what the reasonable price should have been.

19

20  [7] Plaintiffs oppose incorporation by reference of the "Survey of Charges" study and the Tampa Bay news article, Bartlett Decl. Exs. 1-2, on the grounds that the FAC did not refer extensively to them. RJN Opp'n 5. But the purpose of the incorporation by reference doctrine is to "prevent plaintiffs

21  from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899

22  F.3d. 988, 1002 (9th Cir. 2018). And that is exactly what Plaintiffs have done—relied on them to support their claims but cited only select portions. Plaintiffs admit that the FAC used the study as

23  "one of several sources supporting the allegation that out-of-network and chargemaster prices are far higher than in-network or Medicare rates" and the news article "recount[ed] UnitedHealth's

24  allegations in a payment dispute with TeamHealth, which is also the subject of a TeamHealth lawsuit that Plaintiffs describe" elsewhere in the FAC. RJN Opp'n 4-5.  Plaintiffs' separate assertion that

25  articles publicly available on the internet are not sufficiently authentic to receive judicial notice is absurd.  RJN Opp'n 3.  Plaintiffs themselves rely on portions of these articles and cannot both use

26  the articles and question their authenticity.
    [8] In *Rabang*, the plaintiffs were disenrolled members of a Native American tribe who alleged that

27  defendants' RICO conspiracy to disenroll them caused them to lose housing, medical care, and other federal benefits. The court found injury, but permitted plaintiffs to establish the exact amount of

28  their damages at a later stage.

1    Moreover, as Defendants pointed out, Plaintiffs' fraud theory is flawed in any event because

2    the bills sent to Plaintiffs did not make any representation at all, let alone a fraudulent one. Plaintiffs

3    argue that the bills "contain[] an implicit representation that the invoiced amount was honestly

4    owed" and that this alone is sufficient. Opp'n 13 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*,

5    729 F.3d 108, 120 (2d Cir. 2013)) (internal quotation marks omitted). But the case Plaintiffs cite, *In*

6    *re U.S. Foodservice Inc.*, does not support that point. In that case, the prices were based on a contract

7    that required invoices to be calculated on a cost-plus basis, and defendants' bills were alleged to

8    reflect a knowingly inflated cost. In other words, the invoices represented that the amounts were

9    based on costs, while here, no representation of any kind is made that the billed charges adhered to

10   any specific standard.

11   Finally, merely charging more than what Plaintiffs contend is "reasonable" and might

12   ultimately be awarded by a court in a quantum meruit action does not constitute mail or wire fraud.

13   While Plaintiffs repeatedly assert that Defendants could not recover their chargemaster rates, there is

14   simply no basis for that assertion. To the contrary, Plaintiffs allege that Defendants routinely file suit

15   to enforce their bills in court and collect unpaid amounts. FAC ¶ 95. Despite complaining that

16   defendants have filed more than 4,800 suits, Plaintiffs make no allegation that courts typically refuse

17   to award the billed amount in such suits. In any event, there can be no predicate act of mail or wire

18   fraud where, as here, Plaintiffs only allege a legal dispute about the defendant's ultimate entitlement

19   to the billed amount. *See* Mot. 14 (citing, e.g., *Bowden v. Med. Ctr., Inc.*, 845 S.E.2d 555, 566 (Ga.

20   2020) (dismissing claim under Georgia RICO statute because the alleged fraud was use of

21   chargemaster rates to supply the amount of a lien, which was a legal dispute)).

22                    b.      **The FAC Fails to Allege Scienter**.

23   While Plaintiffs argue that they are entitled to allege state of mind generally so that the

24   FAC's allegations suffice, Opp'n 14, even against this standard the FAC falls short. While Plaintiffs

25   argue repeatedly that the chargemaster rates are "inflated" and that Defendants knew the rates were

26   unlawful, there is no support for that statement. Plaintiffs argue that the FAC explains "chargemaster

27   inflation" and that no one in the industry, including Defendants, expects to be paid chargemaster

28   rates. Yet, as discussed above, the FAC (and Plaintiffs' Opposition) merely establish that insurers

1   and the government do not pay chargemaster rates—not that uninsured or out-of-network patients do

2   not pay chargemaster rates. Plaintiffs further argue that Defendants' settlement of out-of-network

3   lawsuits with insurers for 75 to 90% of their chargemaster rates evidences scienter; however, that

4   assertion is illogical and false. To the contrary, obtaining a 90% rate settlement in hotly disputed,

5   protracted litigation involving hundreds of thousands of claims demonstrates that Defendants'

6   chargemaster rates are a reasonable and meaningful measure of value. Finally, accepting discounted

7   rates from insurers for thousands of patients versus payment by a single patient is not unreasonable

8   or evidence of fraud. Rather, these practices are inherent in the U.S. healthcare system. *See, e.g.*,

9   *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000).

10       **C.    Plaintiffs Fail to Address the Deficiencies in Their State Law Statutory Claims.**

11       As Defendants explained in their opening memorandum, the claims asserted under the

12   California, New York, and Texas state statutes should be dismissed both because Plaintiffs lack

13   standing and because these claims rest on the same inadequately and conclusorily asserted facts

14   underlying the defective RICO claim. Mot. 17-21. Plaintiffs' Opposition fails to overcome these

15   pleading defects, so Counts II through IV should be dismissed.

16       **1.    The California Statutory Claims Should Be Dismissed.**

17       As Defendants' Motion established, Plaintiffs Fraser and Fiume have failed to plead their

18   California statutory claims because: (1) having failed to plead injury in fact or actual reliance, they

19   lack standing to bring their UCL claim and CLRA claims; (2) they fail to plead a misrepresentation

20   by any Defendant other than HCFS; and (3) they fail to plead "unfair" conduct. Mot. 17-19.

21   Plaintiffs' Opposition does not support a different conclusion.

22       ***First***, Fraser and Fiume cannot establish standing under the standard articulated in *Kwikset*

23   *Corp. v. Superior Court*, 51 Cal. 4th 310 (2011). Fraser's mere allegation that she paid an

24   undisclosed installment amount is insufficient to plead economic injury caused by an alleged UCL

25   violation. *Id.* at 326. Fraser has not alleged (and could not credibly assert) that she should pay

26   nothing for the medical treatment she received. She also has not alleged what her medical treatment

27   "should have cost." She therefore has not and cannot allege that payments she has made to date are

28   in excess of that unspecified lower cost. Accordingly, she has not alleged economic injury as a result

1  of the alleged billing conduct and she also cannot plead actual reliance on any misrepresentation

2  made by Defendants. *See Durell v. Sharp Health*care, 183 Cal. App. 4th 1350, 1366-67 (2010)

3  (plaintiff must allege reliance and economic injury to plead CLRA claim). As to Fiume, Plaintiffs

4  admit she has not pled economic injury caused by Defendants' alleged conduct. Opp'n 15. Rather,

5  Plaintiffs argue that in seeking injunctive relief under the UCL they are relieved of any such

6  pleading obligation. *Id.* Plaintiffs are wrong. The *Ames* court (cited by Plaintiffs) recognized

7  standing in the limited instance where allegations of debt collection efforts "imply that the debt is an

8  enforceable one" and raise an "imminent invasion or injury." *Ames*, 2019 WL 366210, at \*4 n.7.

9  Fiume has not alleged such imminent invasion. Moreover, like Fraser (and unlike the plaintiff in

10  *Ames*), Fiume admits she received medical treatment and does not allege what lesser amount she

11  believes she should have been billed. She also cannot show actual reliance on the purported

12  misrepresentations since she paid nothing.[9]

13     ***Second***, Plaintiffs cannot dispute that the purported misrepresentations are only alleged to

14  have been made by HCFS. Instead, Plaintiffs argue their UCL claim can extend to the other

15  Defendants based on the common scheme allegations advanced in support of their RICO claims.

16  Opp'n 16. But, as Plaintiffs' own case recognizes, they must plead that each defendant "personally

17  participated in the scheme." *Woodard v. Labrada*, Case No. EDCV 16-00189 JGB (SPx), 2017 WL

18  3309765, at \* 11 (C.D. Cal. July 31, 2017). Because the FAC allegations fail to adequately plead any

19  such scheme, and do not otherwise adequately allege collusion, conspiracy, or aiding and abetting,

20  this argument must be rejected.

21     ***Third***, Plaintiffs' effort to dodge the requirements of pleading "unfair" conduct must be

22  rejected. Plaintiffs do not deny that principles of equity and quantum meruit are legal doctrines

23  which do not reflect some essential public policy sufficient to plead an "unfair" UCL claim. And, to

24  invoke the tethering test for unfairness, it is not sufficient for Plaintiffs to generally assert prevention

25  of "deceptive overbilling for emergency medical care" without tying that policy to a specific

26  constitutional, statutory or regulatory provision. Opp'n 16; *see also Nationwide Biweekly Admin.,*

27

28  [9] The *Ames* plaintiff alleged he should not have been billed at all because he received no service whatsoever. *Ames*, 2019 WL 366210, at \*1.

1    *Inc. v. Superior Court of Alameda Cty.*, 9 Cal. 5th 279, 304 n.10 (2020) (cited by Plaintiffs and

2    recognizing the tethering test requirements). Plaintiffs do not satisfy any of the other tests that courts

3    have applied to find "unfair" conduct has been adequately pled. Indeed, as explained in Defendants'

4    Motion and above, the FAC fails to allege any basis to conclude that the chargemaster rates were set

5    through an improper process or that it was unfair to charge uninsured patients those rates.[10]

6                     **2.      The New York Gen. Bus. Law Section 349 Claim Should Be Dismissed.**

7            Defendant DiBella's claim under the NYGBL is also rife with deficiencies that are not

8    adequately addressed by the Opposition. *See* Mot. 19-20. Plaintiffs argue that to plead "actual

9    injury" Plaintiff DiBella need not allege a "pecuniary harm." Opp'n 17 (*citing Stutman v. Chem.*

10   *Bank*, 95 N.Y.2d 24, 29 (2000)). Plaintiffs miss the point. They must allege that DiBella was actually

11   harmed in some form—whether it be a pecuniary harm or some other form of harm—and DiBella's

12   purported worry over potential future harm is inadequate to satisfy this requirement. *C.f.,*

13   *UnitedHealthcare Servs., Inc. v. Asprinio*, 16 N.Y.S.3d 139, 151 (Sup. Ct. 2015) ("United has not

14   shown it is likely to succeed in establishing that it suffered any damages as result of any misleading

15   billing by Defendants. United has refused to pay the allegedly excessive portion of the charges. The

16   patient has not paid them either.").

17           Next, Plaintiffs attempt to flip the standard applied to plead an omissions-based claim under

18   the NYGBL: Plaintiffs argue that because a patient purportedly does not know about alleged

19   inflation in the chargemaster prices, she has adequately alleged an omission by Defendants.  Opp'n

20   17. That is not the standard. Plaintiffs must allege that Defendants ***alone*** possess the information

21   about chargemaster price inflation. *See Oswego Laborer's Local 214 Pension Fund v. Marine*

22   *Midland Bank*, 85 N.Y.2d 20, 26 (1995). Plaintiffs cannot so plead because they have already

23   alleged that this is an industry-wide practice and they have even alleged that through litigation

24   "across the country" this information is in the public sphere. FAC ¶¶ 74-75.

25           Plaintiffs also argue that DiBella was deceived because a reasonable consumer receiving a

26   ───────────────

     [10] Plaintiffs' reliance on *Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal. App. 5th 1131, 1141 (2016)

27   is misplaced. In *Moran,* the court found that an "unfair" UCL claim was pled premised on first
     finding that plaintiff had adequately pled that the financial liability provision of the contract he

28   signed was unconscionable. *Id.* at 1148-49. For the reasons stated here, Plaintiffs Fraser and Fiume
     have not pled such unconscionability and they do not allege a contract.

───────────────

                                                    13

bill from HCFS would have believed the full billed amounts are owed. In so asserting, Plaintiffs ask the Court to assume—without any legal support—that a reasonable consumer would read only select portions of the bill that reflect the charges, and would not read the portions of the bill that (a) acknowledge a patient may need help with regard to payment and resolution of their bill, and (b) direct the patient to places with information about payment options and payment rights. *See* Dearolf Decl. Ex. 4. Plaintiffs cannot plead deception on such a selective presentation.

Finally, Plaintiffs attempt to defend their assertion of consumer fraud against elderly persons under the NYGBL by simply ignoring that no wrongful conduct with regard to anyone over the age of 65 has been pled. DiBella is not over 65, and thus not only does the law not apply to her, but also she could not represent a purported class of New York residents over age 65 without a representative plaintiff. *See Hoffman v. Blattner Energy, Inc.*, 315 F.R.D. 324, 333 (C.D. Cal. 2016) ("A finding that no class representative has standing with respect to a given claim requires dismissal of that claim." (citation and internal quotation marks omitted)). And, while Plaintiffs allege that "every" bill is fraudulent, they do not allege facts to demonstrate that *any* patient treated and billed is over 65. Plaintiffs cannot proceed on a claim with heightened penalties by simply skipping this pleading step and assuming it will be sorted out later.

### 3.     The Texas Statutory Claim Should Be Dismissed.

Plaintiff Bakonyi's standing under the Texas DTPA depends on her adequately alleging that she has suffered "economic" damages or mental anguish. Plaintiffs do not argue that she suffered mental anguish. Opp'n 18; *see* FAC ¶ 204. As to economic loss, Plaintiffs conflate the DPTA requirement that a consumer seek or acquire goods or services with the additional requirement that the consumer suffer some economic loss. In the case Plaintiffs cite, *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 814 (Tex. 1997), Perry Equipment Corporation (PEC) alleged that it relied on a faulty audit by Arthur Andersen of Maloney Pipeline Systems to purchase that company. The court found that PEC did not have to purchase the audit service to be a consumer under the TDPTA because PEC had required Maloney to purchase the service as a condition of the acquisition transaction. *Id.* at 815. At no point did the court address whether PEC had adequately alleged economic damages—nor could it because PEC had, in fact, paid to purchase Maloney

1    allegedly based on the faulty audit. *Id.* Plaintiff Bakonyi, however, has paid nothing in connection

2    with her medical treatment.

3          Finally, Plaintiffs' conclusory arguments that Defendants' conduct was unconscionable do

4    not meet the applicable legal standard. Mot. 20-21. As with all of Plaintiffs' claims, here as well

5    Plaintiffs ask the Court to accept that Defendants engaged in an "unconscionable" act by billing

6    Plaintiff Bakonyi chargemaster rates for services she admits she received. Plaintiffs do not plead

7    what amount should have been billed and thus, do not plead any facts to show why the amount billed

8    was "grossly unfair." Tex. Bus. & Com. Code § 17.45(5); *see also Bradford v. Vento*, 48 S.W.3d

9    749, 760 (Tex. 2001) (it must be "glaringly noticeable, flagrant, complete and unmitigated" (citation

10   and internal quotation marks omitted)).

11  **III.**    **CONCLUSION.**

12          For all the reasons set forth herein, Defendants respectfully request that the Court dismiss

13   Plaintiffs' Complaint with prejudice.

14

15   Dated: February 25, 2021             */s/ Carol Lynn Thompson*

16                                 Carol Lynn Thompson (SBN 148079)
cthompson@sidley.com

17                                 Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com

18                                 Jennifer Lee (SBN 329079)
jhlee@sidley.com

19                                 SIDLEY AUSTIN LLP

20                                 555 California Street, Suite 2000
San Francisco, CA 94104

21                                 Telephone: (415) 772-1200
Facsimile: (415) 772-7400

22

23                                 Mark B. Blocker (*Pro Hac Vice*)
mblocker@sidley.com

24                                 SIDLEY AUSTIN LLP

25                                 One South Dearborn
Chicago, IL 60603

26                                 Telephone: (312) 853-7000
Facsimile: (312) 853-7436

27                                 *Attorneys for Defendants*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Team Health Holdings, Inc., AmeriTeam Services, LLC, TeamHealth Inc. n/k/a Team Health, LLC, and HCFS Health Care Financial Services, LLC*