1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    SIA FRASER, et al.,                    Case No.  20-cv-04600-JSW

8                    Plaintiffs,
                                            **ORDER GRANTING MOTION TO**
9          v.                               **DISMISS**

10   TEAM HEALTH HOLDINGS, INC., et al.,     Re: Dkt. No. 51

11                   Defendants.

12

13          This matter comes before the Court upon consideration of Defendants' motion to dismiss

14   Plaintiffs' First Amended Class Action Complaint ("FAC"), and the parties' responses to an Order

15   to Show Cause issued on April 19, 2021, directing the parties to show cause why this case should

16   not be transferred pursuant to 28 U.S.C. section 1404(a).  The Court has considered the parties'

17   papers, the responses to the Order to Show Cause, relevant legal authority, and the record in this

18   case, and it HEREBY retains this case and GRANTS Defendants' motion to dismiss with leave to

19   amend.[1]

20                                    **BACKGROUND**

21          Plaintiffs Sia Fraser, Tricia Bakonyi, Gabrielle DiBella, and Katja Fiume (collectively,

22   "Plaintiffs") bring this action alleging that Team Health Holdings, Inc. ("Holdings"), AmeriTeam

23   Services, LLC ("AmeriTeam"), TeamHealth, Inc. n/k/a Team Health LLC ("TeamHealth"), and

24   HCFS Health Care Financial Services, LLC ("HCFS") (collectively, "Defendants") violated the

25   Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. sections 1961, *et*

26

27   _____

28   [1] Defendants submitted a request for judicial notice in connection with the motion to dismiss.
     Because the Court did not rely on the exhibits in reaching its conclusion, it DENIES AS MOOT
     the request for judicial notice.

United States District Court
Northern District of California

*seq.*

According to Plaintiffs, Defendants, together with other entities not named as defendants, are part of an alleged RICO enterprise, which acts to "maximize corporate profits while avoiding state bans on the corporate practice of medicine." (*Id.* ¶ 4.) Plaintiffs allege that the TeamHealth organization is structured as a pyramid with each entity performing a role in the enterprise. Holdings engages in "strategic planning and goals, implementation of overall vision, values, mission and direction of TeamHealth organization." (*Id.* ¶ 43.) AmeriTeam is the primary operating subsidiary of the TeamHealth organization and performs duties such as payroll, procuring professional liability insurance, information technology, finance, tax, compliance, accounts payable, human resources, and negotiations with health insurance plans. (*Id.* ¶ 44.) TeamHealth performed a role substantially similar to the role of AmeriTeam prior to January 1, 2015. (*Id.* ¶ 45.) HCFS performs billing services for companies associated with the TeamHealth organization. (*Id.* ¶ 46.) Defendants contract with hospitals to staff and manage various hospital departments. (*Id.* ¶ 55.) When a patient receives care from a TeamHealth medical professional, TeamHealth bills the patient for the hospital services. (*Id.* ¶¶ 56-58.)

Hospitals and healthcare providers that operate within hospitals, like Defendants, use Current Procedural Terminology ("CPT") codes for the services they provide and assign prices to CPT codes. (*Id.* ¶ 62.) These prices are known as the "list price" or "chargemaster" rates. (*Id.* ¶ 62.) Plaintiffs allege that Defendants control the rates its physicians and practice groups charge patients. (*Id.* ¶ 4.) Specifically, HCFS sets the chargemaster prices that are charged by the provider groups at the hospitals with which the providers contract to provide services. (*Id.* ¶ 139.) Plaintiffs allege that TeamHealth does not have a contract with the patients, and so is only legally entitled to recover the reasonable or market rate price for services provided under the common law doctrine of quantum meruit. (*Id.* ¶¶ 70-71.) Plaintiffs allege, however, that Defendants charge uninsured and out-of-network patients inflated chargemaster rates that exceed the rates hospitals normally charge for the same services. (*Id.* ¶¶ 68, 78.)

Plaintiffs were billed for emergency, radiology, anesthesiology, and other care provided by Defendants. (*Id.* ¶ 18.) Plaintiff Fraser was treated for emergency gallstone surgery by a doctor in

2

a TeamHealth-owned physician group in Oceanside, California in September 2019.  (*Id*. ¶ 19.)  Fraser received bills from TeamHealth for $1,082.  (*Id*. ¶ 21.)  She is paying the bill under a payment plan.  (*Id*. ¶ 22.)

Plaintiff Bakonyi visited the emergency department at a facility in Austin, Texas on September 30, 2019, while experiencing discomfort in her abdomen.  (*Id*. ¶ 24.)  Bakonyi's insurer informed her that TeamHealth had not justified the level of service billed and instructed TeamHealth to resubmit the claim under the correct code.  (*Id*. ¶ 26.)  Instead, TeamHealth billed Bakonyi for $1,370.  (*Id*. ¶ 27.)  Bakonyi continued to communicate with TeamHealth and her insurer regarding her bill.  (*Id*.)  She has not yet made payments on the bill and is concerned that her credit will be adversely impacted by the outstanding debt.  (*Id*. ¶ 30.)

Plaintiff DiBella visited the emergency department in Syracuse, New York after being exposed to a bat to determine if she required a rabies shot.  (*Id*. ¶ 31.)  DiBella did not receive a rabies shot or any other test at the facility.  (*Id*. ¶ 33.)  DiBella received a bill for $554.00 from TeamHealth for her emergency department visit.  (*Id*. ¶ 35.)  She has not yet made payments on her TeamHealth bill, and she is concerned that the outstanding debt will adversely impact her credit.  (*Id*. ¶ 36.)

Plaintiff Fiume visited the emergency department in La Mesa, California on June 13, 2020, because she was experiencing discomfort in her chest and lungs.  (*Id*. ¶ 37.)  Fiume had her vital signs checked and after they appeared normal, she declined further treatments.  (*Id*. ¶ 38.)  One month later, Fiume received a bill from TeamHealth for $715.00 for "high severity" emergency department visits.  (*Id*. ¶ 39.)  Fiume has not yet made payments on her TeamHealth bill, and she is concerned that the outstanding debt will adversely impact her credit.  (*Id*. ¶ 40.)

Plaintiffs bring causes of action for violations of: (1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961, *et seq*.; (2) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code section 17200, *et seq*.; (3) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code section 1750, *et seq*.; (4) Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. & Com. Code section 17.41, *et seq*.; (5) New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law sections 349-350.  Plaintiffs seek damages,

restitution, punitive damages, and an injunction.

## ANALYSIS

**A.      The Court Will Not Transfer the Case.**

Plaintiffs allege venue in this District is proper pursuant to 28 U.S.C. sections 1391(b) and (c) and pursuant to 18 U.S.C. section 1965(a).  None of the Plaintiffs and none of the Defendants reside in this District.  Plaintiffs' choice of venue rests on their allegations that one of the members of the alleged RICO enterprise, non-party TeamHealth West is located in Pleasanton, California.  Plaintiffs allege that Plaintiff Sia Fraser's bills directed that payments be sent to TeamHealth West's address and that TeamHealth West owns the provider group that provided Ms. Fraser's medical care.  (FAC ¶¶ 23, 48.)  While those allegations would be sufficient show venue is proper in this District, they do not necessarily demonstrate this District is the most convenient forum.  Hence, the Court's order to show cause.

Pursuant to 28 U.S.C. section 1404(a), for the convenience of the parties and witnesses and in the interest of justice, a district court may transfer a civil action to any district where the case could have been filed originally.  In general, the moving party bears the burden of showing that transfer is warranted, *see Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979), and does so by presenting affidavits or declarations to establish facts supporting transfer. *Forte Capital Partners v. Harris Cramer*, No. 07-cv-01237-MJJ, 2007 WL 1430052, at *2 (N.D. Cal. May 14, 2007) (citations omitted).[2]

A district court has broad discretion to evaluate a motion to transfer based on an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (citation and quotation omitted).  In order for a district court to transfer an action under Section 1404, the Court applies a two-part test, asking whether: (i) the transferee court is one where the action "might have been brought" and (ii) the convenience of the parties and witnesses and the interest of justice favor transfer. *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985).

---

[2] Neither Plaintiffs nor Defendants have provided any evidence to support their positions in their responses to the Order to Show Cause.

United States District Court
Northern District of California

1. **This Case Might Have Been Brought in an Alternate Forum.**

Plaintiffs' response to the Order to Show Cause states that if the Court determines transfer is warranted, it should transfer the matter to the Southern District of California. Defendants argue that if the case is transferred, it should be to the Eastern District of Tennessee. None of the parties argue that venue is improper in this District. They also do not rebut the opposing parties' assertion that the case could have been brought in either the Southern District of California or the Eastern District of Tennessee. The Court concludes this case could have been brought in either alternate forum, and it turns to the second part of the analysis.

2. **The Relevant Factors Do Not Weigh Strongly in Favor of Transfer.**

The second part of the analysis requires the Court to weigh: (1) the plaintiff's choice of forum; (2) the convenience of the parties and the witnesses; (3) ease of access to evidence; (4) any local interest in the controversy; and (5) the familiarity of each forum with the applicable law. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). This list is not exclusive, and a court may consider other factors. *Williams v. Condensed Curriculum, Int'l, Inc.*, No. 20-cv-5292-YGR, 2020 WL 6700492, at *2 (N.D. Cal. Nov. 13, 2020) ("*Williams*").

a. **Plaintiffs' choice of forum.**

In general, there is a "strong presumption" in favor of a plaintiff's chosen forum. *Secs. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985). However, where, as here, plaintiff is not a resident of the forum, a court may afford less deference to a plaintiff's choice of forum. *See Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001) ("*Bowman*"). The same is true if a forum lacks a significant connection to the activities alleged in the complaint or where a plaintiff brings a class action. *Lou*, 834 F.2d at 739; *see also Bush v. Rust-Oleum Corp.*, No. 20-cv-3268-LB, 2020 WL 6047300, at *2 (N.D. Cal. Oct. 13, 2020).

As noted, none of the Plaintiffs live in this District. They do allege that a member of the alleged enterprise is located here, and there is no evidence that Plaintiffs are forum shopping. The Court will afford some deference to Plaintiffs' choice of forum. *Cf. Bush*, 2020 WL 6047300, at 2

United States District Court
Northern District of California

United States District Court
Northern District of California

(where named plaintiff resided in district and no evidence of forum shopping, giving significant weight to choice of forum); *Bowman*, 157 F. Supp. 2d at 1107 (allowing some deference to plaintiff's choice of forum where no concerns about forum shopping existed).

### b.  Convenience of parties and party witnesses.

The Court next considers the convenience of the parties and party witnesses.  Three of the named Defendants are located in Knoxville, Tennessee, and two of the four Plaintiffs reside in Southern California.  For the two Plaintiffs who reside in the Southern District of California, a transfer to that District would pose no burden.  The same is true for most of the Defendants if the case is transferred to the Eastern District of Tennessee.  The Court concludes that whether the case remains here or is transferred out of this District, there will be burdens on all parties.  However, any prejudice to the Plaintiffs if the case is transferred is minimized by the fact that this is a putative class action.  *See, e.g., Metz v. U.S. Life Ins. Co.*, 674 F. Supp. 2d 1141, 1147 (C.D. Cal. 2009).

"The relative convenience to the witnesses is often recognized as the most important factor to be considered in ruling on a motion under [section] 1404(a)."  *Metz*, 674 F. Supp. 2d at 1147 (C.D. Cal. 2009) (quoting *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005)).  In addition, "courts must consider not only the number of witnesses, but also the nature and quality of their testimony."  *Id.* (quoting *Catch Curve, Inc. v. Venali Inc.*, No. CV 05-04820 DDP (AJWx), 2006 WL 4568799, at*3 (C.D. Cal. Feb. 27, 2006)).  Based on Plaintiffs' allegations, at least some witnesses - those employed by TeamHealth West - are located in this District.  Defendants contend that other party witnesses are located in Tennessee.  A court should not ignore the inconvenience to party witnesses, but it may give them less consideration because they can be compelled to testify regardless of where the case will proceed.  *See, e.g., Williams*, 2020 WL 6700492, at *4.

On balance, the Court finds that the convenience to the parties and to party witnesses is neutral and does not strongly favor a transfer to either alternate forum.

//

//

6

1

2         **c.**        **Convenience of non-party witnesses.**

Plaintiffs argue testimony might be required from non-party witnesses to address

3 Defendants' assertions that the rates they billed do not exceed rates charged by other providers.  If

4 so, that could also require testimony from witnesses located in New York and Texas.  Defendants

5 do not identify any potential non-party witnesses.  Indeed, the record on this factor is so sparse

6 that the Court concludes neither party has demonstrated that it weighs strongly in favor of transfer

7 to an alternate forum.

8         **d.**        **Ease of access to evidence.**

9         At least some relevant evidence will be located where each of the Plaintiffs reside.

10 Although TeamHealth West is a non-party, it is located in this District, and some evidence will be

11 located here.  Defendants argue that it is likely that "other relevant sources of proof" are in their

12 custody, in the Eastern District of Tennessee.  (Dkt. No. 66, Defs. Reply re OSC at 2:23-24.)

13 However, "[w]ith technological advances in document storage and retrieval, transporting

14 documents generally does not create a burden."  *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d

15 1353, 1362 (N.D. Cal. 2007).

16         The Court concludes that neither party has demonstrated that this factor weighs strongly in

17 favor of transfer to an alternate forum.

18         **e.**        **Local interest in controversy.**

19         "The local interest factor has the . . . aim of determining if the forum in which the lawsuit

20 was filed has its own identifiable interest in the litigation which can justify proceeding in spite of

21 . . . burdens."  *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1232 (9th Cir. 2011); *see*

22 *also Decker Coal*, 805 F.2d at 843 (looking to "local interest in having localized controversies

23 decided at home").  Plaintiffs' RICO claim is brought on behalf of a putative nationwide class,

24 which does not favor transfer to any particular forum.

25         With respect to Plaintiffs' state law claims, two of the named Plaintiffs are residents of the

26 Southern District California.  That District – and courts in California in general – would have a

27 local interest in preventing harm to its citizens.  To the extent TeamHealth West's conduct is

28 relevant to Plaintiffs' claims, this District and California have local interest in governing the

conduct of its corporations.  *See id.* at 1232-33 (noting "California courts have repeatedly recognized the state's interest in deciding actions against resident corporations whose conduct in this state causes injury to persons in other jurisdictions") (internal quotations and citations omitted).  However, the primary defendants are not California corporations, which weighs against a finding that there is a local interest in resolving the matter here, rather than Tennessee.  *See Carijano*, 643 F.2d at 1233 (noting that where "defendants are not California corporations, California has little interest in keeping the litigation in this state to deter future wrongful conduct") (quoting *Guimei v. Gen. Elec. Co.*, 172 Cal. App. 4th 689, 702 (2009)).

On balance, the Court concludes that neither party has shown this factor weighs strongly in favor of transfer to an alternate forum.

### f.      Familiarity of each forum with applicable law.

Plaintiffs' primary claim is the RICO claim, and all Districts would be familiar with that law.  *See Allstar Mktg. Group, LLC v. Your Store Online, Inc.*, 666 F.Supp.2d 1109, 1133 (C.D. Cal. 2009) (holding that federal districts are "equally capable of applying federal law").  Although Plaintiffs also assert state law claims, federal courts "routinely apply the law of a [s]tate other than the [s]tate in which they sit."  *Atl. Marine Const. Co., Inc. v. U.S. Dist.*, 571 U.S. 49, 67 (2013).  The Court concludes this factor also does not weigh strongly in favor of transfer to an alternate forum.

### g.      Court congestion.

The parties provided information about court congestion in each of the three Districts at issue.  Although the Northern District of California, has more cases filed per judge than either the Southern District of California or the Eastern District of Tennessee, the median time to disposition is longer in the Eastern District of Tennessee than it is here or in the Southern District of California.  Accordingly, the Court concludes this factor also does not weigh strongly in favor of transfer to an alternate forum.

Having considered the parties' responses to the Order to Show Cause, although the nexus to this District is thin, because of Plaintiffs' RICO claim, venue is proper.  On balance, the Court concludes the majority of the relevant factors regarding transfer are neutral.  Therefore, the Court

1    concludes that neither party has demonstrated that a transfer under Section 1404(a) is appropriate,

2    and it will turn to the merits of Defendants' motion to dismiss.

3    **B.    Article III Standing.**

4          A lack of Article III standing requires dismissal for lack of subject matter jurisdiction

5    under Federal Rule of Civil Procedure 12(b)(1).  "A Rule 12(b)(1) jurisdictional attack may be

6    facial or factual."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A

7    "facial" attack accepts the truth of the plaintiff's allegations but asserts that they "are insufficient

8    on their face to invoke federal jurisdiction."  *Id*.  The district court resolves a facial attack as it

9    would a motion to dismiss under Rule 12(b)(6).  *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir.

10   2013).

11         In a "factual" attack, the movant contests the truth of the plaintiff's factual allegations,

12   usually by introducing evidence outside the pleadings.  *Safe Air for Everyone*, 373 F.3d at 1039.

13   "A factual challenge relies on affidavits or any other evidence properly before the court to contest

14   the truth of the complaint's allegations."  *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th

15   Cir. 2014) (internal citations and quotation marks omitted).  When the defendant raises a factual

16   attack, the plaintiff must support her jurisdictional allegations with "competent proof," *Hertz*

17   *Corp. v. Friend*, 559 U.S. 77, 96-97 (2010), under the same evidentiary standard that governs in

18   the summary judgment context.  *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir.

19   2010) (en banc); *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th Cir.

20   1987); Fed. R. Civ. P. 56(c).

21         Defendants argue that facts in the FAC are insufficient to establish that Plaintiffs Bakonyi,

22   DiBella, and Fiume suffered an injury-in-fact.  Defendants also rely on the declaration of HCFS

23   Health Care Financial Services' executive vice president, Paula Dearolf, to show that Plaintiffs'

24   concerns about future negative impacts on their credit are too speculative to establish injury-in-

25   fact.  (Dkt. No. 51-7, Declaration of Paula Dearolf ("Dearolf Decl.") ¶¶ 6, 10, 13.)  Thus,

26   Defendants' jurisdictional attack is factual because they introduce evidence to challenge Plaintiffs'

27   allegations

28         For this reason, Plaintiffs' characterization of Defendants' arguments as factual claims that

United States District Court
Northern District of California

cannot be resolved on a motion to dismiss is unconvincing.  The Court may consider the Dearolf declaration in resolving a factual attack on subject matter jurisdiction.[3]  In responding to a factual attack, it is Plaintiffs' burden to counter Defendants' evidence.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121-22 (9th Cir. 2014).  Plaintiffs do not challenge the factual assertions in the Dearolf declaration or submit evidence calling those facts into dispute.

"Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Anyone seeking "to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy."  *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983).  Standing is an "essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must demonstrate (1) an "injury in fact," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision.  *Id.* at 560–61.  Injury in fact is satisfied when the plaintiff has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

Defendants argue that Plaintiffs Bakonyi, DiBella, and Fiume lack Article III standing because they have suffered no concrete injury as a result of receiving allegedly excessive medical bills from Defendants.  Defendants do not dispute that Fraser has Article III standing to bring the RICO claim or the California state law claims.  Therefore, the Court need not address whether the other named Plaintiffs have standing to assert that claim.  *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements.").  However, Plaintiffs Bakonyi, DiBella, and Fiume must demonstrate that they have Article III standing to pursue their state law claims.  The Court must

---

[3] Plaintiffs' contention that the Court should disregard the testimony in the Dearolf Declaration because it is not subject to judicial notice is misplaced.  (*See* Dkt. No. 54, Partial Opposition to RJN at 5.)  The Court need not take judicial notice of this extrinsic evidence to consider it; the declaration is properly considered as part of a factual attack under a 12(b)(1) motion.  *Safe Air for Everyone*, 373 F.3d at 1039.

address standing on a claim-by-claim basis. *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 925 (N.D. Cal. 2015). At least one of the five named plaintiffs must have Article III standing for each of the state law claims alleged in the complaint otherwise the Court lacks jurisdiction over the claim and must dismiss it.

Plaintiffs allege that Bakyoni, DiBella, and Fiume have not made payments on their bills and are concerned that the outstanding debt will adversely impact their credit. (*See* FAC ¶¶ 30, 36, 40.) However, Dearolf attests that none of the Plaintiffs have been reported a credit agency. (Dearolf Decl. ¶¶ 6, 10, 13.) Moreover, Dearolf attests that Bakyoni's appeal to her insurer is still pending, and HCFS has informed her that it is not seeking payment from her. (*Id*. ¶ 5.) Dearolf further attests that Fiume's bill qualified for payment pursuant to California's AB75 program, which means that she is not liable for any amount in connection with the bill. (*Id*. ¶ 12.) Dearolf also attests that it is possible DiBella's insurer will pay her bill because DiBella did not inform HCFS or the medical provider that she was insured by Blue Cross Blue Shield when she received medical services. (*Id*. ¶ 8.)

Plaintiffs contend that the fact that the Plaintiffs have not made payments on their bills does not foreclose Article III standing because the receipt of the medical bill in an allegedly excessive amount is sufficient to establish injury and because the inflated bills create a substantial risk that harm will occur. Defendants disagree. Both parties cite cases to support their position.

Defendants cite *Blue v. Diversified Adjustment Serv.*, No. 5:17-cv-00366-SVW-KK, 2017 WL 3600723 (C.D. Cal. Aug. 11, 2017) and *Elston v. Encore Capital Grp., Inc.*, No. 2:18-cv-0071-TOR, 2019 WL 3037054 (E.D. Wash. July 11, 2019) in support of their position.[4] In *Blue*, the court addressed whether the plaintiff had standing to sue a debt collector under the FDCPA for imposing a convenience fee that the plaintiff did not pay. 2017 WL 3600723, at *1. The complaint did "not clarify what actual or particularized injury [plaintiff] suffered as a result of

---

[4] Plaintiffs distinguish *Blue* and *Elston* on the basis that those cases were decided at the summary judgment stage rather than the motion to dismiss stage. However, on a factual attack, the plaintiff must support jurisdictional allegations under the same evidentiary standard that governs in the summary judgment context. *See Leite*, 749 F.3d at 1121-22 (citing *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc)).

United States District Court
Northern District of California

1   [defendant's] allegedly abusive debt collection practices," and the plaintiff admitted that he had

2   not paid the allegedly improper fee. *Id*. at *2. The court concluded that because the plaintiff

3   never paid the fee, he could not show "an invasion of a legally protected interest that is concrete

4   instead of conjectural or hypothetical" as required to establish Article III under the Supreme

5   Court's decision in *Spokeo v. Robins*, 136 S.Ct. 1540 (2016).

6         *Elston* involved a letter sent to the plaintiff in an attempt to collect on an old debt. 2019

7   WL 3037054, at *1. The plaintiff did not make payments on the debt or promise to pay the debt.

8   *Id*. at *2. The court found that the plaintiff failed to allege any concrete harm based on her receipt

9   of the collection letter because the plaintiff did not allege that she was misled by the letter and did

10  not pay or promise to the pay the debt. Additionally, there was nothing to suggest that the debt

11  had been revived. *Id*. at *4.

12        Plaintiffs cite *Hall v. AT&T Corp.*, No. 04-cv433-DRH, 2005 WL 8173642, (S.D. Ill.

13  March 1, 2005). In *Hall*, the plaintiffs alleged injury based on erroneous service charges for

14  which they were improperly billed by defendants. *Id*. at *1. The defendant argued that several

15  plaintiffs failed to allege an injury-in-fact sufficient to establish standing because they never paid

16  the purportedly erroneous charges. *Id*. at *2. The court disagreed with the defendant and

17  concluded with little analysis that the non-paying plaintiffs' allegations were sufficient to confer

18  Article III standing. *Id*.

19        Plaintiffs also cite *Ross-Randolph v. Allstate Ins. Co.*, No. 99-3344, 2001 WL 36042162

20  (D. Md. May 11, 2001). In *Ross-Randolph*, the plaintiffs sued Allstate alleging that it denied

21  certain benefits under liability insurance contracts and refused to pay medical bills related to

22  automobile accidents. *Id*. at *1- 2. Allstate argued that the plaintiffs failed to allege injury-in-fact

23  because the medical providers had not yet compelled the plaintiffs to pay the outstanding medical

24  bill balances that Allstate had refused to pay. *Id*. at *3. The court disagreed finding the fact that

25  payment was not yet compelled did not necessarily defeat standing. *Id*. In reaching that

26  conclusion, the court suggested that if the defendant could show at a later stage that the medical

27  providers had not sought payment, the plaintiffs would not have standing. *Id*.

28        The Court finds Defendants' cited cases more persuasive. Here, as in *Blue* and *Elston*,

United States District Court
Northern District of California

12

1    Plaintiffs allege that they have made no payments on the bill, and there is nothing that suggests

2    that they have made any promise to pay the disputed bills.  Defendants have submitted evidence in

3    the form of a sworn declaration that the bills have not been reported to any credit agencies.

4    Additionally, the record shows that HCFS is not seeking payment of the bills or, in the case of

5    Fiume, that the payment obligation has been relieved.  Conversely, *Hall* and *Ross-Randolph* are

6    out-of-circuit cases that pre-date the Supreme Court's decision in *Spokeo*.

7         The Court is also not persuaded by Plaintiffs' argument that the inflated bills create a

8    substantial risk that injury will occur.  Plaintiffs contend that the threat of injury is particularly

9    acute because Defendants "aggressively pursue[] debt collection."  (Opp'n at 5.)  However, as

10   discussed above, Defendants have submitted evidence showing that they have not and do not

11   intend to pursue payment.  Additionally, Plaintiff Fiume's bill qualified for payment under a

12   payment program, and she is not liable for any amount, which forecloses the risk of future harm to

13   her.

14        The Court concludes that Plaintiffs have failed to meet their burden to establish that

15   Plaintiffs Bakonyi, Fiume, and DiBella have Article III standing to pursue their state law claims.

16   The Court GRANTS Defendants' motion to dismiss on this basis and dismisses the state law

17   claims brought by Plaintiffs Bakonyi, Fiume, and DiBella for lack of Article III standing.

18   **C.**     **The Court Grants Defendants' Motion to Dismiss.**

19        **1.**     **Applicable Legal Standard.**

20        A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

21   pleadings fail to state a claim upon which relief can be granted.  A court's "inquiry is limited to

22   the allegations in the complaint, which are accepted as true and construed in the light most

23   favorable to the plaintiff."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  Even

24   under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's

25   obligation to provide 'grounds' of his 'entitle[ment] to relief' requires more than labels and

26   conclusions, and formulaic recitation of the elements of a cause of action will not do."  *Bell Atl.*

27   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

28   Pursuant to *Twombly*, a plaintiff cannot merely allege conduct that is conceivable but must instead

United States District Court
Northern District of California

13

allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

As a general rule, "a district court may not consider any material beyond the pleadings in ruling on Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). However, documents subject to judicial notice may be considered on a motion to dismiss. *See Mack S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991). In doing so, the Court does not convert a motion to dismiss to one for summary judgment. *Id.* The Court may review matters that are in the public record, including pleadings, orders, and other papers filed in court. *See id.*

If the allegations are insufficient to state a claim, a court should grant leave to amend unless amendment would be futile. *See, e.g.*, *Reddy v. Litton Indus. Inc.*, 912 F.3d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc.*, 911 F.2d at 246-47.

### 2. RICO Claim.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

To allege a plausible RICO claim, Plaintiffs must allege that Defendants participated in "(1) the conduct, (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity…[that is] (5) the proximate cause of harm to the victim." *Eclectic Props. E., LLC v. Maercus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985)). "RICO is to be read broadly…[and] is to be liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 497-98.

When a RICO claim is based on a predicate offense of fraud, the "circumstances

14

1    constituting fraud…shall be stated with particularity" pursuant to Federal Rule of Civil Procedure

2    9(b).  *Edwards v. Marin Park*, *Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004); *Comm. to Protect our*

3    *Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1173 (E.D. Cal. 2017).

### a.    Enterprise.

5    To allege a RICO claim, the defendant must be employed or associated with an

6    "enterprise."  18 U.S.C. § 1962(c).  "An enterprise that is not a legal entity is commonly known as

7    an 'association-in-fact' enterprise."  *Id*. at 940 (citation omitted).  To plead an association-in-fact

8    enterprise, a plaintiff must allege: (1) a common purpose of engaging in a course of conduct; (2)

9    an ongoing organization, either formal or informal; and (3) facts that the associates function as a

10   continuing unit.  *Odom v. Microsoft Corp.*, 4896 F.3d 541, 553 (9th Cir. 2007) (en banc) (citation

11   omitted).  The enterprise must a distinct entity from the defendant, "not simply the same 'person'

12   referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).

### b.    Conduct.

14   A RICO claim also requires a showing that defendant "conduct[s] or participate[s], directly

15   or indirectly, in the conduct of [the] enterprise's affairs."  18 U.S.C. § 1962(c).  In RICO cases,

16   "liability depends on showing that the defendants conducted or participated in the conduct of the

17   'enterprise's affairs,' not just their own affairs."  *See Reves v. Ernst & Young*, 507 U.S. 170, 185

18   (1993) (citation omitted).

19   To satisfy the "conduct" element, a plaintiff must allege facts the defendant had "some part

20   in directing [the enterprise's] affairs."  *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)

21   (citation and internal quotation marks omitted).  Simply being "a part" of the enterprise or

22   "performing services" for the enterprise does not rise to the level of direction required.  *Id*.

23   Allegations showing that a defendant conducted its own affairs is insufficient to raise the inference

24   that the defendant conducted the affairs of an enterprise.  *LD v. United Behav. Health*, No. 4:20-

25   cv-02254-YGR, 2020 WL 5074195, at *9 (N.D. Cal. Aug. 26, 2020) (citing *Bias v. Wells Fargo &*

26   *Co*., 942 F. Supp. 2d 915, 939 (N.D. Cal. 2013)).

### c.    Predicate acts.

28   Racketeering activity requires commission of one of the predicate acts enumerated in 18

United States District Court
Northern District of California

U.S.C. section 1961(1).  Here, Plaintiffs allege predicate acts of mail and wire fraud.  "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props*, 751 F.3d at 997.

Allegations of predicate acts of mail and wire fraud in RICO claims must be pled with specificity and satisfy the requirement of Rule 9(b) that the plaintiff "state with particularity the circumstances constituting fraud."  *See Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988); Fed. R. Civ. P. 9(b).  However, the particularity requirement does not apply to allegations of fraudulent intent, which only must be "alleged generally." *Eclectic Props*., 751 F.3d at 995 n.5.  To be pleaded with particularity, allegations of fraud must "be specific enough to give defendants notice of the particular misconduct…so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation and quotation marks omitted).  This includes alleging " 'the who, what, when, where, and how' of the misconduct charged." *Id*. (citation omitted).

### d.    Application to the FAC.

Plaintiffs allege that Defendants are part of an "association-in-fact" enterprise consisting of Holdings, AmeriTeam and TeamHealth, a network of subsidiaries organized regionally that contract with provider groups, the provider groups, HCFS, and Healthcare Revenue Recovery Group, a subsidiary that performs debt collection.  Plaintiffs allege that the common purpose of the enterprise is to circumvent prohibitions on the corporate practice of medicine and fraudulently overcharge patients by systematically inflating prices for the services performed.  Plaintiffs allege that Defendants' RICO violations have damaged Plaintiffs by causing them to make inflated payments and incur debt for the enterprise's medical services in reliance on reported and false rates.

Defendants first argue that Plaintiffs fail to plead both the "common purpose" and the "conduct" elements of their RICO claim.  Defendants contend that Plaintiffs fail to allege a common purpose because the FAC merely alleges that a group of entities were involved in trying

to earn money, which is insufficient to establish a common purpose because it is consistent with ordinary business conduct. Defendants also argue that Plaintiffs' RICO claims fail because the FAC does not allege specific acts undertaken by Defendants in conducting the affairs of the alleged enterprise, or that the alleged conduct of the enterprise was distinct from the entities' own affairs. The thrust of both arguments is that Plaintiffs' allegations do no more than establish routine business activities among the Defendants, which is insufficient to plead a RICO claim.

Courts routinely reject attempts to characterize routine commercial relationships as RICO enterprises. *See, e.g.*, *Gardner v. Starkist Co.*, 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019); ("characterizing routine commercial dealing as a RICO enterprise is not enough"); *Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042, at *11 (C.D. Cal. July 13, 2015) ("[T]here has been remarkable uniformity in [the] conclusion that RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client.").

Some courts have reached this conclusion by importing a fraudulent requirement into the common purpose analysis. *See, e.g.*, *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d. Cir. 2004); *Lynn v. McCormick*, 760 Fed. App'x 51, 53 (2d Cir. 2019); *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211-1212 (11th Cir. 2020). However, the Ninth Circuit has not said whether the common purpose must be fraudulent. *Chagby v. Target Corp.*, No. CV 08-4425-GKH (PJWX), 2008 WL 5686105, at *2 (C.D. Cal. Oct. 27, 2008) *aff'd*, 358 Fed. App'x 805 (9th Cir. 2009).[5] Other courts have not required the common purpose to be fraudulent but have still found the common purpose element unsatisfied where the alleged enterprise reflects a routine contract for services in which the entities are pursuing their individual economic interests and not

---

[5] Plaintiffs cite to *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F.Supp.2d 985 (C.D. Cal. 2008) in support of the contention that a fraudulent common purpose is not required. In *Friedman*, the plaintiff brought RICO claims against an operator of fitness centers alleging that the fitness center wrongfully charged additional dues after cancellation. *Id*. The plaintiff alleged that the fitness center, together with outside payment processors, formed an associated-in-fact enterprise. *Id*. The court found that the plaintiff had sufficiently pleaded a RICO enterprise. *Id*. at 990. In *Friedman*, the court concluded that the "entities' common purpose was simply to effectuate EFT payments." *Id*. at 991. *Friedman*, however, is viewed as somewhat of an outlier and the court declines to adopt its reasoning here. *See Gomez*, 2015 WL 4270042, at *7.

United States District Court
Northern District of California

1    a shared purpose.  *See, e.g., In re Countrywide Fin. Corp. Mortgage–Backed Sec. Litig.,* No. 2:11–

2    CV–07166–MRP, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012).

3         Some courts have relied instead on the conduct element in reaching this conclusion,

4    finding that enterprises formed by business relationships lack sufficient distinction between the

5    alleged conduct of the enterprise and the entities' own affairs to be "conducted" for purposes of a

6    RICO claim.  *See, e.g. In re WellPoint, Inc. Out-of-Network*, 865 F. Supp. 2d 1002, 1034-35 (C.D.

7    Cal. 2011) (Existence of a business relationship…without more does not show that [Defendant]

8    conducted the enterprise); *Crichton v. Golden Rule Ins. Co*, 576 F.3d 392, 399 (7th Cir. 2009)

9    ("[A]n association-in-fact enterprise must be meaningfully distinct from the entities that comprise

10   it such that the entity sought to be held liable can be said to have controlled and conducted the

11   enterprise rather than merely its own affairs.").

12        Thus, although courts have employed a variety of approaches, they consistently reach the

13   conclusion that RICO liability must be predicated on a relationship more substantial than a routine

14   business relationship.  Applying this principle, the Court finds Plaintiffs' RICO allegations

15   deficient with regard to both the common purpose and conduct elements.

16        Here, Plaintiffs allege that "[t]he common purpose of the enterprise is to circumvent

17   prohibitions on the corporate practice of medicine and fraudulently overcharge patients" by

18   systematically inflating prices for the services it performs.  (*Id.* ¶ 145.)  Holdings controls the

19   strategy and direction of the enterprise.  AmeriTeam, and previously TeamHealth, operate under

20   Holdings and conduct the day-to-day operations of the enterprise.  Regional facilitators, owned by

21   AmeriTeam and TeamHealth, Inc., negotiate contracts with hospitals and provider groups.  The

22   provider groups perform the care and provide the medical services "that gives the enterprise the

23   cover necessary to transmit and collect on fraudulent prices."  (*Id.* ¶ 104, 138.)

24        Although Plaintiffs attempt to transform Defendants' business relationships into a RICO

25   enterprise by alleging that they shared the common purpose to fraudulently overcharge patients,

26   there are insufficient facts pled to plausibly support this contention.  Plaintiffs describe the role

27   and business interactions among the entities and assert that each role was done to further the

28   fraudulent scheme, but the allegations do not establish how these relationships go beyond routine

United States District Court
Northern District of California

18

commercial dealings to show a common purpose to commit fraud.

Similarly, the allegations do not raise the inference that the Defendants were performing actions to further a scheme rather than to conduct their own individual affairs.  Plaintiffs allege that Holdings controls the strategy and direction of the enterprise and provides strategic directives to its operating subsidiaries relating to "marketing, branding, strategic direction and relationships, growth and finance/accounting related activities."  (FAC ¶ 131.)  AmeriTeam and TeamHealth engage in "day-to-day management of the enterprise" which includes "providing various administrative support services (e.g., payroll human resource assistance, etc.,) to operating subsidiaries."  (*Id*. ¶¶ 134, 136.)  HCFS "sets the prices and transmits bills to consumers."  (*Id*. ¶ 139.)  The regional subsidiaries "negotiate contracts with hospitals, enabling the provider groups to supply the care for which the fraudulent prices are transmitted."  (*Id*. ¶ 137.)  The provider groups "perform the care that gives the enterprise the cover necessary to transmit and collect on the fraudulent prices."  (*Id*. ¶ 138.)

Plaintiffs contend that this conduct extends to the allegedly fraudulently affairs of the enterprise, but the allegations are consistent with Defendants' conducting their own affairs, not the affairs of the enterprise.  And the FAC does not include facts supporting the inference that these activities are conducted in furtherance of the alleged fraudulent scheme.  This is insufficient to form the basis of a RICO claim. [6]  For these reasons, the Court finds that Plaintiffs have not plead facts transforming Defendants' routine business dealings into a RICO enterprise.

Plaintiffs' allegations also fail for the independent reason that they have failed to adequately allege a predicate act.  Plaintiffs allege that the bills received by Plaintiffs were fraudulently inflated because the chargemaster rates do not represent "reasonable approximations of the actual value of the[] services."  (FAC ¶ 147.)  According to Plaintiffs, because chargemaster rates are universally inflated and unrecoverable, the very fact that Defendants bill uninsured and

---

[6] The FAC is especially sparse on allegations regarding the conduct of the provider groups, and Plaintiffs do not address Defendants' contention that without medical provider groups, the enterprise impermissibly consists of Holdings and its subsidiaries, which fails to meet the distinctness requirement for a RICO Enterprise.  *Yagman v. Kelly*, No. CV17-6022-MWF (PJWx), 2018 WL 2138461, at *15 (C.D. Cal. Mar. 20, 2018).

United States District Court
Northern District of California

out-of-network patients full chargemaster rates constitutes fraud.

The Court concludes that Plaintiffs' allegations lack the specificity required by Rule 9(b). Plaintiffs' general allegations about the use of chargemaster rates in the healthcare industry do not satisfy Rule 9(b)'s pleading requirements with regard to the specific charges at issue.  Although the FAC and Plaintiffs' cited cases suggest that insurers and Medicare do not typically pay the chargemaster rates, they also establish that hospitals and medical providers do often bill out-of-network and uninsured patients based on the chargemaster price.  *See In re N. Cypress Med. Ctr. Operating Co., Ltd.*, 559 S.W.3d 128, 132 (Tex. 2018).  That is, the alleged fraudulent scheme appears to be standard practice in the healthcare industry.  That the practice may be viewed unfavorably does not necessarily establish that it is fraudulent.

Setting aside Plaintiffs' allegations about chargemaster rates generally, there are scant allegations in the FAC regarding the specific charges at issue.  Plaintiffs do not allege how Defendants set the chargemaster rates that were allegedly inflated.  They also fail to allege what price Plaintiffs should have been charged for the services they received or why the chargemaster price billed for the specific service received was not a reasonable approximation of the value of that service.  Plaintiffs' blanket assertion that Defendants commit fraud every time they bill patients based on chargemaster prices is insufficient to allege fraud under Rule 9(b)'s pleading requirements.

Defendants also argue that the bills do not contain a misrepresentation.  The FAC alleges that the bills represent that Defendants' rates for their services are lawful and that the prices billed are the real value of their services when in fact, Defendants' recovery should be limited to quantum meruit.  Defendants contend that this situation is effectively a legal dispute about whether Defendants are entitled to receive the chargemaster price billed.  The fact that Plaintiffs disagree with Defendants about the reasonable cost of services performed does not establish that the bills contained a misrepresentation.  *See Bowden v. Med. Ctr., Inc.*, 845 S.E.2d 555, 566 (Ga. 2020) (dismissing claim under Georgia RICO statute because the alleged fraud was use of chargemaster rates to supply the amount of a lien, which was a legal dispute).  Thus, Court concludes that Plaintiffs' allegations fail to plead a predicate act of mail and wire fraud and

1    dismisses Plaintiffs' RICO claim.[7]

2        For these reasons, the Court grants the motion to dismiss Plaintiffs' RICO claim with leave

3    to amend.

4        ### 3.    California State Law Claims.

5        Plaintiffs also assert claims for violations of the UCL and CLRA.

6            #### a.    Statutory standing.

7        Defendants argue that Fraser lacks statutory standing to pursue her California state law

8    claims.  To establish standing under the UCL, a plaintiff must establish "(1) a loss or deprivation

9    of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) [a]

10   show[ing] that the economic injury was the result of, i.e., caused by, the unfair business practice."

11   *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 321–23 (2011).  "[A]ny plaintiff who has

12   standing under the UCL's and FAL's 'lost money or property' requirement will, *a fortiori*, have

13   suffered 'any damage' for purposes of establishing CLRA standing."  *Moore v. Mars Petcare US,*

14   *Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020) (quoting *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108

15   (9th Cir. 2013)).

16       Here, Fraser alleges that she received a bill from TeamHealth for $1,082 dollars for

17   observation care, which stated the amount was "now due."  (FAC ¶ 21.)  Fraser alleges that

18   TeamHealth continues to demand payment and that she is making payments under a payment plan.

19   She also alleges that "all participants in the enterprise share in its ill-gotten profits."  (*Id*. ¶ 150.)

20   The court finds the allegations sufficient to confer statutory standing on Fraser.  *See Sarun v.*

21   *Dignity Health*, 232 Cal. App. 4th 1159, 1167 (2014), *as modified* (Jan. 13, 2015) (patient's partial

22   payment of hospital bill and receipt of invoice from hospital showing balance due were sufficient

23   to establish injury-in-fact and loss of money or property); *see also Hale v. Sharp Healthcare*, 183

24   Cal. App. 4th 1373, 1383-84 (2010)

25           #### b.    Rule 9(b) Misrepresentation.

26       Here, Plaintiffs' UCL and CLRA claims sound in fraud and must be pled with particularity

27

28   _____

[7] Because Plaintiffs have failed to adequately plead a misrepresentation, the Court does not reach the parties' arguments concerning scienter.

United States District Court
Northern District of California

1    under Federal Rule of Civil Procedure 9(b).  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126

2    (9th Cir. 2009).  This requires articulating the who, what, when, where, and how of the

3    misconduct alleged.  *Id*. (citing *Vess*, 317 F.3d at 1106).

4         Defendants argue that Plaintiffs' fraud-based UCL and CLRA claims fail because they

5    have not adequately alleged how the bills received by Plaintiffs were inflated or that they

6    contained misrepresentations and so the claims based on unfair and fraudulent conduct fail.  The

7    Court agrees.  As discussed above, Plaintiffs have not sufficiently alleged how the rate charged to

8    Fraser was inflated, what the cost of the service should have been, or what role the Defendants

9    played in setting the rates.

10        Plaintiffs' unlawful claim is premised on violations of the CLRA.  (*See* FAC ¶ 186.)

11   Because Plaintiffs' CLRA claim fails, there is no predicate violation supporting Plaintiffs'

12   unlawful claim, and it fails too.  Plaintiffs primarily allege that Defendants violated the unfair

13   prong of the UCL by fraudulently charging inflated rates, so these claims fail too for the reasons

14   discussed above.  However, to the extent Plaintiffs allege a violation of the unfair prong based on

15   the violation of "basic principles of equity and quantum meruit, these are legal doctrines, not a

16   legislatively declared policy, and do not form the basis of a "tethering" claim.

17        For these reasons, the Court dismisses Plaintiffs' UCL and CLRA claims with leave to

18   amend.

19                            **CONCLUSION**

20        For the foregoing reasons, the Court RETAINS the case and GRANTS Defendants' motion

21   to dismiss WITH LEAVE TO AMEND.  Should Plaintiffs choose to file an amended complaint to

22   remedy the deficiencies identified in this order, they may do so within twenty-one (21) days.

23        **IT IS SO ORDERED.**

24   Dated: March 31, 2022

25   _____

26   JEFFREY S. WHITE
     United States District Judge

27

28